FILED COPY

Joseph J. Tabacco, Jr. (SBN 75484)
jtabacco@bermandevalerio.com
Christopher T. Heffelfinger (SBN 118058)
cheffelfinger@bermandevalerio.com
Nicole Lavallee (SBN 165755)
nlavallee@bermandevalerio.com
**BERMAN DeVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Attorneys for Plaintiff State Treasurer Of The State Of Michigan, As Custodian Of The Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System And Michigan Judges' Retirement System*

2011 JAN 26 PM 4:18

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY ________________

BY FAX

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

STATE TREASURER OF THE STATE OF MICHIGAN, AS CUSTODIAN OF THE MICHIGAN PUBLIC SCHOOL EMPLOYEES RETIREMENT SYSTEM, STATE EMPLOYEES' RETIREMENT SYSTEM, MICHIGAN STATE POLICE RETIREMENT SYSTEM AND MICHIGAN JUDGES' RETIREMENT SYSTEM,

Plaintiff,

vs.

COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, ANGELO R. MOZILO, DAVID SAMBOL, ERIC P. SIERACKI, STANFORD L. KURLAND, KATHLEEN BROWN, HENRY G. CISNEROS, JEFFREY M. CUNNINGHAM, ROBERT J. DONATO, MICHAEL E. DOUGHERTY, BEN M. ENIS, EDWIN HELLER, GWENDOLYN STEWART KING, MARTIN R.

**Case No** CV 11 00809 - JFW (CWx)

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON, KEITH P. RUSSELL, HARLEY W. SNYDER, KPMG LLP, a Delaware LLP, BANC OF AMERICA SECURITIES LLC, a Delaware LLC, J.P MORGAN SECURITIES INC., a Delaware corporation, COUNTRYWIDE SECURITIES CORPORATION, a California corporation, BARCLAYS CAPITAL INC., a Connecticut corporation, DEUTSCHE BANK SECURITIES INC., a Delaware corporation, HSBC SECURITIES (USA) INC., a Delaware corporation, WELLS FARGO SECURITIES, LLC, a Delaware LLC, COMMERZBANK AG, a German corporation, RBS SECURITIES INC., a Delaware corporation, MORGAN STANLEY & CO. INCORPORATED, a Delaware corporation, CITIGROUP GLOBAL MARKETS INC., a New York corporation, GOLDMAN, SACHS & CO., a Delaware corporation, BNY MELLON CAPITAL MARKETS, LLC, a Delaware LLC, ABN AMRO INCORPORATED, a New York corporation, BNP PARIBAS SECURITIES CORP., a Delaware corporation, and UBS SECURITIES LLC, a Delaware LLC.,

Defendants.

# TABLE OF CONTENTS

**PAGE**


I. SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 10

III. THE PARTIES ..... 11

A. Plaintiff ..... 11

B. Defendants ..... 11

1. Countrywide ..... 11

2. The Officer Defendants ..... 12

3. Additional Individual Defendants ..... 17

4. Underwriter Defendants ..... 19

5. KPMG ..... 21

IV. BACKGROUND REGARDING COUNTRYWIDE'S BUSINESS ..... 22

A. Countrywide's Business ..... 22

B. Countrywide Started To Produce More Nontraditional and Far Riskier Loan Products ..... 25

1. Countrywide Sought To Gain Market Dominance ..... 25

2. Countrywide Began Offering A Wide Array Of Nontraditional and Riskier Mortgage Products ..... 29

V. COUNTRYWIDE DID NOT MAINTAIN OR APPLY STRONG UNDERWRITING STANDARDS OR PROPERLY INCREASE LOAN LOSS RESERVES TO ACCOUNT FOR THE INCREASED RISKS ASSOCIATED WITH ITS LOAN PORTFOLIO PARTICULARLY AS THE MARKET STARTED TO DECLINE ..... 34

A. Countrywide's Risk and Liquidity Exposure Increased ..... 34

B. Countrywide Loosened Its Underwriting Standards ..... 40

1. Countrywide Loosened Its Underwriting Standards As Indicated In The Company's Underwriting Matrices ..... 40

2. The Company Also Broadened The Scope Of Permissible Exceptions ..... 42

C. Countrywide Also Engaged In a Company-Wide Practice of Originating and Funding Loans Without Regard to

Underwriting Standards Regarding Loan Quality and Engaged in Predatory Lending ........ 46

D. Countrywide Also Relied on Inflated Appraisals ........ 52

E. Countrywide Belatedly Tightened Underwriting Guidelines in 2007 ........ 55

F. Countrywide Misclassified Subprime Loans as Prime in its Annual and Quarterly Reports ........ 57

G. Countrywide Adopted An Incentive Compensation Scheme That Wrongly Encouraged Lending Personnel To Push Risky Nontraditional Loans ........ 63

H. Countrywide Made Material Misstatements in Its Financial Statements in Violation of GAAP ........ 65

1. Background ........ 65

2. Risk Factors ........ 67

a. Risk Factors in 2004 ........ 67

b. Risk Factors in 2005 ........ 67

c. Risk Factors in 2006 ........ 68

d. Risk Factors in 2007 ........ 69

3. Inadequate ALL Inflated Countrywide's Earnings ........ 69

a. LHI Increased Without Proportionate Increase in ALL As Portfolio Credit Risk Increased ........ 73

b. Underwriting Practices Deteriorated and Nonprime Loan Originations Increased ........ 74

c. Nonaccrual ARM Delinquencies and Delinquent HELOCs Increased at Significant Rate ........ 76

d. Accumulated Negative Amortization on Pay Option ARMs Held For Investment Increased Dramatically ........ 77

4. Overstated RI From Securitizations Inflated Countrywide's Earnings. ........ 78

5. Overstated MSR Inflated Countrywide's Earnings ........ 82

a. Improper MSR Valuations in Violation of GAAP ........ 82

b. Valuation Allowance Did Not Accurately Reflect Increased Credit Risk. ........ 84

c. Drastic Write-Down of Fair Value of MSR ........ 86

6. Understated Reserves For R&Ws Inflated Countrywide's Earnings ..... 88

7. Ineffective Internal Controls Over Financial Reporting ..... 91

I. Countrywide Misrepresented Access to Liquidity and Value of Excess Capital. ..... 94

1. Countrywide Misrepresented Its Access to Liquidity. ..... 95

2. Countrywide Overstated Its Capital. ..... 96

VI. DEFENDANTS MADE FALSE AND MISLEADING MATERIAL STATEMENTS AND OMISSIONS ..... 97

A. The Company's False Statements Regarding 2003 ..... 97

1. 2003 Form 10-K ..... 97

B. The Company's False Statements Regarding 2004 Results ..... 101

1. First Quarter 2004 Form 8-K ..... 101

2. First Quarter 2004 Conference Call ..... 102

3. First Quarter 2004 Form 10-Q ..... 104

4. Amended First Quarter 2004 Form 10-Q/A ..... 105

5. Second Quarter 2004 Form 8-K ..... 106

6. Second Quarter 2004 Conference Call ..... 106

7. Second Quarter 2004 Form 10-Q ..... 107

8. Amended Second Quarter 2004 Form 10-Q/A ..... 109

9. Third Quarter 2004 Form 8-K ..... 110

10. Third Quarter 2004 Conference Call ..... 111

11. Third Quarter 2004 Form 10-Q ..... 112

12. Amended Third Quarter 2004 Form 10-Q/A ..... 113

13. Year End 2004 Form 8-K ..... 114

14. Year End 2004 Conference Call ..... 114

15. 2004 Form 10-K ..... 115

C. The Company's False Statements Regarding 2005 Results ..... 120

1. March 15, 2005 Piper Jaffray Conference ..... 120

2. First Quarter 2005 Form 8-K ..... 123

3. First Quarter 2005 Conference Call ..... 123
4. First Quarter 2005 Form 10-Q ..... 124
5. June 2, 2005 Sanford Bernstein & Co. Strategic Decisions Conference ..... 126
6. Second Quarter 2005 Form 8-K ..... 128
7. Second Quarter 2005 Conference Call ..... 128
8. Second Quarter 2005 Form 10-Q ..... 131
9. September 13, 2005 Lehman Brothers Financial Services Conference ..... 133
10. Third Quarter 2005 Form 8-K ..... 134
11. Third Quarter 2005 Conference Call ..... 135
12. Third Quarter 2005 Form 10-Q ..... 136
13. Year End 2005 Form 8-K ..... 138
14. Year End 2005 Conference Call ..... 138
15. 2005 Form 10-K ..... 138

D. The Company's False Statements Regarding 2006 Results ..... 143
1. First Quarter 2006 Form 8-K ..... 143
2. First Quarter 2006 Conference Call ..... 143
3. First Quarter 2006 Form 10-Q ..... 144
4. May 17, 2006 American Financial Services Association Finance Industry Conference for Fixed Income Investors ..... 147
5. Second Quarter 2006 Form 8-K ..... 149
6. Second Quarter 2006 Conference Call ..... 149
7. Second Quarter 2006 Form 10-Q ..... 150
8. September 12, 2006 Equity Investors Forum ..... 152
9. September 13, 2006 Fixed Income Investor Forum ..... 153
10. Third Quarter 2006 Form 8-K ..... 156
11. Third Quarter 2006 Conference Call ..... 156
12. Third Quarter 2006 Form 10-Q ..... 157
13. Year-End 2006 Form 8-K ..... 160

14. Year-End 2006 Conference Call ........ 160

15. 2006 Form 10-K ........ 162

E. The Company's False Statements Regarding 2007 Results Before The Truth Begins To Emerge ........ 167

1. March 6, 2007 Raymond James Institutional Investor Conference ........ 167

2. First Quarter 2007 Form 8-K ........ 168

3. First Quarter 2007 Conference Call ........ 168

4. April 26, 2007 AFSA 7th Finance Industry Conference ........ 170

5. First Quarter 2007 Form 10-Q ........ 173

VII. THE REGISTRATION STATEMENTS AND PROSPECTUSES FOR COUNTRYWIDE'S OFFERINGS OF DEBT SECURITIES CONTAINED UNTRUE STATEMENTS ........ 176

A. Series A Medium-Term Notes ........ 176

B. Series B Medium-Term Notes ........ 177

C. 6.25% Subordinated Notes Due May 15, 2016 ........ 179

VIII. DESPITE DEFENDANTS' EFFORT TO CONCEAL THE TRUTH, CURATIVE DISCLOSURES SLOWLY REVEALED THE TRUE FACTS ........ 180

A. Partial Corrective Disclosures and Continued Misrepresentations on July 24, 2007 ........ 180

B. Misrepresentations on August 2, 2007 ........ 184

C. Corrective Disclosures and Continued Misrepresentations on August 9, 2007 ........ 185

D. Corrective Disclosure on August 14, 2007 ........ 187

E. Corrective Disclosure on August 15, 2007 ........ 188

F. Corrective Disclosures on August 16, 2007 ........ 189

G. Positive News and Misrepresentations on August 23, 2007 ........ 190

H. Corrective Disclosure on August 24, 2007 ........ 191

I. Corrective Disclosure on September 10, 2007 ........ 192

J. Corrective Disclosure on October 24, 2007 ........ 192

K. Corrective Disclosure and Continued Misrepresentations on October 26, 2007 ........ 194

L. Corrective Disclosure on October 30, 2007 ... 196

M. Corrective Disclosure on November 7, 2007 ... 197

N. Misrepresentations on November 9, 2007 - Third Quarter 2007 Form 10-Q ... 198

O. Corrective Disclosure on November 26, 2007 ... 200

P. Corrective Disclosure on December 13, 2007 ... 201

Q. Corrective Disclosure and Continued Misrepresentations on January 8, 2008 ... 202

R. Corrective Disclosure on January 9, 2008 ... 203

S. January 11, 2008 Merger Announcement ... 204

T. Misrepresentation on January 29, 2008 ... 205

U. Corrective Disclosure on March 6, 2008 ... 205

V. Corrective Disclosure on March 8, 2008 ... 206

IX. ADDITIONAL ALLEGATIONS SUPPORTING THE OFFICER DEFENDANTS' SCIENTER ... 207

A. Since Mortgage Banking Was Countrywide's "Core Business," the Officer Defendants Closely Monitored the Company's Underwriting Standards, Lending Practices and Credit Risk Exposure ... 207

B. The Officer Defendants' Own Statements Touting The Company's Loan Origination And Underwriting Policies Demonstrate Their Intimate Knowledge Of The Company's Core Business ... 209

C. CWs Confirm The Officer Defendants' Knowledge Of the Loosening Underwriting Standards ... 211

D. Nature Of The GAAP Violations Further Evidence That The Officer Defendants Were Aware Of, Or Recklessly Disregarded, The Company's Violations Of GAAP And Reporting Of False Financial Statements ... 213

E. The Officer Defendants Engaged In Insider Selling ... 217

X. KPMG'S NEGLIGENT OR RECKLESS FAILURE TO CONDUCT AUDITS IN ACCORDANCE WITH GAAS. ... 218

A. The Standards of GAAS and the AICPA Audit & Accounting Guide ... 219

B. Audit Risk Factors in 2004 ... 221

1. Red Flag: Implementation of Aggressive Goal to Capture 30% Market Share ... 221

2. Red Flag: Improper Documentation for Loans, Misclassification of Subprime Loans as Prime Loans and Management Overrides....222

3. Red Flag: 99% Increase In Nonprime Loans, 108% Increase In ARM Loans, 71% Increase In HELOC Loans ....223

4. Red Flag: ALL as a Percentage of LHI Remained Flat Despite Increase in Higher Risk Loans....224

5. Red Flag: Increase in MSR Balance, But Decrease in Valuation Allowance....225

6. Red Flag: Based on Credit Risk Increases, Flawed Assumptions Used to Value RI....226

C. Audit Risk Factors in 2005....227

1. Red Flag: Implementation of Countrywide's Exception Processing System....228

2. Red Flag: Shocking 335% Increase In Pay Option ARM Loan Origination....229

3. Red Flag: 99% Increase in HELOC Delinquencies....230

4. Red Flag: Despite Increased Credit Risks, ALL as a Percentage of LHI Decreased....231

5. Red Flag: Increase in Prime Rate From 2004....231

6. Red Flag: Valuation Allowance For Impairment Of Countrywide's MSRs Dropped From 11% To Only 3% Of Gross MSRs....232

7. Red Flag: Decrease in Net Lifetime Credit Losses And Unreasonable Weighted Average Life Of Retained Interests....232

8. Red Flag: 27% Drop in New R&W Provisions As A Percentage Of Relevant Securitizations....233

D. Audit Risk Factors in 2006....233

1. Red Flag: Accumulated Negative Amortization on Pay Option ARMS Increased 775%....234

2. Red Flag: 87% Increase in HELOC Delinquencies....234

3. Red Flag: ALL as a Percentage of LHI Remained Flat....235

4. Red Flag: No Modification to Fair Value Assumptions Used in MSR Model....236

5. Red Flag: Historical Performance Used to Calculate Fair Value Of Retained Interests....236

6. Red Flag: Insufficient R&W Reserve Relative To Skyrocketing Delinquency Rates ....................237

XI. ADDITIONAL FACTS REGARDING THE FAILURE OF THE UNDERWRITER DEFENDANTS TO CONDUCT ADEQUATE DUE DILIGENCE ....................238

XII. LOSS CAUSATION AND DAMAGES ....................240

XIII. APPLICABLILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ....................242

XIV. NO SAFE HARBOR....................243

COUNTS ....................244

COUNT I ....................244

COUNT II ....................247

COUNT III....................250

COUNT IV ....................251

COUNT V....................255

COUNT VI ....................256

COUNT VII ....................260

COUNT VIII....................261

COUNT IX ....................262

COUNT X....................265

COUNT XI ....................266

XV. PRAYER FOR RELIEF....................267

XVI. JURY DEMAND ....................268

Plaintiff State Treasurer of the State of Michigan, Custodian of the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System, and Michigan Judges' Retirement System, ("Plaintiff") through its attorneys, Bill Schuette, Attorney General of the State of Michigan, Joseph J. Tabacco, Jr., Special Assistant Attorney General and Nicole Lavallee, Special Assistant Attorney General, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters:

## I. SUMMARY OF THE ACTION

1. Defendant Countrywide Financial Corporation ("Countrywide" or "the Company") was a holding company founded in March 1969 that eventually became, through its subsidiaries as described herein, the largest mortgage lender in the United States, providing mortgage lending and other finance-related businesses, including mortgage banking, retail banking and mortgage warehouse lending, securities dealing, insurance underwriting and international mortgage loan processing and servicing.

2. Historically, Countrywide was known as one of the largest mortgage lenders in the United States, which primarily offered traditional fixed-rate first-lien mortgage loans to borrowers. Countrywide purchased and originated these loans, then packaged and sold pools of home loans and securitizations to the "secondary market", in order to generate income to fund its long-term capital needs. Because Countrywide's loans were primarily conforming loans that met with the requirements of Government Sponsored Entities ("GSEs"), such as Fannie Mae and Freddie Mac, they were considered safer investments by the secondary market and were therefore sold at "premium" prices.

3. Countrywide's underwriting guidelines and the enforcement thereof defined the Company's risk profile and was of critical importance to its operations and its ability to sell loans to the secondary market. In fact, the quality of

Countrywide's loans was the single most important aspect of its business and operations. As a lender that securitized and sold most of the loans it originated in the secondary market subject to repurchase obligations, the quality of Countrywide's loans subjected it to significant repurchase liability arising from its representations and warranties to the secondary market. Countrywide's loan originations constituted the Company's core operations and formed the heart of its business.

4. Beginning in 2003, Countrywide embarked on an effort to overtake its competitors and capture a dominant share of the nation's residential loan market. The impetus for the growth – Countrywide's desire to capture ***"market dominance"*** with enormous and unprecedented 30% market share of the U.S. residential loan market – was announced in mid-2003 by defendant Angelo R. Mozilo ("Mozilo"), the Company's co-founder, Chairman and Chief Executive Officer ("CEO").

5. Notwithstanding concerns voiced by analysts and others that this sudden increase in loan origination might translate into a reduction in overall loan quality, the Company repeatedly assured the public and its investors that policies and procedures for underwriting loans—in essence, determining whether the borrower was likely to pay in full and on time—were tightly controlled and supervised and "designed to produce high quality loans." Countrywide repeatedly touted its prudent, conservative and risk-managed lending practices, diversified loan portfolio and a supposed high quality credit culture throughout the Relevant Period.[1] Countrywide also repeatedly stressed during this period that it had more stringent underwriting standards than others in the industry – something that the Company claimed set it apart from most mortgage originators and would allow it to weather, unscathed, any problems in the market. The Company represented to

[1] For purposes of this Complaint, the Relevant Period shall mean the period between March 12, 2004 and March 7, 2008.

the public that it followed strict and disciplined appraisal and underwriting procedures, far superior to those of competing lenders and designed to produce high quality loans. In fact, the Company repeatedly represented that it offered ”nonprime” loans only to the most sophisticated and creditworthy borrowers and that the majority of its loan portfolio consisted of less risky “prime” loans.

6. In fact, in 2007, as other lenders, notably subprime lenders, began to fail, Mozilo and other Countrywide officers continued to portray Countrywide as uniquely positioned to capitalize on any impending mortgage crisis because of its strict standards. Indeed, in March 2007, Defendant Mozilo stated in a CNBC interview that Countrywide would benefit from the tumult in the housing market. Defendant Mozilo boasted that “[t]his will be great for Countrywide . . . because at the end of the day, all of the irrational competitors will be gone.”

7. However, nothing could have been further from the truth. In fact, beginning in 2003, Countrywide had embarked on an aggressive corporate strategy to originate as many loans as possible, by increasingly underwriting and purchasing of subprime, nontraditional and risky mortgage products. These risky products included pay option adjustable rate mortgage (“Pay Option ARMs”) in which borrowers could select from among various monthly payments, including payments that neither paid down principal nor covered the full amount of interest, and home equity lines of credit (“HELOCs”), which were second-lien mortgages secured only by the difference between the value of a home and the amount due on a first mortgage, where the borrower’s equity in the financed property is reduced or non-existent. Countrywide's production of nontraditional mortgages increased substantially – both in absolute dollar amounts and as a percentage of the Company’s total mortgage origination.

8. The Company knew the risks of nontraditional mortgage lending in general, and about the risks associated with Pay Option ARM and HELOC programs in particular. Indeed, these nontraditional loans were the subject of

regulatory guidance on nontraditional mortgage lending drafted and published jointly on October 4, 2006 by the Department of the Treasury Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, and Office of Thrift Supervision.[2] This guidance, which was transmitted to all CEO's of lending institutions, required institutions engaging in nontraditional lending to use heightened risk management to account for and guard against the increased risk of loan loss. Regulators provided specific guidance on the need to avoid asset concentrations, increase underwriting and credit qualification standards, and implement adequate controls to manage the heightened risks of nontraditional mortgages, particularly those with multiple or "layered risk" characteristics, such as loans made without verification of income or assets. The guidance also laid out the risks associated with these nontraditional loans, which by 2006 were already well-known to those engaged in the mortgage industry: (a) the risk of "payment shock" when the interest rate on a Pay-Option ARM resets, thereby increasing the monthly payment; (b) the risk of "negative amortization" with Pay Option ARMs in which unpaid interest amounts are added to the outstanding principal amount owed, thus increasing the overall loan balance; and (c) the substantial increased risk that a HELOC, especially during a "down" real estate market, might become unsecured and worthless in a default.

9. However, the Company further compounded the risks associated with its expanding nontraditional loan portfolio by engaging in practices that were in direct conflict with the *Interagency Guidance*.

10. The Company's push to book loans spiraled out of control and led to the creation of an improper incentive compensation system that encouraged lending personnel to make the riskiest loans regardless of the borrower's ability to

---

[2] *Interagency Guidance on Nontraditional Mortgage Product Risks*, 71 Fed. Reg. 58,609, *et seq*. (Oct. 4, 2006) ("*Interagency Guidance*").

repay. In sum, during the Relevant Period, Countrywide sacrificed loan ***quality*** for loan ***quantity*** in order to pump up loan production, charge extra fees and higher interest rates and boost its revenues. In fact, Countrywide could no longer sell its loans to GSEs, but had to sell them to private institutional investors, with significant repurchase liability.

11. Against the backdrop of these risky practices, Defendants issued a variety of false and misleading statements regarding the Company's underwriting practices, its exposure to the subprime market and its financial results in violation of both federal and state laws.

12. With respect to its underwriting practices, defendants issued false and misleading statements regarding the fact that the Company was: (a) steadily loosening its underwriting standards to sweep in borrowers with poor credit; (b) making the vast majority of Pay Option ARMs on a "low doc" or "no doc" basis -- i.e. without any meaningful verification of income or assets; (c) further circumventing those already weakened underwriting criteria by approving "exception loans" -- i.e. loans which did not meet its underwriting criteria -- through the use of a computer system called the Exception Processing System ("EPS"), but only after charging these high risk borrowers extra points and fees; and (d) engaging in widespread predatory lending practices to steer many borrowers into subprime loans or other nontraditional loans, when they have qualified for conventional financing with lower rates.

13. To further conceal its greatly increased production of "subprime" loans (i.e. risky loans made to borrowers with poor credit), Countrywide employed an internal, undisclosed definition of "prime" versus "subprime", and, in its public reports, classified loans as prime that clearly were subprime. Additionally, the Company maintained that its Pay Option ARMs were prudently underwritten and that borrowers holding these loans were of the highest credit

quality and had strong credit scores, when in fact many of these loans were made to borrowers with very weak credit.

14. Throughout the Relevant Period, Countrywide and the Officer Defendants also falsely and materially inflated Countrywide's assets, gain-on-sale and reported net income in violation of Generally Accepted Accounting Principles ("GAAP"). Accounting rules required that Countrywide's allowance for loan losses ("ALL" or "loan loss reserves") accurately reflect the inherent risk of non-repayment in its portfolio of loans held for investment ("LHI"). These Defendants knowingly or recklessly ignored numerous "red flags" that indicated the substantial risks and mounting losses inherent in Countrywide's risk loan portfolio and failed, in violation of GAAP, to set aside sufficient reserves for the massive loan losses that would inevitably occur. For example, these Defendants refused to increase the Company's ALL even though they knew by September 2006 that 66% of borrowers were electing to make less than full interest payments on the Company's Pay Option ARM loans. By the end of the fiscal year ending December 31, 2006 ("FY 2006"), the Company had $654 million worth of accumulated negative amortization, compared to only $74.7 million at the end of the fiscal year 2005 ("FY 2005") and only $29 thousand in fiscal year 2004 ("FY 2004").[3]

15. Although this alarming growth in accumulated negative amortization should have been seen as an early warning sign, Defendants failed to adequately increase Countrywide's ALL to accurately reflect this known risk, thus dramatically widening the shortfall between Countrywide's actual loan losses and the amount that it set aside in its loan loss reserve and overstating Countrywide's

[3] At all relevant times, Countryside's fiscal year ran from January 1 through December 31. Accordingly, references to Countrywide's quarterly reporting periods are designated herein as "Q1" for January 1 – March 31, "Q2" for April 1 - June 30, "Q3" for July 1 - September 30, and "Q4" for October 1 – December 31.

reported earnings. Yet, notwithstanding the dramatic rise in the number of delinquencies that Countrywide experienced from its LHI, Defendants refused to properly increase the Company's ALL during the Relevant Period and instead kept its ALL at a relatively constant rate more suited for a conservative, traditional loan portfolio.

16. As the level of risk in Countrywide's LHI drastically increased, the Company kept the level of ALL relatively constant or even allowed it to decrease, knowing that to increase ALL would have a direct, dollar-for-dollar impact on the amount of earnings the Company could report in its financial statements. In addition to the failure to increase loan loss reserves, Countrywide also reported inflated earnings, in violation of GAAP, by overvaluing its valuation of retained interests ("RIs") and mortgage servicing rights ("MSRs") from loans sold to the secondary market; and by failing to properly reserve for representations and warranties ("R&Ws") it made to secondary market purchasers.

17. For its part, KPMG LLP ("KPMG") negligently or recklessly failed to comply with Generally Accepted Auditing Standards ("GAAS") in auditing Countrywide's financial statements for its FY 2004 through FY 2006, and thus participated in conveying materially false and misleading statements to the investing public.

18. In the midst this massive expansion effort, Countrywide made numerous debt offerings, for the purpose of raising capital to continue funding its loan origination operations. However, as described more fully below, the Underwriter Defendants (defined below) are responsible by statute for untrue statements included in registration statements and prospectuses for offerings of Countrywide debt securities purchased by Plaintiff during the Relevant Period.

19. Countrywide's risky scheme to artificially inflate earnings in the short term initially resulted in remarkable growth for the Company, with a seemingly booming business, a dominant market share and a stock price that, after

trading under $20 for most of 2003, traded in the mid-$30s throughout most of the relevant time alleged in this Complaint and climbed to a high of $45 by early 2007.

20. However, starting on July 24, 2007, the Company's carefully spun web had begun to unravel. Countrywide announced a loan loss provision of $293 million attributable to deterioration in its loan portfolio and securities. The Company also had to write down, by $338 million, the value of retained interests on securitizations of HELOCs. The Company also revealed, in remarks during its quarterly conference call, that it had been misclassifying loans as "prime" that the industry would have viewed as "subprime" and that it had "recalibrated" its proprietary underwriting system and made changes to its underwriting guidelines and processes. On, July 27, 2007, Stifel Nicolaus issued a report sharply criticizing Countrywide's previous representations about its portfolio's exposure. The analyst stated that, "[g]iven the magnitude of the credit problems . . . we think [management] made serious miscalculations (and possibly misrepresentations) about the quality of the loans added to the bank."

21. As the truth continued to be revealed, it became clear that the Company had failed to adhere to its underwriting standards and was experiencing a dramatic increase in losses from bad loans. Countrywide made a series of additional, partially corrective disclosures about worsening problems in its mortgage portfolio (including an enormous and unprecedented $1.2 billion loss for the third quarter of 2007) and its inability to obtain capital. Stock market analysts began speculating that Countrywide might have to file for bankruptcy. As the Company's credit rating was downgraded and its credit facilities and other back up sources of liquidity dried up, Countrywide was faced with a liquidity crisis (the true depth of which was further hidden from its investors) that directly impacted Countrywide's ability to make more loans.

22. On January 11, 2008, amid rumors that Countrywide was preparing to commence bankruptcy proceedings, Bank of America, N.A. ("BofA") announced that it had entered into an Agreement and Plan of Merger to acquire Countrywide, at the bargain-basement price of $4 billion in stock, representing a mere 26% of Countrywide's reported book value at that time. The merger with BofA was finalized on July 1, 2008. The full extent of Countrywide's corporate fraud was finally revealed a couple months later, on March 8, 2008, when *The Wall Street Journal* reported that "[t]he Federal Bureau of Investigation is probing . . . Countrywide Financial Corp. for possible securities fraud." According to *The Wall Street Journal*, the inquiry involves "whether senior officials made misrepresentations about the Company's financial position and the quality of its mortgage loans in securities filings."

23. Nearly all of Countrywide's growth in stock price from 2003 to 2007 was wiped out by this devastating collapse, with the stock price losing ***87%*** of its value between July 2007 and March 2008, from approximately $34 to $4 per share, as a result of the revelations of the truth concerning Countrywide. As a result of the wrongdoing herein alleged, Plaintiff lost tens of millions of dollars on its investments in Countrywide publicly traded common stock and debt securities.

24. On August 14, 2007, George Pappas, on behalf of himself and all others similarly situated, filed suit against Countrywide and several individuals, alleging securities law violations. *See George Pappas v. Countrywide Financial Corp. et al.*, No. 07-CV-05295-MRP (C.D. Cal.). On November 28, 2007, U.S. District Judge Mariana R. Pfaelzer consolidated the *Pappas* action with several other cases involving publicly traded Countrywide securities, in *In re Countrywide Financial Corporation Securities Litigation*, No. CV 07-05295 MRP (MANx) (C.D. Cal.). Lead Plaintiffs therein filed a Consolidated Amended Class Action Complaint on April 14, 2008, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Sections 11, 12 and 15 of the Securities Act against

Countrywide, certain of its current and former directors and officers, KPMG and underwriters of public offerings of Countrywide securities. Judge Pfaelzer granted class certification on December 9, 2009 and preliminarily approved a class settlement on August 2, 2010. Plaintiff opted out of the Class Action by filing a notice on October 18, 2010, the deadline set by Judge Pfaelzer for opting out of the class action. On January 7, 2011, Judge Pfaelzer granted preliminary approval to a First Amendment to the Settlement Agreement.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to Section 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l and 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a); and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5; Sections 25500 and 25501 *et seq.* of the California Corporations Code for violations of Sections 25400 and 25401 of the Cal. Corp. Code; Sections 1709-1710 of the Cal. Civ. Code; and Section 17200 *et seq.* of the Cal. Bus. & Prof. Code.

26. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §§1331 and 1367.

27. Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §1391(b), (c)-(d). Many of the acts and omissions charged herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in substantial part in the Central District of California. At all relevant times, Countrywide maintained its corporate headquarters and principal executive offices in this District and did so throughout the Relevant Period.

28. In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchange.

29. This action is not preempted by the Federal Securities Litigation Uniform Standards Act of 1998, Pub. L. No. 105-353 (1998) ("SLUSA"), because: (a) this action is brought solely by a "State Pension Plan" as that term is defined in SLUSA, and Plaintiff has authorized its participation in this action; and (b) this action is not a class action or an action brought by a representative party and does not seek damages on behalf of more than fifty persons.

## III. THE PARTIES

### A. Plaintiff

30. Plaintiff State Treasurer of the State of Michigan, Custodian of the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System, and Michigan Judges' Retirement System, serves the working and retired public servants of four SMRS systems: the Public School Employees Retirement System; the State Employees' Retirement System; the State Police Retirement System; and the Judges Retirement System. Within these systems, four defined benefit pension plans and two defined contribution pension plans are administered with combined net assets of nearly $51 billion. Pursuant to its delegated investment authority, the State Treasurer of the State of Michigan purchased and sold shares and debt securities of Countrywide during the Relevant Period, including, but not limited to, the transactions set forth in Exhibit A attached hereto.

### B. Defendants

#### 1. Countrywide

31. Defendant Countrywide is, and at all relevant times herein was, a corporation organized and existing under the laws of the State of Delaware.

During the Relevant Period alleged in this Complaint, Countrywide maintained its principal executive offices located at 4500 Park Granada, Calabasas, California. Countrywide was founded in March 1969 and engaged, itself and through its subsidiaries and segments, in mortgage lending and other finance-related businesses, including mortgage banking, retail banking and mortgage warehouse lending, securities dealing, insurance underwriting and international mortgage loan processing and servicing. Countrywide common stock has traded actively on the New York Stock Exchange (the "NYSE") since October 1985.

32. Pursuant to an Agreement and Plan of Merger by and between Countrywide and BofA dated as of January 11, 2008, Countrywide merged with and into Red Oak Merger Corporation ("Red Oak"), a Delaware corporation and wholly owned subsidiary of BofA, on or about July 1, 2008 (the "Merger"). Upon consummation of the Merger, Red Oak (as the surviving Merger subsidiary) changed its name to Countrywide Financial Corporation, and under the direction of BofA, it continues to operate Countrywide's mortgage business.

**2. The Officer Defendants**

33. Defendant Angelo R. Mozilo was the co-founder of the Company which was formed in 1969 and was a member of its Board of Directors (the "Board") and served in various executive capacities since its formation, including serving as President of the Company from March 2000 through December 2003. Mozilo was Chairman of the Board from March 1999 until the Merger and CEO from February 1998 until the Merger. Mozilo was also a Director of Countrywide Home Loans, Inc. ("CHL"), Countrywide's principal operating subsidiary, at certain points during the Relevant Period. Mozilo is a resident of Ventura County, California and has often transacted business in California, including his responsibilities as Chairman of the Board and CEO of Countrywide. Mozilo signed the Company's Annual Reports on Form 10-K for and from 2003 through 2006 filed with the SEC and accompanying certifications made pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX"), SOX certifications accompanying the Company's Quarterly Reports on Form 10-Q filed with the SEC for and from the first quarter of 2004 through and including the third quarter of 2007, SOX certifications for the 10-Q/Amended Quarterly Reports for the first and second quarter of 2004, the Company's Form S-3 filed with the SEC on April 7, 2004 and the Company's Form S-3 ASR filed with the SEC on February 9, 2006.

34. Defendant David Sambol ("Sambol") joined Countrywide in 1985 and became the Company's President and Chief Operating Officer ("COO") in September 2006 and a member of the Board from 2007 through the Merger. Prior to that, from 2004 to 2006, Sambol served as Executive Managing Director for Countrywide's Business Segment Operations, leading all revenue-generating operations of the Company, as well as the corporate operational and support units comprised of Administration, Marketing and Corporate Communications, and Enterprise Operations and Technology. Sambol also served as Chairman and CEO of the Company's principal operating subsidiary, CHL, from 2007 until the Merger, and from 2004 through 2006, Sambol was President and COO of CHL. Sambol was also a Director of CHL at certain points during the relevant period. Sambol is a resident of Los Angeles County, California and has often transacted business in California, including his responsibilities as President and COO of Countrywide. Sambol signed the Company's Quarterly Reports on Form 10-Q filed with the SEC for and from the third quarter 2006 through and including the third quarter of 2007 and the Company's Form S-3 ASR filed with the SEC on February 9, 2006.

35. Defendant Eric P. Sieracki ("Sieracki") served as the Company's Executive Managing Director and Chief Financial Officer ("CFO") and as CFO of Countrywide Bank from April 2005 until the Merger, and was a member of the Executive Strategy Committee. Sieracki was responsible for oversight of Countrywide's major financial departments, including corporate accounting,

treasury, financial planning, strategic planning and taxation. He also served as the Company's senior manager in the areas of investor relations, corporate development and equity capital activities. Sieracki joined the Company in 1988 as Senior Vice President of Countrywide Asset Management Corporation and has held a number of executive positions. In 1989, he was promoted to Executive Vice President of Corporate Finance, in charge of finance and accounting responsibilities for Countrywide and its subsidiaries. Sieracki was also the Senior Managing Director and CFO (Principal Financial and Accounting Officer) of CHL at certain points during the relevant period. Sieracki is a resident of Los Angeles County, California and has often transacted business in California, including his responsibilities as Executive Managing Director and CFO of Countrywide. Sieracki signed the Annual Reports on Form 10-K for 2005 and 2006 filed with the SEC and accompanying SOX certifications, Quarterly Reports on Form 10-Q for and from the first quarter of 2005 through and including the third quarter of 2007 and accompanying SOX certifications, Form 10-Q/A Amended Quarterly Reports for the first and second quarters of 2004 and accompanying SOX certifications and the Company's Form S-3 filed with the SEC on February 9, 2006.

36. Defendant Stanford L. Kurland ("Kurland") joined Countrywide in 1979 and became COO in 1988 and President in January 2004. Kurland remained President and COO of Countrywide until his resignation on September 7, 2006. Kurland served in a number of other executive positions at the Company, including Executive Managing Director from 2000 to 2003 and Senior Managing Director from 1989 to 2000. He was also a member of the Board of the Company from 1999 until his resignation. From 2004 through 2006, Kurland was CEO and Chairman of the Board of Directors of CHL. Kurland is a resident of Los Angeles County, California and has often transacted business in California, including his responsibilities as President and COO of Countrywide. Kurland signed the

Company's Annual Reports on Form 10-K filed with the SEC for 2003, 2004 and 2005; Quarterly Reports on Form 10-Q for and from the first quarter of 2004 through and including the second quarter of 2006; Form 10-Q/A Amended Quarterly Reports for the first and second quarters of 2004; the Company's Form S-3 filed with the SEC on April 7, 2004; and the Company's Form S-3 ASR filed with the SEC on February 9, 2006. Kurland also signed Form 8-Ks filed with the SEC on April 21, 2004 and July 26, 2004.

37. Defendants Mozilo, Sambol, Sieracki and Kurland (collectively, the "Officer Defendants"), by virtue of their high-level positions with Countrywide, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition during their tenure with the Company as alleged herein. As set forth below, the information conveyed in the Company's SEC filings, press releases and other public statements was the result of the collective actions of these individuals. Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing and/or disseminating the statements at issue in this case, approved or ratified these statements or was aware or recklessly disregarded that these statements were being issued regarding the Company. Accordingly, it is appropriate to treat the Officer Defendants as a group for pleading purposes.

38. As officers and directors of a publicly held company whose common stock and other securities were registered with the SEC pursuant to the Exchange Act, and whose common stock was traded on the NYSE, and governed by federal securities laws, the Officer Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's business, operations, financial statements and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so

that the market prices of the Company's publicly traded securities would be based on accurate information. The Officer Defendants each violated these requirements and obligations.

39. The Officer Defendants, because of their positions of control and authority as senior executive officers and/or directors of Countrywide, were able to and did control the content of the SEC filings, press releases and other public statements issued by Countrywide during the Relevant Period. Each of these individuals was provided with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Thus, each of the Officer Defendants is responsible for the accuracy of the public statements detailed herein.

40. The Officer Defendants, because of their positions of control and authority as senior executive officers and/or directors of Countrywide, had access to the adverse undisclosed information about Countrywide's business, operations, financial statements and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations by or about Countrywide materially misleading.

41. Countrywide and each Officer Defendant is liable as a participant in a scheme and course of business that operated as a fraud or deceit on Plaintiff and its agents as purchasers of Countrywide securities, including the making of false and misleading statements and/or concealing and omitting material adverse facts. The scheme and course of business: (a) deceived Plaintiff regarding the true nature of Countrywide's risky nontraditional loan portfolio and failure to follow its underwriting guidelines and policies; (b) deceived Plaintiff regarding the adequacy of Countrywide's loan loss reserves underlying the valuation of the

Company's RIs, MSRs and LHI; (c) artificially inflated the price of Countrywide's stock and other debt securities; and (d) caused Plaintiff and its agents to purchase and hold Countrywide stock and other debt securities at artificially inflated prices. These Defendants disseminated and approved these false and misleading statements, including statements with material omissions, regarding the Countrywide's actual earnings and financial condition, as well as Countrywide's predicted earnings and growth for several fiscal years prior to the Merger. Those statements were made in public filings with the SEC, public statements, press releases, and comments to Wall Street analysts, among others, as set forth below and throughout this Complaint.

**3. Additional Individual Defendants**

42. Defendant Kathleen Brown ("Brown") was a member of Countrywide's Board of Directors from March 2005 until March 29, 2007. Brown signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006. Brown also signed the Company's Annual Reports on Form 10-K filed with the SEC for 2005 and 2006.

43. Defendant Henry G. Cisneros ("Cisneros") was a member of Countrywide's Board from 2001 until October 24, 2007. Cisneros signed the Company's Form S-3 filed with the SEC on April 7, 2004, Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

44. Defendant Jeffrey M. Cunningham ("Cunningham") was a member of Countrywide's Board from 1998 until the Merger. Cunningham signed the Company's Form S-3 filed with the SEC on April 7, 2004, Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

45. Defendant Robert J. Donato ("Donato") was a member of Countrywide's Board from 1993 until the Merger. Donato signed the Company's

Form S-3 filed with the SEC on April 7, 2004, Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

46. Defendant Michael E. Dougherty ("Dougherty") was a member of Countrywide's Board from 1998 until March 28, 2007. Dougherty signed the Company's Form S-3 filed with the SEC on April 7, 2004, Form S-3 filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

47. Defendant Ben M. Enis ("Enis") was a member of Countrywide's Board from 1984 until June 2006. Enis signed the Company's Form S-3 filed with the SEC on April 7, 2004, Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004 and 2005.

48. Defendant Edwin Heller ("Heller") was a member of Countrywide's Board from 1993 until June 2006. Heller signed the Company's Form S-3 filed with the SEC on April 7, 2004, Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004 and 2005.

49. Defendant Gwendolyn Stewart King ("King") was a member of Countrywide's Board from 2001 until November 15, 2004. King signed the Company's Form S-3 filed with the SEC on April 7, 2004 and Annual Report on Form 10-K for 2003.

50. Defendant Martin R. Melone ("Melone") was a member of Countrywide's Board from 2003 until the Merger. Melone signed the Company's Form S-3 filed with the SEC on April 7, 2004, Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

51. Defendant Robert T. Parry ("Parry") was a member of Countrywide's Board from 2004 until the Merger. Parry signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2004, 2005 and 2006.

52. Defendant Oscar P. Robertson ("Robertson") was a member of Countrywide's Board from 2000 until the Merger. Robertson signed the Company's Form S-3 filed with the SEC on April 7, 2004, Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

53. Defendant Keith P. Russell ("Russell") was a member of Countrywide's Board from 2003 until the Merger. Russell signed the Company's Form S-3 filed with the SEC on April 7, 2004, Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

54. Defendant Harley W. Snyder ("Snyder") was a member of Countrywide's Board from 1991 until the Merger. Snyder signed the Company's Form S-3 filed with the SEC on April 7, 2004; Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

55. The Defendants named in this section are collectively referred to herein as the "Individual Defendants."

**4. Underwriter Defendants**

56. Defendant Banc of America Securities LLC ("Banc of America") is headquartered in New York and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes and Series A Medium-Term Notes.

57. Defendant J.P Morgan Securities Inc. ("J.P. Morgan") is headquartered in New York and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes and Series B Medium-Term Notes.

58. Defendant Countrywide Securities Corporation ("CSC") is headquartered in North Carolina and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes, Series A Medium-Term Notes and Series B Medium-Term Notes.

59. Defendant Barclays Capital Inc. ("Barclays") is headquartered in New York and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes, Series A Medium-Term Notes and Series B Medium-Term Notes.

60. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is headquartered in New York and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes and Series B Medium-Term Notes.

61. Defendant HSBC Securities (USA) Inc. ("HSBC Securities") is headquartered in New York and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes and Series B Medium Term Notes.

62. Defendant Wells Fargo Securities, LLC, formerly known as Wachovia Capital Markets, LLC ("Wells Fargo Securities"), is headquartered in North Carolina and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes, Series A Medium-Term Notes and Series B Medium-Term Notes.

63. Defendant Commerzbank AG ("Commerzbank"), has offices in New York and is named in its capacity as *successor-in-interest* to Dresdner Kleinwort Wasserstein Securities LLC, who acted as an underwriter with respect to offerings of Series A Medium-Term Notes.

64. Defendant RBS Securities Inc., formerly known as Greenwich Capital Markets, Inc. ("RBS Securities"), is headquartered in Connecticut and acted as an underwriter with respect to offerings of Series A Medium-Term Notes and Series B Medium-Term Notes.

65. Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is headquartered in New York and acted as an underwriter with respect to offerings of Series A Medium-Term Notes.

66. Defendant Citigroup Global Markets Inc. ("Citigroup") is headquartered in New York and acted as an underwriter with respect to the offering of Series B Medium-Term Notes.

67. Defendant Goldman, Sachs & Co. ("Goldman Sachs") is headquartered in New York and acted as an underwriter with respect to offerings of Series B Medium-Term Notes.

68. Defendant BNY Mellon Capital Markets, LLC ("BNY") is headquartered in New York and is named in its capacity as *successor-in-interest* to BNY Capital Markets, Inc, which acted as an underwriter with respect to the offerings of Series B Medium-Term Notes.

69. Defendant ABN AMRO Incorporated ("ABN AMRO") is headquartered in Illinois and acted as an underwriter with respect to the offering of Series B Medium-Term Notes.

70. Defendant BNP Paribas Securities Corp. ("BNP Paribas") is headquartered in New York and acted as an underwriter with respect to the offering of Series B Medium-Term Notes.

71. Defendant UBS Securities LLC ("UBS") is headquartered in Connecticut and acted as an underwriter with respect to offerings of Series B Medium-Term Notes.

72. The Defendants named in this Section are collectively referred to herein as the "Underwriter Defendants."

**5. KPMG**

73. Defendant KPMG LLP is, and at all relevant times herein was, a public accounting firm with offices throughout the United States, including in California. KPMG maintains its national headquarters at 345 Park Avenue, New

York, New York. KPMG served as Countrywide's outside auditor starting in January 2004. KPMG provided audit, audit-related, tax and other services to Countrywide, which included the issuance of unqualified opinions on the Company's financial statements for the years ended December 31, 2004, 2005 and 2006, and opinions of management's assessments of internal controls for years ended December 31, 2004, 2005 and 2006.[4] KPMG consented to the incorporation by reference of its unqualified opinions on the Company's financial statements and its opinion of management's assessment of internal controls for the years ended December 31, 2005 and/or 2004 in Countrywide's Registration Statement filed with the SEC on February 9, 2006, the Company's Prospectus Supplement filed with the SEC on May 15, 2006 for 6.25% Subordinated Notes and the Prospectus Supplement filed with the SEC on February 15, 2006 for the Series B Medium-Term Notes.

## IV. BACKGROUND REGARDING COUNTRYWIDE'S BUSINESS

### A. Countrywide's Business

74. For many years, Countrywide was known as one of the largest mortgage lenders in the United States. This reputation was built on years of offering customary fixed-rate first-lien mortgage loans (also known as "traditional" loans) to borrowers. Historically, Countrywide's primary business had been originating traditional loans that could be sold to the GSEs, such as Fannie Mae and Freddie Mac, i.e., conforming loans.[5] In 2002, nearly 60% of all loans written by Countrywide were conforming loans, as compared to only about 25% non-conforming for that same period.

---

[4] KPMG identified one material weakness in the Company's internal controls over financial reporting for the year ended December 31, 2004.

[5] Conforming loans were considered safer investments for lenders because they were subject to maximum loan amounts, debt-to-income ratio limits and documentation requirements.

75. Countrywide's primary business segment, Mortgage Banking, was responsible for originating, purchasing, selling and servicing non-commercial mortgages across the nation. Countrywide had different divisions within Mortgage Banking which handled various loan origination and purchasing functions, including the Correspondent Lending Division ("CLD") (loan purchasing), Full Spectrum Lending Division ("FSL") (subprime loan origination), the Wholesale Lending Division ("WLD") (wholesale loan origination and purchasing) and the Consumer Markets Division (retail loan origination).

76. Four other business segments provided interrelated services to the Mortgage Bank segment: (a) Banking, which operated a federally registered institution that took deposits, originated some loans and invested in mortgages and HELOCs; (b) Capital Markets, which operated an institutional broker-dealer specializing in underwriting and trading mortgage-backed securities ("MBS"); (c) Insurance, which provided property, casualty, life and disability insurance to homeowners as well as reinsurance coverage to primary mortgage insurers; and (d) Global Operations, which licensed proprietary software to mortgage businesses abroad.

77. The three largest business segments, Mortgage Banking, Banking and Capital Markets, worked together and fed off of the loan origination and purchase process, to generate well over 90% of Countrywide's pre-tax earnings by 2006. Some of the loans originated or acquired by Mortgage Banking were held for investment by the Banking Division, and the rest were sold off through securitizations and other wholesale arrangements by Capital Markets.

78. Countrywide pooled most of the loans it originated and purchased, and sold them in market transactions (referred to as the "secondary market"), either through whole loan sales or securitizations. In whole loan sales, loans are pooled and sold in bulk to investors (or other banks who, in turn, might have

securitized the loans themselves), and the seller records gains on the sales. In securitizations, loans are pooled together and transferred to a trust controlled by the securitizer. The trust then creates and sells MBS. Holders of MBS receive the right to a portion of the monthly payment stream from the pooled loans.

79. During the Relevant Period, Countrywide generated massive revenues through the sale of loan pools and securitizations. The price paid by purchasers of securitizations or pools of whole loans varied based on the demand for the particular types of loans described in the sale. The stated characteristics of the loans, such as whether the loans were prime or subprime, had adjustable or fixed interest rates or included a prepayment penalty, all influenced the price. Various loans, such as subprime, earned greater prices or "premiums," in the secondary market because the higher interest rates and prepayment penalties associated with these loans resulted in a higher expectation of income stream.

80. Even though Countrywide sold most of its loans, it often retained the right to service these loans, which generated additional profits for Countrywide. Countrywide also earned profits by retaining an interest in any payment streams not sold to MBS holders.

81. Countrywide had significant short- and long-term financing needs to continue originating and purchasing loans, and then selling them to the secondary market. Short-term financing needs (such as the cost of warehousing loans pending sale and trading activities for MBS) were met through unsecured commercial paper and medium-term notes, asset-backed commercial paper, revolving lines of credit, short-term repurchase agreements, unsecured subordinated debt, junior subordinated debt and deposit-gathering. By contrast, long-term financing needs (such as capital needed to originate and purchase loans and invest in MSRs and RIs) were funded by the profits earned from secondary market sales. According to Form 10-K reports filed by Countrywide during the Relevant Period, Countrywide's primary business objective was to ensure

"ongoing access to the secondary market by producing high quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards."

**B. Countrywide Started To Produce More Nontraditional and Far Riskier Loan Products**

**1. Countrywide Sought To Gain Market Dominance**

82. Because revenues from the sale of loans became such a large portion of Countrywide's revenues by the start of the Relevant Period, the success of Countrywide's ongoing operations was dependent on its ability to originate and purchase loans that could be sold to the secondary market. Beginning in mid-2003, Countrywide, led by Mozilo and Sambol, was intent on elbowing out competing lenders that tried to hone in on Countrywide's share of the residential hom loan market. According to a February 23, 2008 article in WSJ, tensions between Sambol, who was emerging as a major force within the Company, and Countrywide's risk managers, as to the best strategy to grow Countrywide's business, boiled over at a meeting of dozens of executives in the Company's headquarters. According to the article, the conflicts regarding how to grow the business were resolved as Sambol succeeded in imposing a new Company-wide "mandate" to originate more "non-conforming" loans to increase loan production across the board.

83. Mozilo quickly embraced Sambol's plan to turn Countrywide into the largest mortgage originator in terms of volume. During a conference call with analysts on July 22, 2003, Mozilo stated that his goal for the Company was "to ***dominate*** the purchase market and to get our overall market share to the ultimate 30% by 2006, 2007[.]" Mozilo reiterated during a January 27, 2004 conference call that "[o]ur goal is ***market dominance***[6], and we are targeting 30% origination market share by 2008 to support our macro hedge strategy."

---

[6] Except as otherwise noted herein, all emphasis is added.

84. As Countrywide's reported production figures show, Countrywide had in fact moved away from its historical core business of underwriting conforming loans. As reported in Countrywide's periodic filings and reflected in the chart below, in 2004, 2005 and 2006, Countrywide originated more non-conforming loans than in any prior period:

| | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| **Prime Conforming as % of Total Loans Originated** | 59.6% | 54.2% | 38.2% | 32% | 31.9% |
| **Prime Non-Conforming as % of Total Loans Originated** | 24.5% | 31.4% | 38.7% | 47.2% | 45.2% |

85. Numerous Confidential Witnesses ("CWs") from different levels and involved in different aspects of the Company corroborate the dramatic nature of Countrywide's strategy shift from traditional to high-risk mortgage lender. CW1, a Countrywide regional vice-president of sales for several mid-Atlantic states from September 2002 to May 2007, who supervised 170 employees in nine offices, stated that he received daily e-mails from Countrywide's National Director of Sales, Scott Bridges, to increase sales of non-conforming loans and thereby increase their region's ranking among the others in the Company. According to this witness, "the real pressure came from above." By increasing the origination of non-conforming loans, Countrywide was able to originate many more loans each year and, because non-conforming loans were riskier than conforming loans, Countrywide was able to charge borrowers higher fees when extending such loans.

86. CW2, a senior loans specialist from 2001 to 2004 and a branch operations manager from 2004 to 2007, corroborates that Scott Bridges sent out FSL Notify, a notification via email kept in an Excel spreadsheet which ranked all of the branches according to their progress in meeting their goals which were

based on the number of loans sold, from the "top dogs to the lowest on the totem pole." These rankings were stored in the Company's Lotus Notes-based system and were accessed through a page called "Inside the Spectrum." This ranking usually came with some sort of message attached lauding those who made their numbers or urging improvements in others. Also, the notifications were often accompanied or followed by unscheduled audio recordings sent via email from Mozilo himself, urging employees to follow certain directives. "Out on the floor (where the loan officers sat), they would talk about meeting the units," CW2 said, referring to the number of loans set as a goal each month. "It was all about making the units." According to a branch manager in the FSL division, CW3, Countrywide increased its Company-wide loan origination goal five-fold, from $1 billion per month in 2004 to $5 billion per month by 2007.

87. Another senior loans specialist and branch operations manager from 2004 to 2007, CW4, corroborates that Mozilo "kept his finger on the pulse" of the Company's bottom line by sending out these emails stating the volume of loans that had been made in a month and setting goals for the next month. According to CW4, "Countrywide [became] known in the business as a sweatshop." During the last few months of CW2's employment, in the summer of 2007, Mozilo sent several messages urging employees to make more subprime loans, which were among the most profitable products the Company sold. CW5, another operations manager in Billings, Montana from April 2000 to February 2007, recalled that the emails were personalized and worded something like: "Angelo [Mozilo] wants you to tell customers about a great new program to promote to realtors to help homebuyers get into more house." CW6, who was a Senior Vice President and Credit Risk Director in 2006 and 2007 at Countrywide's office in Plano, Texas, recalls Mozilo complaining in a meeting during a visit that the Plano office was not originating loans quickly enough. Mozilo asked the rhetorical question, "How

come I can go out and buy a new Bentley for $175,000 in 45 minutes and it takes me 30 days to buy a house?"

88. In addition, Countrywide directly and indirectly motivated its branch managers, loan officers and brokers to underwrite and approve more loans, irrespective of their suitability for the borrowers. CW2 stated that what motivated employees was the pressure to make their goals. "The pressure was on to make the units. The branch manager would have Friday morning meetings and offer $50 gift cards and lunch to the teams that sold the most." According to this witness, management placed Countrywide's lending divisions and underwriters under constant pressure to approve increasing quantities of loans. In a WSJ article on October 24, 2007 (written after the truth regarding Defendants' wrongdoing started to emerge) (the "October 24, 2007 WSJ Exposé"), another employee of Countrywide confirmed that Countrywide regularly encouraged employees to sell more loans by offering prizes, such as trips to Hawaii, to top-producing employees.

89. CW2 also explained that branch managers had specific goals to meet every month in terms of the number of loans—or "units"—the branch made and the revenue it made. Countrywide's branch managers recorded the loans in process—and their status such as applied, submitted, approved and funded—in a software program that could be viewed in real time by Countrywide's senior management. To assess the branch's progress towards meeting the goals that were set—and they varied from one month to the next from 40 to 50 to 60 loans—the Company's regional vice president reviewed the numbers mid-month and at the end of the month. The branch managers then put pressure on the loan officers and account executives to make the numbers in order to earn commissions. CW4, a branch operations manager, confirmed that "[l]oan officers were told to get a loan no matter what, get a deal. That's all it was about—the numbers."

90. Countrywide's strategy to put loan production into overdrive appeared to work, at least at first. According to the October 24, 2007 *Wall Street Journal* Exposé, Pay Option ARM loans originated by Countrywide "accounted for $93 billion, or 19%, of the company's loan volume by 2005, making it the top option ARM lender that year." Countrywide originated over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007. Countrywide recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production divisions in 2005 and 2006, respectively. In 2005, Countrywide reported $451.6 million in pre-tax earnings from Capital Markets sales, representing 10.9% of its pre-tax earnings; in 2006, it recognized $553.5 million in pre-tax earnings from that division, representing 12.8% of its pre-tax earnings. In its 2006 annual report, Countrywide trumpeted the fact that, "[w]hile the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

### 2. Countrywide Began Offering A Wide Array Of Nontraditional and Riskier Mortgage Products

91. At the same time that Countrywide began to put loan production into overdrive, Countrywide also altered its loan mix significantly, shifting from issuing traditional fixed-rate mortgages to borrowers with prime credit scores, to issuing more nontraditional, higher-risk loans, designed to allow borrowers, often those with blemished credit, to borrow more money than would be available under the Company's pre-2003 fixed-rate conforming loan business model.

92. Countrywide's nontraditional mortgages primarily featured ARMs, which are characterized by an initial interest rate that is lower than that of a fixed rate mortgage, for a predetermined introductory period. The interest rate resets at the end of the introductory period, depending on the economic index to which the

rate is linked. According to CWs 6 and 7, who were both branch managers, Countrywide offered two principal ARM programs, 2-28 and 3-27, meaning that the teaser rate would last for only 2 or 3 years, and then reset for the next 28 or 27 years. This translated into an increased monthly payment for the balance of the loan. Countrywide's ARM programs also included pre-payment penalties, so that if the borrower re-financed before the end of the introductory rate period (and avoid the increased monthly payments), the borrower would have to pay a penalty to Countrywide.

93. Countrywide's ARM products also included Pay Option ARMs, which permitted a borrower to select from among various monthly payments, including payments that neither paid down principal nor covered the full amount of interest due in a given month. The range of monthly payment options, from high to low dollar amounts, were: (a) a payment based on a loan that was fully amortized over a particular number of years (e.g., a standard 30-year mortgage); (b) an "interest only" payment that did not include any principal pay down; and (c) a set "minimum monthly payment" that did not cover either the monthly principal amount or the monthly interest owed on the loan. Under this loan, if a borrower selected to pay only the minimum monthly payment, which deferred payment of both principal ***and*** interest, the loan would begin a process of "negative amortization" in which the unpaid interest is added to the outstanding principal amount owed, thus increasing the overall loan balance.

94. As described in the Company's filings, under Countrywide's Pay Option ARM program, there were limits on the amount of missed interest that could be rolled into the principal balance. So, in addition to the reset that occurred at the end of the introductory ARM period described above, loan payments for Pay Option ARMs were re-calculated when the loan balance increased to 110%-125% of the original loan as a result of negative amortization.

At that point, the loan was "recast" and expected to be repaid on a fully-amortized basis over the remaining term.

95. Countrywide also offered loan programs that reduced or eliminated the need for any documentation to prove loan applicants' income and/or assets, i.e., "low-doc" and "no-doc" loans. These types of loans were originally intended for professionals and business owners with high credit scores, who preferred not to disclose their confidential financial information every time they applied for a mortgage. However, the lack of verification made these loans particularly simple targets for borrowers to lie about their income or assets in order to qualify for a loan.

96. Another nontraditional loan product offered by Countrywide was the HELOC, which is a second mortgage secured by the home that is in junior position to the first mortgage. In addition to taking out a "primary" mortgage loan for the traditional maximum of 80% of the property's value, some borrowers take out a HELOC (referred to in the mortgage industry as a "piggyback loan") for as much as the remaining 20% of the purchase price, to avoid having to purchase private mortgage insurance that would otherwise be required.

97. Countrywide could charge higher interest and fees for HELOCs, making HELOCs very attractive to Countrywide. According to a UBS survey reported in the October 24, 2007 *Wall Street Journal* Exposé:

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and offered "piggyback mortgages," which allow borrowers to finance more than 80% of a home's value without paying for private mortgage insurance. By 2006, nearly 29% of the option ARMs originated by Countrywide and packaged into mortgage securities had a combined loan-to-value of 90% or more, up from just 15% in 2004, according to UBS.

98. Countrywide viewed Pay Option ARMs as especially lucrative in the short term because investors were willing to pay more for securities backed by Pay Option ARMs than for those backed by traditional mortgages and guaranteed by a GSE. The stated characteristics of the loans, such as whether the loans were prime or subprime, had adjustable or fixed interest rates or included a prepayment penalty, all influenced the price. The reason investors preferred subprime MBS was the potential for increased payment stream from the higher interest rates charged for these loans, and the lower risk of early repayment because of built-in prepayment penalties. According to CW8, who was Vice President and Regional Operations Manager for Countrywide's WLD in the Southwest from 2005 until October 2007, Countrywide would "do everything" in terms of buying risky loans that it could then package and sell. "There was such a demand for high loan-to-value Alt-A paper[7] throughout 2005 and 2006," CW8 said, "they were giving Wall Street what they wanted."

99. In fact, Countrywide directly tied its loan originations to the appetite of potential purchasers of loan pools and MBS. According to an FSL branch manager, CW7, Countrywide had a system called CLUES or the "Countrywide Loan Underwriting Evaluating System." The CLUES system contained guidelines for loans that outside investors like Lehman Brothers wanted to purchase. Loan officers received "black box updates" from the CLUES system, signifying that investors had changed their guidelines for the types of loans they wanted to buy from Countrywide. Loan officers were expected to originate loans that met these purchaser guidelines. Another FSL branch manager, CW3,

[7] Alt-A, or Alternative-A loans, are mortgages that have a risk profile greater than prime mortgages (or A paper) but less than subprime. A key feature of Alt-A loans is that many times they are given to people who are unable or unwilling to verify their income or assets. Because lenders often do not ask for this type of verification, potential borrowers often lie about their income and assets in order to secure the loan. For this reason Alt-A mortgages are sometimes given the nickname "NINA" loans: No Income, No Assets.

corroborates that all of FSL's loan programs were designed based on Wall Street's appetite to buy the loans. "Whoever designed them, we ran with it because Wall Street was buying it."

100. By offering nontraditional loans like Pay Option ARMs, HELOCs and reduced documentation loans, Countrywide was not only able to increase its market share, it also earned a significant profit from the higher fees that borrowers paid for those loans and the higher prices investors were willing to pay for loan pools and securitized assets on the secondary market. As reported in Countrywide's periodic filings and reflected in the chart below, in 2004, 2005 and 2006, Countrywide originated more ARMs, HELOCs and subprime mortgages (as that term was defined by Countrywide) than in any prior period:

| | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| **Adjustable Rate Loans as % of Total Loans Originated** | 14% | 21% | 52% | 52% | 45% |
| **HELOC as % of Total Loans Originated** | 4.6% | 4.2% | 8.5% | 9.0% | 10.2% |
| **Nonprime (Subprime) as % of Total Loans Originated** | 3.7% | 4.6% | 11.0% | 8.9% | 8.7% |

101. When challenged about the ramifications such massive growth might have on loan quality, on July 22, 2003 Mozilo assured the market: "Going for 30% mortgage share here is ***totally unrelated to quality of loans we go after. . . .*** There will be ***no compromise*** by this company in the overall quality of the product line, you know, which manifests itself in your delinquencies and foreclosures, but we don't compromise on that as we grow market share, nor is there a necessity to do that." Unfortunately, this was not a true statement.

102. As alleged below, defendants misled investors in a number of ways regarding the impact of the Company's massive growth and shift from more conservative loans on the Company's financial results and future prospects in a

number of ways. First, contrary to their assertions, the Company failed to adhere to strict underwriting standards and, thus, did not ensure that the loans they originated were of high quality. To the contrary, defendants loosened and deteriorated Countrywide's loan origination and underwriting standards and permitted an explosion of "exceptions" under those standards. Second, they concealed the fact that Countrywide was classifying many loans as "prime" that failed to meet the requisite industry definitions for that term, which rendered their statements about its subprime exposure false and misleading. Third, they failed to properly increase the Company's loan loss reserves to reflect the increased risk in its portfolio.

## V. COUNTRYWIDE DID NOT MAINTAIN OR APPLY STRONG UNDERWRITING STANDARDS OR PROPERLY INCREASE LOAN LOSS RESERVES TO ACCOUNT FOR THE INCREASED RISKS ASSOCIATED WITH ITS LOAN PORTFOLIO PARTICULARLY AS THE MARKET STARTED TO DECLINE

### A. Countrywide's Risk and Liquidity Exposure Increased

103. At the same time that Countrywide began its aggressive push into higher risk, nontraditional mortgages, macroeconomic considerations were generally making mortgage lending an increasingly risky business. The residential real estate market began to experience a retreat from the unprecedented price spikes of the housing bubble that peaked in 2005, with real estate prices declining at an increasingly rapid pace from 2006 through the end of the Relevant Period. Also during this time, home foreclosures were increasing to historic levels.

104. By 2005, mortgage and banking industry regulators considered lending that employed the above-described loan products and other combinations of heightened risk factors (known as "layered risk" or "risk-layering") to be particularly risky lending practices and required that institutions engaging in such practices use heightened risk management including: (a) maintaining stringent underwriting standards; (b) limiting concentrations of risks; (c) limiting third-

party loan originations; (d) ratcheting up the level of monitoring and stress testing of nontraditional mortgage portfolios; and (e) increasing allowances for loan and lease losses to adequately account for the heightened risks inherent in nontraditional mortgage loan portfolios, particularly those with risk-layering characteristics.

105. The increasing issuance of Pay Option ARM loans, including those with "layered risk" characteristics, prompted an interagency group of federal bank regulators to jointly draft and publish, on October 4, 2006, the *Interagency Guidance,* "to address risks associated with the growing use of mortgage products [like Pay Option ARM loans] that allow borrowers to defer payment of principal and, sometimes, interest." The proposed guidance was first issued in December 2005, and Countrywide provided detailed written comments to the regulators on March 27, 2006. The proposed guidance, and later the *Interagency Guidance*, sent a clear message to the market that bank regulators were concerned about generally lax underwriting standards and risk management practices of subprime lenders. The Office of Thrift Supervision sent a copy of the *Interagency Guidance* and supplemental information (which all officers were required to be familiar with) to Mozilo on October 10, 2006, as acknowledged in the Company's public filings.

106. Industry consensus was that, while Pay Option ARM loans could be appropriate for a small portion of the population, such as well-qualified borrowers with high credit scores who intended to hold a mortgage for a short period of time or borrowers with verifiable employment or self-employment whose income tended to spike from month to month or year to year, such mortgages were not appropriate for most borrowers. Concerned with institutions' increasing reliance on "reduced documentation [lending practices], particularly unverified income to qualify borrowers for nontraditional mortgage loans," the *Interagency Guidance* warned:

> Because these practices essentially substitute assumptions and unverified information for analysis of a borrower's repayment capacity and general creditworthiness, they should be ***used with caution.*** As the level of credit risk increases, the Agencies expect an institution to more diligently verify and document a borrower's income and debt reduction capacity. . . . For example, stated income should be accepted only if there are mitigating factors that clearly minimize the need for direct verification of repayment capacity. For many borrowers, institutions generally should be able to readily document income using recent W-2 statements, pay stubs, or tax returns.

107. In fact, the notion that low or no documentation loans—particularly when coupled with "nontraditional" mortgages—are likely to contain material misrepresentations and/or fraud that will result in increased default rates was nothing new to the industry. For instance, in August 2006, WSJ ran an article stating:

> Banking regulators say that lenders are increasingly relying on unverified income to qualify borrowers for so-called nontraditional mortgage loans. Those products -- such as Pay Option adjustable-rate mortgages and interest-only loans -- allow borrowers to defer payment of principal and sometimes interest. ***Many analysts see such a combination of nontraditional products and nontraditional underwriting processes as presenting another layer of risk*** to those who could be hurt by defaults, including consumers, shareholders in mortgage lenders and investors in securities backed by mortgage loans.
>
> ***"There is more risk with a loan that is not fully documented***," says Suzanne Mistretta, senior director of residential mortgage at Fitch

> Ratings, because "borrowers can overestimate their income to obtain a larger loan they otherwise might not have qualified for.

108. On the subject of ***"Risk Layering,"*** the *Interagency Guidance* stated, in relevant part:

> Institutions that originate or purchase mortgage loans that combine nontraditional features, such as interest only loans with ***reduced documentation*** or a ***simultaneous second-lien loan,*** face ***increased risk.*** When features are layered, an institution should demonstrate that mitigating factors support the underwriting decision and the borrower's repayment capacity.

109. Because a HELOC is in second position to the first lien loan, it is secured only by the difference between the value of the home and the amount due on a first mortgage. Industry consensus is that HELOCs are at higher risk of becoming unsecured, and therefore worthless, in the event of a default, especially in a market with declining real estate values. Therefore, with respect to HELOCs, the *Interagency Guidance* cautioned:

> Simultaneous second-lien loans reduce owner equity and increase credit risk. Historically, as combined loan-to-value ratios rise, so do defaults. A delinquent borrower with little or no equity in a property may have little incentive to work with a lender to bring the loan current and avoid foreclosure. In addition, second-lien home equity lines of credit (HELOCs) typically increase borrower exposure to increasing interest rates and monthly payment burdens. Loans with minimal or no owner equity ***should not have a payment structure that allows for delayed or negative amortization*** without other significant risk mitigating factors.

110. Notwithstanding this unambiguously clear cautionary language in the *Interagency Guidance,* according to the October 24, 2007 *Wall Street Journal*

Exposé, the vast majority of Countrywide's Pay Option ARMs featured layered-risk characteristics. According to WSJ, 78% of Countrywide's Pay Option ARMs originated in 2004 "were 'low-doc' mortgages in which the borrower didn't fully document income or assets" and the number grew to 91% in 2006. The Company's Form 10-Q for Q2 2007, filed with the SEC on November 9, 2007, also reveals that by the end of 2006, 81% of Pay Option ARMs held for investment by Countrywide were "low-doc" or "no-doc" stated income loans.

111. Moreover, as Countrywide originated more Pay Option ARMs with layered risk features such as reduced documentation and secondary-lien financing, the wholesale market appetite for Countrywide loan portfolios started to disappear. CW6 described one instance in April 2007, when Countrywide was unable to find a single buyer for a wholesale loan pool consisting of 100% financed loans that included risky, second-lien HELOCs. In fact, 13 investors refused to even look at the portfolio, and one investor looked at it but opted not to buy it. As a result, Countrywide had to keep this bad portfolio of risky, 100% financed loans on its books as LHI. This drop-off in secondary market sales should have been seen as a clear signal to senior management that Countrywide's loan quality had hit rock bottom.

112. As it became more and more difficult for Countrywide to sell its loans on the secondary market, Countrywide had no choice but to increase the amount of Pay Option ARMs held by the Company for investment. As reported in Countrywide's periodic filings and reflected in the chart below, the amount of Pay Option ARMs held by the Company for investment grew significantly in 2004, 2005 and 2006 (in the millions):

| | **2003** | **2004** | **2005** | **2006** |
|---|---|---|---|---|
| **Pay Option ARMs Held for Investment** | N/A | 4,698 | 26,101 | 32,732 |

As of December 31, 2006, Pay Option ARMs represented 46% of the Company's total LHI. Additionally, Countrywide was required to increase its RIs in MBS containing nonprime and HELOCs which were sold by the Capital Markets division during the same period.[8]

113. Defendants knew, as highlighted in the public filings they controlled, that the key to the Company's success was quality control and verification of LHI, as well as the loans securitized and sold into secondary security markets, through the implementation and enforcement of appropriate underwriting standards. Indeed, Countrywide's ability to sell these loans quickly depended upon convincing investors in the secondary market that the loans being sold were of high quality. Among other things, this required Countrywide to make various R&Ws, which vouched for the accuracy of loan documents, to the secondary market, giving secondary market participants recourse if the R&Ws proved to be untrue.

114. Countrywide's explosive origination of nontraditional loans between 2003 and 2008 may have been highly lucrative for the Company in the short term but, as Defendants knew or should have known, this constituted a high-risk activity that threatened the Company's core business, especially when the secondary market dried up and Countrywide had to hold more risky loans for investment and retain more interests in Pay Option ARM and HELOC securitizations. As a result, Countrywide's shift to risky loan products made it more vulnerable to liquidity constraints in the home mortgage market. Indeed, as recently as January 3, 2011, BofA announced a settlement to pay Fannie Mae and Freddie Mac a total of $2.8 billion to make good on R&Ws by Countrywide, who

[8] A retained interest provides an interest payment from a real estate mortgage investment conduit ("REMIC"). Retained interest holders receive interest payments from a REMIC after all required regular interest has been paid to other investors in higher priority securities tranches. Countrywide's retained interests would take the first losses if any mortgage pool underperformed, giving the securitization purchasers limited default protection.

sold loans to these GSE's prior to the Merger that turned out to be fraudulent or violated fair lending laws. These facts and the risks associated with them were not disclosed to investors, and Plaintiff, who were damaged as a result.

**B. Countrywide Loosened Its Underwriting Standards**

115. At Defendants' direction, Countrywide pursued a lending campaign, beginning in 2003, that was characterized by chronic failures in standard appraisal, underwriting and credit qualification practices, and that heavily concentrated the Company's mortgage lending in risky Pay Option ARM loans, the overwhelming bulk of which were made on a less than fully documented basis. Unbeknownst to Countrywide's investors, including Plaintiff, from mid-2003 onward, concurrent with Countrywide's push to achieve a 30% market share, Countrywide continually loosened its underwriting guidelines to the point of nearly abandoning them by 2006.

116. While the Officer Defendants consistently hyped the Company's underwriting and credit qualification processes, the truth was that Countrywide had actually lowered the Company's credit score requirements and eased other qualifying criteria to facilitate the approval of huge volumes of loans, regardless of the credit quality of the loans or the magnitude of "exceptions" from the underwriting standards that would need to be granted in order to fund the loans. Countrywide and the Officer Defendants in fact were well aware that Countrywide had abandoned any discipline in these processes and had chosen to sacrifice quantity over quality in their reckless quest to become the nation's largest home lender. The loosening of the underwriting standards is evidenced by (a) the Company's Underwriting Matrices and (b) the Company's loan exception processing.

**1. Countrywide Loosened Its Underwriting Standards As Indicated In The Company's Underwriting Matrices**

117. The most direct evidence of Countrywide's systematic relaxation of lending standards can be seen in the key internal documents relied on by

underwriters, loan officers, account executives and branch managers—called Underwriting Matrices—which were authored by Countrywide's highest-level managers at Countrywide's corporate headquarters. According to several CWs, Countrywide progressively loosened its guidelines in its Underwriting Matrices by reducing minimum credit scores needed to qualify for loans, allowing borrowers to finance more than the traditional 80% of the home's value, allowing borrowers to assume more debt load and making loans on little or no income or asset verification.

118. As an Operations Manager, CW5 was required to be familiar with Countrywide's underwriting and loan origination policies and procedures. CW5 regularly accessed the Underwriting Matrices through Countrywide's proprietary computer system called "CW Insider." According to CW5, the CW Insider system, which was developed in 2003 or 2004, acted like a one-stop website for all of Countrywide's lending divisions, to answer any questions a loan officer or account executive might have about any Countrywide loan product. According to CW9, who was an FSL branch manager, all employees, even those who travelled, had access to Countrywide's Underwriting Matrices through their company computers.

119. Based on CW5's regular access to this proprietary system, CW5 is personally aware that the Underwriting Matrices were updated often. Specifically, the Company lowered minimum FICO[9] scores and other risk factors (e.g. time elapsed since a bankruptcy discharge, default, etc.) for the various risk grades of borrowers (ranging from AA+ to C-), while concurrently increasing maximum loan amounts steadily during the period from 2003 to 2007. In particular, CW5 recalls that Countrywide's guidelines were relaxed substantially at the beginning

[9] The Fair Isaac Credit Organization, or "FICO," score is one of the most widely accepted measures of the creditworthiness of a borrower. FICO scores range from 300-850, with the U.S. median approximately 720.

of 2005, when Countrywide increased its origination of interest-only ARM loans. FSL branch manager CW3 recalls that, between 2003 and 2005, Countrywide loosened loan-to-value restrictions as well as FICO score requirements in its underwriting guidelines. CW9 confirms that the underwriting standards reflected in the Underwriting Matrices loosened up in 2005 and 2006, at the height of the market when "everyone was doing the same kind of loans," i.e., subprime loans.

120. According to these CWs, management's rationale for loosening the guidelines contained in the Company's Underwriting Matrices was simple: the goal was to capture a population of borrowers with lower credit scores who previously would not have qualified for a loan. Under tighter guidelines, such loans would trigger an "exception" which would have likely resulted in the loan being refused. However, this loosening of the underwriting standards was never disclosed to investors.

**2. The Company Also Broadened The Scope Of Permissible Exceptions**

121. All lenders have guidelines for approval. "Exceptions" or "exception loans" in the mortgage industry are loans whose criteria fall outside the Company's underwriting standards but are approved nonetheless. Typically, the only way an exception is granted is if there are other compensating factors. For example, if a borrower has a FICO score that is lower than the minimum to qualify for a loan, the lender may make an exception based on the fact that the borrower's debt ratio is very low, the borrower has high verified assets or the down payment will be large. In other words, the lender may make an exception because other compensating factors exceed standard guidelines.

122. However, rather than encourage its underwriting staff to approve exception loans based on reasonable compensating factors, Countrywide instead opted for an easier approach which eliminated the need for exceptions altogether. Specifically, Countrywide adopted a new, publicly undisclosed "exception

philosophy," or rather "no exception philosophy," which significantly lowered the guidelines by incorporating a lower range of FICO scores and increased loan amount limits, thereby reducing the number of exceptions that were triggered.

123. As a result of this undisclosed "no exception philosophy," Countrywide made it easier for lending personnel to make increasingly larger loans to low-quality borrowers. The reduced underwriting guidelines also made it possible for Countrywide to purchase more loans and meet its aggressive market share goals. In fact, several CWs agree that it would have been impossible for Countrywide to grow its business in the way Sambol and Mozilo wanted had Countrywide continued to use the Underwriting Matrices and guidelines in place in 2003. According to CW6, by late 2006, Countrywide's Wholesale Lending portfolio (which at the time consisted of around $88 billion in loans), consisted mostly of Pay Option ARMs made to borrowers with FICO scores around 500.

124. According to Plaintiff's investigation, Countrywide had an internal, proprietary computer system that was used to identify and route highly risky loans out of the regular loan approval process and to the Company's central "corporate underwriting" offices (called "Structured Loan Desks" or "SLD") in Plano, Texas or Pasadena, California for evaluation. According to CW5, an FSL branch manager, and several other FSL branch managers, the EPS was not used to reject loans that were outside the Company's underwriting guidelines. Rather, CW5 and other loan officers used the EPS to obtain approval authority from "corporate" to ***close*** and ***fund*** such loans. According to this witness, there were very few rejections of requests made through the EPS.

125. According to CW5, the EPS gave management the opportunity to approve loans that, on their surface, should be rejected. "If your loan didn't fit the guidelines, you could go into this exception department and request an over-ride." The EPS software was filled out online and had entry tabs by which loan officers could enter a customer's FICO score, loan amount, property value used as

collateral and a description of the client's situation. This last section was used liberally by loan officers to justify the exception. Often, only selective information from a loan application was inputted in order to ensure that the exception was granted.

126. CW5 recalled that it was almost impossible to get an exception approved when the EPS was first rolled out. However, during the last two years CW5 worked at Countrywide, between 2005 and 2007, there was "a very high approval process." CW5 said, "They were granting exceptions for off-the-wall loans." For example, CW5 described how, in 2000, the standard debt-to-income ratio was 38% -- meaning Countrywide wouldn't approve loans for borrowers who exceeded this debt ratio. However, when CW5 quit in February 2007, Countrywide was approving loans for borrowers with debt ratios as high as 70% through the EPS. By 2007, Countrywide was also approving loans to self-employed borrowers that put 0% or 5% down with no documentation or reduced documentation through the EPS, compared to the requirement that such borrowers put down at least 10% when this CW first started working at Countrywide in 2000.

127. In addition, according to CW5, the EPS permitted management to override low credit scores and in turn add "additional pricing" or discount points. This was accomplished through a second proprietary system, called Price Any Loan or PAL, which was used to price exception loans based on their risk. For example, CW5 recalls that Countrywide approved loans for people with low credit scores through the EPS, by classifying the low credit score as an "isolated event" in the borrower's credit history. SLD would then require higher pricing or other terms in view of these violations. SLD would approve the loan but charge a higher interest rate or a higher margin.

128. CW10 recalls that loan officers would regularly go over his head if he refused to approve a loan based on the Underwriting Matrices, and get approval

for the loan through the EPS. If SLD approved the exception loan, CW10's hands would be tied and the loan was approved except in the rarest of cases. CW10 generally recalls seeing "bad loans" go through the EPS. In sum, loan applications that should never have been approved were constantly kicked further up the corporate ladder until they reached a level where they would be approved by those driven solely by corporate profits.

129. CW7 confirmed that the EPS was regularly used by loan officers to approve loans outside of Countrywide's underwriting guidelines. As an FSL branch manager, every month CW7 received an Excel spreadsheet that showed a tally of what loans were granted exceptions, which ones were denied and which loans had closed. According to CW7, newspaper accounts that took Mozilo to task for offering steep loan discounts to the "friends of Angelo" were nothing compared to the types of loan exceptions approved via the EPS every day. "I gave people who had no right getting pricing exceptions, exceptions just to get the loans closed." CW7 was constantly under pressure from his boss, Regional Vice President of Countrywide FSL, John Mauk ("Mauk"), to close as many loans as possible: "My boss was saying, 'I don't care. Close it. We need to show numbers.'" In fact, according to CW3, Mauk would often intervene in the EPS process to make sure an exception was approved. "He'd pick up the phone and make the magic happen."

130. CW11 was a Subprime Exceptions Pricing Manager at Countrywide's office in West Hills, California, from 2005 to 2006. In this capacity, CW11 purchased loans for Countrywide's CLD that fell outside of its underwriting guidelines. To do this, CW11 used a pricing model that calculated the Net Economic Contribution (or" NEC") for each loan. According to CW11, although she had authority to purchase only loans that had a NEC of 3, she regularly requested and received permission from her superior to buy loans with a lower NEC (representing a riskier loan).

131. In sum, the steady and systematic loosening of underwriting standards was the catalyst for the dramatic increase in riskiness of the loans that Countrywide was originating or purchasing. As alleged above, by 2006, the secondary market had begun rejecting loan pools, which meant that Countrywide was forced to keep more and more pools of bad loans, originated under the loosened underwriting standards, on their books.

### C. Countrywide Also Engaged In a Company-Wide Practice of Originating and Funding Loans Without Regard to Underwriting Standards Regarding Loan Quality and Engaged in Predatory Lending

132. As explained below, these same witnesses confirm that the underwriting guidelines -- as loose as they were -- themselves were not strictly adhered to. In fact, loans were routinely approved for borrowers who, even based on Countrywide's loosened underwriting standards, did not actually qualify for the loan. The general consensus among the CW's interviewed was that loans were to be approved automatically unless there was a "blatant" problem on the face of the loan application. In fact, according to CW10, Countrywide's actual underwriting guidelines were even looser than what the Underwriting Matrices required.

133. According to one witness who was an Operations Manager, CW5, beginning in 2003, a substantial portion of loans originated by Countrywide were low-doc or no-doc loans, offered as both prime and subprime programs. By 2005, according to CW5, underwriting practices for such loans were even weaker. For example, Countrywide had an automated underwriting program called the "Alternate Credit Program," which was used to process and approve loans applied for online. CW5 recalls that borrowers with higher debt-to-income ratios and lower FICO scores than required by Countrywide's underwriting guidelines would regularly be approved for loans through this system, with no verification of income or assets.

134. According to CW1, loan origination standards and procedures were not designed to produce high quality loans. In fact, the opposite rule applied, i.e., lending personnel were expected to ***look for a way to make the loan rather than turn it down.*** Asked whether the Company had a tightly controlled credit policy as claimed by senior management, CW1 said that anyone could qualify for a loan—with or without documentation of income. Meaningful underwriting, therefore, was virtually impossible to perform.

135. In August 26, 2007, the New York times ("NYT") revealed, in an article titled "*Inside the Countrywide Lending Spree*" (the "August 26, 2007 NYT Exposé"), the extent to which Countrywide encouraged lending personal to engage in predatory lending[10] tactics rather than perform sound underwriting:

> On its way to becoming the nation's largest mortgage lender, the Countrywide Financial Corporation encouraged its sales force to court customers over the telephone with a seductive pitch that seldom varied. 'I want to be sure you are getting the best loan possible,' the sales representatives would say. But providing 'the best loan possible' to customers wasn't always the bank's main goal, say some former employees. Instead, ***potential borrowers were often led to high-cost and sometimes unfavorable loans*** that resulted in richer commissions for Countrywide's smooth talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America.
>
> Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to

[10] Predatory lending is a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest rates and fees that are unreasonably high.

> ***wring maximum profits out of the mortgage lending boom no matter what it costs borrowers***, according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided. One document, for instance, shows that until last September the computer system in the company's subprime unit excluded borrowers' cash reserves, which had the effect of steering them away from lower-cost loans to those that were more expensive to homeowners and more profitable to Countrywide.

136. Further, according to the August 26, 2007 NYT Exposé, "documents from the subprime unit also show that Countrywide was willing to underwrite loans ***that left little disposable income for borrowers' food, clothing and other living expenses.***" For example, one Countrywide manual stated that a borrower with a family of four could obtain a loan even if the monthly mortgage payment left the family with only $1,000 to live on for the month. A single borrower could obtain a loan whose payment left him or her only $550 for food, clothing or other expenses for the month.

137. An article on November 11, 2007 in NYT echoed the same chilling reality about Countrywide's maniacal expansion into the Pay Option ARM market, describing the Company as a sort of "*Jurassic Park*" in the mortgage industry. The article cited an internal Countrywide sales document called "Pay Option ARMs Made Simple" which asked what type of customer would benefit from such a loan. One of the answers was "Anyone who wants the lowest possible payment!" According to CW10, Countrywide's WLD frequently pushed borrowers to the FSL division to get them into subprime loans when, in fact, they could have qualified for prime loans. CW10 recalls seeing some borrowers with FICO scores as high as 700 being sent to FSL to get subprime loans.

138. CW1 testified that FICO scores became unimportant after 2003, with potential borrowers able to obtain a mortgage with very low FICO scores (i.e., in

the 500s). In particular, CW1 relates how senior management mandated that CW1's managers run credit reports to find customers in CW1's region who had FICO credit scores of 580 and below. The so-called "580 Reports" listed everyone within the region by name, address and phone number. Account executives were expected to call each customer and sell them a loan. Account managers would then have to explain why they did not close a loan with each and every customer on the 580 Report.

139. CW2 testified that for the most part, Countrywide aggressively pushed customers into an ARM, even those customers who were on fixed incomes. If an account executive could not close a mortgage deal, a second voice, usually a team leader or manager, would get on the phone to convince the customer to accept it. According to CW2, if a customer could not make a down payment, Countrywide would approve 100% financing, and roll the closing costs into the amount of the loan.

140. Several CWs also observed several instances where Countrywide's underwriting policies were ignored with the approval of supervisors. CW1 said, "there was pressure to cut and paste and do whatever we could to put these people in subprime loans." Asked whether he ever witnessed any fraud, he said that two of Countrywide's FSL offices—one in Farmington, Connecticut and another in Braintree, Massachusetts—were shut down as a result of fraudulent activities. This CW was also aware that account executives would run customers' credit reports repeatedly to drive down their FICO scores, so they could only qualify for subprime loans.

141. According to CW7, the Braintree, Massachusetts branch, which was managed by Nick Marcopolous ("Macropolous"), was Countrywide's top producing branch, closing more than 100 loans per month. Other FSL branches, such as CW7's branch, typically closed about 40-50 loans per month. CW7's branch had 40 loan officers and 10 processors and even in their most productive

months they only "nipped at the heels" of the Braintree, Massachusetts branch. According to CW3, he learned through conversations with co-workers and other branch managers that Marcopolous and others in the Braintree office were cutting and pasting information into the loan documents in order to get the loans approved. After the Braintree, MA branch was closed, CWs 3 and 7 learned that Marcopolous had been promoted to Divisional Executive Vice President and was running the entire East Coast region for Countrywide's FSL division.

142. During the course of reviewing loan applications, CW4 testified to always catching fraud in CW4's files. However, notwithstanding the obvious fraud, Regional Vice President Paul Seller, would take the files away from her and give them to another reviewer, who would fund the loans anyway through the EPS system. The type of fraud detected included forged signatures, sometimes by loan officers, who were trying to push through loans.

143. CW2 testified that the pressure to close loans was so intense among account executives that even they perpetrated fraud in processing applications. For example, account executives would try to hide 401K loans, alimony and child support by removing pay stubs with those expenses on them in order to falsely inflate a customer's income. When CW2 found documents which revealed these inconsistencies, CW2 was told by the team and branch managers to shred the documents. If the underwriters questioned a loan, the account executive and branch manager would alter the documents and submit them again, "praying for a new underwriter" to approve it who would not recognize the applicant's name from the previous submission.

144. In fact, it was generally known at Countrywide that there were borrowers who were applying for Stated Income/Stated Assets ("SISA") loans who were making false statements about their income and assets. CW2 recalls that approximately 25% of the loans CW2 reviewed had some type of discrepancy with the borrower's statements, which indicated some sort of fraud, e.g., the

amount of the stated income on the loan application did not match a pay stub that was located in the file. Notwithstanding these obvious discrepancies, CW's branch manager usually signed off on each loan folder and passed it along for approval.

145. In addition, CW2 witnessed several incidents of fraud by lending personnel relating to SISA and NINA loans. For example, if the customer submitted pay stubs or other documentation that showed they could not qualify under a full documentation loan for the loan amount they wanted, the loan officer for Countrywide would change the application to a SISA or NINA loan so the borrower would have a better chance to qualify. This was easy to accomplish because the income and asset statement page on the Countrywide loan application was not a signed page and the account executive could simply change the application. CW2 was eventually fired for raising questions about Countrywide's fraudulent lending practices. According to CW7, some branch managers had Adobe W2 tax forms on their computers so they could generate whatever tax returns they needed to close the loans. They also had ADP software that enabled them to print out checks and blank IRS forms.

146. CW7, who reported to Mauk, Regional Vice President of Countrywide FSL, admitted that there was "a lot of fraud" that occurred with stated income loans because FSL did not even check a borrower's tax return to verify income. "We had to trust what they said was true," CW7 said. According to CW7, FSL did not audit loans until a first payment default. In particular, FSL was routinely making risky loans to borrowers with the weakest credit, who were constantly re-financing their homes to get out more money: "Everything was flying fast and furious."

147. Another FSL branch manager, CW3, who managed the Rockville, Maryland, office from 2001 to January 2008 and also reported to Mauk, corroborates CW7's testimony that there was constant pressure from senior

management to push loan officers to get underwriting to approve as many loans as possible, preferably Pay Option ARMs. Most of the loans closed in CW3's branch were "Fast and Easy Loans," which required no income documentation. Like NINA borrowers, Fast and Easy borrowers did not have to provide any significant documentation to support their loan applications, and meaningful underwriting, i.e., a real assessment of the borrower's capacity to pay, was virtually impossible to perform. CW3 even saw NINA loans extended to borrowers with really low FICO scores, down to 500. "They were truly subprime."

### D. Countrywide Also Relied on Inflated Appraisals

148. Part of Countrywide's scheme to increase market share and to make as many loans as possible also involved the corruption of the appraisal process. Countrywide wanted appraisals that supported the loans it wished to make. As part of its corporate objective to abandon underwriting standards in order to maximize market share and profits, Countrywide engaged in a practice of pressuring and intimidating appraisers into using appraisal techniques that met Countrywide's business objectives even if the use of such appraisal techniques was improper and in violation of industry standards and routinely circumvented The Uniform Standards of Professional Appraisal Practice ("USPAP"), incorporated into federal law, 12 C.F.R. §34.44. Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and independent. USPAP requires appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct).

149. Moreover, the *Interagency Guidance* specify that when institutions offer nontraditional mortgages, underwriting standards should "comply with the

agencies' [existing] real estate lending standards and appraisal regulations and associated guidelines." The guidelines warn that, "[i]f appraisal, loan documentation, or credit problems or consumer complaints are discovered, the institution should take immediate action."

150. However, according to allegations in a whistleblower complaint filed in the Southern District of Texas, No. 4:08-cv-01464 by Mark Zachary (a former Regional Vice President of Countrywide's joint venture with KB Home) ("Zachary"), against Countrywide, the Company blatantly ignored its underwriting policies and procedures by knowingly relying on overstated, low-quality appraisals that failed to conform to industry standards. In September 2006, Zachary informed Countrywide about the questionable use of only one appraiser to perform all of the appraisals on KB Home properties being purchased with Countrywide's loans. According to Zachary, Countrywide executives knew that the appraiser was being strongly encouraged to inflate appraisal values by as much as 6% to allow homeowners to "roll up" all closing costs. According to Zachary, this practice resulted in borrowers being "duped" as to the values of their homes. This also made loans more risky because when values were falsely increased, loan-to-value ratios calculated with these phony numbers were necessarily incorrect.

151. Zachary also advised Countrywide executives that this practice misled investors who later purchased these loans through securitizations because these investors were not made aware that the actual home values were less than the inflated appraised values. According to Zachary, the inflated appraised values put buyers "upside down" on their homes immediately after purchasing them; that is, the borrowers immediately owed more than their homes were worth. Thus, the buyers were set up to be more susceptible to defaulting on their loans. This practice also put Countrywide at risk because they deliberately were unaware of the true value of the assets on which the Company was loaning money. Zachary

brought his concerns first to the executives of the Countrywide/KB Homes joint venture, but when he was "brushed aside" by them, he turned to Countrywide executives in Houston, the Company's Employee Relations Department and finally the Company's Senior Risk Management Executives. In January 2007, an audit was conducted and brought to the attention of these Countrywide executives which corroborated his concerns.

152. Another complaint, filed by a real estate appraisal company Capitol West Appraisals, LLC ("Capitol West"), provides further evidence that Countrywide encouraged and engaged in a practice of pressuring real estate appraisers to artificially increase appraisal values for properties underlying mortgages Countrywide originated and/or underwrote. According to the complaint, Countrywide loan officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions. When Capitol West refused to vary the appraisal values from what it independently determined was appropriate, Countrywide placed Capitol West on its "Field Review List," or an Exclusionary List. The Field Review List or Exclusionary List was a Countrywide database containing the names of appraisers whose reports Countrywide would not accept unless the mortgage broker also submitted a report from a second appraiser. According to the complaint, the practical effect of being placed on the Field Review List was to be "blacklisted"—no mortgage broker would hire an appraiser appearing on the Field Review List to review a property sale in which Countrywide would be the lender because the broker simply would not pay to have two appraisals done. Instead, the broker would simply retain another appraiser who was not on the Field Review List. While an honest lender might have a legitimate purpose to maintain a list of appraisers it was unwilling to use, Capital West claimed that Countrywide was falsely and fraudulently using their Exclusionary List to punish and retaliate against appraisers who even

attempted to maintain the designed integrity and independence of the appraisal process.

153. According to Capitol West, Countrywide created certain procedures to further enforce its blacklisting of uncooperative appraisers. For example, if a mortgage broker were to hire an appraiser that happened to be on the Field Review List, Countrywide used its wholly owned subsidiary, LandSafe, Inc., to perform an appraisal and cut off the offending appraiser. As part of the scheme, LandSafe performed a "field review" of the appraisal performed by the blacklisted appraiser, which was specifically intended to "shoot holes" in the appraisal. Landsafe's appraisal would then be used to complete the loan.

### E. Countrywide Belatedly Tightened Underwriting Guidelines in 2007

154. It was not until late February and early March 2007, when the secondary market began to dry up, that Countrywide belatedly began to tighten up its origination terms. According to a REUTERS article, *Countrywide Ends No Down-Payment Lending*, published on March 9, 2007, Countrywide instructed its brokers to stop offering borrowers the option of no-money-down home loans, or "piggyback" loans, that allowed borrowers to buy a house with 100% financing. In a Company-wide email, Countrywide told its loan originators: "Please get in any deals over 95 LTV (loan-to- value) today!... Countrywide BC will no longer be offering any 100 LTV products as of Monday, March 12." Furthermore, the August 26, 2007 *New York Times* Exposé disclosed that, at least up until February 23, 2007, the Company continued to originate loans comprising more than 95% of a home's appraised value and required no documentation of a borrower's income.

155. Countrywide documents show that it, too, was a lax lender. For example, it wasn't until March 16 that Countrywide eliminated so-called piggyback loans from its product list, loans that permitted borrowers to buy a

house without putting down any of their own money. And Countrywide waited until February 23 to stop peddling another risky product, loans that were worth more than 95% of a home's appraised value and required no documentation of a borrower's income.

156. On July 24, 2007, Countrywide filed a Form 8-K and issued a press release announcing its financial results for the second quarter of 2007. In addition to reporting dramatic new charges and loan loss provisions, Countrywide revealed that the quality of Countrywide's loans, especially its prime loans, was weaker than had previously been represented. Moreover, during an earnings call later that day, the Company revealed for the first time that in actuality its underwriting guidelines had been inadequate throughout the Relevant Period, stating that the Company had "made many changes" to its "underwriting guidelines and processes, in order to improve the quality and secondary market execution of our production." The Company also disclosed that its proprietary underwriting system needed to be "recalibrated."

157. However, evidence suggests that these partial corrective disclosures were false. For example, the August 26, 2007 *New York Times* Exposé revealed that, in July 2007, Countrywide's product list showed that it would lend $500,000 to a borrower rated C-, the second riskiest grade. As long as the loan represented no more than 70% of the underlying property's value, Countrywide would lend to a borrower even if the person had a credit score as low as 500.

158. In fact, the article revealed that the Company would lend even if the borrower had been 90 days late on a current mortgage payment twice in the last 12 months, if the borrower had filed for personal bankruptcy protection or if the borrower had faced foreclosure or default notices on his or her property.

159. CW4, commenting on Mozilo's repeated assurances in July 2007 to investors that Countrywide could weather the storm because it only wrote high quality loans, said that Mozilo lied to investors: "We were still taking subprime

loans when he said that." Even after the Company increased the minimum FICO score to 620 in August 2007, "they were still writing subprime loans in the 500s." According to CW4, "[Countrywide's management] did loans they had no business doing. You don't put someone struggling to pay bills into an adjustable rate mortgage or an interest only mortgage." Loan officers in this CW's office "were taking borrowers who were in bankruptcy, coming out of foreclosure or in foreclosure" or who could "barely make ends meet." CW4 said "most of the subprime loan customers had horrible credit."

### F. Countrywide Misclassified Subprime Loans as Prime in its Annual and Quarterly Reports

160. In addition to failing to disclose the truth about the Company's loosening and abandonment of its underwriting guidelines during the Relevant Period, Defendants also made false and misleading statements to its investors that Countrywide's exposure to the subprime loans was minimal. Countrywide made regular public disclosures distinguishing between its "prime" and "subprime" (sometimes referred to as "nonprime") loan originations and securitizations. As alleged below, these statements were false and misleading because throughout the Relevant Period, the Company employed an undisclosed standard for classifying loans as subprime that was lower than the accepted industry standard.

161. As previously explained, the FICO score is one of the most widely accepted measures of the creditworthiness of a borrower and is a key determinant of whether a given borrower will be classified as "prime" or "subprime." There is a strong presumption in the mortgage-lending industry that a FICO score of 660 divides prime and subprime borrowers.

162. The principal industry definition of "subprime" is found in the *Expanded Guidance for Subprime Lending Programs* (the "*Expanded Guidance*"), issued jointly on January 31, 2001 by the U.S. Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal

Deposit Insurance Corporation and the Office of Thrift Supervision. The *Expanded Guidance* was sent to Mozilo and other banking CEOs on or about February 2, 2001, and Countrywide management was required to be familiar with it. The guidance advises financial institutions that the elevated levels of credit and other risks arising from subprime lending tend to require heightened risk management and additional capital reserves.

163. As explained in the *Expanded Guidance*, "[t]he term 'subprime' refers to the credit characteristics of individual borrowers. Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments and bankruptcies. They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories."

164. The Office of Thrift Supervision's February 2001 transmittal letter advises that the *Expanded Guidance* was intended to provide, among other things, "a more specific definition of the term subprime." Among the credit risk characteristics listed in the *Expanded Guidance* that label a borrower as "subprime" is a "[r]elatively high default probability as evidenced by, for example, a credit bureau risk score (FICO) of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood[.]"

165. Freddie Mac, one of the GSEs that purchased loans from Countrywide during the Relevant Period, stated in its February 2003 public guidelines that "FICO scores objectively evaluate all the information in the Borrower's repository credit file at the time the FICO score was created. Freddie Mac has identified a strong correlation between Mortgage performance and FICO scores." For loans on single-family properties, Freddie Mac views a borrower with a FICO score above 660 as "likely to have an acceptable credit reputation."

Further, FICO scores between 620 and 660 "should be viewed as an indication that the Borrower's willingness to repay and ability to manage obligations as agreed are uncertain." A FICO score below 620, according to Freddie Mac, "should be viewed as a strong indication" that the borrower's credit profile is "not acceptable."

166. Defendants were well aware that the appearance of being primarily engaged in prime lending was of critical importance to Countrywide's survival. For example, during an investor conference with analysts at Lehman Brothers on September 13, 2006, Mozilo insisted that Countrywide had only a minor position in subprime, stating that subprime loans are "only 9% of our production today." During the same conference, Sambol claimed that "[o]ur profile in the subprime market has been one where we have, for the most part, been on the sidelines." One year earlier, during a September 13, 2005 analyst call, Mozilo, referring to securitized loans, stated that "all loans originated and sold" were "primarily prime quality."

167. However, in reality, Countrywide secretly employed an internal FICO of 620, not 660, to differentiate between prime and subprime loans, referring to the latter category as "nonprime." In fact, numerous CWs confirm that Countrywide consistently made loans that were classified as prime to borrowers with FICO scores below 660, and even below 620, in proportions and amounts far greater than those suggested by the Company's top executives, and contrary to Countrywide's public assurances that it was a conservative and cautious lender in subprime loans and in general.

168. As explained previously, the FSL was Countrywide's subprime loan origination division. According to CW5, borrowers with FICO scores below 600 were sent to the FSL division. This meant that a wide range of borrowers—those with FICO scores below the industry subprime benchmark of 660 but above

600—could be given loans by the other Countrywide lending divisions that were classified as "prime."

169. Even after borrowers with low FICO scores (i.e., below 600) were referred to FSL, they could still be classified as "prime." CW7, an FSL branch manager, testified that FSL regularly classified loans as "prime" which should have been considered subprime based on the borrower's FICO score. FSL used an automated underwriting system called Desktop Underwriter ("DU") that was used on all loans. Once the loan officer input all of the information, the DU system would generate one of four possible outcomes: (a) denied; (b) approved as B or C (i.e., subprime) paper; (c) approved as EA (expanded approval); or (d) approved as A (i.e., prime) paper. According to CW7, a borrower with a FICO of 580 could get an "uplift" to prime status from DU by inputting a low loan-to-value ratio, low debt-to-income ratio and a lot of cash in reserves. Moreover, if DU rejected the conforming loan, the loan officer would "re-commit" under the prime non-conforming program and re-run the loan. If DU still rejected the non-conforming (large) loan as outside the non-conforming guidelines, the loan officer would submit the loan for exception consideration through the EPS. According to CW7, loans approved through the EPS were usually treated as prime.

170. CW9 corroborates that DU was often used to "upgrade" a subprime loan to a prime loan. CW3 also confirms that borrowers with FICO scores as low as 620 were classified as "prime" loans by FSL. According to CW4, who reviewed close to 30 to 40 loan applications per day, testified that Countrywide regularly made prime loans to customers with scores as low as 520 in 2006 and as low as 540 in the spring and early summer of 2007.

171. Countrywide's internal classification of subprime loans as "prime" was undisclosed during the Relevant Period. Countrywide routinely referred to "prime" loans in SEC filings and other public statements without clarifying that its unique definition of "prime" was inconsistent with the public's and industry's

understanding of that term, thereby rendering those statements misleading. Countrywide's unique, internal standard remained concealed until the Company's July 24, 2007 conference call discussing its catastrophic second quarter 2007 results. During the call, John McMurray ("McMurray"), the Company's Chief Risk Officer ("CRO") stated in his opening presentation that "[a] prime FICO loan—***a prime loan with FICOs in the low 500s*** is going to be over 30 times more likely to be seriously delinquent than a prime loan with an 800 FICO, holding all other variables constant." Later during the call, in response to a question about delinquencies among the Company's "prime mortgages," McMurray stated, "There is a belief by many that prime FICOs stop at 620. ***That is not the case.*** There are affordability programs and Fannie Mae, expanded approval, as an example, ***that go far below 620, yet those are still considered prime."***

172. Based on this explanation and other statements made during the conference call, an analyst from HSBC Securities stated that "[w]e do believe in some color given by management, ***that the definition of 'prime' (or Alt-A for that matter) was loosened in the recent boom.*** Management referred to certain affordability programs where FICO scores ***went 'far below' 620 (which already is well below the bank regulator's definition of subprime, which has a 660 cutoff)."*** The same analyst noted that "management acknowledged that the higher combined loan to value (CLTV) and reduced documentation higher CLTV products—classic speculator products—are accounting for a disproportionate share of credit costs."

173. This analyst was plainly observing for the first time that Countrywide categorized as "prime" borrowers who should have been categorized as subprime, while lowering income documentation standards below prudent levels and increasing loan-to-value ratios above prudent levels.