COPY

Joseph J. Tabacco, Jr. (SBN 75484)
jtabacco@bermandevalerio.com
Christopher T. Heffelfinger (SBN 118058)
cheffelfinger@bermandevalerio.com
Nicole Lavallee (SBN 165755)
nlavallee@bermandevalerio.com
**BERMAN DeVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Attorneys for Plaintiff State Treasurer Of The State Of Michigan, As Custodian Of The Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System And Michigan Judges' Retirement System*

FILED
CLERK, U.S. DISTRICT COURT
APR 22 2011
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

BY FAX

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE TREASURER OF THE STATE OF MICHIGAN, AS CUSTODIAN OF THE MICHIGAN PUBLIC SCHOOL EMPLOYEES RETIREMENT SYSTEM, STATE EMPLOYEES' RETIREMENT SYSTEM, MICHIGAN STATE POLICE RETIREMENT SYSTEM AND MICHIGAN JUDGES' RETIREMENT SYSTEM,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, ANGELO R. MOZILO, DAVID SAMBOL, ERIC P. SIERACKI, KATHLEEN BROWN, HENRY G. CISNEROS, JEFFREY M. CUNNINGHAM, ROBERT J. DONATO, MICHAEL E. DOUGHERTY, BEN M. ENIS, EDWIN HELLER, MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON, KEITH P. | **Case No. CV 11-00809-MRP (MANx)**<br><br>**AMENDED COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

RUSSELL, HARLEY W. SNYDER, KPMG LLP, a Delaware LLP, BANC OF AMERICA SECURITIES LLC, a Delaware LLC, J.P MORGAN SECURITIES INC., a Delaware corporation, COUNTRYWIDE SECURITIES CORPORATION, a California corporation, BARCLAYS CAPITAL INC., a Connecticut corporation, DEUTSCHE BANK SECURITIES INC., a Delaware corporation, HSBC SECURITIES (USA) INC., a Delaware corporation, WELLS FARGO SECURITIES, LLC, a Delaware LLC, RBS SECURITIES INC., a Delaware corporation, GOLDMAN, SACHS & CO., a Delaware corporation, ABN AMRO INCORPORATED, a New York corporation, and BNP PARIBAS SECURITIES CORP., a Delaware corporation,

Defendants.

# TABLE OF CONTENTS

**PAGE**


I. SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 11

III. THE PARTIES ..... 12

A. Plaintiff ..... 12

B. Defendants ..... 12

1. Countrywide ..... 12

2. The Officer Defendants ..... 13

3. Additional Individual Defendants ..... 17

4. Underwriter Defendants ..... 19

5. KPMG ..... 21

IV. BACKGROUND REGARDING COUNTRYWIDE'S BUSINESS ..... 21

A. Countrywide's Business ..... 21

B. Countrywide Started To Produce More Nontraditional And Far Riskier Loan Products ..... 24

1. Countrywide Sought To Gain Market Dominance ..... 24

2. Countrywide Began Offering A Wide Array Of Nontraditional And Riskier Mortgage Products ..... 29

V. COUNTRYWIDE DID NOT MAINTAIN OR APPLY STRONG UNDERWRITING STANDARDS OR PROPERLY INCREASE LOAN LOSS RESERVES TO ACCOUNT FOR THE INCREASED RISKS ASSOCIATED WITH ITS LOAN PORTFOLIO PARTICULARLY AS THE MARKET STARTED TO DECLINE ..... 33

A. Countrywide's Risk And Liquidity Exposure Increased ..... 33

B. Countrywide Loosened Its Underwriting Standards ..... 40

1. Countrywide Loosened Its Underwriting Standards As Indicated In The Company's Underwriting Matrices ..... 40

2. The Company Also Broadened The Scope Of Permissible Exceptions ..... 42

C. Countrywide Also Engaged In A Company-Wide Practice Of Originating And Funding Loans Without Regard To Underwriting Standards Regarding Loan Quality And Engaged In Predatory Lending ..... 47

D. Countrywide Also Relied On Inflated Appraisals ..... 54

E. Countrywide Belatedly Tightened Underwriting Guidelines In 2007 .......... 57

F. Countrywide Misclassified Subprime Loans As Prime In Its Annual And Quarterly Reports .......... 59

G. Countrywide Adopted An Incentive Compensation Scheme That Wrongly Encouraged Lending Personnel To Push Risky Nontraditional Loans .......... 65

H. Countrywide Made Material Misstatements In Its Financial Statements In Violation Of GAAP .......... 67

1. Background .......... 67

2. Risk Factors .......... 69

a. Risk Factors In 2004 .......... 69

b. Risk Factors In 2005 .......... 69

c. Risk Factors In 2006 .......... 71

d. Risk Factors In 2007 .......... 71

3. Inadequate ALL Inflated Countrywide's Earnings .......... 72

a. LHI Increased Without Proportionate Increase In ALL As Portfolio Credit Risk Increased .......... 75

b. Underwriting Practices Deteriorated And Nonprime Loan Originations Increased .......... 76

c. Nonaccrual ARM Delinquencies And Delinquent HELOCs Increased At Significant Rate .......... 79

d. Accumulated Negative Amortization On Pay Option ARMs Held For Investment Increased Dramatically .......... 79

4. Overstated RI From Securitizations Inflated Countrywide's Earnings .......... 81

5. Overstated MSR Inflated Countrywide's Earnings .......... 84

a. Improper MSR Valuations In Violation Of GAAP .......... 85

b. Valuation Allowance Did Not Accurately Reflect Increased Credit Risk .......... 86

c. Drastic Write-Down Of Fair Value Of MSR .......... 88

6. Understated Reserves For R&Ws Inflated Countrywide's Earnings .......... 90

7. Ineffective Internal Controls Over Financial Reporting .......... 93

I. Countrywide Misrepresented Access To Liquidity And Value Of Excess Capital .......... 97
1. Countrywide Misrepresented Its Access To Liquidity .......... 97
2. Countrywide Overstated Its Capital .......... 98
VI. DEFENDANTS MADE FALSE AND MISLEADING MATERIAL STATEMENTS AND OMISSIONS .......... 99
A. The Company's False Statements Regarding 2003 .......... 100
1. 2003 Form 10-K .......... 100
B. The Company's False Statements Regarding 2004 Results .......... 104
1. First Quarter 2004 Form 8-K .......... 104
2. First Quarter 2004 Conference Call .......... 104
3. First Quarter 2004 Form 10-Q .......... 106
4. Amended First Quarter 2004 Form 10-Q/A .......... 107
5. Second Quarter 2004 Form 8-K .......... 108
6. Second Quarter 2004 Conference Call .......... 109
7. Second Quarter 2004 Form 10-Q .......... 110
8. Amended Second Quarter 2004 Form 10-Q/A .......... 111
9. Third Quarter 2004 Form 8-K .......... 112
10. Third Quarter 2004 Conference Call .......... 113
11. Third Quarter 2004 Form 10-Q .......... 114
12. Amended Third Quarter 2004 Form 10-Q/A .......... 116
13. Year End 2004 Form 8-K .......... 117
14. Year End 2004 Conference Call .......... 117
15. 2004 Form 10-K .......... 118
C. The Company's False Statements Regarding 2005 Results .......... 122
1. March 15, 2005 Piper Jaffray Conference .......... 122
2. First Quarter 2005 Form 8-K .......... 125
3. First Quarter 2005 Conference Call .......... 126
4. First Quarter 2005 Form 10-Q .......... 127
5. May 24, 2005 Countrywide Analyst Conference .......... 129

6. June 2, 2005 Sanford Bernstein & Co. Strategic Decisions Conference ....... 130

7. Second Quarter 2005 Form 8-K ....... 131

8. Second Quarter 2005 Conference Call ....... 132

9. Second Quarter 2005 Form 10-Q ....... 135

10. September 13, 2005 Lehman Brothers Financial Services Conference ....... 137

11. Third Quarter 2005 Form 8-K ....... 138

12. Third Quarter 2005 Conference Call ....... 138

13. Third Quarter 2005 Form 10-Q ....... 139

14. Year End 2005 Form 8-K ....... 141

15. Year End 2005 Conference Call ....... 142

16. 2005 Form 10-K ....... 142

D. The Company's False Statements Regarding 2006 Results ....... 147

1. March 21, 2006 Piper Jaffray Financial Services Conference ....... 147

2. March 30, 2006 Financial Equity Investor's Forum ....... 148

3. First Quarter 2006 Form 8-K ....... 149

4. First Quarter 2006 Conference Call ....... 150

5. First Quarter 2006 Form 10-Q ....... 151

6. May 17, 2006 American Financial Services Association Finance Industry Conference for Fixed Income Investors ....... 153

7. May 31, 2006 Sanford C. Bernstein Strategic Decisions Conference ....... 155

8. Second Quarter 2006 Form 8-K ....... 156

9. Second Quarter 2006 Conference Call ....... 157

10. Second Quarter 2006 Form 10-Q ....... 157

11. September 12, 2006 Equity Investors Forum ....... 160

12. September 13, 2006 Fixed Income Investor Forum ....... 161

13. Third Quarter 2006 Form 8-K ....... 164

14. Third Quarter 2006 Conference Call ....... 164

15. Third Quarter 2006 Form 10-Q ....165

16. Year-End 2006 Form 8-K ....167

17. Year-End 2006 Conference Call ....168

18. 2006 Form 10-K ....170

E. The Company's False Statements Regarding 2007 Results Before The Truth Begins To Emerge ....175

1. March 6, 2007 Raymond James Institutional Investor Conference ....175

2. March 13, 2007 CNBC Interview ....175

3. First Quarter 2007 Form 8-K ....176

4. First Quarter 2007 Conference Call ....177

5. April 26, 2007 AFSA 7th Finance Industry Conference ....179

6. First Quarter 2007 Form 10-Q ....182

VII. THE REGISTRATION STATEMENTS AND PROSPECTUSES FOR COUNTRYWIDE'S OFFERINGS OF DEBT SECURITIES CONTAINED UNTRUE STATEMENTS ....185

A. Series B Medium-Term Notes ....185

B. 6.25% Subordinated Notes Due May 15, 2016 ....187

VIII. DESPITE DEFENDANTS' EFFORT TO CONCEAL THE TRUTH, CURATIVE DISCLOSURES SLOWLY REVEALED THE TRUE FACTS ....188

A. Partial Corrective Disclosures And Continued Misrepresentations In July 2007 ....188

B. Misrepresentations On August 2, 2007 ....193

C. Corrective Disclosures And Continued Misrepresentations On August 9, 2007 ....194

D. Corrective Disclosure On August 14, 2007 ....196

E. Corrective Disclosure On August 15, 2007 ....197

F. Corrective Disclosures On August 16, 2007 ....199

G. Positive News And Misrepresentations On August 23, 2007 ....200

H. Corrective Disclosure On August 24, 2007 ....201

I. Corrective Disclosure On September 10, 2007 ....202

J. Corrective Disclosure On September, 2007 ....202

K. Corrective Disclosure On October 24, 2007 .....203

L. Corrective Disclosure And Continued Misrepresentations On October 26, 2007 .....204

M. Corrective Disclosure On October 30, 2007 .....206

N. Corrective Disclosure On November 7, 2007 .....208

O. Misrepresentations On November 9, 2007 - Third Quarter 2007 Form 10-Q .....208

P. Corrective Disclosure On November 19, 2007 .....210

Q. Corrective Disclosure On November 26, 2007 .....210

R. Corrective Disclosure On December 13, 2007 .....212

S. Corrective Disclosure And Continued Misrepresentations On January 8, 2008 .....213

T. Corrective Disclosure On January 9, 2008 .....214

U. January 11, 2008 Merger Announcement .....215

V. Misrepresentation On January 29, 2008 .....216

W. Corrective Disclosure On March 6, 2008 .....216

X. Corrective Disclosure On March 8, 2008 .....217

IX. ADDITIONAL ALLEGATIONS SUPPORTING THE OFFICER DEFENDANTS' SCIENTER .....218

A. Since Mortgage Banking Was Countrywide's "Core Business," The Officer Defendants Closely Monitored The Company's Underwriting Standards, Lending Practices And Credit Risk Exposure .....219

B. The Officer Defendants' Own Statements Touting The Company's Loan Origination And Underwriting Policies Demonstrate Their Intimate Knowledge Of The Company's Core Business .....220

C. Numerous Documents Confirm The Officer Defendants' Knowledge Of Credit Risks And Risks Resulting From Improper Underwriting Standards .....222

1. The Officer Defendants Were Aware Of Deteriorating Standards In Loan Origination .....222

2. Documents Demonstrate That The Officer Defendants Knew Problems Associated With Pay Option ARMs .....223

3. The Officer Defendants' Were Aware of Risks of HELOCS .....227

4. The Officer Defendants Received Warnings Regarding Loan Exceptions ....230

D. CWs Confirm The Officer Defendants' Knowledge Of The Loosening Underwriting Standards ....232

E. Nature Of The GAAP Violations Further Evidence That The Officer Defendants Were Aware Of, Or Recklessly Disregarded, The Company's Violations Of GAAP And Reporting Of False Financial Statements ....235

F. The Officer Defendants Engaged In Insider Selling....238

X. KPMG'S NEGLIGENT OR RECKLESS FAILURE TO CONDUCT AUDITS IN ACCORDANCE WITH GAAS. ....240

A. The Standards Of GAAS And The AICPA Audit & Accounting Guide ....241

B. Audit Risk Factors In 2004 ....242

1. Red Flag: Implementation Of Aggressive Goal To Capture 30% Market Share....243

2. Red Flag: Improper Documentation For Loans, Misclassification Of Subprime Loans As Prime Loans And Management Overrides....244

3. Red Flag: 99% Increase In Nonprime Loans, 108% Increase In ARM Loans, 71% Increase In HELOC Loans ....245

4. Red Flag: ALL As A Percentage Of LHI Remained Flat Despite Increase In Higher Risk Loans ....246

5. Red Flag: Increase In MSR Balance, But Decrease In Valuation Allowance ....247

6. Red Flag: Based On Credit Risk Increases, Flawed Assumptions Used To Value RI ....248

C. Audit Risk Factors In 2005 ....249

1. Red Flag: Implementation Of Countrywide's Exception Processing System ....249

2. Red Flag: Shocking 335% Increase In Pay Option ARM Loan Origination....251

3. Red Flag: 99% Increase In HELOC Delinquencies ....252

4. Red Flag: Despite Increased Credit Risks, ALL As A Percentage Of LHI Decreased ....253

5. Red Flag: Increase In Prime Rate From 2004 ....253

6. Red Flag: Valuation Allowance For Impairment Of Countrywide's MSRs Dropped From 11% To Only 3%

Of Gross MSRs ....................253

7. Red Flag: Decrease in Net Lifetime Credit Losses And Unreasonable Weighted Average Life Of Retained Interests ....................254

8. Red Flag: 27% Drop In New R&W Provisions As A Percentage Of Relevant Securitizations ....................254

D. Audit Risk Factors In 2006 ....................255

1. Red Flag: Accumulated Negative Amortization On Pay Option ARMS Increased 775% ....................256

2. Red Flag: 87% Increase In HELOC Delinquencies ....................256

3. Red Flag: ALL As A Percentage Of LHI Remained Flat ....................257

4. Red Flag: No Modification To Fair Value Assumptions Used In MSR Model ....................257

5. Red Flag: Historical Performance Used To Calculate Fair Value Of Retained Interests ....................258

6. Red Flag: Insufficient R&W Reserve Relative To Skyrocketing Delinquency Rates ....................259

XI. ADDITIONAL FACTS REGARDING THE FAILURE OF THE UNDERWRITER DEFENDANTS TO CONDUCT ADEQUATE DUE DILIGENCE ....................260

XII. LOSS CAUSATION AND DAMAGES ....................262

XIII. APPLICABLILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ....................263

XIV. NO SAFE HARBOR ....................265

XV. COUNTS ....................266

COUNT I ....................266

COUNT II ....................269

COUNT III ....................271

COUNT IV ....................273

COUNT V ....................276

COUNT VI ....................278

COUNT VII ....................280

COUNT VIII ....................281

COUNT IX ....................283

COUNT X....285
COUNT XI ....287
XVI. PRAYER FOR RELIEF....288
XVII. JURY DEMAND ....289

Plaintiff State Treasurer of the State of Michigan, Custodian of the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System, and Michigan Judges' Retirement System, ("Plaintiff") through its attorneys, Bill Schuette, Attorney General of the State of Michigan, Joseph J. Tabacco, Jr., Special Assistant Attorney General and Nicole Lavallee, Special Assistant Attorney General, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters:

## I. SUMMARY OF THE ACTION

1. Defendant Countrywide Financial Corporation ("Countrywide" or "the Company") was a holding company founded in March 1969 that eventually became, through its subsidiaries as described herein, the largest mortgage lender in the United States, providing mortgage lending and other finance-related businesses, including mortgage banking, retail banking, mortgage warehouse lending, securities dealing, insurance underwriting and international mortgage loan processing and servicing.

2. Historically, Countrywide was known as one of the largest mortgage lenders in the United States, which primarily offered traditional fixed-rate first-lien mortgage loans to borrowers. Countrywide purchased and originated these loans, then packaged and sold pools of home loans and securitizations to the "secondary market," in order to generate income to fund its long-term capital needs. Because Countrywide's loans were primarily conforming loans that met with the requirements of Government Sponsored Entities ("GSEs"), such as Fannie Mae and Freddie Mac, they were considered safer investments by the secondary market and were therefore sold at "premium" prices.

3. Countrywide's underwriting guidelines and the enforcement thereof defined the Company's risk profile and was of critical importance to its operations and its ability to sell loans to the secondary market. In fact, the quality of

Countrywide's loans was the single most important aspect of its business and operations. As a lender that securitized and sold most of the loans it originated in the secondary market subject to repurchase obligations, the quality of Countrywide's loans subjected it to significant repurchase liability arising from its representations and warranties to the secondary market. Countrywide's loan originations constituted the Company's core operations and formed the heart of its business.

4. Beginning in 2003, Countrywide embarked on an effort to overtake its competitors and capture a dominant share of the nation's residential loan market. The impetus for the growth – Countrywide's desire to capture ***"market dominance"*** with enormous and unprecedented 30% market share of the U.S. residential loan market – was announced in mid-2003 by Defendant Angelo R. Mozilo ("Mozilo"), the Company's co-founder, Chairman and Chief Executive Officer ("CEO").

5. Notwithstanding concerns voiced by analysts and others that this sudden increase in loan origination might translate into a reduction in overall loan quality, the Company repeatedly assured the public and its investors that policies and procedures for underwriting loans – in essence, determining whether the borrower was likely to pay in full and on time – were tightly controlled and supervised and "designed to produce high quality loans." Countrywide repeatedly touted its prudent, conservative and risk-managed lending practices, diversified loan portfolio and a supposed high quality credit culture throughout the Relevant Period.[1] Countrywide also repeatedly stressed during this period that it had more stringent underwriting standards than others in the industry – something that the Company claimed set it apart from most mortgage originators and would allow it to weather, unscathed, any problems in the market. The Company represented to

[1] For purposes of this Complaint, the Relevant Period shall mean the period between March 12, 2004 and March 7, 2008.

the public that it followed strict and disciplined appraisal and underwriting procedures, far superior to those of competing lenders and designed to produce high quality loans. In fact, the Company repeatedly represented that it offered "nonprime" loans only to the most sophisticated and creditworthy borrowers and that the majority of its loan portfolio consisted of less risky "prime" loans.

6. In fact, in 2007, as other lenders, notably subprime lenders, began to fail, Mozilo and other Countrywide officers continued to portray Countrywide as uniquely positioned to capitalize on any impending mortgage crisis because of its strict standards. Indeed, in March 2007, Mozilo stated in a CNBC interview that Countrywide would benefit from the tumult in the housing market. Defendant Mozilo boasted that "[t]his will be great for Countrywide . . . because at the end of the day, all of the irrational competitors will be gone."

7. However, nothing could have been further from the truth. In fact, beginning in 2003, Countrywide had embarked on an aggressive corporate strategy to originate as many loans as possible, by increasingly underwriting and purchasing subprime, nontraditional and risky mortgage products. These risky products included pay option adjustable rate mortgage ("Pay Option ARMs") in which borrowers could select from among various monthly payments, including payments that neither paid down principal nor covered the full amount of interest, and home equity lines of credit ("HELOCs"), which were second-lien mortgages secured only by the difference between the value of a home and the amount due on a first mortgage, where the borrower's equity in the financed property is reduced or non-existent. Countrywide's production of nontraditional mortgages increased substantially – both in absolute dollar amounts and as a percentage of the Company's total mortgage origination.

8. The Company knew the risks of nontraditional mortgage lending in general, and about the risks associated with Pay Option ARM and HELOC programs in particular. Indeed, these nontraditional loans were the subject of

regulatory guidance on nontraditional mortgage lending drafted and published jointly on October 4, 2006 by the Department of the Treasury Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation ("FDIC"), and Office of Thrift Supervision.[2] This guidance, which was transmitted to all CEO's of lending institutions, required institutions engaging in nontraditional lending to use heightened risk management to account for, and guard against, the increased risk of loan loss. Regulators provided specific guidance on the need to avoid asset concentrations, increase underwriting and credit qualification standards and implement adequate controls to manage the heightened risks of nontraditional mortgages, particularly those with multiple or "layered risk" characteristics, such as loans made without verification of income or assets. The guidance also laid out the risks associated with these nontraditional loans, which by 2006 were already well-known to those engaged in the mortgage industry: (a) the risk of "payment shock" when the interest rate on a Pay Option ARM resets, thereby increasing the monthly payment; (b) the risk of "negative amortization" with Pay Option ARMs in which unpaid interest amounts are added to the outstanding principal amount owed, thus increasing the overall loan balance; and (c) the substantial increased risk that a HELOC, especially during a "down" real estate market, might become unsecured and worthless in a default.

9. However, the Company further compounded the risks associated with its expanding nontraditional loan portfolio by engaging in practices that were in direct conflict with the *Interagency Guidance*.

10. The Company's push to book loans spiraled out of control and led to the creation of an improper incentive compensation system that encouraged lending personnel to make the riskiest loans regardless of the borrower's ability to

---

[2] *Interagency Guidance on Nontraditional Mortgage Product Risks*, 71 Fed. Reg. 58,609, *et seq*. (Oct. 4, 2006) ("*Interagency Guidance*").

repay. In sum, during the Relevant Period, Countrywide sacrificed loan ***quality*** for loan ***quantity*** in order to pump-up loan production, charge extra fees and higher interest rates and boost its revenues. In fact, Countrywide could no longer sell its loans to GSEs, but had to sell them to private institutional investors, with significant repurchase liability.

11. Against the backdrop of these risky practices, Defendants issued a variety of false and misleading statements regarding the Company's underwriting practices, its exposure to the subprime market and its financial results in violation of both federal and state laws.

12. With respect to its underwriting practices, defendants issued false and misleading statements regarding the fact that the Company was: (a) steadily loosening its underwriting standards to sweep in borrowers with poor credit; (b) making the vast majority of Pay Option ARMs on a "low doc" or "no doc" basis – i.e., without any meaningful verification of income or assets; (c) further circumventing those already weakened underwriting criteria by approving "exception loans" – i.e., loans which did not meet its underwriting criteria – through the use of a computer system called the Exception Processing System ("EPS"), but only after charging these high risk borrowers extra points and fees; and (d) engaging in widespread predatory lending practices to steer many borrowers into subprime loans or other nontraditional loans, when they have qualified for conventional financing with lower rates.

13. To further conceal its greatly increased production of "subprime" loans (i.e., risky loans made to borrowers with poor credit), Countrywide employed an internal, undisclosed definition of "prime" versus "subprime," and, in its public reports, classified loans as prime that clearly were subprime. Additionally, the Company maintained that its Pay Option ARMs were prudently underwritten and that borrowers holding these loans were of the highest credit

quality and had strong credit scores, when in fact many of these loans were made to borrowers with very weak credit.

14. Throughout the Relevant Period, Countrywide and the Officer Defendants also falsely and materially inflated Countrywide's assets, gain-on-sale and reported net income in violation of Generally Accepted Accounting Principles ("GAAP"). Accounting rules required that Countrywide's allowance for loan losses ("ALL" or "loan loss reserves") accurately reflect the inherent risk of non-repayment in its portfolio of loans held for investment ("LHI"). Defendants knowingly or recklessly ignored numerous "red flags" that indicated the substantial risks and mounting losses inherent in Countrywide's risk loan portfolio and failed, in violation of GAAP, to set aside sufficient reserves for the massive loan losses that would inevitably occur. For example, Defendants refused to increase the Company's ALL even though they knew by September 2006 that 66% of borrowers were electing to make less than full interest payments on the Company's Pay Option ARM loans. By the end of the fiscal year ending December 31, 2006, the Company had $654 million worth of accumulated negative amortization, compared to only $74.7 million at the end of the fiscal year 2005 and only $29 thousand in fiscal year 2004.[3]

15. Although this alarming growth in accumulated negative amortization should have been seen as an early warning sign, Defendants failed to adequately increase Countrywide's ALL to accurately reflect this known risk, thus dramatically widening the shortfall between Countrywide's actual loan losses and the amount that it set aside in its loan loss reserve and overstating Countrywide's reported earnings. Yet, notwithstanding the dramatic rise in the number of

[3] At all relevant times, Countryside's fiscal year ran from January 1 through December 31. Accordingly, references to Countrywide's quarterly reporting periods are designated herein as "Q1" for January 1 – March 31, "Q2" for April 1 – June 30, "Q3" for July 1 – September 30 and "Q4" for October 1 – December 31.

delinquencies that Countrywide experienced from its LHI, Defendants refused to properly increase the Company's ALL during the Relevant Period and instead kept its ALL at a relatively constant rate more suited for a conservative, traditional loan portfolio.

16. As the level of risk in Countrywide's LHI drastically increased, the Company kept the level of ALL relatively constant or even allowed it to decrease, knowing that to increase ALL would have a direct, dollar-for-dollar impact on the amount of earnings the Company could report in its financial statements. In addition to the failure to increase loan loss reserves, Countrywide also reported inflated earnings, in violation of GAAP, by overvaluing its valuation of retained interests ("RIs") and mortgage servicing rights ("MSRs") from loans sold to the secondary market, and by failing to properly reserve for representations and warranties ("R&Ws") it made to secondary market purchasers.

17. For its part, KPMG LLP ("KPMG") negligently or recklessly failed to comply with Generally Accepted Auditing Standards ("GAAS") in auditing Countrywide's financial statements for its FY 2004 through FY 2006, and thus participated in conveying materially false and misleading statements to the investing public.

18. In the midst this massive expansion effort, Countrywide made numerous debt offerings, for the purpose of raising capital to continue funding its loan origination operations. However, as described more fully below, the Underwriter Defendants (defined below) are responsible by statute for untrue statements included in registration statements and prospectuses for offerings of Countrywide debt securities purchased by Plaintiff during the Relevant Period.

19. Countrywide's risky scheme to artificially inflate earnings in the short term initially resulted in remarkable growth for the Company, with a seemingly booming business, a dominant market share and a stock price that, after trading under $20 for most of 2003, traded in the mid-$30s throughout most of the

Relevant Period alleged in this Complaint and climbed to a high of $45 by early 2007.

20. However, starting in mid-July, 2007, the Company's carefully spun web began to unravel. Countrywide announced a loan loss provision of $293 million attributable to deterioration in its loan portfolio and securities. The Company also had to write down, by $338 million, the value of retained interests on securitizations of HELOCs. The Company also revealed, in remarks during its quarterly conference call, that it had been misclassifying loans as "prime" that the industry would have viewed as "subprime" and that it had "recalibrated" its proprietary underwriting system and made changes to its underwriting guidelines and processes. On, July 27, 2007, Stifel Nicolaus issued a report sharply criticizing Countrywide's previous representations about its portfolio's exposure. The analyst stated that "[g]iven the magnitude of the credit problems . . . we think [management] made serious miscalculations (and possibly misrepresentations) about the quality of the loans added to the bank."

21. As the truth continued to be revealed, it became clear that the Company had failed to adhere to its underwriting standards and was experiencing a dramatic increase in losses from bad loans. Countrywide made a series of additional, partially corrective disclosures about worsening problems in its mortgage portfolio (including an enormous and unprecedented $1.2 billion loss for the third quarter of 2007) and its inability to obtain capital. Stock market analysts began speculating that Countrywide might have to file for bankruptcy. As the Company's credit rating was downgraded and its credit facilities and other back up sources of liquidity dried up, Countrywide was faced with a liquidity crisis (the true depth of which was further hidden from its investors) that directly impacted Countrywide's ability to make more loans.

22. On January 11, 2008, amid rumors that Countrywide was preparing to commence bankruptcy proceedings, Bank of America, N.A. ("BofA")

announced that it had entered into an Agreement and Plan of Merger to acquire Countrywide, at the bargain-basement price of $4 billion in stock, representing a mere 26% of Countrywide's reported book value at that time. The merger with BofA was finalized on July 1, 2008. The full extent of Countrywide's corporate fraud was finally revealed a couple months later, on March 8, 2008, when *The Wall Street Journal* ("*WSJ*") reported that "[t]he Federal Bureau of Investigation is probing . . . Countrywide Financial Corp. for possible securities fraud." According to *WSJ*, the inquiry involves "whether senior officials made misrepresentations about the Company's financial position and the quality of its mortgage loans in securities filings."

23. On January 27, 2011, the Financial Crisis Inquiry Commission (the "FCIC") issued a 662-page report titled "Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States" on the results of its examination and conclusions as to the causes of the financial and economic crisis in the United States (the "FCIC Report"). In addition to addressing how the financial crisis occurred, the FCIC Report conducted case studies which explain how several institutions, including Countrywide, played a pivotal role in the crisis. Materials were also made available to the public, including documents, e-mails, videos of the FCIC's hearings, testimony and supporting research. The materials and portions of the report relating to Countrywide corroborate confidential witness testimony about Countrywide's deteriorating loan portfolio and further reveal that Countrywide's senior management was repeatedly warned that, among other things: (a) as early as 2004, Countrywide's loan portfolio was already showing signs of deteriorating credit quality and poor performance; (b) Countrywide's high-risk loan originations, featuring HELOCs and Pay Option ARMs, had ballooned to hundreds of billions of dollars as a result of unjustified loan exceptions; and (c) Countrywide's credit risk had skyrocketed as massive amounts of Pay Option

ARMs originated on a reduced or no-documentation basis, resulting in billions of dollars of riskier loans. Notwithstanding these warnings, Countrywide issued an internal mandate – over the objections of its Credit Risk Committee – to its loan officers, account executives and branch managers to match any loan offered by a competitor lender, making Countrywide's loan underwriting guidelines among the most lax in the U.S. mortgage industry. The facts giving rise to the FCIC's findings about Countrywide's lending and underwriting practices revealed in the FCIC Report were known to Defendants before and during the Relevant Period, but were withheld from public disclosure.

24. Nearly all of Countrywide's growth in stock price from 2003 to 2007 was wiped out by this devastating collapse, with the stock price losing ***87%*** of its value between July 2007 and March 2008, from approximately $34 to $4 per share, as a result of the revelations of the truth concerning Countrywide. As a result of the wrongdoing herein alleged, Plaintiff lost tens of millions of dollars on its investments in Countrywide publicly traded common stock and debt securities.

25. On August 14, 2007, George Pappas, on behalf of himself and all others similarly situated, filed suit against Countrywide and several individuals, alleging securities law violations. See *George Pappas v. Countrywide Financial Corp. et al.*, No. 07-CV-05295-MRP (C.D. Cal.). On November 28, 2007, U.S. District Judge Mariana R. Pfaelzer consolidated the *Pappas* action with several other cases involving publicly traded Countrywide securities, in *In re Countrywide Financial Corporation Securities Litigation*, No. CV 07-05295 MRP (MANx) (C.D. Cal.). Lead Plaintiffs therein filed a Consolidated Amended Class Action Complaint on April 14, 2008, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Sections 11, 12 and 15 of the Securities Act against Countrywide, certain of its current and former directors and officers, KPMG and underwriters of public offerings of Countrywide securities. Judge Pfaelzer granted class certification on December 9, 2009 and preliminarily approved a

class settlement on August 2, 2010. Plaintiff opted out of the Class Action by filing a notice on October 18, 2010, the deadline set by Judge Pfaelzer for opting out of the class action. On January 7, 2011, Judge Pfaelzer granted preliminary approval to a First Amendment to the Settlement Agreement.

## II. JURISDICTION AND VENUE

26. The claims asserted herein arise under and pursuant to Section 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l and 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a); and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5; Sections 25500 and 25501 *et seq*. of the California Corporations Code for violations of Sections 25400 and 25401 of the Cal. Corp. Code; Sections 1709-1710 of the Cal. Civ. Code; and Section 17200 *et seq*. of the Cal. Bus. & Prof. Code.

27. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §§1331 and 1367.

28. Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §1391(b), (c)-(d). Many of the acts and omissions charged herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in substantial part in the Central District of California. At all relevant times, Countrywide maintained its corporate headquarters and principal executive offices in this District and did so throughout the Relevant Period.

29. In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchange.

30. This action is not preempted by the Federal Securities Litigation Uniform Standards Act of 1998, Pub. L. No. 105-353 (1998) ("SLUSA"), because: (a) this action is brought solely by a "State Pension Plan" as that term is defined in SLUSA, and Plaintiff has authorized its participation in this action; and (b) this action is not a class action or an action brought by a representative party and does not seek damages on behalf of more than fifty persons.

## III. THE PARTIES

### A. Plaintiff

31. Plaintiff State Treasurer of the State of Michigan, Custodian of the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System, and Michigan Judges' Retirement System, serves the working and retired public servants of four SMRS systems: the Public School Employees Retirement System; the State Employees' Retirement System; the State Police Retirement System; and the Judges Retirement System. Within these systems, four defined benefit pension plans and two defined contribution pension plans are administered with combined net assets of nearly $51 billion. Pursuant to its delegated investment authority, the State Treasurer of the State of Michigan purchased and sold shares and debt securities of Countrywide during the Relevant Period, including, but not limited to, the transactions set forth in Exhibit A attached hereto.

### B. Defendants

#### 1. Countrywide

32. Defendant Countrywide is, and at all relevant times herein was, a corporation organized and existing under the laws of the State of Delaware. During the Relevant Period alleged in this Complaint, Countrywide maintained its principal executive offices located at 4500 Park Granada, Calabasas, California. Countrywide was founded in March 1969 and engaged, itself and through its subsidiaries and segments, in mortgage lending and other finance-related

businesses, including mortgage banking, retail banking and mortgage warehouse lending, securities dealing, insurance underwriting and international mortgage loan processing and servicing. Countrywide common stock has traded actively on the New York Stock Exchange (the "NYSE") since October 1985.

33. Pursuant to an Agreement and Plan of Merger by and between Countrywide and BofA dated as of January 11, 2008, Countrywide merged with and into Red Oak Merger Corporation ("Red Oak"), a Delaware corporation and wholly owned subsidiary of BofA, on or about July 1, 2008 (the "Merger"). Upon consummation of the Merger, Red Oak (as the surviving Merger subsidiary) changed its name to Countrywide Financial Corporation, and under the direction of BofA, it continues to operate Countrywide's mortgage business.

**2. The Officer Defendants**

34. Defendant Angelo R. Mozilo was the co-founder of the Company which was formed in 1969 and was a member of its Board of Directors (the "Board") and served in various executive capacities since its formation, including serving as President of the Company from March 2000 through December 2003. Mozilo was Chairman of the Board from March 1999 until the Merger and CEO from February 1998 until the Merger. Mozilo was also a Director of Countrywide Home Loans, Inc. ("CHL"), Countrywide's principal operating subsidiary, at certain points during the Relevant Period. Mozilo is a resident of Ventura County, California and has often transacted business in California, including his responsibilities as Chairman of the Board and CEO of Countrywide. Mozilo signed the Company's Annual Reports on Form 10-K for and from 2003 through 2006 filed with the SEC and accompanying certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), SOX certifications accompanying the Company's Quarterly Reports on Form 10-Q filed with the SEC for and from the first quarter of 2004 through and including the third quarter of 2007, SOX certifications for the 10-Q/Amended Quarterly Reports for the first and second

quarter of 2004 and the Company's Form S-3 ASR filed with the SEC on February 9, 2006.

35. Defendant David Sambol ("Sambol") joined Countrywide in 1985 and became the Company's President and Chief Operating Officer ("COO") in September 2006 and a member of the Board from 2007 through the Merger. Prior to that, from 2004 to 2006, Sambol served as Executive Managing Director for Countrywide's Business Segment Operations, leading all revenue-generating operations of the Company, as well as the corporate operational and support units comprised of Administration, Marketing and Corporate Communications, and Enterprise Operations and Technology. Sambol also served as Chairman and CEO of the Company's principal operating subsidiary, CHL, from 2007 until the Merger, and from 2004 through 2006, Sambol was President and COO of CHL. Sambol was also a member of Countrywide's Credit Risk Committee, which was composed of the Chief Risk Officer ("CRO") and other senior executives. During the Relevant Period, this Committee regularly reviewed and monitored credit risk and the actual and projected credit losses for all of the Company's portfolios, and also evaluated loan loss reserves and the methodology for calculating them. Sambol was also a Director of CHL at certain points during the Relevant Period. Sambol is a resident of Los Angeles County, California and has often transacted business in California, including his responsibilities as President and COO of Countrywide. Sambol signed the Company's Quarterly Reports on Form 10-Q filed with the SEC for and from the third quarter 2006 through and including the third quarter of 2007 and the Company's Form S-3 ASR filed with the SEC on February 9, 2006.

36. Defendant Eric P. Sieracki ("Sieracki") served as the Company's Executive Managing Director and Chief Financial Officer ("CFO") and as CFO of Countrywide Bank from April 2005 until the Merger, and was a member of the Executive Strategy Committee. Sieracki was responsible for oversight of

Countrywide's major financial departments, including corporate accounting, treasury, financial planning, strategic planning and taxation. He also served as the Company's senior manager in the areas of investor relations, corporate development and equity capital activities. Sieracki joined the Company in 1988 as Senior Vice President of Countrywide Asset Management Corporation and has held a number of executive positions. In 1989, he was promoted to Executive Vice President of Corporate Finance, in charge of finance and accounting responsibilities for Countrywide and its subsidiaries. Sieracki was also the Senior Managing Director and CFO (Principal Financial and Accounting Officer) of CHL at certain points during the Relevant Period. During the Relevant Period, Sieracki was a member of several senior management committees, including the Credit Risk Committee and the Asset/Liability Committee. Sieracki is a resident of Los Angeles County, California and has often transacted business in California, including his responsibilities as Executive Managing Director and CFO of Countrywide. Sieracki signed the Annual Reports on Form 10-K for 2005 and 2006 filed with the SEC and accompanying SOX certifications, Quarterly Reports on Form 10-Q for and from the first quarter of 2005 through and including the third quarter of 2007 and accompanying SOX certifications, Form 10-Q/A Amended Quarterly Reports for the first and second quarters of 2004 and accompanying SOX certifications and the Company's Form S-3 filed with the SEC on February 9, 2006.

37. Defendants Mozilo, Sambol and Sieracki (collectively, the "Officer Defendants"), by virtue of their high-level positions with Countrywide, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition during their tenure with the Company as alleged herein. As set forth below, the information

conveyed in the Company's SEC filings, press releases and other public statements was the result of the collective actions of these individuals. Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing and/or disseminating the statements at issue in this case, approved or ratified these statements or was aware or recklessly disregarded that these statements were being issued regarding the Company. Accordingly, it is appropriate to treat the Officer Defendants as a group for pleading purposes.

38. As officers and directors of a publicly held company whose common stock and other securities were registered with the SEC pursuant to the Exchange Act, and whose common stock was traded on the NYSE, and governed by federal securities laws, the Officer Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's business, operations, financial statements and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. The Officer Defendants each violated these requirements and obligations.

39. The Officer Defendants, because of their positions of control and authority as senior executive officers and/or directors of Countrywide, were able to and did control the content of the SEC filings, press releases and other public statements issued by Countrywide during the Relevant Period. Each of these individuals was provided with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Thus, each of the Officer Defendants is responsible for the accuracy of the public statements detailed herein.

40. The Officer Defendants, because of their positions of control and authority as senior executive officers and/or directors of Countrywide, had access to the adverse undisclosed information about Countrywide's business, operations,

financial statements and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations by or about Countrywide materially misleading.

41. Countrywide and each Officer Defendant is liable as a participant in a scheme and course of business that operated as a fraud or deceit on Plaintiff and its agents as purchasers of Countrywide securities, including the making of false and misleading statements and/or concealing and omitting material adverse facts. The scheme and course of business: (a) deceived Plaintiff regarding the true nature of Countrywide's risky nontraditional loan portfolio and failure to follow its underwriting guidelines and policies; (b) deceived Plaintiff regarding the adequacy of Countrywide's loan loss reserves underlying the valuation of the Company's RIs, MSRs and LHI; (c) artificially inflated the price of Countrywide's stock and other debt securities; and (d) caused Plaintiff and its agents to purchase and hold Countrywide stock and other debt securities at artificially inflated prices. Defendants disseminated and approved these false and misleading statements, including statements with material omissions, regarding the Countrywide's actual earnings and financial condition, as well as Countrywide's predicted earnings and growth for several fiscal years prior to the Merger. Those statements were made in public filings with the SEC, public statements, press releases, and comments to Wall Street analysts, among others, as set forth below and throughout this Complaint.

**3. Additional Individual Defendants**

42. Defendant Kathleen Brown ("Brown") was a member of Countrywide's Board of Directors from March 2005 until March 29, 2007. Brown signed the Company's Form S-3 ASR filed with the SEC on February 9,

2006. Brown also signed the Company's Annual Reports on Form 10-K filed with the SEC for 2005 and 2006.

43. Defendant Henry G. Cisneros ("Cisneros") was a member of Countrywide's Board from 2001 until October 24, 2007. Cisneros signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

44. Defendant Jeffrey M. Cunningham ("Cunningham") was a member of Countrywide's Board from 1998 until the Merger. Cunningham signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

45. Defendant Robert J. Donato ("Donato") was a member of Countrywide's Board from 1993 until the Merger. Donato signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

46. Defendant Michael E. Dougherty ("Dougherty") was a member of Countrywide's Board from 1998 until March 28, 2007. Dougherty signed the Company's, Form S-3 filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

47. Defendant Ben M. Enis ("Enis") was a member of Countrywide's Board from 1984 until June 2006. Enis signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004 and 2005.

48. Defendant Edwin Heller ("Heller") was a member of Countrywide's Board from 1993 until June 2006. Heller signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004 and 2005.

49. Defendant Martin R. Melone ("Melone") was a member of Countrywide's Board from 2003 until the Merger. Melone signed the Company's

Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

50. Defendant Robert T. Parry ("Parry") was a member of Countrywide's Board from 2004 until the Merger. Parry signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2004, 2005 and 2006.

51. Defendant Oscar P. Robertson ("Robertson") was a member of Countrywide's Board from 2000 until the Merger. Robertson signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

52. Defendant Keith P. Russell ("Russell") was a member of Countrywide's Board from 2003 until the Merger. Russell signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

53. Defendant Harley W. Snyder ("Snyder") was a member of Countrywide's Board from 1991 until the Merger. Snyder signed the Company's Form S-3 ASR filed with the SEC on February 9, 2006 and Annual Reports on Forms 10-K filed with the SEC for 2003, 2004, 2005 and 2006.

54. The Defendants named in this section are collectively referred to herein as the "Individual Defendants."

**4. Underwriter Defendants**

55. Defendant Banc of America Securities LLC ("Banc of America") is headquartered in New York and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes.

56. Defendant J.P Morgan Securities Inc. ("J.P. Morgan") is headquartered in New York and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes and Series B Medium-Term Notes.

57. Defendant Countrywide Securities Corporation ("CSC") is headquartered in North Carolina and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes and Series B Medium-Term Notes.

58. Defendant Barclays Capital Inc. ("Barclays") is headquartered in New York and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes and Series B Medium-Term Notes.

59. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is headquartered in New York and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes and Series B Medium-Term Notes.

60. Defendant HSBC Securities (USA) Inc. ("HSBC Securities") is headquartered in New York and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes and Series B Medium Term Notes.

61. Defendant Wells Fargo Securities, LLC, formerly known as Wachovia Capital Markets, LLC ("Wells Fargo Securities"), is headquartered in North Carolina and acted as an underwriter with respect to offerings of 6.25% Subordinated Notes and Series B Medium-Term Notes.

62. Defendant RBS Securities Inc., formerly known as Greenwich Capital Markets, Inc. ("RBS Securities"), is headquartered in Connecticut and acted as an underwriter with respect to offerings of  Series B Medium-Term Notes.

63. Defendant Goldman, Sachs & Co. ("Goldman Sachs") is headquartered in New York and acted as an underwriter with respect to offerings of Series B Medium-Term Notes.

64. Defendant ABN AMRO Incorporated ("ABN AMRO") is headquartered in Illinois and acted as an underwriter with respect to offerings of Series B Medium-Term Notes.

65. Defendant BNP Paribas Securities Corp. ("BNP Paribas") is headquartered in New York and acted as an underwriter with respect to the offering of Series B Medium-Term Notes.

66. The Defendants named in this Section are collectively referred to herein as the "Underwriter Defendants."

**5. KPMG**

67. Defendant KPMG LLP is, and at all relevant times herein was, a public accounting firm with offices throughout the United States, including in California. KPMG maintains its national headquarters at 345 Park Avenue, New York, New York. KPMG served as Countrywide's outside auditor starting in January 2004. KPMG provided audit, audit-related, tax and other services to Countrywide, which included the issuance of unqualified opinions on the Company's financial statements for the years ended December 31, 2004, 2005 and 2006, and opinions of management's assessments of internal controls for years ended December 31, 2004, 2005 and 2006.[4] KPMG consented to the incorporation by reference of its unqualified opinions on the Company's financial statements and its opinion of management's assessment of internal controls for the years ended December 31, 2005 and/or 2004 in Countrywide's Registration Statement filed with the SEC on February 9, 2006, the Company's Prospectus Supplement filed with the SEC on May 15, 2006 for 6.25% Subordinated Notes and the Prospectus Supplement filed with the SEC on February 15, 2006 for the Series B Medium-Term Notes.

## IV. BACKGROUND REGARDING COUNTRYWIDE'S BUSINESS

### A. Countrywide's Business

68. For many years, Countrywide was known as one of the largest mortgage lenders in the United States. This reputation was built on years of

[4] KPMG identified one material weakness in the Company's internal controls over financial reporting for the year ended December 31, 2004.

offering customary fixed-rate first-lien mortgage loans (also known as "traditional" loans) to borrowers. Historically, Countrywide's primary business had been originating traditional loans that could be sold to the GSEs, such as Fannie Mae and Freddie Mac, i.e., conforming loans.[5] In 2002, nearly 60% of all loans written by Countrywide were conforming loans, as compared to only about 25% non-conforming for that same period.

69. Countrywide's primary business segment, Mortgage Banking, was responsible for originating, purchasing, selling and servicing non-commercial mortgages across the nation. Countrywide had different divisions within Mortgage Banking which handled various loan origination and purchasing functions, including the Correspondent Lending Division ("CLD") (loan purchasing), Full Spectrum Lending Division ("FSL") (subprime loan origination), the Wholesale Lending Division ("WLD") (wholesale loan origination and purchasing) and the Consumer Markets Division (retail loan origination).

70. Four other business segments provided interrelated services to the Mortgage Bank segment: (a) Banking, which operated a federally registered institution that took deposits, originated some loans and invested in mortgages and HELOCs; (b) Capital Markets, which operated an institutional broker-dealer specializing in underwriting and trading mortgage-backed securities ("MBS"); (c) Insurance, which provided property, casualty, life and disability insurance to homeowners as well as reinsurance coverage to primary mortgage insurers; and (d) Global Operations, which licensed proprietary software to mortgage businesses abroad.

[5] Conforming loans were considered safer investments for lenders because they were subject to maximum loan amounts, debt-to-income ratio limits and documentation requirements.

71. The three largest business segments, Mortgage Banking, Banking and Capital Markets, worked together and fed off of the loan origination and purchase process, to generate well over 90% of Countrywide's pre-tax earnings by 2006. Some of the loans originated or acquired by Mortgage Banking were held for investment by the Banking Division, and the rest were sold off through securitizations and other wholesale arrangements by Capital Markets.

72. Countrywide pooled most of the loans it originated and purchased, and sold them in market transactions (referred to as the "secondary market"), either through whole loan sales or securitizations. In whole loan sales, loans are pooled and sold in bulk to investors (or other banks who, in turn, might have securitized the loans themselves), and the seller records gains on the sales. In securitizations, loans are pooled together and transferred to a trust controlled by the securitizer. The trust then creates and sells MBS. Holders of MBS receive the right to a portion of the monthly payment stream from the pooled loans.

73. During the Relevant Period, Countrywide generated massive revenues through the sale of loan pools and securitizations. The price paid by purchasers of securitizations or pools of whole loans varied based on the demand for the particular types of loans described in the sale. The stated characteristics of the loans, such as whether the loans were prime or subprime, had adjustable or fixed interest rates or included a prepayment penalty, all influenced the price. Various loans, such as subprime, earned greater prices or "premiums," in the secondary market because the higher interest rates and prepayment penalties associated with these loans resulted in a higher expectation of income stream.

74. Even though Countrywide sold most of its loans, it often retained the right to service these loans, which generated additional profits for Countrywide. Countrywide also earned profits by retaining an interest in any payment streams not sold to MBS holders.

75. Countrywide had significant short- and long-term financing needs to continue originating and purchasing loans, and then selling them to the secondary market. Short-term financing needs (such as the cost of warehousing loans pending sale and trading activities for MBS) were met through unsecured commercial paper and medium-term notes, asset-backed commercial paper, revolving lines of credit, short-term repurchase agreements, unsecured subordinated debt, junior subordinated debt and deposit-gathering. By contrast, long-term financing needs (such as capital needed to originate and purchase loans and invest in MSRs and RIs) were funded by the profits earned from secondary market sales. According to Form 10-K reports filed by Countrywide during the Relevant Period, Countrywide's primary business objective was to ensure "ongoing access to the secondary market by producing high quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards."

## B. Countrywide Started To Produce More Nontraditional And Far Riskier Loan Products

### 1. Countrywide Sought To Gain Market Dominance

76. Because revenues from the sale of loans became such a large portion of Countrywide's revenues by the start of the Relevant Period, the success of Countrywide's ongoing operations was dependent on its ability to originate and purchase loans that could be sold to the secondary market. Beginning in mid-2003, Countrywide, led by Mozilo and Sambol, was intent on elbowing out competing lenders that tried to hone in on Countrywide's share of the residential home loan market. According to a February 23, 2008 article in *WSJ*, tensions between Sambol, who was emerging as a major force within the Company, and Countrywide's risk managers, as to the best strategy to grow Countrywide's business, boiled over at a meeting of dozens of executives in the Company's headquarters. According to the article, the conflicts regarding how to grow the

business were resolved as Sambol succeeded in imposing a new Company-wide "mandate" to originate more "non-conforming" loans to increase loan production across the board.

77. Mozilo quickly embraced Sambol's plan to turn Countrywide into the largest mortgage originator in terms of volume. During a conference call with analysts on July 22, 2003, Mozilo stated that his goal for the Company was "to ***dominate*** the purchase market and to get our overall market share to the ultimate 30% by 2006, 2007[.]" Mozilo reiterated during a January 27, 2004 conference call that "[o]ur goal is ***market dominance***[6], and we are targeting 30% origination market share by 2008 to support our macro hedge strategy."

78. As Countrywide's reported production figures show, Countrywide had in fact moved away from its historical core business of underwriting conforming loans. As reported in Countrywide's periodic filings and reflected in the chart below, in 2004, 2005 and 2006, Countrywide originated more non-conforming loans than in any prior period:

| | **2002** | **2003** | **2004** | **2005** | **2006** |
|---|---|---|---|---|---|
| **Prime Conforming as % of Total Loans Originated** | 59.6% | 54.2% | 38.2% | 32% | 31.9% |
| **Prime Non-Conforming as % of Total Loans Originated** | 24.5% | 31.4% | 38.7% | 47.2% | 45.2% |

79. Numerous Confidential Witnesses ("CWs") from different levels and involved in different aspects of the Company corroborate the dramatic nature of Countrywide's strategy shift from traditional to high-risk mortgage lender. CW1, a Countrywide regional vice-president of sales for several mid-Atlantic states from September 2002 to May 2007, who supervised 170 employees in nine

[6] Except as otherwise noted herein, all emphasis is added.

offices, stated that he received daily e-mails from Countrywide's National Director of Sales, Scott Bridges ("Bridges"), to increase sales of non-conforming loans and thereby increase their region's ranking among the others in the Company. According to this witness, "the real pressure came from above." By increasing the origination of non-conforming loans, Countrywide was able to originate many more loans each year and, because non-conforming loans were riskier than conforming loans, Countrywide was able to charge borrowers higher fees when extending such loans.

80. CW2, a senior loans specialist from 2001 to 2004 and a branch operations manager from 2004 to 2007, corroborates that Bridges sent out FSL Notify, a notification via email kept in an Excel spreadsheet which ranked all of the branches according to their progress in meeting their goals which were based on the number of loans sold, from the "top dogs to the lowest on the totem pole." These rankings were stored in the Company's Lotus Notes-based system and were accessed through a page called "Inside the Spectrum." This ranking usually came with some sort of message attached lauding those who made their numbers or urging improvements in others. Also, the notifications were often accompanied or followed by unscheduled audio recordings sent via email from Mozilo himself, urging employees to follow certain directives. "Out on the floor (where the loan officers sat), they would talk about meeting the units," CW2 said, referring to the number of loans set as a goal each month. "It was all about making the units." According to a branch manager in the FSL division, CW3, Countrywide increased its Company-wide loan origination goal five-fold, from $1 billion per month in 2004 to $5 billion per month by 2007.

81. Another senior loans specialist and branch operations manager from 2004 to 2007, CW4, corroborates that Mozilo "kept his finger on the pulse" of the Company's bottom line by sending out these emails stating the volume of loans that had been made in a month and setting goals for the next month. According to

CW4, "Countrywide [became] known in the business as a sweatshop." During the last few months of CW2's employment, in the summer of 2007, Mozilo sent several messages urging employees to make more subprime loans, which were among the most profitable products the Company sold. CW5, another operations manager in Billings, Montana from April 2000 to February 2007, recalled that the emails were personalized and worded something like: "Angelo [Mozilo] wants you to tell customers about a great new program to promote to realtors to help homebuyers get into more house." CW6, who was a Senior Vice President and Credit Risk Director in 2006 and 2007 at Countrywide's office in Plano, Texas, recalls Mozilo complaining in a meeting during a visit that the Plano office was not originating loans quickly enough. Mozilo asked the rhetorical question, "How come I can go out and buy a new Bentley for $175,000 in 45 minutes and it takes me 30 days to buy a house?"

82. In addition, Countrywide directly and indirectly motivated its branch managers, loan officers and brokers to underwrite and approve more loans, irrespective of their suitability for the borrowers. CW2 stated that what motivated employees was the pressure to make their goals. "The pressure was on to make the units. The branch manager would have Friday morning meetings and offer $50 gift cards and lunch to the teams that sold the most." According to this witness, management placed Countrywide's lending divisions and underwriters under constant pressure to approve increasing quantities of loans. In a *WSJ* article on October 24, 2007 (written after the truth regarding Defendants' wrongdoing started to emerge) (the "October 24, 2007 *WSJ* Exposé"), another employee of Countrywide confirmed that Countrywide regularly encouraged employees to sell more loans by offering prizes, such as trips to Hawaii, to top-producing employees.

83. CW2 also explained that branch managers had specific goals to meet every month in terms of the number of loans – or "units" – the branch made and

the revenue it made. Countrywide's branch managers recorded the loans in process – and their status such as applied, submitted, approved and funded – in a software program that could be viewed in real time by Countrywide's senior management. To assess the branch's progress towards meeting the goals that were set – and they varied from one month to the next from 40 to 50 to 60 loans – the Company's regional vice president reviewed the numbers mid-month and at the end of the month. The branch managers then put pressure on the loan officers and account executives to make the numbers in order to earn commissions. CW4, a branch operations manager, confirmed that "[l]oan officers were told to get a loan no matter what, get a deal. That's all it was about – the numbers."

84. Countrywide's strategy to put loan production into overdrive appeared to work, at least at first. According to the October 24, 2007 *WSJ* Exposé, Pay Option ARM loans originated by Countrywide "accounted for $93 billion, or 19%, of the company's loan volume by 2005, making it the top option ARM lender that year." Countrywide originated over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007. Countrywide recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production divisions in 2005 and 2006, respectively. In 2005, Countrywide reported $451.6 million in pre-tax earnings from Capital Markets sales, representing 10.9% of its pre-tax earnings; in 2006, it recognized $553.5 million in pre-tax earnings from that division, representing 12.8% of its pre-tax earnings. In its 2006 annual report, Countrywide trumpeted the fact that "[w]hile the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

### 2. Countrywide Began Offering A Wide Array Of Nontraditional And Riskier Mortgage Products

85. At the same time that Countrywide began to put loan production into overdrive, Countrywide also altered its loan mix significantly, shifting from issuing traditional fixed-rate mortgages to borrowers with prime credit scores, to issuing more nontraditional, higher-risk loans, designed to allow borrowers, often those with blemished credit, to borrow more money than would be available under the Company's pre-2003 fixed-rate conforming loan business model.

86. Countrywide's nontraditional mortgages primarily featured ARMs, which are characterized by an initial interest rate that is lower than that of a fixed rate mortgage, for a predetermined introductory period. The interest rate resets at the end of the introductory period, depending on the economic index to which the rate is linked. According to CWs 6 and 7, who were both branch managers, Countrywide offered two principal ARM programs, 2-28 and 3-27, meaning that the teaser rate would last for only 2 or 3 years, and then reset for the next 28 or 27 years. This translated into an increased monthly payment for the balance of the loan. Countrywide's ARM programs also included pre-payment penalties, so that if the borrower re-financed before the end of the introductory rate period (and avoid the increased monthly payments), the borrower would have to pay a penalty to Countrywide.

87. Countrywide's ARM products also included Pay Option ARMs, which permitted a borrower to select from among various monthly payments, including payments that neither paid down principal nor covered the full amount of interest due in a given month. The range of monthly payment options, from high to low dollar amounts, were: (a) a payment based on a loan that was fully amortized over a particular number of years (e.g., a standard 30-year mortgage); (b) an "interest only" payment that did not include any principal pay down; and (c) a set "minimum monthly payment" that did not cover either the monthly

principal amount or the monthly interest owed on the loan. Under this loan, if a borrower selected to pay only the minimum monthly payment, which deferred payment of both principal ***and*** interest, the loan would begin a process of "negative amortization" in which the unpaid interest is added to the outstanding principal amount owed, thus increasing the overall loan balance.

88. As described in the Company's filings, under Countrywide's Pay Option ARM program, there were limits on the amount of missed interest that could be rolled into the principal balance. So, in addition to the reset that occurred at the end of the introductory ARM period described above, loan payments for Pay Option ARMs were re-calculated when the loan balance increased to 110%-125% of the original loan as a result of negative amortization. At that point, the loan was "recast" and expected to be repaid on a fully-amortized basis over the remaining term.

89. Countrywide also offered loan programs that reduced or eliminated the need for any documentation to prove loan applicants' income and/or assets, i.e., "low-doc" and "no-doc" loans. These types of loans were originally intended for professionals and business owners with high credit scores, who preferred not to disclose their confidential financial information every time they applied for a mortgage. However, the lack of verification made these loans particularly simple targets for borrowers to lie about their income or assets in order to qualify for a loan.

90. Another nontraditional loan product offered by Countrywide was the HELOC, which is a second mortgage secured by the home that is in junior position to the first mortgage. In addition to taking out a "primary" mortgage loan for the traditional maximum of 80% of the property's value, some borrowers take out a HELOC (referred to in the mortgage industry as a "piggyback loan") for as much as the remaining 20% of the purchase price, to avoid having to purchase private mortgage insurance that would otherwise be required.

91. Countrywide could charge higher interest and fees for HELOCs, making HELOCs very attractive to Countrywide. According to a UBS survey reported in the October 24, 2007 *WSJ* Exposé:

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and offered "piggyback mortgages," which allow borrowers to finance more than 80% of a home's value without paying for private mortgage insurance. By 2006, nearly 29% of the option ARMs originated by Countrywide and packaged into mortgage securities had a combined loan-to-value of 90% or more, up from just 15% in 2004, according to UBS.

92. Countrywide viewed Pay Option ARMs as especially lucrative in the short term because investors were willing to pay more for securities backed by Pay Option ARMs than for those backed by traditional mortgages and guaranteed by a GSE. The stated characteristics of the loans, such as whether the loans were prime or subprime, had adjustable or fixed interest rates or included a prepayment penalty, all influenced the price. The reason investors preferred subprime MBS was the potential for increased payment stream from the higher interest rates charged for these loans, and the lower risk of early repayment because of built-in prepayment penalties. According to CW8, who was Vice President and Regional Operations Manager for Countrywide's WLD in the Southwest from 2005 until October 2007, Countrywide would "do everything" in terms of buying risky loans that it could then package and sell. "There was such a demand for high loan-to-value Alt-A paper[7] throughout 2005 and 2006," CW8 said, "they were giving Wall Street what they wanted."

---

[7] Alt-A, or Alternative-A loans, are mortgages that have a risk profile greater than prime mortgages (or A paper) but less than subprime. A key feature of Alt-A loans is that many times they are given to people who are unable or unwilling to verify their income or assets. Because lenders often do not ask for this type of verification, potential borrowers often lie about their income and assets in order to secure the loan. For this reason Alt-A mortgages are sometimes given the nickname "NINA" loans: No Income, No Assets.

93. In fact, Countrywide directly tied its loan originations to the appetite of potential purchasers of loan pools and MBS. According to an FSL branch manager, CW7, Countrywide had a system called CLUES or the "Countrywide Loan Underwriting Evaluating System." The CLUES system contained guidelines for loans that outside investors like Lehman Brothers wanted to purchase. Loan officers received "black box updates" from the CLUES system, signifying that investors had changed their guidelines for the types of loans they wanted to buy from Countrywide. Loan officers were expected to originate loans that met these purchaser guidelines. Another FSL branch manager, CW3, corroborates that all of FSL's loan programs were designed based on Wall Street's appetite to buy the loans. "Whoever designed them, we ran with it because Wall Street was buying it."

94. By offering nontraditional loans like Pay Option ARMs, HELOCs and reduced documentation loans, Countrywide was not only able to increase its market share, it also earned a significant profit from the higher fees that borrowers paid for those loans and the higher prices investors were willing to pay for loan pools and securitized assets on the secondary market. As reported in Countrywide's periodic filings and reflected in the chart below, in 2004, 2005 and 2006, Countrywide originated more ARMs, HELOCs and subprime mortgages (as that term was defined by Countrywide) than in any prior period:

| | **2002** | **2003** | **2004** | **2005** | **2006** |
|---|---|---|---|---|---|
| **Adjustable Rate Loans as % of Total Loans Originated** | 14% | 21% | 52% | 52% | 45% |
| **HELOC as % of Total Loans Originated** | 4.6% | 4.2% | 8.5% | 9.0% | 10.2% |
| **Nonprime (Subprime) as % of Total Loans Originated** | 3.7% | 4.6% | 11.0% | 8.9% | 8.7% |

95. When challenged about the ramifications such massive growth might have on loan quality, on July 22, 2003 Mozilo assured the market: "Going for 30% mortgage share here is ***totally unrelated to quality of loans we go after. . . .*** There will be ***no compromise*** by this company in the overall quality of the product line, you know, which manifests itself in your delinquencies and foreclosures, but we don't compromise on that as we grow market share, nor is there a necessity to do that." Unfortunately, this was not a true statement.

96. As alleged below, defendants misled investors in a number of ways regarding the impact of the Company's massive growth and shift from more conservative loans on the Company's financial results and future prospects in a number of ways. First, contrary to their assertions, the Company failed to adhere to strict underwriting standards and, thus, did not ensure that the loans they originated were of high quality. To the contrary, defendants loosened and deteriorated Countrywide's loan origination and underwriting standards and permitted an explosion of "exceptions" under those standards. Second, they concealed the fact that Countrywide was classifying many loans as "prime" that failed to meet the requisite industry definitions for that term, which rendered their statements about its subprime exposure false and misleading. Third, they failed to properly increase the Company's loan loss reserves to reflect the increased risk in its portfolio. As stated in the FCIC Report, the percentage of Countrywide's Pay Option ARMs that were negatively amortizing grew from just 1% in 2004 to 53% in 2005 and then to more than 90% by 2007.

## V. COUNTRYWIDE DID NOT MAINTAIN OR APPLY STRONG UNDERWRITING STANDARDS OR PROPERLY INCREASE LOAN LOSS RESERVES TO ACCOUNT FOR THE INCREASED RISKS ASSOCIATED WITH ITS LOAN PORTFOLIO PARTICULARLY AS THE MARKET STARTED TO DECLINE

### A. Countrywide's Risk And Liquidity Exposure Increased

97. At the same time that Countrywide began its aggressive push into higher risk, nontraditional mortgages, macroeconomic considerations were

generally making mortgage lending an increasingly risky business. The residential real estate market began to experience a retreat from the unprecedented price spikes of the housing bubble that peaked in 2005, with real estate prices declining at an increasingly rapid pace from 2006 through the end of the Relevant Period. Also during this time, home foreclosures were increasing to historic levels.

98. By 2005, mortgage and banking industry regulators considered lending that employed the above-described loan products and other combinations of heightened risk factors (known as "layered risk" or "risk-layering") to be particularly risky lending practices and required that institutions engaging in such practices use heightened risk management including: (a) maintaining stringent underwriting standards; (b) limiting concentrations of risks; (c) limiting third-party loan originations; (d) ratcheting up the level of monitoring and stress testing of nontraditional mortgage portfolios; and (e) increasing allowances for loan and lease losses to adequately account for the heightened risks inherent in nontraditional mortgage loan portfolios, particularly those with risk-layering characteristics.

99. The increasing issuance of Pay Option ARM loans, including those with "layered risk" characteristics, prompted an interagency group of federal bank regulators to jointly draft and publish, on October 4, 2006, the *Interagency Guidance*, "to address risks associated with the growing use of mortgage products [like Pay Option ARM loans] that allow borrowers to defer payment of principal and, sometimes, interest." The proposed guidance was first issued in December 2005, and Countrywide provided detailed written comments to the regulators on March 27, 2006. The proposed guidance, and later the *Interagency Guidance*, sent a clear message to the market that bank regulators were concerned about generally lax underwriting standards and risk management practices of subprime lenders. The Office of Thrift Supervision sent a copy of the *Interagency*

*Guidance* and supplemental information (which all officers were required to be familiar with) to Mozilo on October 10, 2006, as acknowledged in the Company's public filings.

100. Industry consensus was that, while Pay Option ARM loans could be appropriate for a small portion of the population, such as well-qualified borrowers with high credit scores who intended to hold a mortgage for a short period of time or borrowers with verifiable employment or self-employment whose income tended to spike from month to month or year to year, such mortgages were not appropriate for most borrowers. Concerned with institutions' increasing reliance on "reduced documentation [lending practices], particularly unverified income to qualify borrowers for nontraditional mortgage loans," the *Interagency Guidance* warned:

> Because these practices essentially substitute assumptions and unverified information for analysis of a borrower's repayment capacity and general creditworthiness, they should be ***used with caution.*** As the level of credit risk increases, the Agencies expect an institution to more diligently verify and document a borrower's income and debt reduction capacity. . . . For example, stated income should be accepted only if there are mitigating factors that clearly minimize the need for direct verification of repayment capacity. For many borrowers, institutions generally should be able to readily document income using recent W-2 statements, pay stubs, or tax returns.

101. In fact, the notion that low or no documentation loans – particularly when coupled with "nontraditional" mortgages – are likely to contain material misrepresentations and/or fraud that will result in increased default rates was nothing new to the industry. For instance, in August 2006, *WSJ* ran an article stating:

> Banking regulators say that lenders are increasingly relying on unverified income to qualify borrowers for so-called nontraditional mortgage loans. Those products – such as Pay Option adjustable-rate mortgages and interest-only loans – allow borrowers to defer payment of principal and sometimes interest. ***Many analysts see such a combination of nontraditional products and nontraditional underwriting processes as presenting another layer of risk*** to those who could be hurt by defaults, including consumers, shareholders in mortgage lenders and investors in securities backed by mortgage loans.
>
> ***"There is more risk with a loan that is not fully documented***," says Suzanne Mistretta, senior director of residential mortgage at Fitch Ratings, because "borrowers can overestimate their income to obtain a larger loan they otherwise might not have qualified for.

102. On the subject of ***"Risk Layering,"*** the *Interagency Guidance* stated, in relevant part:

> Institutions that originate or purchase mortgage loans that combine nontraditional features, such as interest only loans with ***reduced documentation*** or a ***simultaneous second-lien loan,*** face ***increased risk.*** When features are layered, an institution should demonstrate that mitigating factors support the underwriting decision and the borrower's repayment capacity.

103. Because a HELOC is in second position to the first lien loan, it is secured only by the difference between the value of the home and the amount due on a first mortgage. Industry consensus is that HELOCs are at higher risk of becoming unsecured, and therefore worthless, in the event of a default, especially in a market with declining real estate values. Therefore, with respect to HELOCs, the *Interagency Guidance* cautioned:

> Simultaneous second-lien loans reduce owner equity and increase credit risk. Historically, as combined loan-to-value ratios rise, so do defaults. A delinquent borrower with little or no equity in a property may have little incentive to work with a lender to bring the loan current and avoid foreclosure. In addition, second-lien home equity lines of credit (HELOCs) typically increase borrower exposure to increasing interest rates and monthly payment burdens. Loans with minimal or no owner equity ***should not have a payment structure that allows for delayed or negative amortization*** without other significant risk mitigating factors.

104. Notwithstanding this unambiguously clear cautionary language in the *Interagency Guidance*, according to the October 24, 2007 *WSJ* Exposé, the vast majority of Countrywide's Pay Option ARMs featured layered-risk characteristics. According to *WSJ*, 78% of Countrywide's Pay Option ARMs originated in 2004 "were 'low-doc' mortgages in which the borrower didn't fully document income or assets" and the number grew to 91% in 2006. The Company's Form 10-Q for Q2 2007, filed with the SEC on November 9, 2007, also reveals that by the end of 2006, 81% of Pay Option ARMs held for investment by Countrywide were "low-doc" or "no-doc" stated income loans.

105. Moreover, as Countrywide originated more Pay Option ARMs with layered risk features such as reduced documentation and secondary-lien financing, the wholesale market appetite for Countrywide loan portfolios started to disappear. CW6 described one instance in April 2007, when Countrywide was unable to find a single buyer for a wholesale loan pool consisting of 100% financed loans that included risky, second-lien HELOCs. In fact, 13 investors refused to even look at the portfolio, and one investor looked at it but opted not to buy it. As a result, Countrywide had to keep this bad portfolio of risky, 100% financed loans on its books as LHI. This drop-off in secondary market sales

should have been seen as a clear signal to senior management that Countrywide's loan quality had hit rock bottom.

106. As it became more and more difficult for Countrywide to sell its loans on the secondary market, Countrywide had no choice but to increase the amount of Pay Option ARMs held by the Company for investment. As reported in Countrywide's periodic filings and reflected in the chart below, the amount of Pay Option ARMs held by the Company for investment grew significantly in 2004, 2005 and 2006 (in the millions):

| | **2003** | **2004** | **2005** | **2006** |
|---|---|---|---|---|
| **Pay Option ARMs Held for Investment** | N/A | 4,698 | 26,101 | 32,732 |

As of December 31, 2006, Pay Option ARMs represented 46% of the Company's total LHI. Additionally, Countrywide was required to increase its RIs in MBS containing nonprime and HELOCs which were sold by the Capital Markets division during the same period.[8]

107. Defendants knew, as highlighted in the public filings they controlled, that the key to the Company's success was quality control and verification of LHI, as well as the loans securitized and sold into secondary security markets, through the implementation and enforcement of appropriate underwriting standards. Indeed, Countrywide's ability to sell these loans quickly depended upon convincing investors in the secondary market that the loans being sold were of high quality. Among other things, this required Countrywide to make various R&Ws, which vouched for the accuracy of loan documents, to the secondary

[8] A retained interest provides an interest payment from a real estate mortgage investment conduit ("REMIC"). Retained interest holders receive interest payments from a REMIC after all required regular interest has been paid to other investors in higher priority securities tranches. Countrywide's retained interests would take the first losses if any mortgage pool underperformed, giving the securitization purchasers limited default protection.

market, giving secondary market participants recourse if the R&Ws proved to be untrue.

108. Countrywide's explosive origination of nontraditional loans between 2003 and 2008 may have been highly lucrative for the Company in the short term but, as Defendants knew or should have known, this constituted a high-risk activity that threatened the Company's core business, especially when the secondary market dried up and Countrywide had to hold more risky loans for investment and retain more interests in Pay Option ARM and HELOC securitizations.

109. As a result, Countrywide's shift to risky loan products made it more vulnerable to liquidity constraints in the home mortgage market. Indeed, as recently as January 3, 2011, BofA announced a settlement to pay Fannie Mae and Freddie Mac a total of $2.8 billion to make good on R&Ws by Countrywide, who sold loans to these GSE's prior to the Merger that turned out to be fraudulent or violated fair lending laws. In addition, as revealed in a complaint filed against Countrywide by Ambac Assurance Corporation, which insured Countrywide loans securitized and sold in the secondary market during the Relevant Period, "Faced with . . . remarkably poor loan performance, Ambac reviewed the loan origination files of the defaulted loans for conformance with Countrywide's loan-level representations and warranties. Ambac has to date reviewed a total of 6,533 loans across twelve Transactions. Of these, 6,362 loans (or over 97% of the loans reviewed) with an aggregate initial principal balance of approximately $658 million materially breached Countrywide's loan-level representations and warranties. Among other breaches, Countrywide's loans did not bear the represented attributes or conform to Countrywide's own underwriting guidelines and in many cases were made to borrowers with little or no ability to repay their loans." These facts and the risks associated with them were not disclosed to investors, and Plaintiff, who were damaged as a result.

**B. Countrywide Loosened Its Underwriting Standards**

110. At Defendants' direction, Countrywide pursued a lending campaign, beginning in 2003, that was characterized by chronic failures in standard appraisal, underwriting and credit qualification practices, and that heavily concentrated the Company's mortgage lending in risky Pay Option ARM loans, the overwhelming bulk of which were made on a less than fully documented basis. Unbeknownst to Countrywide's investors, including Plaintiff, from mid-2003 onward, concurrent with Countrywide's push to achieve a 30% market share, Countrywide continually loosened its underwriting guidelines to the point of nearly abandoning them by 2006.

111. While the Officer Defendants consistently hyped the Company's underwriting and credit qualification processes, the truth was that Countrywide had actually lowered the Company's credit score requirements and eased other qualifying criteria to facilitate the approval of huge volumes of loans, regardless of the credit quality of the loans or the magnitude of "exceptions" from the underwriting standards that would need to be granted in order to fund the loans. Countrywide and the Officer Defendants in fact were well aware that Countrywide had abandoned any discipline in these processes and had chosen to sacrifice quantity over quality in their reckless quest to become the nation's largest home lender. The loosening of the underwriting standards is evidenced by (a) the Company's Underwriting Matrices and (b) the Company's loan exception processing.

**1. Countrywide Loosened Its Underwriting Standards As Indicated In The Company's Underwriting Matrices**

112. The most direct evidence of Countrywide's systematic relaxation of lending standards can be seen in the key internal documents relied on by underwriters, loan officers, account executives and branch managers – called Underwriting Matrices – which were authored by Countrywide's highest-level

managers at Countrywide's corporate headquarters. According to several CWs, Countrywide progressively loosened its guidelines in its Underwriting Matrices by reducing minimum credit scores needed to qualify for loans, allowing borrowers to finance more than the traditional 80% of the home's value, allowing borrowers to assume more debt load and making loans on little or no income or asset verification.

113. As an Operations Manager, CW5 was required to be familiar with Countrywide's underwriting and loan origination policies and procedures. CW5 regularly accessed the Underwriting Matrices through Countrywide's proprietary computer system called "CW Insider." According to CW5, the CW Insider system, which was developed in 2003 or 2004, acted like a one-stop website for all of Countrywide's lending divisions, to answer any questions a loan officer or account executive might have about any Countrywide loan product. According to CW9, who was an FSL branch manager, all employees, even those who travelled, had access to Countrywide's Underwriting Matrices through their company computers.

114. Based on CW5's regular access to this proprietary system, CW5 is personally aware that the Underwriting Matrices were updated often. Specifically, the Company lowered minimum FICO[9] scores and other risk factors (e.g. time elapsed since a bankruptcy discharge, default, etc.) for the various risk grades of borrowers (ranging from AA+ to C-), while concurrently increasing maximum loan amounts steadily during the period from 2003 to 2007. In particular, CW5 recalls that Countrywide's guidelines were relaxed substantially at the beginning of 2005, when Countrywide increased its origination of interest-only ARM loans. FSL branch manager CW3 recalls that, between 2003 and 2005, Countrywide

[9] The Fair Isaac Credit Organization, or "FICO," score is one of the most widely accepted measures of the creditworthiness of a borrower. FICO scores range from 300-850, with the U.S. median approximately 720.

loosened loan-to-value restrictions as well as FICO score requirements in its underwriting guidelines. CW9 confirms that the underwriting standards reflected in the Underwriting Matrices loosened up in 2005 and 2006, at the height of the market when "everyone was doing the same kind of loans," i.e., subprime loans.

115. According to these CWs, management's rationale for loosening the guidelines contained in the Company's Underwriting Matrices was simple: the goal was to capture a population of borrowers with lower credit scores who previously would not have qualified for a loan. Under tighter guidelines, such loans would trigger an "exception" which would have likely resulted in the loan being refused. However, this loosening of the underwriting standards was never disclosed to investors.

116. The FCIC's conclusions confirm that Defendants' aggressive 30% market share goal was the impetus for loosening underwriting standards during the Relevant Period:

> Countrywide's option ARM business peaked at $14.5 billion in originations in the second quarter of 2005, about 25% of all its loans originated that quarter. But it had to relax underwriting standards to get there. In July 2004, Countrywide decided it would lend up to 90% of a home's appraised value, up from 80%, and reduced the minimum credit score to as low as 620. In early 2005, Countrywide eased standards again, increasing the allowable combined loan-to-value ratio (including second liens) to 95%.

**2. The Company Also Broadened The Scope Of Permissible Exceptions**

117. All lenders have guidelines for approval. "Exceptions" or "exception loans" in the mortgage industry are loans whose criteria fall outside the Company's underwriting standards but are approved nonetheless. Typically, the only way an exception is granted is if there are other compensating factors. For

example, if a borrower has a FICO score that is lower than the minimum to qualify for a loan, the lender may make an exception based on the fact that the borrower's debt ratio is very low, the borrower has high verified assets or the down payment will be large. In other words, the lender may make an exception because other compensating factors exceed standard guidelines.

118. However, rather than encourage its underwriting staff to approve exception loans based on reasonable compensating factors, Countrywide instead opted for an easier approach which eliminated the need for exceptions altogether. Specifically, Countrywide adopted a new, publicly undisclosed "exception philosophy," or rather "no exception philosophy," which significantly lowered the guidelines by incorporating a lower range of FICO scores and increased loan amount limits, thereby reducing the number of exceptions that were triggered.

119. As a result of this undisclosed "no exception philosophy," Countrywide made it easier for lending personnel to make increasingly larger loans to low-quality borrowers. The reduced underwriting guidelines also made it possible for Countrywide to purchase more loans and meet its aggressive market share goals. In fact, several CWs agree that it would have been impossible for Countrywide to grow its business in the way Sambol and Mozilo wanted had Countrywide continued to use the Underwriting Matrices and guidelines in place in 2003. According to CW6, by late 2006, Countrywide's Wholesale Lending portfolio (which at the time consisted of around $88 billion in loans), consisted mostly of Pay Option ARMs made to borrowers with FICO scores around 500.

120. According to Plaintiff's investigation, Countrywide had an internal, proprietary computer system that was used to identify and route highly risky loans out of the regular loan approval process and to the Company's central "corporate underwriting" offices (called "Structured Loan Desks" or "SLD") in Plano, Texas or Pasadena, California for evaluation. According to CW5, an FSL branch manager, and several other FSL branch managers, the EPS was not used to reject

loans that were outside the Company's underwriting guidelines. Rather, CW5 and other loan officers used the EPS to obtain approval authority from "corporate" to ***close*** and ***fund*** such loans. According to this witness, there were very few rejections of requests made through the EPS.

121. According to CW5, the EPS gave management the opportunity to approve loans that, on their surface, should be rejected. "If your loan didn't fit the guidelines, you could go into this exception department and request an over-ride." The EPS software was filled out online and had entry tabs by which loan officers could enter a customer's FICO score, loan amount, property value used as collateral and a description of the client's situation. This last section was used liberally by loan officers to justify the exception. Often, only selective information from a loan application was inputted in order to ensure that the exception was granted.

122. CW5 recalled that it was almost impossible to get an exception approved when the EPS was first rolled out. However, during the last two years CW5 worked at Countrywide, between 2005 and 2007, there was "a very high approval process." CW5 said, "They were granting exceptions for off-the-wall loans." For example, CW5 described how, in 2000, the standard debt-to-income ratio was 38% – meaning Countrywide wouldn't approve loans for borrowers who exceeded this debt ratio. However, when CW5 quit in February 2007, Countrywide was approving loans for borrowers with debt ratios as high as 70% through the EPS. By 2007, Countrywide was also approving loans to self-employed borrowers that put 0% or 5% down with no documentation or reduced documentation through the EPS, compared to the requirement that such borrowers put down at least 10% when this CW first started working at Countrywide in 2000.

123. In addition, according to CW5, the EPS permitted management to override low credit scores and in turn add "additional pricing" or discount points.

This was accomplished through a second proprietary system, called Price Any Loan or PAL, which was used to price exception loans based on their risk. For example, CW5 recalls that Countrywide approved loans for people with low credit scores through the EPS, by classifying the low credit score as an "isolated event" in the borrower's credit history. SLD would then require higher pricing or other terms in view of these violations. SLD would approve the loan but charge a higher interest rate or a higher margin.

124. CW10 recalls that loan officers would regularly go over his head if he refused to approve a loan based on the Underwriting Matrices, and get approval for the loan through the EPS. If SLD approved the exception loan, CW10's hands would be tied and the loan was approved except in the rarest of cases. CW10 generally recalls seeing "bad loans" go through the EPS. In sum, loan applications that should never have been approved were constantly kicked further up the corporate ladder until they reached a level where they would be approved by those driven solely by corporate profits.

125. CW7 confirmed that the EPS was regularly used by loan officers to approve loans outside of Countrywide's underwriting guidelines. As an FSL branch manager, every month CW7 received an Excel spreadsheet that showed a tally of what loans were granted exceptions, which ones were denied and which loans had closed. According to CW7, newspaper accounts that took Mozilo to task for offering steep loan discounts to the "friends of Angelo" were nothing compared to the types of loan exceptions approved via the EPS every day. "I gave people who had no right getting pricing exceptions, exceptions just to get the loans closed." CW7 was constantly under pressure from his boss, Regional Vice President of Countrywide FSL, John Mauk ("Mauk"), to close as many loans as possible: "My boss was saying, 'I don't care. Close it. We need to show numbers.'" In fact, according to CW3, Mauk would often intervene in the EPS

process to make sure an exception was approved. "He'd pick up the phone and make the magic happen."

126. CW11 was a Subprime Exceptions Pricing Manager at Countrywide's office in West Hills, California, from 2005 to 2006. In this capacity, CW11 purchased loans for Countrywide's CLD that fell outside of its underwriting guidelines. To do this, CW11 used a pricing model that calculated the Net Economic Contribution (or" NEC") for each loan. According to CW11, although she had authority to purchase only loans that had a NEC of 3, she regularly requested and received permission from her superior to buy loans with a lower NEC (representing a riskier loan).

127. According to a Complaint filed by the SEC against Mozilo, Sambol and Sieracki (the "SEC Complaint"), from 2005 to 2007, Countrywide developed what was referred to as a "matching strategy," also known as the "supermarket strategy," where it attempted to offer any product that was offered by any competitor, even a subprime lender. If Countrywide did not offer a product offered by a competitor, Countrywide's production division invoked the matching strategy to add the product to Countrywide's menu. For example, if Countrywide's minimum FICO score for a product was 600, but a competitor's minimum score was 560, the production division invoked the matching strategy to reduce the minimum required FICO score at Countrywide to 560.

128. According to the SEC complaint, by the end of 2006, Countrywide wrote an increasing number of loans as exceptions that failed to meet its already loosened underwriting guidelines even though Defendants knew exception loans had a higher rate of default. Thus, Countrywide's underwriting standards were ***at least*** as aggressive as the most aggressive lenders in the country. However, as John McMurray ("McMurray"), Countrywide's CRO, repeatedly warned Defendants, Countrywide implemented its matching strategy without also requiring the credit risk mitigants that were being used by Countrywide's

competitors. McMurray wrote Sambol on June 24, 2005, "***our match end up being more aggressive tha[n] the guideline we were originally trying to match***."

129. In sum, the steady and systematic loosening of underwriting standards was the catalyst for the dramatic increase in riskiness of the loans that Countrywide was originating or purchasing. As alleged above, by 2006, the secondary market had begun rejecting loan pools, which meant that Countrywide was forced to keep more and more pools of bad loans, originated under the loosened underwriting standards, on their books.

### C. Countrywide Also Engaged In A Company-Wide Practice Of Originating And Funding Loans Without Regard To Underwriting Standards Regarding Loan Quality And Engaged In Predatory Lending

130. As explained below, these same witnesses confirm that the underwriting guidelines – as loose as they were – themselves were not strictly adhered to. In fact, loans were routinely approved for borrowers who, even based on Countrywide's loosened underwriting standards, did not actually qualify for the loan. The general consensus among the CW's interviewed was that loans were to be approved automatically unless there was a "blatant" problem on the face of the loan application. In fact, according to CW10, Countrywide's actual underwriting guidelines were even looser than what the Underwriting Matrices required.

131. According to one witness who was an Operations Manager, CW5, beginning in 2003, a substantial portion of loans originated by Countrywide were low-doc or no-doc loans, offered as both prime and subprime programs. By 2005, according to CW5, underwriting practices for such loans were even weaker. For example, Countrywide had an automated underwriting program called the "Alternate Credit Program," which was used to process and approve loans applied for online. CW5 recalls that borrowers with higher debt-to-income ratios and lower FICO scores than required by Countrywide's underwriting guidelines would

regularly be approved for loans through this system, with no verification of income or assets.

132. According to CW1, loan origination standards and procedures were not designed to produce high quality loans. In fact, the opposite rule applied, i.e., lending personnel were expected to ***look for a way to make the loan rather than turn it down.*** Asked whether the Company had a tightly controlled credit policy as claimed by senior management, CW1 said that anyone could qualify for a loan – with or without documentation of income. Meaningful underwriting, therefore, was virtually impossible to perform.

133. In August 26, 2007, *The New York Times* ("*NYT*") revealed, in an article titled "*Inside the Countrywide Lending Spree*" (the "August 26, 2007 *NYT* Exposé"), the extent to which Countrywide encouraged lending personal to engage in predatory lending[10] tactics rather than perform sound underwriting:

> On its way to becoming the nation's largest mortgage lender, the Countrywide Financial Corporation encouraged its sales force to court customers over the telephone with a seductive pitch that seldom varied. 'I want to be sure you are getting the best loan possible,' the sales representatives would say. But providing 'the best loan possible' to customers wasn't always the bank's main goal, say some former employees. Instead, ***potential borrowers were often led to high-cost and sometimes unfavorable loans*** that resulted in richer commissions for Countrywide's smooth talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America.

[10] Predatory lending is a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest rates and fees that are unreasonably high.

> Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to ***wring maximum profits out of the mortgage lending boom no matter what it costs borrowers***, according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided. One document, for instance, shows that until last September the computer system in the company's subprime unit excluded borrowers' cash reserves, which had the effect of steering them away from lower-cost loans to those that were more expensive to homeowners and more profitable to Countrywide.

134. Further, according to the August 26, 2007 *NYT* Exposé, "documents from the subprime unit also show that Countrywide was willing to underwrite loans ***that left little disposable income for borrowers' food, clothing and other living expenses.***" For example, one Countrywide manual stated that a borrower with a family of four could obtain a loan even if the monthly mortgage payment left the family with only $1,000 to live on for the month. A single borrower could obtain a loan whose payment left him or her only $550 for food, clothing or other expenses for the month.

135. An article on November 11, 2007 in *NYT* echoed the same chilling reality about Countrywide's maniacal expansion into the Pay Option ARM market, describing the Company as a sort of "*Jurassic Park*" in the mortgage industry. The article cited an internal Countrywide sales document called "Pay Option ARMs Made Simple" which asked what type of customer would benefit from such a loan. One of the answers was "Anyone who wants the lowest possible payment!" According to CW10, Countrywide's WLD frequently pushed borrowers to the FSL division to get them into subprime loans when, in fact, they could have qualified for prime loans. CW10 recalls seeing some borrowers with FICO scores as high as 700 being sent to FSL to get subprime loans.

136. CW1 testified that FICO scores became unimportant after 2003, with potential borrowers able to obtain a mortgage with very low FICO scores (i.e., in the 500s). In particular, CW1 relates how senior management mandated that CW1's managers run credit reports to find customers in CW1's region who had FICO credit scores of 580 and below. The so-called "580 Reports" listed everyone within the region by name, address and phone number. Account executives were expected to call each customer and sell them a loan. Account managers would then have to explain why they did not close a loan with each and every customer on the 580 Report.

137. CW2 testified that for the most part, Countrywide aggressively pushed customers into an ARM, even those customers who were on fixed incomes. If an account executive could not close a mortgage deal, a second voice, usually a team leader or manager, would get on the phone to convince the customer to accept it. According to CW2, if a customer could not make a down payment, Countrywide would approve 100% financing, and roll the closing costs into the amount of the loan.

138. Several CWs also observed several instances where Countrywide's underwriting policies were ignored with the approval of supervisors. CW1 said, "there was pressure to cut and paste and do whatever we could to put these people in subprime loans." Asked whether he ever witnessed any fraud, he said that two of Countrywide's FSL offices – one in Farmington, Connecticut and another in Braintree, Massachusetts – were shut down as a result of fraudulent activities. This CW was also aware that account executives would run customers' credit reports repeatedly to drive down their FICO scores, so they could only qualify for subprime loans.

139. According to CW7, the Braintree, Massachusetts branch, which was managed by Nick Marcopolous ("Marcopolous"), was Countrywide's top producing branch, closing more than 100 loans per month. Other FSL branches,

such as CW7's branch, typically closed about 40-50 loans per month. CW7's branch had 40 loan officers and 10 processors and even in their most productive months they only "nipped at the heels" of the Braintree, Massachusetts branch. According to CW3, he learned through conversations with co-workers and other branch managers that Marcopolous and others in the Braintree office were cutting and pasting information into the loan documents in order to get the loans approved. After the Braintree, MA branch was closed, CWs 3 and 7 learned that Marcopolous had been promoted to Divisional Executive Vice President and was running the entire East Coast region for Countrywide's FSL division.

140. During the course of reviewing loan applications, CW4 testified to always catching fraud in CW4's files. However, notwithstanding the obvious fraud, Regional Vice President Paul Seller, would take the files away from her and give them to another reviewer, who would fund the loans anyway through the EPS system. The type of fraud detected included forged signatures, sometimes by loan officers, who were trying to push through loans.

141. CW2 testified that the pressure to close loans was so intense among account executives that even they perpetrated fraud in processing applications. For example, account executives would try to hide 401K loans, alimony and child support by removing pay stubs with those expenses on them in order to falsely inflate a customer's income. When CW2 found documents which revealed these inconsistencies, CW2 was told by the team and branch managers to shred the documents. If the underwriters questioned a loan, the account executive and branch manager would alter the documents and submit them again, "praying for a new underwriter" to approve it who would not recognize the applicant's name from the previous submission.

142. In fact, it was generally known at Countrywide that there were borrowers who were applying for Stated Income/Stated Assets ("SISA") and No Income no Assets ("NINA") loans who were making false statements about their

income and assets. CW2 recalls that approximately 25% of the loans CW2 reviewed had some type of discrepancy with the borrower's statements, which indicated some sort of fraud, e.g., the amount of the stated income on the loan application did not match a pay stub that was located in the file. Notwithstanding these obvious discrepancies, CW's branch manager usually signed off on each loan folder and passed it along for approval.

143. In addition, CW2 witnessed several incidents of fraud by lending personnel relating to SISA and NINA loans. For example, if the customer submitted pay stubs or other documentation that showed they could not qualify under a full documentation loan for the loan amount they wanted, the loan officer for Countrywide would change the application to a SISA or NINA loan so the borrower would have a better chance to qualify. This was easy to accomplish because the income and asset statement page on the Countrywide loan application was not a signed page and the account executive could simply change the application. CW2 was eventually fired for raising questions about Countrywide's fraudulent lending practices. According to CW7, some branch managers had Adobe W2 tax forms on their computers so they could generate whatever tax returns they needed to close the loans. They also had ADP software that enabled them to print out checks and blank IRS forms.

144. CW7, who reported to Mauk, Regional Vice President of Countrywide FSL, admitted that there was "a lot of fraud" that occurred with stated income loans because FSL did not even check a borrower's tax return to verify income. "We had to trust what they said was true," CW7 said. According to CW7, FSL did not audit loans until a first payment default. In particular, FSL was routinely making risky loans to borrowers with the weakest credit, who were constantly re-financing their homes to get out more money: "Everything was flying fast and furious."

145. A November 13, 2008, *Businessweek* story corroborates confidential witness accounts that fraud was "rampant" in Countrywide offices throughout the country and was known to Countrywide headquarters. According to a former Countrywide wholesaler John Sipes ("Sipes"), "underwriters at the Santa Monica (Calif.) and Beverly Hills branches of Countrywide often shredded tax documents they received from borrowers to destroy proof of the borrowers' incomes and extend bigger loans than they could afford." The story revealed:

> The practice was so rampant in those two branches that the corporate offices launched an internal probe. Each night, Sipes says, Countrywide investigators collected the bins from paper shredders and analyzed their contents. After a while, he says, the branch managers told them: "Don't put anything in the shredder bins at work. If you're going to shred, take it home."

146. Another FSL branch manager, CW3, who managed the Rockville, Maryland, office from 2001 to January 2008 and also reported to Mauk, corroborates CW7's testimony that there was constant pressure from senior management to push loan officers to get underwriting to approve as many loans as possible, preferably Pay Option ARMs. Most of the loans closed in CW3's branch were "Fast and Easy Loans," which required no income documentation. Like NINA borrowers, Fast and Easy borrowers did not have to provide any significant documentation to support their loan applications, and meaningful underwriting, i.e., a real assessment of the borrower's capacity to pay, was virtually impossible to perform. CW3 even saw NINA loans extended to borrowers with really low FICO scores, down to 500. "They were truly subprime."

147. CW3's account is corroborated by Brian Koss ("Koss"), a senior regional vice president at Countrywide who was interviewed for a January 17, 2008 *Businessweek* article. Koss, who spent 4 years running 54 Countrywide

branches in New England and upstate New York, said Countrywide "approached making loans like making widgets, focusing on cost to produce and not risk or compliance." Like CW3, Koss stated that it was well known within Countrywide that the "Fast and Easy Loans" programs was abused and misused by loan officers who were more concerned with "getting the deal done." According to Koss, "[a]s long as people had jobs and values were on the rise, life was good."

148. According to an article by William K. Black and L. Randall Wray (both professors of economics at the University of Missouri, Kansas City) for the *Huffington Post* on November 4, 2010, a review of the high delinquency rates for Countrywide loans acquired by BofA leads to the conclusion that fraud must have been rampant in Countrywide's loan originations:

> [T]hese data suggest that the delinquency/foreclosure rate for Countrywide-originated mortgages must have been well over 20 percent – over ten times the normal delinquency rate and four times the traditional rule of thumb for fatal losses. These exceptionally large rates of horrible loans, defaulting so quickly after origination, are a powerful indicator that Countrywide was engaged in accounting control fraud.

149. According to the FCIC Report, Countrywide had about 5,000 internal referrals of potentially fraudulent activity in its mortgage business in 2005, 10,000 in 2006 and 20,000 in 2007, according to Francisco San Pedro, the former Senior Vice President of Special Investigations at the Company. But it filed only 855 Suspicious Activity Reports with the Financial Crimes Enforcement Network in 2005, 2,895 in 2006 and 2,261 in 2007.

**D. Countrywide Also Relied On Inflated Appraisals**

150. Part of Countrywide's scheme to increase market share and to make as many loans as possible also involved the corruption of the appraisal process. Countrywide wanted appraisals that supported the loans it wished to make. As part of its corporate objective to abandon underwriting standards in order to

maximize market share and profits, Countrywide engaged in a practice of pressuring and intimidating appraisers into using appraisal techniques that met Countrywide's business objectives even if the use of such appraisal techniques was improper and in violation of industry standards and routinely circumvented The Uniform Standards of Professional Appraisal Practice ("USPAP"), incorporated into federal law, 12 C.F.R. §34.44. Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and independent. USPAP requires appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct).

151. Moreover, the *Interagency Guidance* specify that when institutions offer nontraditional mortgages, underwriting standards should "comply with the agencies' [existing] real estate lending standards and appraisal regulations and associated guidelines." The guidelines warn that "[i]f appraisal, loan documentation, or credit problems or consumer complaints are discovered, the institution should take immediate action."

152. However, according to allegations in a whistleblower complaint filed in the Southern District of Texas, No. 4:08-cv-01464 by Mark Zachary (a former Regional Vice President of Countrywide's joint venture with KB Home) ("Zachary"), against Countrywide, the Company blatantly ignored its underwriting policies and procedures by knowingly relying on overstated, low-quality appraisals that failed to conform to industry standards. In September 2006, Zachary informed Countrywide about the questionable use of only one appraiser to perform all of the appraisals on KB Home properties being purchased with Countrywide's loans. According to Zachary, Countrywide executives knew that the appraiser was being strongly encouraged to inflate appraisal values by as

much as 6% to allow homeowners to "roll up" all closing costs. According to Zachary, this practice resulted in borrowers being "duped" as to the values of their homes. This also made loans more risky because when values were falsely increased, loan-to-value ratios calculated with these phony numbers were necessarily incorrect.

153. Zachary also advised Countrywide executives that this practice misled investors who later purchased these loans through securitizations because these investors were not made aware that the actual home values were less than the inflated appraised values. According to Zachary, the inflated appraised values put buyers "upside down" on their homes immediately after purchasing them; that is, the borrowers immediately owed more than their homes were worth. Thus, the buyers were set up to be more susceptible to defaulting on their loans. This practice also put Countrywide at risk because they deliberately were unaware of the true value of the assets on which the Company was loaning money. Zachary brought his concerns first to the executives of the Countrywide/KB Homes joint venture, but when he was "brushed aside" by them, he turned to Countrywide executives in Houston, the Company's Employee Relations Department and finally the Company's Senior Risk Management Executives. In January 2007, an audit was conducted and brought to the attention of these Countrywide executives which corroborated his concerns.

154. Another complaint, filed by a real estate appraisal company Capitol West Appraisals, LLC ("Capitol West"), provides further evidence that Countrywide encouraged and engaged in a practice of pressuring real estate appraisers to artificially increase appraisal values for properties underlying mortgages Countrywide originated and/or underwrote. According to the complaint, Countrywide loan officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions. When Capitol West refused to vary the appraisal values from what it independently determined was

appropriate, Countrywide placed Capitol West on its "Field Review List," or an Exclusionary List. The Field Review List or Exclusionary List was a Countrywide database containing the names of appraisers whose reports Countrywide would not accept unless the mortgage broker also submitted a report from a second appraiser. According to the complaint, the practical effect of being placed on the Field Review List was to be "blacklisted" – no mortgage broker would hire an appraiser appearing on the Field Review List to review a property sale in which Countrywide would be the lender because the broker simply would not pay to have two appraisals done. Instead, the broker would simply retain another appraiser who was not on the Field Review List. While an honest lender might have a legitimate purpose to maintain a list of appraisers it was unwilling to use, Capital West claimed that Countrywide was falsely and fraudulently using their Exclusionary List to punish and retaliate against appraisers who even attempted to maintain the designed integrity and independence of the appraisal process.

155. According to Capitol West, Countrywide created certain procedures to further enforce its blacklisting of uncooperative appraisers. For example, if a mortgage broker were to hire an appraiser that happened to be on the Field Review List, Countrywide used its wholly owned subsidiary, LandSafe, Inc., to perform an appraisal and cut off the offending appraiser. As part of the scheme, LandSafe performed a "field review" of the appraisal performed by the blacklisted appraiser, which was specifically intended to "shoot holes" in the appraisal. Landsafe's appraisal would then be used to complete the loan.

## E. Countrywide Belatedly Tightened Underwriting Guidelines In 2007

156. It was not until late February and early March 2007, when the secondary market began to dry up, that Countrywide belatedly began to tighten up its origination terms. According to a *Reuters* article, *Countrywide Ends No Down-*

*Payment Lending*, published on March 9, 2007, Countrywide instructed its brokers to stop offering borrowers the option of no-money-down home loans, or "piggyback" loans, that allowed borrowers to buy a house with 100% financing. In a Company-wide email, Countrywide told its loan originators: "Please get in any deals over 95 LTV (loan-to- value) today! . . . Countrywide BC will no longer be offering any 100 LTV products as of Monday, March 12." Furthermore, the August 26, 2007 *NYT* Exposé disclosed that, at least up until February 23, 2007, the Company continued to originate loans comprising more than 95% of a home's appraised value and required no documentation of a borrower's income.

157. Countrywide documents show that it, too, was a lax lender. For example, it wasn't until March 16 that Countrywide eliminated so-called piggyback loans from its product list, loans that permitted borrowers to buy a house without putting down any of their own money. And Countrywide waited until February 23 to stop peddling another risky product, loans that were worth more than 95% of a home's appraised value and required no documentation of a borrower's income.

158. On July 24, 2007, Countrywide filed a Form 8-K and issued a press release announcing its financial results for the second quarter of 2007. In addition to reporting dramatic new charges and loan loss provisions, Countrywide revealed that the quality of Countrywide's loans, especially its prime loans, was weaker than had previously been represented. Moreover, during an earnings call later that day, the Company revealed for the first time that in actuality its underwriting guidelines had been inadequate throughout the Relevant Period, stating that the Company had "made many changes" to its "underwriting guidelines and processes, in order to improve the quality and secondary market execution of our production." The Company also disclosed that its proprietary underwriting system needed to be "recalibrated."

159. However, evidence suggests that these partial corrective disclosures were false. For example, the August 26, 2007 *NYT* Exposé revealed that, in July 2007, Countrywide's product list showed that it would lend $500,000 to a borrower rated C-, the second riskiest grade. As long as the loan represented no more than 70% of the underlying property's value, Countrywide would lend to a borrower even if the person had a credit score as low as 500.

160. In fact, the article revealed that the Company would lend even if the borrower had been 90 days late on a current mortgage payment twice in the last 12 months, if the borrower had filed for personal bankruptcy protection or if the borrower had faced foreclosure or default notices on his or her property.

161. CW4, commenting on Mozilo's repeated assurances in July 2007 to investors that Countrywide could weather the storm because it only wrote high quality loans, said that Mozilo lied to investors: "We were still taking subprime loans when he said that." Even after the Company increased the minimum FICO score to 620 in August 2007, "they were still writing subprime loans in the 500s." According to CW4, "[Countrywide's management] did loans they had no business doing. You don't put someone struggling to pay bills into an adjustable rate mortgage or an interest only mortgage." Loan officers in this CW's office "were taking borrowers who were in bankruptcy, coming out of foreclosure or in foreclosure" or who could "barely make ends meet." CW4 said "most of the subprime loan customers had horrible credit."

**F. Countrywide Misclassified Subprime Loans As Prime In Its Annual And Quarterly Reports**

162. In addition to failing to disclose the truth about the Company's loosening and abandonment of its underwriting guidelines during the Relevant Period, Defendants also made false and misleading statements to its investors that Countrywide's exposure to the subprime loans was minimal. Countrywide made regular public disclosures distinguishing between its "prime" and "subprime"

(sometimes referred to as "nonprime") loan originations and securitizations. As alleged below, these statements were false and misleading because throughout the Relevant Period, the Company employed an undisclosed standard for classifying loans as subprime that was lower than the accepted industry standard.

163. As previously explained, the FICO score is one of the most widely accepted measures of the creditworthiness of a borrower and is a key determinant of whether a given borrower will be classified as "prime" or "subprime." There is a strong presumption in the mortgage-lending industry that a FICO score of 660 divides prime and subprime borrowers.

164. The principal industry definition of "subprime" is found in the *Expanded Guidance for Subprime Lending Programs* (the "*Expanded Guidance*"), issued jointly on January 31, 2001 by the U.S. Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC and the Office of Thrift Supervision. The *Expanded Guidance* was sent to Mozilo and other banking CEOs on or about February 2, 2001, and Countrywide management was required to be familiar with it. The guidance advises financial institutions that the elevated levels of credit and other risks arising from subprime lending tend to require heightened risk management and additional capital reserves.

165. As explained in the *Expanded Guidance*, "[t]he term 'subprime' refers to the credit characteristics of individual borrowers. Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments and bankruptcies. They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories."

166. The Office of Thrift Supervision's February 2001 transmittal letter advises that the *Expanded Guidance* was intended to provide, among other things, "a more specific definition of the term subprime." Among the credit risk

characteristics listed in the *Expanded Guidance* that label a borrower as "subprime" is a "[r]elatively high default probability as evidenced by, for example, a credit bureau risk score (FICO) of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood[.]"

167. Freddie Mac, one of the GSEs that purchased loans from Countrywide during the Relevant Period, stated in its February 2003 public guidelines that "FICO scores objectively evaluate all the information in the Borrower's repository credit file at the time the FICO score was created. Freddie Mac has identified a strong correlation between Mortgage performance and FICO scores." For loans on single-family properties, Freddie Mac views a borrower with a FICO score above 660 as "likely to have an acceptable credit reputation." Further, FICO scores between 620 and 660 "should be viewed as an indication that the Borrower's willingness to repay and ability to manage obligations as agreed are uncertain." A FICO score below 620, according to Freddie Mac, "should be viewed as a strong indication" that the borrower's credit profile is "not acceptable."

168. Defendants were well aware that the appearance of being primarily engaged in prime lending was of critical importance to Countrywide's survival. For example, during an investor conference with analysts at Lehman Brothers on September 13, 2006, Mozilo insisted that Countrywide had only a minor position in subprime, stating that subprime loans are "only 9% of our production today." During the same conference, Sambol claimed that "[o]ur profile in the subprime market has been one where we have, for the most part, been on the sidelines." One year earlier, during a September 13, 2005 analyst call, Mozilo, referring to securitized loans, stated that "all loans originated and sold" were "primarily prime quality."

169. However, in reality, Countrywide secretly employed an internal FICO of 620, not 660, to differentiate between prime and subprime loans, referring to the latter category as "nonprime." In fact, numerous CWs confirm that Countrywide consistently made loans that were classified as prime to borrowers with FICO scores below 660, and even below 620, in proportions and amounts far greater than those suggested by the Company's top executives, and contrary to Countrywide's public assurances that it was a conservative and cautious lender in subprime loans and in general.

170. As explained previously, the FSL was Countrywide's subprime loan origination division. According to CW5, borrowers with FICO scores below 600 were sent to the FSL division. This meant that a wide range of borrowers – those with FICO scores below the industry subprime benchmark of 660 but above 600 – could be given loans by the other Countrywide lending divisions that were classified as "prime."

171. Even after borrowers with low FICO scores (i.e., below 600) were referred to FSL, they could still be classified as "prime." CW7, an FSL branch manager, testified that FSL regularly classified loans as "prime" which should have been considered subprime based on the borrower's FICO score. FSL used an automated underwriting system called Desktop Underwriter ("DU") that was used on all loans. Once the loan officer input all of the information, the DU system would generate one of four possible outcomes: (a) denied; (b) approved as B or C (i.e., subprime) paper; (c) approved as EA (expanded approval); or (d) approved as A (i.e., prime) paper. According to CW7, a borrower with a FICO of 580 could get an "uplift" to prime status from DU by inputting a low loan-to-value ratio, low debt-to-income ratio and a lot of cash in reserves. Moreover, if DU rejected the conforming loan, the loan officer would "re-commit" under the prime non-conforming program and re-run the loan. If DU still rejected the non-conforming (large) loan as outside the non-conforming guidelines, the loan officer would

submit the loan for exception consideration through the EPS. According to CW7, loans approved through the EPS were usually treated as prime.

172. CW9 corroborates that DU was often used to "upgrade" a subprime loan to a prime loan. CW3 also confirms that borrowers with FICO scores as low as 620 were classified as "prime" loans by FSL. According to CW4, who reviewed close to 30 to 40 loan applications per day, testified that Countrywide regularly made prime loans to customers with scores as low as 520 in 2006 and as low as 540 in the spring and early summer of 2007.

173. Countrywide's internal classification of subprime loans as "prime" was undisclosed during the Relevant Period. Countrywide routinely referred to "prime" loans in SEC filings and other public statements without clarifying that its unique definition of "prime" was inconsistent with the public's and industry's understanding of that term, thereby rendering those statements misleading. Countrywide's unique, internal standard remained concealed until the Company's July 24, 2007 conference call discussing its catastrophic second quarter 2007 results. During the call, McMurray, the Company's CRO stated in his opening presentation that "[a] prime FICO loan – ***a prime loan with FICOs in the low 500s*** is going to be over 30 times more likely to be seriously delinquent than a prime loan with an 800 FICO, holding all other variables constant." Later during the call, in response to a question about delinquencies among the Company's "prime mortgages," McMurray stated, "There is a belief by many that prime FICOs stop at 620. ***That is not the case.*** There are affordability programs and Fannie Mae, expanded approval, as an example, ***that go far below 620, yet those are still considered prime."***

174. Based on this explanation and other statements made during the conference call, an analyst from HSBC Securities stated that "[w]e do believe in some color given by management, ***that the definition of 'prime' (or Alt-A for that matter) was loosened in the recent boom.*** Management referred to certain

affordability programs where FICO scores ***went 'far below' 620 (which already is well below the bank regulator's definition of subprime, which has a 660 cutoff).*"** The same analyst noted that "management acknowledged that the higher combined loan to value (CLTV) and reduced documentation higher CLTV products – classic speculator products – are accounting for a disproportionate share of credit costs."

175. This analyst was plainly observing for the first time that Countrywide categorized as "prime" borrowers who should have been categorized as subprime, while lowering income documentation standards below prudent levels and increasing loan-to-value ratios above prudent levels.

176. Countrywide was regularly funding Pay Option ARMs to borrowers with FICO scores as low as 620 and sometimes lower. According to CW5, at the time these statements were made, Countrywide routinely funded Pay Option ARMs to thousands of borrowers with FICO scores as low as 620 and sometimes lower. CW5 recalls seeing an internal Countrywide document titled "Pay Option ARM 101: 'Learning the Basics,'" which was available on the CW Insider System, that showed loan officers Company-wide how to sell Pay Option ARMs to any borrower, regardless of their FICO score or creditworthiness. One of the sales pitches involved convincing borrowers that "they could afford more house because of the lower payment at the beginning."

177. Further, according to CW7, not only were Pay Option ARMs routinely made to borrowers with credit scores as low as 620 (or lower), but these loans also were often underwritten through "low-doc" programs that did not involve any meaningful verification of income or assessment of the borrower's capacity to repay the loan.

178. A July 27, 2007 analyst report by Stifel Nicolaus discussing the disappointing second quarter results, questioned the analyst's own "sanguine views" on the Company's credit exposure, stating, "given the magnitude of the

credit problems in the bank, we think ***mgmt made serious miscalculations (and possibly misrepresentations) about the quality of the loans*** added to the bank. In the analysis we present later in this note, we find that ***CFC's home equity securitizations are performing roughly in line with LEND's*** [a competing subprime lender's] ***subprime deals***. We also find that underwriting standards deteriorated through 2006 and have only improved slightly in 2007."

179. The Stifel Nicolaus report further examined the gravity of Countrywide's loose lending practices and expanded definition of "prime" by disclosing that almost 20% of Countrywide's prime HELOCs in the first two quarters of 2007 were given to ***subprime borrowers with FICO scores of less than 660***. Moreover, almost 23% of the prime HELOCs in those quarters had a CLTV ***greater than 100%***. In the analyst's view, "the increasing share of sub-660 FICO, 100%+ CLTV, and second home/non-owner occupied loans [was] ***disturbing***." The Stifel Nicolaus report also noted that in the first half of 2007, ***78%*** of Countrywide's HELOCs were reduced documentation loans.

### G. Countrywide Adopted An Incentive Compensation Scheme That Wrongly Encouraged Lending Personnel To Push Risky Nontraditional Loans

180. Countrywide's "culture change" from traditional lending to nontraditional high risk lending was further fueled by its widespread use of deceptive lending practices, including a compensation structure, devised and approved by management, that was closely linked to loan volume, regardless of credit quality. According to a former sales representative quoted in the August 26, 2007 *NYT* Exposé, "[t]he whole commission structure in both prime and subprime was designed to reward salespeople for pushing whatever programs Countrywide made the most money on in the secondary market."

181. Countrywide's executives knew that the Company's incentive compensation schemes inappropriately incentivized brokers and branch managers to sell Pay Option ARM loans over any other mortgage product. With respect to

the issue of employee compensation by mortgage lenders, the *Interagency Guidance* provided the following cautionary guidance:

> Attention should be paid to appropriate legal review and to using compensation programs that do not improperly encourage lending personnel to direct consumers to particular products.
>
> ***
>
> Further, institutions should consider the effect of ***employee incentive programs*** that could produce higher concentrations of nontraditional mortgage loans.

182. Notwithstanding this clear guidance, Countrywide awarded its lending personnel powerful incentives to approve loans regardless of quality. According to a February 2008 article in *WSJ*, Countrywide was so focused on growing loan origination that in at least one building, oversized replicas of monthly bonus checks were hung above employees' cubicles so everyone could see which employees were most successful in originating new mortgages. Brokers who induced borrowers to take out subprime loans were even rewarded in some instances by prizes such as all-expense-paid trips to Las Vegas. As reported in October 2007 by *WSJ*, employees in at least one California branch received prizes, including trips to Hawaii, for selling the most Pay Option ARMs.

183. According to CW5, beginning in early 2005, the Company and senior management began to actively push loan officers to sell Pay Option ARMs. They did this by allowing the loan officers to set the margin on the loan and therefore, the ultimate commission they received for selling the loan. The "margin" was the amount of percentage points above the "index" usually based on LIBOR or U.S. Treasury rates that would be charged once the initial teaser period ended. Countrywide's loan officers had the ability to raise this "margin" as high as 5%. The higher the margin, the more commission the loan officers made. CW1 confirms that management pushed subprime loans because it charged a 5%

margin, as opposed to a smaller margin for Alt-A or prime loans. "It got to the point where it was all about money." In addition, CW5 confirmed that brokers could earn equal to 1% of the loan's value if they added a three-year prepayment penalty to a Pay Option ARM loan.

184. Countrywide also encouraged its lending personnel to generate more subprime loans by using a commission structure that rewarded sales representatives for making risky, high-cost loans. According to CW3, loan officers received higher compensation on subprime loans versus prime loans. CW7 stated that at the end of each month, loan officers pushed through more subprime loans and loan exceptions, because the closed loans might bump them up into a higher category for compensation. As FSL branch managers, CWs 3, 7 and 9 all confirm that they were compensated based on the profitability of the branch. CW8 stated that branch managers who reported to him could earn an extra $10,000 to $25,000 each month if they brought in a large volume of loans. According to CW3, regional vice presidents, such as Mauk, were paid between 5 to 10 basis points of the total loan volume for the entire region each month, so they also had an incentive to close more loans quickly.

185. Countrywide's compensation model was designed with the goal of originating loans and selling them to the secondary markets as quickly as possible, regardless of the quality of the loans, the suitability of the products for the borrower or the number and magnitude of exceptions to Countrywide's supposedly sound underwriting standards.

## H. Countrywide Made Material Misstatements In Its Financial Statements In Violation Of GAAP

### 1. Background

186. GAAP constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for

the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB"). SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1) provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

187. During the Relevant Period, Countrywide made numerous untrue statements of material fact and omitted to state material facts necessary to make its reported financial results not misleading. Countrywide violated GAAP in connection with its: (a) ALL on LHI, (b) valuation of RIs, (c) valuation of MSRs, and (d) accruals for breaches of R&Ws in connection with loan securitizations.

188. Given the Company's core business, delinquency rate and nonaccrual loans were key metrics for determining the Company's ALL, valuation of MSR, accruals for breaches of R&Ws and valuation of RI. Delinquent loans and nonaccrual loans aid management in determining the probability of loan default. Loans which are delinquent for at least 90 days are characterized as nonaccrual loans. Once a loan reaches nonaccrual status, the Company recorded interest income as payments were collected as opposed to when the payments became due.

189. The principles described in Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies*, set forth the standards of financial accounting and reporting for loss contingencies that Countrywide was required to adhere to in order to properly accrue liabilities for ALL and breaches in R&Ws.

190. SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities*, was issued in September 2000 by the FASB, and later amended by SFAS No. 156, *Accounting for Servicing of Financial Assets*. The principles described in SFAS No. 140 set forth "the standards for accounting for securitizations and other transfers of financial assets and collateral." In particular, SFAS No. 140 sets forth the standards to properly

assess the fair value for RI and MSR. Both RI and MSR are components of the income statement revenue line item gain-on-sale. SFAS No. 140, ¶ 11.

191. The AICPA issues industry-specific Audit & Accounting Guides ("AAG") to provide guidance in preparing financial statements in accordance with GAAP. The AAG for Depository and Lending Institutions was applicable to Countrywide and interpreted GAAP pronouncements on the proper methods to assess fair value for RI and MSR and accrue liabilities for ALL and R&Ws.

192. The AICPA also issues industry-specific Audit Risk Alerts ("ARA"), including financial institutions. The ARA are used by industry participants, such as Countrywide and its auditor, KPMG, to address areas of concern and identify the significant business risks that may result in the material misstatement of the financial statements. As evidence of their broad application, each year, representatives of each industry participate in the development of the ARA. The ARA are included in the AICPA's annual Audit and Accounting Manual ("AAM").

**2. Risk Factors**

193. The following risk factors were issued by the AICPA related to lending institutions during the Relevant Period.

**a. Risk Factors In 2004**

194. The 2004 ARA stated that financial institutions that emphasized subprime lending were beginning to show credit quality weakness. AAM 8050.07. Credit risk is an important factor when management estimates ALL and R&Ws as well as RI and MSR valuation. SFAS No. 5, SAB 102, SFAS No. 140, AAG Chs. 9 & 10.

**b. Risk Factors In 2005**

195. The 2005 ARA elaborated on the 2004 ARA and focused on several significant risks confronting lending institutions. The first area of emphasis was the valuation of MBS and related assets such as MSR and RI derived from ARM.

The 2005 ARA noted that the combination of continued interest rate increases and a market that was "flooded" with MBS "may be impairing these assets." AAM 8050.10. Countrywide faced a liquidity risk because there was an increasing risk that it would not be able to find a buyer for its securities at a desirable price. Thus, the increased risk of illiquidity should have been incorporated in Countrywide's valuation models and related accounting estimates.

196. The 2005 ARA cautioned that when the valuation of MBS or MSR represents a material component of an entity's financial statements, as they did on Countrywide's financial statements, that entity must have a robust methodology in place to evaluate all of the critical variables in the pricing model. AAM 8050.11.

197. The 2005 ARA also cited to the findings of the Office of the Comptroller of the Currency, which warned that financial institutions with significant holdings of financial instruments such as MBS "need to focus on the economic value of their equity." For Countrywide, this would have included RI. AAM 8050.14.

198. Due at least in part to the continued rise in interest rates, this risk directly impacted Countrywide. SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102"), notes that "[i]t is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process. . . . A registrant's loan loss allowance methodology generally should . . . [c]onsider the particular risks inherent in different kinds of lending . . . [and] ***[c]onsider current collateral values***." As a result, Countrywide's increasing exposure to ARMs, in addition to its borrowers' tendency to make less than full payments on "pay option" loans with decreasing collateral values, exposed Countrywide to a risk of understating its ALL.

**c. Risk Factors In 2006**

199. The 2006 ARA focused on many of the same significant risks that confronted mortgage lenders in 2005. Such relevant risk areas included the increase in originations of risky loan products, such as ARMs and Pay Option ARMs, which posed particular risks for entities that had not "developed appropriate risk management policies (such as avoidance of negative amortization)." AAM 8050.35. The 2006 ARA raised the specific concern that the value of these products were often predicated on an assumption that home prices would continue to rise, which it observed was an assumption unlikely to be sustainable: "[S]ome of these [ARM] products assume a continued rise in home prices that may not continue." AAM 8050.35. As a result, Countrywide should have ensured that it was reflecting the increased credit risk of such products in its valuation model and assumptions used to prepare the financial statements.

200. The 2006 ARA noted increased concerns regarding home equity lending and related mortgages in terms of the easing of underwriting standards. AAM 8050.36. In particular, the ARA continued to emphasize that if an institution elected to change its underwriting standards to issue riskier loans, the effect of such loans must be considered in evaluating the ALL. AAM 8050.36.

**d. Risk Factors In 2007**

201. During 2007, the AAG listed fraud risk factors applicable to mortgage lenders. Each of these factors should have been considered by management in assessing whether the Company's reserves and fair value assumptions were appropriate (AAG Chs. 9-10). These risk factors included (AAG Ch. 5, Ex. 5-1):

(a) significant volatility in financial markets where the institution is exposed to loss of revenue;

(b) deteriorating economic conditions (for example, real estate prices) within industries or geographic regions in which the institution has significant credit concentrations; and

(c) decline in asset quality due to borrowers affected by recessionary declines.

### 3. Inadequate ALL Inflated Countrywide's Earnings

202. Countrywide classified LHI when management intended to hold the loans for the foreseeable future or to maturity. LHI were reflected on its balance sheet at amortized cost reduced by an ALL for potential credit losses inherent in the portfolio. GAAP required the Company to establish such a reserve for potential credit losses related to borrowers who were expected to default on their obligations to make monthly mortgage payments.

203. The proper assessment of Countrywide's ALL was critical because it indicated the expected level of loss the Company was reasonably likely to incur on LHI on its balance sheet. Further, the provision for loan losses, a component of the ALL, had a direct impact on net earnings.

204. As stated above, SFAS No. 5 sets forth the standards of financial accounting and reporting for loss contingencies. Specifically, SFAS No. 5 provides in paragraph 8:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if ***both*** of the following conditions are met:
>
> a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b. The amount of loss can be reasonably estimated.

[Emphasis in original.]

205. The SEC also provided explicit guidance on the proper accounting for loan losses that Countrywide should have followed but did not. SAB 102 states in pertinent part: ***"It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process . . . .*** A registrant's loan loss allowance methodology generally should . . . [c]onsider all known relevant internal and external factors that may affect loan collectibility . . . [and] [b]e based on current and reliable data[.]"

206. SAB 102 also provides: "Factors that should be considered in developing loss measurements include . . . ***[l]evels of and trends in delinquencies and impaired loans . . . [and] [e]ffects of any changes in risk selection and underwriting standards***, and other changes in lending policies, procedures, and practices . . . ." The SEC further stated in SAB 102 that "[f]or many entities engaged in lending activities, ***the allowance and provision for loan losses are significant elements of the financial statements***. Therefore, the staff believes ***it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses***."

207. Countrywide claimed it was determining its ALL consistent with SAB 102. It stated that its ALL was evaluated "on a periodic basis by management" and any adjustments were purportedly reflected in the Company's earnings. For example, Countrywide stated in its 2006 Form 10-K that "we continually assess the credit quality of our portfolios for loans held for investment to identify and provide for losses incurred." This Form 10-K also stated that "[o]ur allowance estimation process benefits from the extensive history and experience we have developed in our mortgage loan servicing activities," and that while "this process is subject to risks and uncertainties:

> ***[W]e address this risk by actively monitoring the delinquency and default experience of our homogenous pools by considering current economic and market conditions.*** Based on our assessments of current conditions, we make appropriate adjustments to our historically developed assumptions when necessary to adjust historical factors to account for present conditions. ***Our senior management is actively involved in the review and approval of our allowance for loan losses.***

208. The AAG also provided specific guidance on estimating ALL. Chapter 9 stated that management should generally consider historical rates of default when evaluating ALL reserves but "[c]hanges in facts, circumstances or institution's procedures may cause ***factors different from those considered in the past to become significant*** to the estimate of the allowance at the balance sheet date." AAG Ch. 9, "Credit Losses."

209. The Company generally established its ALL based on historical default rates and loss percentages for similar loans originated by the Company. Due to the Company's loosened underwriting standards and use of historical default rates, the Company failed to incorporate the significant increases in credit risk in establishing its ALL.

210. The AAG also provided guidance on when loans could be considered impaired. In particular, Chapter 9 states that under SFAS No. 5 "a loan would be impaired at origination . . . if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive, in which case, the ***loss should be recognized at the date of the loan origination***."

211. GAAP, including SFAS No. 5 and SAB 102, as emphasized in AAG Ch. 9, required Countrywide to adjust historical trends and increase ALL for each reporting period based on both the increased probability of impairment and actual impairment at origination. The Company did not do so, in violation of SFAS No.

5 and SAB 102, which specifically ties loan underwriting standards and changes in risk to the setting of loan loss reserves. Rather, the Company kept ALL relatively constant during the Relevant Period before management finally began to institute some changes in 2007.

212. The Company ignored the following risk factors and did not properly estimate the Company's ALL: (a) percentage of LHI increased without proportionate increase in ALL as portfolio credit risk increased; (b) underwriting practices deteriorated and nonprime loan originations increased; (c) delinquent loans increased substantially; and (d) dramatic increases in accumulated negative amortization on Pay Option ARMs held for investment. As a result, the Company understated its ALL, overstated LHI on its balance sheet and overstated revenues.

**a. LHI Increased Without Proportionate Increase In ALL As Portfolio Credit Risk Increased**

213. The comparison of the ALL as a percentage of LHI measures portfolio credit risk coverage. During the Relevant Period, when the Company's exposure to and volume of nontraditional, riskier loans were increasing dramatically, the Company's ALL increased steadily in dollar value but not in proportion to the increased credit risk in its LHI.

214. The Company's portfolio of LHI increased dramatically from only 10% of Countrywide's total assets in 2002 to 27% in 2003, 31% in 2004 and 40% in 2005. However, the Company failed to properly account for that credit risk in its ALL. The following table illustrates these trends:

| Quarter | LHI ($000s) | ALL ($000s) | ALL as % of LHI |
|---|---|---|---|
| 4Q02 | $ 6,112,475 | $ 42,049 | **0.69%** |
| 4Q03 | $ 26,446,504 | $ 78,449 | **0.30%** |
| 1Q04 | $ 30,033,754 | $ 93,054 | **0.31%** |
| 2Q04 | $ 34,001,291 | $ 105,839 | **0.31%** |
| 3Q04 | $ 35,035,980 | $ 107,765 | **0.31%** |

| Quarter | LHI ($000s) | ALL ($000s) | ALL as % of LHI |
|---|---|---|---|
| 4Q04 | $ 39,785,132 | $ 125,046 | **0.31%** |
| 1Q05 | $ 47,833,388 | $ 134,916 | **0.28%** |
| 2Q05 | $ 62,684,289 | $ 155,962 | **0.25%** |
| 3Q05 | $ 67,960,558 | $ 184,784 | **0.27%** |
| 4Q05 | $ 70,260,353 | $ 189,201 | **0.27%** |
| 1Q06 | $ 74,279,882 | $ 172,271 | **0.23%** |
| 2Q06 | $ 79,991,180 | $ 183,581 | **0.23%** |
| 3Q06 | $ 81,004,695 | $ 207,987 | **0.26%** |
| 4Q06 | $ 78,346,811 | $ 261,954 | **0.33%** |
| 1Q07 | $ 75,551,461 | $ 374,367 | **0.50%** |
| 2Q07 | $ 74,569,443 | $ 512,094 | **0.69%** |
| 3Q07 | $ 84,778,139 | $ 1,219,963 | **1.44%** |
| 4Q07 | $ 94,772,621 | $ 2,399,491 | **2.53%** |

215. Beginning in 2003, Countrywide systematically increased its origination of nontraditional and "nonprime" loans which increased its risks. It also loosened its underwriting and appraisal standards further increasing its risks. See Sections V.B, V.C and V.D. Because of these increased risks, AAG (Ch. 9), the AAMs (8050.07, 8050.33) and SAB 102 required that estimates for ALL reflect the "effects of [these] changes in risk selections and underwriting standards." However, as the chart shows, the Company did not change estimates until the later half of 2007.

**b. Underwriting Practices Deteriorated And Nonprime Loan Originations Increased**

216. As detailed in Section V.B and V.C above, Countrywide had very poor underwriting practices. In 2003, Countrywide produced approximately $20 billion in "nonprime" loans, which was 4.6% of the total mortgage loans produced for 2003. Compared to 2003, in 2004, the Company's "nonprime" mortgage origination dramatically increased almost 99%. In 2004, the Company increased

its "nonprime" production to more than $39 million, which was 10.9% of Countrywide's total mortgage production.

217. During 2004, the Company increased the dollar value of ARM loans that it produced by 108% and increased HELOC loans by 70.7%. Accordingly, the Company was incurring substantially more risk.

218. The chart below shows the increases in nonprime and nontraditional mortgage loans at Countrywide:

| ($ millions) | **2003** | **% of 2003** | **2004** | **% of 2004** | **% Change** |
|---|---|---|---|---|---|
| **Total Mortgages** | $434,864 | | $363,364 | | -16.4% |
| **Nonprime Mortgages** | $19,827 | 4.6% | $39,441 | 10.9% | 98.9% |
| **ARMs** | $91,321 | 21.0% | $189,931 | 52.3% | 108.0% |
| **Pay Option ARMs** | n/a | n/a | $21,802 | 6.0% | n/a |
| **HELOCs** | $18,103 | 4.2% | $30,893 | 8.5% | 70.7% |

219. Countrywide's pervasive improper lending practices, loans to borrowers with high loan-to-value ratios, high debt-to-income ratios, low FICO scores and decreased due diligence leading to increased risk of false appraisals and other frauds in loan applications resulted in loans that were impaired at origination as contemplated in AAG Ch. 9. As a result, historical default rates, used by the Company to calculate ALL, were flawed, reported net value of the Company's LHI was overstated, revenue was overstated and net income was overstated.

220. During 2005, the Company continued to increase its production of nonprime and nontraditional mortgages. In 2005, Countrywide originated $45 billion in "nonprime" loans which comprised 8.9% of total mortgages produced. The production of nonprime loans increased 13.2% during 2005 as compared to 2004, reflecting Countrywide's continued assumption of increased credit risk. For

example, Countrywide increased originations of Pay Option ARM loans by 335%, ARMs increased 37.7% and HELOCs increased 45.2%.

221. The increase in "nonprime" and nontraditional mortgages is depicted in the table below:

| ($ millions) | **2004** | **% of 2004** | **2005** | **% of 2005** | **% Change** |
|---|---|---|---|---|---|
| **Total Mortgages** | $363,364 | | $499,301 | | 37.4% |
| **Nonprime Mortgages** | $39,441 | 10.9% | $44,637 | 8.9% | 13.2% |
| **ARMs** | $189,931 | 52.3% | $261,577 | 52.4% | 37.7% |
| **Pay Option ARMs** | $21,802 | 6.0% | $94,867 | 19.0% | 335.1% |
| **HELOCs** | $30,893 | 8.5% | $44,850 | 9.0% | 45.2% |

222. The table above once again illustrates Countrywide's failure to properly account for increased risk in accordance with SAB 102 during 2005, as the ALL as a percent of LHI inexplicably ***decreased*** from 0.31% to 0.27%. This shows, again, Countrywide's failure to adjust its historical rate of default to include the known increased risk from nontraditional loan products, nonprime loans and faulty credit-granting decisions resulting from its changed business practices and model.

223. In light of the fact that a material number of loans were impaired at origination, Countrywide's historical "default rate" was an inaccurate measure for use in calculating ALL. As a result, Countrywide's financial statements failed to comply with GAAP.

224. In 2006, Countrywide once again understated its ALL. Countrywide failed to properly accrue ALL due to the increased risk assumed by the Company in 2006. The 2006 ALL as a percentage of LHI remained constant as compared to 2005, at a rate of 0.33%. This lack of change once again illustrates Countrywide's

failure to adjust its historical rate of default to include the Company's increased risk, not just from 2006, but also from 2003 to 2006.

### c. Nonaccrual ARM Delinquencies And Delinquent HELOCs Increased At Significant Rate

225. Increases in originations of risky loans, particularly ARMs and Pay Option ARMs, posed particular risks for lenders that had not "developed appropriate risk management policies (such as avoidance of negative amortization)." AAM 8050.35. Accordingly, Countrywide's ALL should have been increased to reflect such increased credit risk. As detailed below, delinquencies in Pay Option ARMs and HELOCs, the loans that presented the greatest risk of default, increased substantially during the Relevant Period as detailed below:

| | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| **60/90 days+ delinquent Pay Option ARMs as % of all Pay Option ARMs** | N/A | 0.10%* | 0.22%* | 0.63% | 5.36% |
| **Delinquent HELOCs as % of all loans serviced** | 0.73% | 0.79% | 1.57% | 2.93% | 5.92% |

** 60 days delinquent*

### d. Accumulated Negative Amortization On Pay Option ARMs Held For Investment Increased Dramatically

226. During the Relevant Period, many borrowers only made the minimum payments on Pay Option ARMs and Countrywide recorded massive amounts of negative amortization from Pay Option ARMs as deferred revenue. While booking this deferred revenue presented a current impression that the Company's results were becoming better, in fact, the accumulated negative amortization signaled that these loans were ticking time-bombs of delinquencies and defaults, as mentioned in AAG Ch. 8, "Loans." As soon as borrowers reached the specified, pre-set negative amortization caps, which forced them to start

repaying the loan, not only would such borrowers be delinquent, but their loans would also have experienced meaningful deterioration in the applicable loan-to-value ratios, given that unpaid interest, according to the terms of the mortgages, was added to principal.

227. As shown in the table below, the amount of accumulated negative amortization on Countrywide's Pay Option ARMs held for investment grew dramatically during the Relevant Period. During 2005, accumulated negative amortization ballooned by more than 250,000%, and grew another 775% during 2006 and another 97% during 2007. Despite the increasing risk from accumulating negative amortization, ALL remained relatively flat as a percentage of LHI until the third quarter of 2007:

| | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| **Accumulated neg. amortization from orig. loan balance ($ millions)** | 0.029 | 74.7 | 654 | 1,216 |
| **Current period neg. amortization** | 0.029 | 74.7 | 579.2 | 562 |
| **Annual growth rate** | N/A | 257,586% | 775% | 97% |
| **ALL as % of LHI** | 0.31% | 0.27% | 0.33% | 2.53% |

228. During the Relevant Period, the Company's ALL was materially understated in violation of GAAP. The Company ignored the following risk factors and did not properly estimate the Company's ALL: (a) percentage of LHI increased without proportionate increase in ALL as portfolio credit risk increased; (b) underwriting practices deteriorated and nonprime loan originations increased; (c) delinquent loans increased substantially; and (d) dramatic increase in accumulated negative amortization on Pay Option ARMs held for investment.

### 4. Overstated RI From Securitizations Inflated Countrywide's Earnings

229. As a result of the Company's increased credit risk and failure to adhere to its own underwriting guidelines, Countrywide overstated the fair value of its RI from securitizations in violation of SFAS No. 140 and SFAS No. 115, *Accounting for Certain Investments in Debt and Equity Securities*.

230. According to its Form 10-K reports, Countrywide "sells substantially all of the mortgage loans it produces in the secondary mortgage market, primarily in the form of securities." Moreover, Countrywide generally maintained the riskiest tranches on its books as RIs. Because the valuation of RI was directly linked to gain-on-sale, a component of net income, Countrywide's improper valuation of RI from securitizations resulted in an overstatement of gain-on-sale and ultimately net income.

231. SFAS No. 140, paragraph 59 notes: "If the retained interests are subordinated to more senior interests held by others, that subordination may concentrate into the retained interests most of the risks inherent in the transferred assets and shall be taken into consideration in estimating the fair value of the retained interests." AAG Ch. 10, "Transfers of Loans and Mortgage Banking Activities"; 2005 AAM 8050.14.

232. Management stated in the Company's Form 10-K filings that it "estimate[s] fair value [of RI] through the use of discounted cash flow models." The Company further said that "[t]he key assumptions used in the valuation of RI include mortgage prepayment speeds, discount rates, and . . . the net lifetime credit losses." Moreover, Countrywide "develop[s] cash flow, prepayment and net lifetime credit loss assumptions based on ***the historical performance of the loans underlying our retained interests*** . . . ."

233. The values of the Company's RI were based in large part upon the quality of the underlying loans. Given that a substantial portion of the underlying

loans in the securitizations beginning in 2003 were not originated in accordance with the Company's underwriting standards, there was an increased risk that those loans would not perform in accordance with their terms and, consequently, the securitizations would not perform as expected.

234. Because the RI were the riskiest tranches of the securitizations, the failure to comply with Countrywide's underwriting standards significantly impacted the value of RI. Thus, to properly value RI, Countrywide was required to adjust assumptions that had been based upon the historical rate of default (i.e., net lifetime credit losses) to include the increased credit risk of the underlying loans included in its securitizations.

235. Once RI was initially recorded, Countrywide was required to determine the fair value of RI in each subsequent quarter. SFAS No. 140 provided guidance on how to determine the fair value of RI:

> Valuation techniques for measuring financial assets and liabilities and servicing assets and liabilities shall be consistent with the objective of measuring fair value. ***Those techniques shall incorporate assumptions that market participants would use in their estimates of values, future revenues, and future expenses, including assumptions about interest rates, default, prepayment, and volatility.***
>
> * * *
>
> Estimates of expected future cash flows, if used to estimate fair value, shall be based on ***reasonable and supportable assumptions and projections. All available evidence shall be considered in developing estimates of expected future cash flows.***

SFAS No. 140, ¶¶ 68-70.

236. A key assumption Countrywide used to assess the fair value of RI was the "default rate," which was encompassed in "net lifetime credit loss" as referenced in the Company's Forms 10-K. Net lifetime credit loss is determined

by estimating when and how many loans will default and multiplying that amount by the percentage of the loan balance that will be uncollectible. Default rate is the speed at which the underlying mortgage loans become delinquent or default.

237. A second important assumption used to estimate the fair value of RI is "weighted average life." This assumption refers to the period of time during which the benefit of RI is expected to be received; in other words, the length of time that Countrywide will get paid on its RI, if any. This is influenced by prepayment rates and credit risk. SFAS No. 140, ¶17. Countrywide's shift toward nonprime and nontraditional lending beginning in 2003 should have decreased the weighted average life of RI, instead of allowing weighted average life to remain constant or increase. This is because the "life" of a loan ends when the borrower defaults, resulting in a lower weighted average life. As Countrywide increased the number of loans it made to less creditworthy borrowers under loosened underwriting standards and weak (if any) due diligence, defaults would be expected to increase and the weighted average life of such loans would be expected to decrease.

238. The table below illustrates that Countrywide did not sufficiently adjust its historical default assumptions to encompass the new riskier loans that the Company was producing at a rapid pace; nor did they include the increased credit risk from Countrywide's loosened underwriting practices. Countrywide failed to take these steps even though financial institutions with significant holdings of financial instruments like MBS "need[ed] to focus on the economic value of their equity," which, for Countrywide, would have included RI. 2005 AAM 8050.14. The Company failed to appropriately include in its assumptions for both weighted average life and net credit losses the likelihood that there had been and would continue to be an increase in defaults.

| | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| **Nonprime Loans Originated ($millions)** | $19,827 | $39,441 | $44,637 | $40,596 | $16,993 |
| **Total Delinquencies** | 3.91% | 3.83% | 4.61% | 5.02% | 6.96% |
| **Nonprime Delinquencies** | 12.46% | 11.29% | 15.20% | 19.03% | 27.29% |
| **Prime Home Equity Delinquencies** | 0.73% | 0.79% | 1.57% | 2.93% | 5.92% |
| **Weighted Average Life** | 2.0 | 2.5 | 2.4 | 2.8 | 6.4 |
| **Net Lifetime Credit Posses** | 1.90% | 2.00% | 1.70% | 2.60% | 10.90% |
| **Weighted Average Prepayment Speed** | 30.60% | 34.80% | 38.30% | 32.20% | 21.00% |
| **Fair Value of RI ($millions)** | $1,355.5 | $1,908.5 | $2,675.5 | $3,040.6 | $2,450.4 |

239. Under legitimate risk assumptions, Countrywide's intentional lowering of lending standards and the resulting increased delinquencies would have resulted in proportionally reduced valuations of RI throughout the Relevant Period. As a result, the fair market value of Countrywide's RI was materially overstated in each of the years from 2004 through the first half of 2007, as Countrywide failed to employ fair value assumptions to RI to reflect the increased risk from the underlying loans it originated in violation of SFAS Nos. 140 and 115.

**5. Overstated MSR Inflated Countrywide's Earnings**

240. Countrywide typically retained the right to service mortgage loans after it sold them in the secondary market. Throughout the Relevant Period, Countrywide overstated its MSRs and the Officer Defendants also falsely and materially inflated Countrywide's assets, gain-on-sale and reported net income in violation of GAAP.

241. The Company's valuation of its MSR during the Relevant Period was materially overstated because its cash flow model ignored: (a) the Company's change in lending practices beginning in 2003 to offer nontraditional, high-risk loans; (b) the Company's significant increasing production of subprime loans; (c) the Company's continued exceptions from its underwriting guidelines; (d) the drastic increase in loan delinquencies and defaults; and (e) the increased expected costs associated with servicing delinquent loans. Under proper risk assumptions, the "change in culture" and resulting increased delinquencies would have resulted in proportionally reduced valuations of its MSR throughout the Relevant Period.

**a. Improper MSR Valuations In Violation Of GAAP**

242. Until January 1, 2006, Countrywide's valuation of MSR was governed by SFAS No. 140. According to Countrywide's Form 10-K filings, MSR were carried at the lower of their amortized cost or fair value and periodically amortized and evaluated for impairment. Impairment was recognized when the current fair value of the MSR fell below the asset's amortized cost basis. Moreover, if MSR were impaired, the impairment was recognized in current period earnings and the carrying value of the MSR was adjusted through a valuation allowance. The valuation allowance account reduces the value of MSRs (i.e., amortized cost) when impaired.

243. Countrywide maintained a pricing model to estimate the fair value of its MSRs. According to Countrywide's 2005 Form 10-K, in periods prior to 2006, this pricing model was used to gauge the adequacy of the valuation allowance: "Our MSR valuation process combines the use of a sophisticated discounted cash flow model . . . The cash flow assumptions and prepayment assumptions used in our discounted cash flow model are based on our empirical data drawn from the historical performance of our MSRs, which we believe are consistent with assumptions used by market participants valuing similar MSRs."

244. SFAS No. 156, *Accounting for Servicing of Financial Assets*, amended SFAS No. 140 as of January 1, 2006 and provided reporting entities a choice of methods to use when valuing MSRs. Countrywide elected to follow SFAS No. 156 as of January 1, 2006, and chose to record MSRs at fair value (as opposed to amortized cost) in subsequent quarters.

245. In accordance with this election, the Company identified MSRs relating to all existing residential mortgage loans as a class of servicing rights and elected to apply fair value accounting to these MSRs. SFAS No. 156 changed the accounting for and reporting of the recognition and measurement of separately recognized servicing assets and liabilities. Like SFAS No. 140, SFAS No. 156 requires MSRs to be initially recorded at fair value. However, SFAS No. 156 allows MSRs to be ***carried on the books at fair value in subsequent periods*** (without the need to subsequently value them at amortized cost).

246. In 2006 and thereafter, the fair values that Countrywide assigned its MSRs were determined by a discounted cash flow model. According to Countrywide's third quarter 2007 Form 10-Q, "[t]he discounted cash flow models incorporate cash flow and prepayment projections based on data drawn from the ***historical performance of the loans underlying the Company's MSRs*** . . . in determining the assets' fair value."

### b. Valuation Allowance Did Not Accurately Reflect Increased Credit Risk

247. Countrywide's 2007 Form 10-K stated that any calculated change in the fair value of its MSRs was based upon two primary components: (a) a reduction in fair value due to the realization of expected cash flows; and (b) a change in fair value resulting from changes in interest rates and other market factors, otherwise referred to as a change in fair value due to management's assumptions.

248. As noted above, management stated in Countrywide's Form 10-Ks that it used "discounted cash flow models that incorporate cash flow and prepayment projections based on data drawn from the historical performance of the loans underlying the Company's MSRs" to determine changes in fair value due to management's assumptions. The Company further stated that "[t]he key assumptions used in the valuation of MSRs include mortgage prepayment speeds, the discount rate (projected London Inter Bank Offering Rate ("LIBOR") plus option-adjusted spread)" and the weighted average life of the loans. However, missing in this model is the default rate – a critical factor.

249. The chart below demonstrates that as Countrywide's underwriting guidelines continued to loosen over the Relevant Period, delinquencies and pending foreclosures from loan defaults rose significantly. By failing to appropriately use the default rate as a key assumption in the valuation of MSRs, the Company did not properly value its MSRs, and the Company's assets and net income was accordingly overstated.

| | **2005** | **2006** | **2007** |
|---|---|---|---|
| **Total Delinquencies** | 4.61% | 5.02% | 6.96% |
| **Nonprime** | 15.20% | 19.03% | 27.29% |
| **Prime home Equity** | 1.57% | 2.93% | 5.92% |
| **Prepayment Speed** | 22.80% | 21.00% | 17.90% |
| **Weighted Average Life** | 5.6 | 5.8 | 6.4 |
| **Fair Value of MSRs ($000s)** | $12,720,755 | $16,172,064 | $18,958,180 |

250. As Countrywide increased originations of mortgages overall, and also increased the percentage of mortgages granted to less creditworthy borrowers using loosened underwriting standards and without prudent due diligence, the gross value of Countrywide's MSRs as reported rose from $8.1 billion as of December 31, 2003 to $9.8 billion as of December 31, 2004. However, despite

the 22% increase in the gross value and risks attributable to these assets, Countrywide actually decreased its valuation allowance for impairment of MSRs by 9% from $1.2 billion to $1.1 billion. Instead of a decrease in valuation allowances, one would expect an increase in the valuation allowance as a result of the increased credit risk associated with loosening underwriting standards.

251. In the following year, the reported gross balance of MSRs rose 33% from $9.8 billion as of December 31, 2004 to $13.0 billion as of December 31, 2005. However, despite the continued significant increase in credit risk assumed by Countrywide during that year, the valuation allowance for impairment of MSRs actually decreased 61% from $1.1 billion to only $0.4 billion. It was illogical that the valuation allowance would drop in relative terms from 11% to only 3% of gross MSRs given known exposure to increased default risk due to the loosening in underwriting standards and failures to exercise prudent due diligence, and the effect of that risk on the value of MSRs.

**c. Drastic Write-Down Of Fair Value Of MSR**

252. Countrywide first wrote-down the fair value of its MSRs in its third quarter 2007 Form 10-Q. In that quarter, Countrywide recorded a reduction of $1.1 billion in the fair value of the MSRs due solely to a change in model assumptions. Nevertheless, there does not appear to have been any meaningful change to the key fair value assumptions in the model disclosed by Countrywide to explain this change, strongly indicating an understanding that its model was inadequate but a refusal to acknowledge its prior improper valuations. In fact, the increased weighted average life and the decreased prepayment speed both implied that the modified fair value assumptions would have resulted in an increase to the reported value of its MSRs as of September 30, 2007, rather than the decrease which was reported. The table below compares the key assumptions to determining fair value disclosed by Countrywide's 3Q07 Form 10-Q with the key assumptions used at the end of 2006, as disclosed in its 2006 Form 10-K:

| | 12/31/06 | 9/30/07 |
|---|---|---|
| **Fair Value of MSRs ($ billion)** | $16.20 | 20.1 |
| **Weighted Average Life (in yrs)** | 5.8 | 6.4 |
| **Annual Prepayment Speed** | 21.0% | 18.1% |
| **Option-Adjusted Spread** | 6.2% | 6.1% |

253. As illustrated above, there was no significant change in management's key assumptions to warrant such a massive write-down of Countrywide's MSRs. Nonetheless, Countrywide continued to write down its MSRs in the fourth quarter of 2007 as reported in its 2007 Form 10-K. These facts lead to the inference that Countrywide's assumptions used to value its MSRs were incorrect and that some other undisclosed assumption such as default risk or increasing servicing costs had been introduced, which resulted in the write-down.

254. This hidden introduction of "new" assumptions, ones that Countrywide did not seem to consider with respect to prior valuations, provides evidence that there was a failure to appropriately value its MSRs during the Relevant Period to reflect the true credit risk of the underlying loans that Countrywide serviced.

255. Additional evidence of management's hidden assumptions arises from the Company's own SEC filings. Countrywide disclosed in its 2007 Form 10-K that "[w]e recorded a decrease in the fair value of the MSRs in 2007 of $1,085.4 million, primarily as a result of decreasing mortgage rates during the last half of the year which ***increased expected future prepayment speeds*** of our agency servicing portfolio."

256. However, as mentioned in Section V.H.4 above, the weighted average prepayment speed for both MSRs and RIs decreased in the Company's disclosed fair value assumptions as of December 31, 2007. Countrywide does

provide some disclosure that the market deterioration moderated the impact of prepayments, but there is no disclosure reconciling these conflicting conclusions.

257. Consequently, the Company's valuation of its MSRs during the Relevant Period was materially overstated because its cash flow model ignored (a) the Company's change in lending practices beginning in 2003 to offer nontraditional, high -risk loans; (b) the Company's significant increasing production of subprime loans; (c) the Company's continued exceptions from its underwriting guidelines; (d) the drastic increase in loan delinquencies and defaults; and (e) the increased expected costs associated with servicing delinquent loans. Under proper risk assumptions, the "change in culture" and resulting increased delinquencies would have resulted in proportionally reduced valuations of its MSRs throughout the Relevant Period.

### 6. Understated Reserves For R&Ws Inflated Countrywide's Earnings

258. Countrywide stated in its SEC filings that "[w]hen we securitize our mortgage loans we retain varying levels of credit risk. This credit risk arises through R&Ws that we make as part of our securitization activities, as well as through retention of limited recourse for credit losses in the case of certain securitizations."

259. Moreover, according to Countrywide's SEC filings, the Company retained credit risk for all R&Ws offered in a securitization. Countrywide defined "credit risk" in its 2007 10-K as follows: "credit risk . . . is the risk that a borrower ***will not repay*** the [underlying] loans' balance as agreed and the risk that the proceeds from liquidation of the collateral securing the loan will not be adequate to repay the loan's balance."

260. During the Relevant Period, Countrywide made R&Ws in connection with the sale of its mortgage loans to the secondary market through securitizations. The accrual of loss contingencies for R&Ws is based upon the

rate of expected future claims from investors resulting from breaches of the Company's corporate guarantees and mortgage loan R&Ws.

261. As a result of its failure to adhere to its own underwriting standards, Countrywide did not properly accrue liabilities for breaches of R&Ws throughout the Relevant Period. Accordingly, Countrywide and the Officer Defendants also materially understated Countrywide's liabilities and overstated its gain-on-sale revenues and net income.

262. "Credit loss" is a loss that arises from the retention of credit risk. If Countrywide breached its corporate guarantees and mortgage loan R&Ws to secondary market purchasers, it would be required to either repurchase the underlying mortgage loan with the identified defects or compensate the purchaser. In such cases, the Company would bear subsequent credit losses on the mortgage loans.

263. Countrywide understated its loss accrual for R&Ws because it ignored the high risk and poor quality of its underlying loans and its deteriorated underwriting practices. Consequently, the Officer Defendants violated GAAP. Specifically, SFAS No. 5, Accounting for Contingencies, required that Countrywide record a reserve for a future loss associated with a breach of its R&Ws that was probable and estimable: "An estimated loss from a loss contingency . . . shall be accrued by a charge to income if both of the following conditions are met: (a.) Information available prior to issuance of the financial statements indicates that it is ***probable*** [future event or events are likely to occur] that . . . a liability had been incurred at the date of the financial statements. . . . [and] (b.) [t]he amount of loss can be ***reasonably estimated***."

264. Further, SFAS No. 140 and Emerging Issues Task Force No. 92-2, *Measuring Loss Accruals by Transferors for Transfers of Receivables with Recourse* ("EITF 92-2"), states that the reserve should be estimated based upon certain factors, including the Company's historical repurchase experience,

industry repurchase experience, ***expected future volume of repurchases and expected value of underlying collateral***.

265. SFAS No. 140 and EITF 92-2 required the reserve to be estimated and recorded as a liability on Countrywide's balance sheet in the period in which the loans were sold, with a corresponding reduction of Countrywide's gain-on-sale in its income statement. Specifically, SFAS No. 140 provides:

> Upon completion of a transfer of assets that satisfies the conditions to be accounted for as a sale (paragraph 9), the transferor (seller) shall (paragraph 11):
>
> a. Derecognize all assets sold[;]
>
> b. Recognize all assets obtained and ***liabilities incurred*** in consideration as proceeds of the sale, including cash, put or call options held or written (for example, guarantee or ***recourse obligations***), forward commitments . . . swaps . . . and servicing liabilities, if applicable[;]
>
> c. ***Initially measure at fair value*** assets obtained and ***liabilities incurred in a sale*** or, if it is not practicable to estimate the fair value of an asset or a liability, apply alternative measures[; and]
>
> d. Recognize in earnings any gain or loss on the sale.

(Certain emphasis in original.)

266. In the third quarter of 2007, Countrywide was forced to admit that the amount of its reserves for R&Ws had been wrong. At that time, the Company increased its allowance for R&Ws by a shocking $291.5 million or 611% from the $41.0 million reported twelve months earlier in the third quarter of 2006. Notably, the Company reported that $177.3 million or 60% of this increased allowance related to prime loans and $67.1 million related to the nonprime loans, demonstrating the true extent of the Company's exposure to losses in its purported

"prime" loan portfolio as a result of (a) its improper lending practices, and (b) its improper internal definition of "prime."

267. Countrywide's reserves for R&Ws were materially understated and in violation of GAAP during the Relevant Period for at least the following reasons: (a) the Company changed its lending practices beginning in 2003 to offer nontraditional, high risk loans to all borrowers, even those incapable of repaying the loans; (b) the increased origination of high-risk loans to unqualified borrowers with little-to-no supporting documentation; (c) the Company's continued origination of loans through exceptions from its underwriting guidelines; and (d) the increased probability that borrowers would default.

268. During the Relevant Period, Countrywide violated GAAP by not properly accruing loss contingencies that were probable and estimable in accordance with SFAS Nos. 5, 140 and EITF 92-2. The Company understated its liabilities and overstated its reported net income.

**7. Ineffective Internal Controls Over Financial Reporting**

269. Due to the Company's lack of effective internal controls, the Company issued inherently risky loans, such as Pay Option ARMs, with complete disregard of its underwriting standards. Such lending practices caused the default rate of Countrywide's loans to increase at an accelerated pace throughout the Relevant Period.

270. Moreover, the Officer Defendants concealed the deteriorating internal controls during the Relevant Period and issued false and misleading statements as to the effectiveness of the Company's internal controls. The ineffectiveness of Countrywide's internal controls allowed the Officer Defendants to inappropriately classify subprime loans as prime loans further masking the failing financial health of the Company.

271. As a result of Countrywide's failure to maintain effective internal control over its financial reporting, the Officer Defendants were also able to

manipulate the recording of reserves for R&W and write-down the fair values of the Company's LHI and MSRs. Countrywide's weak internal controls allowed the Officer Defendants to materially misstate the financial statements during the Relevant Period.

272. Countrywide's 2007 Form 10-K filing asserts management's responsibility over internal controls:

> Management is responsible for establishing and maintaining ***adequate internal control over financial reporting for the Company***. . . . In making its assessment of internal control over financial reporting, management [claimed to] use[ ] the criteria established in 'Internal Control-Integrated Framework' issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)."

273. COSO defines "internal controls" in Ch. 1 of its Framework as follows:

> "Internal control is a process, effected by an entity's board of directors, management and other personnel, designed to provide ***reasonable assurance*** regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of operations; (ii) ***Reliability of financial reporting***; (iii) Compliance with applicable laws and regulations.

274. Moreover, COSO emphasizes the importance of a strong control environment, which sets a positive "tone at the top" and then flows down through the Company. The COSO Framework Executive Summary identifies the pervasive influence that the control environment has on the company, as follows:

> The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the ***foundation for all other components of internal control***, providing discipline and structure. Control environment factors include the integrity, ethical

> values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.

275. In addition, the COSO Framework, Ch. 2, establishes that management's philosophy and operating style directly affect the manner in which the company is managed, the amount of risk that the company accepts and ultimately the success of the company. Chapter 2 of the COSO Framework states:

> Management's philosophy and operating style affect the way the enterprise is managed, including the ***kinds of business risks accepted***.… Other elements of management's philosophy and operating style include attitudes toward financial reporting, conservative or aggressive selection from available alternative accounting principles, ***conscientiousness and conservatism with which accounting estimates are developed***, and attitudes toward data processing and accounting functions and personnel. . . . ***The impact of an ineffective control environment could be far reaching, possibly resulting in a financial loss, a tarnished public image or a business failure***.

276. Specifically, Chapter 8 of the COSO Framework establishes the CEO's responsibility over internal control. Chapter 8 states as follows:

> [The chief executive] has ultimate ownership responsibility for the internal control system. One of the most important aspects of carrying out this responsibility is to ensure the existence of a ***positive control environment***. More than any other individual or function, the chief executive sets the "tone at the top" that affects control environment factors and other components of internal control.

277. SOX Section 404 requires management to assess the effectiveness of the internal control structure and the financial reporting for procedures. Further, SEC Release No. 33-8238 requires management to report publicly all material weaknesses in the company's internal controls. "A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." PCAOB Auditing Standards No. 2, ¶10.

278. Beginning in 2002, the Officer Defendants were required under SOX Rule 302 to provide assurances relating to the Company's "internal control over financial reporting." Rule 302 states as follows:

> [E]ach annual report . . . [should] contain an internal control report, which shall: (1) state the responsibility of management for ***establishing and maintaining an adequate internal control structure and procedures for financial reporting***; and (2) contain an assessment, as of the end of the most recent fiscal year of the issuer, ***of the effectiveness of the internal control structure*** and procedures of the issuer for financial reporting.

279. As explained above and in the Company's regulatory filings, the Officer Defendants represented to the marketplace that their assessment of internal controls over financial reporting was based upon the framework established by COSO. Also, the Officer Defendants represented in the Company's Form 10-K filings that the Company's internal control over financial reporting was effective for 2004,[11] 2005 and 2006. These statements were false because Countrywide concealed its lax underwriting standards and increased approval of exception

---

[11] In the Company's 2004 Form 10-K, management noted a material weakness regarding recognizing gains on sale of MBS with embedded derivatives but there was no recognition of a material weakness due to lax underwriting standards.

loans. As a result, management's reports on internal control over financial reporting, required by SOX Rule 302, were materially false and misleading because Countrywide's internal controls were ineffective to prevent or detect errors or misstatements in its operations, underwriting practices or financial reporting.

280. Management's assessment of internal control over financial reporting was a critical metric for investors because it provided assurance that the Company's financial statements were reliable and in compliance with applicable laws. However, during the Relevant Period, as alleged herein, Countrywide did not properly assess its internal controls over financial reporting, thus it violated the "Internal Control-Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and SOX.

### I. Countrywide Misrepresented Access To Liquidity And Value Of Excess Capital

281. Both liquidity and capital are essential elements to the survival of a company. The Company stated in its SEC filings that "[w]e have significant short-term and long-term financing needs." Moreover, "public corporate debt markets are a key source of financing for us, due to their efficiency and low costs." In order to maintain access to public corporate debt markets, the Company stated in its SEC filings that "it was critical for us to maintain investment-grade credit ratings." During the Relevant Period, Countrywide materially misrepresented its access to liquidity and overstated its capital.

#### 1. Countrywide Misrepresented Its Access To Liquidity

282. Liquidity is simply the measure of an organization's ability to meet its current financial obligations. Countrywide represented in its SEC filings that the short- and long-term financing needs were primarily met through facilities, including, but not limited to: (a) Federal Home Loan Bank advances; (b) revolving lines of credit; (c) public debt markets; and (d) secondary mortgage markets.

283. Countrywide's cultural shift to higher risk loans to higher risk borrowers threatened the Company's sources of liquidity. The deteriorating quality of loans which formed the core of the Company's business had the potential of destroying Countrywide's reputation and creditworthiness and ultimately cutting off access to financing sources – thus, threatening the Company's liquidity.

284. On July 24, 2007, the financial community became aware of the problems with Countrywide's loan quality. Moreover, the poor quality loans were defaulting at alarming rates forcing Countrywide to take large write-downs. As a result, the Company's availability and access to short- and long-term financing needs were at risk. The Company could no longer rely on its access to secondary mortgage markets as a source of long-term capital to support the Mortgage Banking operations.

285. As Countrywide's sources of liquidity dried up, Countrywide lost its ability to sell debt securities, which as stated above, was a "key source of financing."

286. Shocking investors, the Company announced on August 16, 2007 that it tapped into its $11.5 billion credit facility to supplement its funding liquidity position because it was having difficulty selling short-term debt. Analysts speculated that bankruptcy was possible if market conditions worsened.

**2. Countrywide Overstated Its Capital**

287. The Company stated in its SEC filings that its "primary source of equity capital is retained earnings." As a result of the Company's failure to properly account for its ALL, liabilities for breaches of R&Ws, and improper valuation of RIS and MSRs, its net income was overstated. Thus, the Company's retained earnings, a component of stockholders' equity, was overstated as well.

288. Countrywide's capital decreased severely from the massive write-downs that the Company had to take as a result of failing to properly reserve for

loan losses and properly value its assets. As the secondary mortgage markets were unavailable and credit losses were escalating, Countrywide was forced to take a $3 billion write-down in the third quarter of 2007. Moreover, in the next quarter, the Company had to make an additional $2.2 billion write-down. With these write-downs, the Company basically lost all of its excess capital, which was reported to be in the range of $1.1 to $4.7 billion.

289. The Company's ability to survive as an independent entity was shrinking as it was losing access to liquidity and depleting its capital. As a result, on January 11, 2008, BofA announced that it was purchasing Countrywide for approximately $4 billion, representing roughly 26% of Countrywide's third quarter 2007 reported book value of $15.3 billion.

290. BofA's low offer for Countrywide further supports the allegations that the Company's stockholders' equity was inflated and the Company's statements regarding access to financing were false and misleading. Stockholders' equity is a key metric for investors.

291. As detailed below, Countrywide continued to reassure the public that it had access to liquidity and adequate capital, despite the truth gradually coming to light. Consequently, Countrywide's credibility plummeted, its creditworthiness declined, access to liquidity was choked off and its overstated capital was reduced by inevitable write-downs.

## VI. DEFENDANTS MADE FALSE AND MISLEADING MATERIAL STATEMENTS AND OMISSIONS

292. During the Relevant Period, Countrywide made numerous untrue statements of material fact and omitted to state material facts necessary to make its statements about financial results not misleading. These statements generally fall within three broad categories. First, Defendants issued false statements regarding the Company's underwriting practices. In fact, at the same time Countrywide loosened and abandoned its loan origination and underwriting

standards, it falsely assured investors and analysts that the Company's underwriting policies and procedures, particularly in subprime loans, were sound and indeed superior to those of competing lenders. Second, Defendants issued false statements regarding the Company's exposure to the subprime market. Third, Defendants issued false financial results.

### A. The Company's False Statements Regarding 2003

#### 1. 2003 Form 10-K

293. On March 12, 2004, Countrywide filed its Annual Report for 2003 with the SEC on Form 10-K (the "2003 Form 10-K"). The report was signed by Defendant Mozilo, among others. According to reported consolidated loan production numbers in the 2003 Form 10-K, prime first mortgage loans equaled $396,934,000,000, prime home equity loans equaled $18,103,000,000 and subprime mortgage loans equaled $19,827,000,000. Subprime mortgages produced equaled 4.6% of the total dollar amount of loans produced at year end.

294. The Company also reported Mortgage Banking loan production by loan type in the 2003 Form 10-K. Mortgage Banking produced $12,268,000,000 in prime home equity loans and $15,525,000,000 in subprime loans at year end. Prime home equity loans and subprime loans equaled 7.0% of the total Mortgage Banking loans originated at year end.

295. Furthermore, the Company reported that prime and prime home equity LHI equaled $22.0 billion at year end.

296. In a section of the 2003 Form 10-K titled "Secondary Mortgage Market," the Company stated that "[w]e ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages. . . As described elsewhere in this document, we have a major focus on ensuring the quality of our mortgage loan production . . . ."

297. In a section of the 2003 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and

supervised process "designed to produce high quality loans" through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

> **Mortgage Credit Risk**
>
> **Overview**
>
> In our mortgage lending activities, we manage our credit risk by producing high quality loans . . . .
>
> * * *
>
> **Loan Quality**
>
> Our Credit Policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines, and loan origination standards and procedures.
>
> Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through . . . manual or automated underwriting of additional credit characteristics.
>
> * * *
>
> Our loan origination standards and procedures are designed to produce high quality loans. These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and on-going review of their work . . . . In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy, and help to prevent fraud, while at the same time increasing productivity.

> In addition to our pre-funding controls and procedures, ***we employ an extensive post funding quality control process.*** Our quality control department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in depth underwriting and appraisal review, and if necessary, a fraud investigation. We also employ a post-funding proprietary loan performance evaluation system. This system identifies fraud and poor performance of individuals and business entities associated with the origination of our loans. The combination of this system and our audit results ***allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance to laws and regulations to ensure that current loan production represents acceptable credit risk, as defined by the Board of Directors***.

298. In addition, Defendants claimed that Countrywide's underwriting processes were superior to those of its competitors who originated nontraditional and subprime loans. During an analyst conference call on April 21, 2004, when asked whether Countrywide's management was "comfortable" with the inherent risk of selling nontraditional mortgage products, Mozilo responded:

> [W]e have successfully managed this product for years. ***So I think using what our competitors do as a barometer will put you down the wrong path. We are a very different focused company that understands this product very well, how to originate, how to manage it, how to underwrite, how to service it.*** So we look at . . . this subprime business as . . . one that has to be carefully managed, but one that has a tremendous opportunity for us long into the future, certainly through the balance of this decade and beyond.

299. Further assuring investors of the veracity of the information contained in the 2003 Form 10-K, the report included the SOX certifications signed by Mozilo. The certifications falsely stated, in part, that: (a) the Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" (b) the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows" of Countrywide; and (c) "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Countrywide's] ability to record, process, summarize and report financial information" were "disclosed."

300. The statements referenced above in the 2003 Form 10-K were materially false and misleading when made. As set forth in greater detail above, management's statements relating to the volume of loans produced, the amount of revenues from the sale of prime loans and the value of prime LHI were false and misleading because Countrywide misclassified subprime loans as prime loans. See Section V.F above. Countrywide's statements that it "consistently produce[d] quality mortgages" and that its "loan origination standards and procedures are designed to produce high quality loans" were false and misleading because Countrywide loosened and abandoned its underwriting guidelines beginning in 2003 and through the period alleged in this Complaint, to increase loan volume without regard to loan quality and to increase earnings and market share, as more fully alleged in Sections V.B and V.C above. Moreover, the SOX certifications signed by Mozilo was false and misleading because the 2003 Form 10-K contained untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading. See Section V.H.

**B. The Company's False Statements Regarding 2004 Results**

**1. First Quarter 2004 Form 8-K**

301. On April 21, 2004, Countrywide filed a Form 8-K, signed by then-President Stanford L. Kurland ("Kurland")[12], attaching a press release that announced the Company's financial results for the first quarter of 2004. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,358,667,000, revenues of $2,214,903,000 net earnings of $690,972,000 and diluted earnings per share of $2.22 for the quarter. The Company also reported net LHI of $29,940,700,000, allowance for loan losses of $93,054,000, net MSR of $6,406,491,000, total assets of $100,279,813,000, total liabilities of $91,493,807,000 and total shareholders' equity of $8,786,006,000.

**2. First Quarter 2004 Conference Call**

302. After issuing the press release on April 21, 2004, the Company hosted a conference call for investors and analysts (the "April 21, 2004 Conference Call"), and made a number of false and misleading statements consistent with the Company's press release.

303. During the April 21, 2004 Conference Call an analyst from Basswood Partners asked Mozilo to explain the functionalities of an ARM. In response, Mozilo asserted that an ARM product is "***a great product, a prime product (sic) for the bank***, as long as it fits within the regulatory bounds that are set for the bank."

304. On the same conference call, Mozilo responded to an analyst's concern about the Company's subprime lending, by representing that Countrywide understood the subprime business better than its competitors:

---

[12] Kurland joined Countrywide in 1979 and became COO in 1988 and President in January 2004. Kurland remained President and COO of Countrywide until his resignation on September 7, 2006.

> I think using what our competitors do as barometer will put you down the wrong path. We are a very different, focused company that understands this product very well, how to originate, how to manage it, how to underwrite it, how to service it. So we look at – the short answer to your question is that we look at this subprime business as one that has to be carefully managed.

305. In response to an analyst's question during the April 21, 2004 Conference Call regarding the potential risks from originating nontraditional, riskier loans, such as subprime loans, Mozilo falsely stated that Countrywide had taken a more disciplined approach than its competitors, that it was not involved in the "frothy business" that others engaged in and that it was properly monitoring subprime risks:

> There's very good solid subprime business and there's this frothy business that you relate to. And you have to really – when you're doing your analysis, what is the average FICO score of these – because you can get so deep into this marginal credit that you can have serious problems, you know, where you're taking, you know, 400 FICOs with no documentation. That is dangerous stuff. So I think it's very important that you understand the disciplines that the company has, that Countrywide has which is a very strong discipline in the origination of subprime loans and maintaining that discipline is critically important to us. When you look at subprime you have to look at it in various tranches and we're at the high end of that tranche.

306. When an analyst asked if subprime mortgages would ever be held for investment on Countrywide's books, Kurland responded that Countrywide did not plan to ever hold subprime mortgages as an investment on its books. Specifically, Kurland stated that: "[w]e don't intend to maintain as an investment subprime

mortgages on our balance sheet. . . . [T]here is no intention at all to ha[ve] a permanent investment in a pool of subprime loans."

307. The statements made during the April 21, 2004 Conference Call were false and misleading when made. None of the Officer Defendants issued any corrections to Kurland's statements, thereby ratifying these false public statements. The statement by Mozilo that Countrywide's ARM loans were "prime product[s]" was false and misleading for the same reasons set forth in Section V.F above. Furthermore, his statements that Countrywide's ARM loans were prime products, "that the Company had . . . very strong disciplines in the origination of subprime loans"; that "we are a very different company that understands this [subprime] product"; and that Countrywide's subprime originations were "at the high end" of the subprime tranche; were false and misleading because Countrywide loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality. See Section V.B above. Further, Mozilo knew that the Company's underwriting policies treated as prime many loans that should have been classified as subprime by mortgage industry standards. See Section V.F. Moreover, Kurland's statement that "[w]e don't intend to maintain as an investment subprime mortgages on our balance sheet" was misleading because Countrywide assumed subprime risk both on and off its balance sheet since a large part of its asset residuals were derived from subprime loans. Countrywide also maintained off-balance sheet subprime risk through its R&Ws of subprime loans. See Section V.F.

### 3. First Quarter 2004 Form 10-Q

308. On May 7, 2004, Countrywide filed its quarterly report on Form 10-Q for the first quarter of 2004, ended March 31, 2004, signed by Kurland. The Company reported financial results as detailed below.

309. In the "Off-Balance Sheet Arrangements and Guarantees" section of its first quarter 2004 Form 10-Q, Countrywide described the R&WS exposure

associated with the securitization of its loans as follows: "[m]anagement does not believe that any of its off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

310. In the first quarter 2004 Form 10-Q, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in Countrywide's total volume of loans produced). Specifically, Mortgage Banking prime home equity loans produced during the quarter equaled $3,729,000,000. Mortgage Banking subprime loans produced during the quarter equaled $6,048,000,000, and were 8.9% of total Mortgage Banking loan production for the quarter.

311. In the Form 10-Q, Kurland described the Company's management of credit risk in the following terms: "[w]e manage mortgage credit risk principally by . . . ***only retaining high credit quality mortgages in our loan portfolio.***"

312. Also, in the section entitled "Controls and Procedures," Countrywide described the adequacy of its internal controls: "There has been no change in our internal control over financial reporting (sic) during the quarter ended March 31, 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

313. Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Mozilo, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

**4. Amended First Quarter 2004 Form 10-Q/A**

314. On April 25, 2005, the Company filed its amended quarterly report on Form 10-Q/A for the first quarter of 2004, ended March 31, 2004, signed by Defendant Sieracki, among others. The Company reported gain-on-sale of loans and securities of $1,117,390,000, revenues of $1,973,626,000, net earnings of $543,189,000 and diluted earnings per share of $1.75 for the quarter. The Company also reported net LHI of $29,940,700,000, ALL of $93,054,000, net MSR of $6,369,646,000, total assets of $110,747,452,000, total liabilities of $102,109,229,000 and total shareholders' equity of $8,638,223,000.

315. The Company's statements regarding financial results as referenced in ¶¶309 and 314 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Also, management's statements regarding the quality and volume of prime home equity and subprime loans originated during the quarter were false and misleading because Countrywide misclassified subprime loans as prime loans. See Section V.F. Moreover, management's representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality. See Sections V.B and V.C. Moreover, the SOX certifications signed by Mozilo was false and misleading because the financial statements issued during the Relevant Period were materially misstated and violated GAAP. See Section V.H above.

**5. Second Quarter 2004 Form 8-K**

316. On July 26, 2004, Countrywide filed a Form 8-K signed by Kurland, attaching a press release that announced the Company's financial results for the second quarter of 2004. In the press release, Defendants Mozilo noted that these results were achieved in a tough environment and that Countrywide's impressive performance demonstrated its ability to "prudently manage risk." In the press

release, Countrywide reported gain-on-sale of loans and securities of $1,277,331,000, revenues of $2333104000, net earnings of $699,623,000 and diluted EPS of $2.24 for the quarter. The Company also reported net LHI of $33,895,452,000, ALL of $105,839,000, net MSR of $8,334,826,000, total assets of $103,753,435,000, total liabilities of $94,308,638,000 and total shareholders' equity of $9,444,797,000.

**6. Second Quarter 2004 Conference Call**

317. On a conference call held later that day to discuss the Company's second quarter 2004 results (the "July 22, 2004 Conference Call"), Mozilo responded to a question from an analyst at Lehman Brothers regarding Countrywide's provision for loan loss reserves. Mozilo insisted that Company's reserves were adequate based upon its high credit quality loans:

> First of all, the – in terms of loan losses, the loan losses are far below what you would expect to experience in a – in this type of a bank, simply because we – as a de novo institution, from both our viewpoint and the regulatory viewpoint, we have focused on FICOs well above the 700 – the average FICO in that portfolio is around 740, so our delinquencies and foreclosures – I think foreclosures are nonexistent. Delinquencies are very, very low in that entity. And I would expect that that – because of the quality of that portfolio and the type of loans that are in there, which are mortgage loans, assets that we understand very well and know how to service, that we can expect the performance that we're seeing today to continue at a very high level.

318. On the July 22, 2004 Conference Call, Mozilo described the controls that Countrywide had in place at its bank as "very significant" and "extraordinary":

> There's very significant controls in place, and I think that, you know, it's just too – you know, to any extent it gives you comfort, we are

regulated by the Fed. This is a deep area of their concern, as it is ours, so we have extraordinary compliance and controls in place there.

319. Mozilo's statements made during the July 22, 2004 Conference Call were materially false and misleading when made. Specifically, Mozilo's statement that the Company's loan loss reserves were adequate because the Company's portfolio purportedly contained high credit quality loans was false and misleading because Defendants failed to account for the increased risk of its mortgage loans. See Sections V.H and V.B. Additionally, Mozilo's statements touting Countrywide's very significant and extraordinary compliance and internal controls were false and misleading because Countrywide substantially deviated from its underwriting guidelines. See Section V.H.

**7. Second Quarter 2004 Form 10-Q**

320. On August 6, 2004, Countrywide filed its quarterly report on Form 10-Q for the second quarter of 2004 ("2Q 2004 10-Q"), ended June 30, 2004, signed by Kurland. The Company reported financial results as detailed below.

321. The Company stated in the 2Q 2004 10-Q that the impairment of the fair value of its other RIs equaled $178,424,000.

322. In the "Off-Balance Sheet Arrangements and Guarantees" section of the 2Q 2004 10-Q, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "Management does not believe that any of its off balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

323. In the 2Q 2004 10-Q, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in Countrywide's total volume of loans produced). Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $5,239,000,000.

Mortgage Banking subprime loans originated during the quarter equaled $8,132,000,000, and were 9.2% of total Mortgage Banking loan production.

324. Countrywide reported consolidated prime mortgage loans, prime home equity loans and subprime LHI in the amount of $14,015,330,000, $14,818,056,000 and $137,679,000, respectively. Subprime mortgages equaled less than 1% of total mortgage LHI.

325. In the 2Q 2004 10-Q, the Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk . . . by only retaining high credit quality mortgages in our loan portfolio."

326. The Company concluded that there was no change in its internal controls that would affect its financial reporting: "There has been no change in our internal control over financial reporting during the quarter ended June 30, 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

327. Further assuring investors of the veracity of the information contained in the 2Q 2004 10-Q, the report included SOX certifications signed by Mozilo, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

**8. Amended Second Quarter 2004 Form 10-Q/A**

328. On May 16, 2005, Countrywide filed its amended quarterly report on Form 10-Q/A for the second quarter of 2004, ended June 30, 2004 ("2Q 2004 Form 10-Q/A"), signed Defendant Sieracki, among others.

329. In the accompanying press release, Countrywide reported gain-on-sale of loans and securities of $1,418,973,000, revenues of $2,474,746,000, net earnings of $786,479,000 and diluted earnings per share of $2.52 for the quarter. The Company also reported net LHI of $33,895,452,000, ALL of $105,839,000,

net MSR of $8,286,597,000, total assets of $116,210,789,000, total liabilities of $106,826,919,000 and total shareholders' equity of $116,210,789,000.

330. The Company's statements regarding financial results as referenced in ¶¶321-324 and 329 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. The statements made by Defendant Mozilo in the July 22, 2004 press release were false and misleading. Mozilo's statements regarding management's ability to "prudently manage risk" were false and misleading for the same reasons set forth in Sections V.B and V.C. Also, the statements in the 2Q 2004 10-Q/A regarding the volume of prime home equity and subprime loans originated during the quarter and the quality of LHI were false and misleading because Countrywide misclassified subprime loans as prime loans, and also for the reasons set forth in Section V.F. Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false because Countrywide loosened its underwriting guidelines to increase the volume of loans produced without regard to loan quality. See Sections V.B and V.C. The statements in the 2Q 2004 10-Q/A relating to internal controls were false and misleading for the same reasons set forth in Section V.H.7. Moreover, the SOX certifications signed by Mozilo were false and misleading for the same reasons stated in Section V.H above.

**9. Third Quarter 2004 Form 8-K**

331. On October 20, 2004, Countrywide filed a Form 8-K ("October 20, 2004 8-K"), signed by Laura Milleman ("Milleman"), Managing Director and Chief Accounting Officer, which attached a press release that announced the Company's financial results for the third quarter of 2004, ended September 30, 2004. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,188,812,000, revenues of $2,245,607,000, net earnings of

$582,241,000 and diluted earnings per share of $0.94 for the quarter. The Company also reported net LHI of $34,928,215,000, ALL of $107,765,000, net MSR of $8,153,203,000, total assets of $104,388,452,000, total liabilities of $94,366,589,000 and total shareholders' equity of $10,021,863,000.

332. In the press release, Mozilo again highlighted Countrywide's ability to deliver strong results in a tough environment in which interest rates rose by 50 basis points:

> Countrywide's financial results for the quarter – highlighted by diluted earnings per share of $0.94 – once again demonstrate the strength and resilience of our business model.

333. The statements contained in the October 20, 2004 Form 8-K and press release were materially false and misleading when made. Specifically, Mozilo's statement that the third quarter financial results "demonstrate the strength and resilience of our business model" was false and misleading because Countrywide loosened its underwriting policies and substantially increased its exception processing. See Sections V.C and V.H.

**10. Third Quarter 2004 Conference Call**

334. On a conference call held later that same day to discuss the third quarter financial results ("October 20, 2004 Conference Call"), in which Mozilo participated, the Company's senior management discussed the third quarter 2004 financial results and fourth quarter 2004 financial outlook. Mozilo touted the high quality loans held in Countrywide's Bank portfolio: "The bank continues to focus on portfolio quality as the average FICO is now . . . 732 and the weighted average LTV stands at 80%."

335. On the October 20, 2004 Conference Call, an analyst with the Bank of Montreal, Jaime Weiss, asked Mozilo to comment on "insider trading" of Countrywide's stock. Mozilo defended his sales, claiming they were all performed in conformity with a 10b5-1 trading plan:

> My decision has been that since I'm 65 years old to exercise and sell, and it's done on a schedule, on a 10B-51 irrespective of what the markets are. Stock up, stock down, it's sold. And I would attach no meaning to it whatsoever because those who have in the past attached meaning to it have been a big loser. . . So the sale by myself, I think I can speak for Stan, is one of a personal nature and has nothing to do with the Company.

336. Mozilo's statements on the October 20, 2004 Conference Call were materially false and misleading when made. Specifically, his statement regarding the Company's purported high credit quality loans with an average "FICO [of] . . . 732, and . . . [a] weighted average of LTV . . . at 80%" was false and misleading for the same reasons set forth in Sections V.B and V.C. Mozilo's statement that he traded his shares of Countrywide stock "irrespective of the market, stock up or down" was false and misleading for the same reasons set forth in Section IX.F discussing his insider sales of Countrywide stock.

**11. Third Quarter 2004 Form 10-Q**

337. On November 8, 2004, Countrywide filed its quarterly report on Form 10-Q for the third quarter of 2004, ended September 30, 2004 ("3Q 2004 Form 10-Q"), signed by Kurland. The Company reported financial results as detailed below.

338. The Company reported in its 3Q 2004 Form 10-Q that the recovery of the fair value of its other retained interests equaled $162,000.

339. In the "Off-Balance Sheet Arrangements and Guarantees" section of the 3Q 2004 Form 10-Q, Countrywide described its exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition,

revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

340. In the 3Q 2004 Form 10-Q, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in Countrywide's total volume of loans produced). Specifically, Mortgage Banking prime home equity loans originated during the quarter purportedly equaled $6,421,000,000. Mortgage Banking subprime loans produced during the quarter equaled $9,591,000,000, and were 12.45% of total Mortgage Banking loans originated during the quarter.

341. Further, Countrywide's portfolio of mortgage LHI as of September 30, 2004 consisted of prime mortgages, prime home equity loans and subprime loans, and were reported in the 3Q 2004 Form 10-Q to amount to $18,821,053,000, $11,113,845,000 and $124,768,000, respectively. Subprime mortgage loans equaled less than 1% of total mortgage LHI.

342. The Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk principally . . . by only retaining high credit quality mortgages in our loan portfolio."

343. The Company also reported in its 3Q 2004 Form 10-Q that management's review of the Company's disclosure controls and internal controls was "effective": "There has been no change in our internal control over financial reporting during the quarter ended September 30, 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

344. Further assuring investors of the veracity of the information contained in the 3Q 2004 Form 10-Q, the report included SOX certifications signed by Mozilo, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial

information included in this report, fairly present in all material respects the financial condition" of Countrywide.

**12. Amended Third Quarter 2004 Form 10-Q/A**

345. On May 16, 2005, Countrywide filed its amended quarterly report on Form 10-Q/A for the third quarter of 2004, ended September 30, 2004 ("3Q 2004 Form 10-Q/A"), signed Defendant Sieracki, among others. In its 3Q 2004 Form 10-Q/A, Countrywide reported gain-on-sale of loans and securities of $1,017,697,000, revenues of $2,109,503,000, net earnings of $498,071,000 and diluted EPS of $0.80 for the quarter. The Company also reported net LHI of $34,928,215,000, ALL of $107,765,000, net MSR of $8,105,081,000, total assets of $118,712,487,000 total liabilities of $108,835,721,000 and total shareholders' equity of $9,876,766,000.

346. The Company's statements regarding financial results as referenced in ¶¶338-341 and 345 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Also, the statements regarding the quality and volume of prime home equity and subprime loans originating during the quarter and the quality of LHI were false because the Company misclassified subprime loans as prime loans, and also for the reasons set forth in Section V.F. Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality. See Sections V.B and V.C. The statements relating to internal controls were false and misleading for the same reasons set forth in Section V.H.7. Moreover, the SOX certifications signed by Mozilo were false and misleading for the same reasons stated in Section V.H.

**13. Year End 2004 Form 8-K**

347. On February 2, 2005, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2004. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,243,964,000, revenues of $1,977,069,000, net earnings of $343,105,000and diluted earnings per share of $0.56 for the quarter. The Company also reported net LHI of $39,660,086,000, ALL of $125,046,000, net MSR of $8,787,284,000, total assets of $111,464,131,000, total liabilities of $101,035,688,000and total shareholders' equity of $10,428,443,000.

**14. Year End 2004 Conference Call**

348. On the conference call held the same day (the "February 2, 2005 Conference Call"), in which Defendants Mozilo and Kurland participated, the Company's senior management discussed the fourth quarter and year-end 2004 financial results and first quarter 2005 outlook. Kurland and Defendant Mozilo responded to questions from a Piper Jaffray analyst, Robert Napoli, by emphasizing that Countrywide's strategy had not changed to take on more risk:

> Kurland: Our strategy is pretty much the same as we've been operating it . . . [T]he base strategy we believe is solid and has had, you know, excellent results over the years that we've employed it.
>
> Napoli: So the answer is, no, there has been no real change -
>
> Mozilo: No
>
> Napoli: – to take more risk or -
>
> Mozilo: No. No, no, no.

349. The statements made on the February 2, 2005 Conference Call were materially false and misleading when made. The statements that there was no change to Countrywide's strategy to take on more risk were false and misleading

because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality. See Sections V.B and V.C.

**15. 2004 Form 10-K**

350. On March 15, 2005, Countrywide filed its Annual Report for 2004 with the SEC on Form 10-K ("2004 Form 10-K"). The report was signed by Defendants Mozilo, Cisneros, Cunningham, Donato, Dougherty, Enis, Heller, Melone, Parry, Russell, Robertson and Snyder. In it, the Company reported financial results as detailed below. In its 2004 Form 10-K, Countrywide reported gain-on-sale of loans and securities of $4,836,945,000, revenues of $8,566,627,000, net earnings of $2,197,574,000 and diluted earnings per share of $0.80 for the quarter. The Company also reported net LHI of $39,660,086,000, ALL of $125,046,000, net MSR of $8,729,929,000, total assets of $128,495,705,000, total liabilities of $118,185,629,000 and total shareholders' equity of $10,310,076,000.

351. The Company reported in its 2004 Form 10-K, in a section entitled "Valuation of MSRs and other retained interests," that the fair value of the RIs on the Company's balance sheet as of December 31, 2004 was $1,908,504,000. In addition, the reported impairment of "Other Retained Interests" as of year-end 2004 equaled $368,295,000.

352. In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

353. In a section of the 2004 Form 10-K titled "Securitization," the Company also stated the liabilities associated with the risk of R&Ws "total[ed] $139.9 million."

354. In a section titled "Securitizations," the Company reported that the fair value of its MSRs as of December 31, 2004 was $8,882,917,000, in comparison to December 31, 2003, when fair value of MSRs was reported as $6,909,167,000.

355. The Company also reported in its 2004 Form 10-K the volume of loans it originated at year-end: prime mortgage loans equaled $292,672,000,000, prime home equity loans equaled $30,893,000,000 and nonprime mortgage loans equaled $39,441,000,000.

356. In the 2004 Form 10-K, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced during the year (which was included in Countrywide's total volume of Mortgage Banking Loans produced). Specifically, Mortgage Banking prime home equity loans originated during the year equaled $23,351,000,000. Mortgage Banking nonprime mortgage loans originated during the year equaled $33,481,000,000 and were 10.5% of total Mortgage Banking loans originated for the year-end.

357. Countrywide also reported that prime mortgage LHI equaled $22,587,246,000, prime home equity LHI equaled $11,435,792,000 and nonprime LHI equaled $171,592,000, or less than 1% of the total value of prime LHI.

358. The 2004 Form 10-K stated that "[t]he majority of our loan production consists of Prime Mortgage Loans." Specifically, the Company highlighted the quality mortgages that it securitizes and sells to the secondary market:

> We ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages . . . . As described elsewhere

> in this document, we have a major focus on ensuring the quality of our mortgage loan production . . . .

359. In a section of the 2004 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process "designed to produce high quality loans" through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

> **Loan Quality**
>
> Our Credit Policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.
>
> Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through . . . manual or automated underwriting of additional credit characteristics.
>
> * * *
>
> Our loan origination standards and procedures are designed to produce high quality loans. These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of their work. . . . In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.
>
> In addition to our pre-funding controls and procedures, we employ an extensive post-funding quality control process. Our Quality

Control Department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in-depth underwriting and appraisal review, and if necessary, a fraud investigation.

360. KPMG issued an audit report on management's assessment of the Company's internal control over financial reporting, in accordance with the standards of the Public Company Accounting Oversight Board. In a report dated March 11, 2005, KPMG stated:

> . . . [T]he consolidated financial statements referred to above present fairly, in all material respects, the financial position of Countrywide Financial Corporation and subsidiaries as of December 31, 2004, and the results of their operations and their cash flows for the year ended December 31, 2004, in conformity with U.S. generally accepted accounting principles. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

361. Further assuring investors of the veracity of the information contained in the Form 10-K, the report included SOX certifications signed by Mozilo, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide and that the Company employed internal disclosure controls and procedures that detect "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management."

362. The Company's statements regarding financial results as referenced in ¶¶ 350-354 and 357 above were materially false and misleading when made as

detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Furthermore, statements relating to the volume of prime and nonprime loans originated and the value of prime LHI were false and misleading because Countrywide misclassified its subprime loans as prime loans and also for the same reasons set forth in Section V.F. Moreover, Countrywide's statements that it "consistently produce[d] quality mortgages" and that its "loan origination standards and procedures are designed to produce high quality loans" were false and misleading because Countrywide loosened its underwriting guidelines to increase loan volumes without regard to loan quality. See Section V.B and V.C. KPMG's report on management's assessment of the Company's internal control over financial reporting, as referenced in ¶360, was false and misleading for the same reasons stated in Sections V.H and X. Moreover, the SOX certifications signed by Mozilo was false and misleading for the same reasons stated in Section V.H.

### C. The Company's False Statements Regarding 2005 Results

#### 1. March 15, 2005 Piper Jaffray Conference

363. On March 15, 2005, Mozilo spoke at a financial conference sponsored by Piper Jaffray (the "March 15, 2005 Conference"). On the issue of the credit quality of Countrywide's loans, Mozilo made a statement emphasizing his concern about credit quality in the mortgage industry, generally, but then falsely distinguished Countrywide from the many lenders whose credit practices were beginning to make analysts and investors uneasy:

> The general statement is, I am deeply concerned about credit quality in the overall industry. I think that the amount of capacitates that's been developed for subprime is much greater than the quality of subprime loans available. And so they are pushing further as I observe it, they are pushing further down the credit chain into the 500 FICOs

> and below; 550, 540, 530. As you get down to those levels, it becomes very problematic and I don't think there is any amount of money you can charge upfront to cover your losses on those type of loans, so I am deeply concerned about everybody going for subprime.
>
> ***
>
> So we have to remain very disciplined in our subprime efforts, and that's why you don't see massive growth for Countrywide in subprime. We are trying to stay within a category of subprime that we know how to manage and manage effectively. So I have to separate it; overall industry in trouble, Countrywide are not because we have remained very disciplined in origination of subprime loans.

364. Also, during the March 15, 2005 Conference, Mozilo touted the Company's performance results for 2004 and 2005 as having been accomplished with minimal risk:

> Countrywide Bank has grown substantially since its acquisition in May of 2001. Leveraging off synergies from the – with the production and servicing sectors to generate assets and liabilities at a very low cost, while producing competitive financial returns at a minimal risk.

365. Moreover, during the March 15, 2005 Conference, Mozilo responded to an analyst's question regarding the 30% market growth goal that was set by management to be achieved by 2008. Mozilo highlighted that this goal was realistic and Countrywide would not sacrifice its "sound lending" practices to achieve it:

> Your question is 30% – is that realistic 30% goal that we set for ourselves in 2008? It is realistic. And let me give the genesis of it so you don't think it just comes out of nowhere. We went through a very extensive study with the help of the investment school UCLA, as to what happens to businesses as they mature. And if you look at every

> mature business in this country, you will find that the leader of that industry – that particular industry, it has about a 25% to 35% market share, in every single case. So once Countrywide starts off with the premise that we are – our role is to dominate, our objective is to dominate our industry. And clearly the industry is maturing very rapidly through this consolidation, if you look at – there is only 5 or 6 players that you can really name in the mortgage banking business today of any significance. That once we are mature and we want to dominate, we need about a 30% market share to do that. It is achievable, absolutely. . . . ***But I will say this to you that under no circumstances, will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share.***

366. Further, Mozilo again emphasized the Company's management of its subprime business, stating that management was very "concerned about the loan to- value ratio" because those types of loans would be affected first if there is a downturn in the economy and, therefore, the Company must manage them properly:

> Obviously, when you are dealing with subprime, you've got to be concerned about the loan to value ratio, because it's – that's the part and end of the strata and in the event of bump in the economy or both in the economy they get – they are effected first. And so, your delinquencies tend to rise, in that category during that period of time. But you are compensated by late fees, late charges, pre payment bounties etcetera, and again this is not a new business for us, subprime is a business we've been in for over 10 years, we have been through various cycles in those 10 years, and I think we have got to properly manage and surrounded it.

367. Mozilo's statements made at the March 15, 2005 Conference above were materially false and misleading when made. Specifically, Mozilo's statement that "we have to remain very disciplined in our subprime efforts, and that's why you don't see massive growth for Countrywide in subprime" was false and misleading because Countrywide misclassified its subprime loans as prime loans. See Section V.F. Also, Mozilo's statements criticizing the Company's peers for "pushing further down the credit chain into the 500 FICOs and below; 550, 540, 530" to originate loans, but claiming that Countrywide's practices were different, more conservative and relatively safe as opposed to high risk, were also misleading because Countrywide loosened its underwriting practices to increase its loan volume without regard to loan quality. See Section V.C. Moreover, Mozilo's statement that Countrywide was "[l]everaging off synergies from the – with the production and servicing sectors to generate assets and liabilities at a very low cost, while producing competitive financial returns at a minimal risk" was false and misleading for the same reasons set forth in Section V.C. Mozilo's statement that "under no circumstances, will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share" was also false and misleading because Countrywide loosened and abandoned its underwriting guidelines to boost loan volumes to reach the 30% market share goal. See Sections V.B and V.C. Last, Mozilo's statement regarding the prudent management of Countrywide's subprime loan-to-value ratio was false and misleading for the same reasons set forth in Sections V.B and V.C.

**2. First Quarter 2005 Form 8-K**

368. On April 26, 2005, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release that announced the Company's financial results for the first quarter of 2005, ended March 31, 2005. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,361,788,000, revenues of $2,404,885,000 , net earnings of $688,852,000 and diluted earnings

per share of $1.13 for the quarter. The Company also reported net LHI of $47,698,472,000, ALL of $134,916,000, net MSR of $9,746,957,000, total assets of $137,033,041,000, total liabilities of $126,080,994,000 and total shareholders' equity of $10,952,047,000.

**3. First Quarter 2005 Conference Call**

369. Later the same day, Countrywide held a conference call (the "April 26, 2005 Conference Call") in which Kurland and Defendants Mozilo and Sieracki discussed the Company's financial results for the first quarter of 2005. Mozilo responded to a question from an analyst at NWQ Investment Management, Mark Patterson, regarding changes in underwriting policies at Countrywide:

> Patterson: Right. Okay. That makes sense. One final question, on the quality of the assets going into the Bank, you guys have been very high quality assets prime quality assets going into the Bank. I assume that continues, but has there been any changes in the underwriting metrics with the current origination levels, or is your expected origination during 2005 in terms of FICO or combined loaned to value or debt to income or any of those kind of underwriting metrics?
>
> Mozilo: I think we're, as Stan said, I think we're going to remain, you'll see us consistent with the first quarter and most of what we did in 2004. We don't see any change in our protocol relative to the quality of loans we'll be originating.

370. Further, during the April 26, 2005 Conference Call, Kurland responded to a question from a KBW analyst, Frederick Cannon, indicating that Countrywide and its bank originated only high quality Pay Option ARMs:

> Cannon: Okay. And are you originating a lot of the pay option ARMs for the Bank portfolio at this point in time?
>
> Kurland: You know, combination. Most of it is not going into the Bank. But, you know, we're trying to develop the protocol and

process for delivering greater levels to meet the Bank's growth need? These are all high FICO.

371. The statements made at the April 26, 2005 Conference Call above were materially false and misleading when made. Specifically, Mozilo's statement that Countrywide's "protocol" or "underwriting metric" relative to the volume of loans originated "will remain . . . consistent" was false and misleading because Countrywide loosened its underwriting guidelines to increase the volume of loans originated without regard to loan quality. See Sections V.B and V.C. Additionally, Kurland's statement that Countrywide's Pay Option ARMs were "all high FICO" was false and misleading for the same reasons set forth in Sections V.B and V.F. None of the Officer Defendants issued any corrections to Kurland's statement, thereby ratifying these false public statements.

**4. First Quarter 2005 Form 10-Q**

372. On May 9, 2005, Countrywide filed its Form 10-Q for the first quarter of 2005, ended March 31, 2005 ("1Q 2005 Form 10-Q"), signed by Defendant Sieracki, among others. The Company reported financial results as detailed below.

373. In the "Off-Balance Sheet Arrangements and Guarantees" section of the 1Q 2005 Form 10-Q, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "[w] e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

374. The Company also reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in the total volume of loans produced). Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $6,619,000,000. Mortgage Banking

nonprime mortgage loans originated during the quarter equaled $8,187,000,000 and were 10.4% of total Mortgage Banking loans originated during the quarter.

375. The Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk principally . . . by retaining high credit quality mortgages in our loan portfolio."

376. The Company also reported in its 1Q 2005 Form 10-Q management's review of the Company's disclosure controls and internal controls:

> There has been no change in our internal control over financial reporting during the quarter ended March 31, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting . . . .

377. Further assuring investors of the veracity of the information contained in the 1Q 2005 Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

378. The Company's statements regarding financial results as referenced in ¶373 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Also, the statements regarding the quality of the volume of loans produced and LHI were false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section V.F. Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false and misleading because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality. See Sections V.B and V.C. The

statements relating to internal controls were false and misleading for the same reasons set forth in Section V.H.7. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section V.H.

**5. May 24, 2005 Countrywide Analyst Conference**

379. Defendants Mozilo and Sambol, as well as Kurland and McMurray, Countrywide's CRO, hosted a Countrywide Financial Corporation Analyst Meeting on May 24, 2005. At the meeting, McMurray stated, without correction or explanation by Mozilo or Sambol, that the Company originated loans that met its credit standards:

> So what we are looking for there [in a series of postclosing quality controls], is to ensure that the loans that we originate have ***both met our credit standards and we[re] underwritten according to those standards.***"

380. In response to a question from Bob Napoli of Piper Jaffray regarding Countrywide's increased credit risk exposure resulting from the growth of the bank, an unidentified Countrywide representative touted that Countrywide's loans held for investment were "first rate mortgages" and "high quality loans" and, accordingly, the Company's ALL were adequate:

> Well, you know, first of all the bank is investing in . . . ***prime mortgages, primarily HELOCs and some first rate mortgages*** . . . . So, not much on the interest rate risk side. But again, ***very high quality loans that have performed historically and we have you know, default models that provide conservative reserves against that book of business***.

381. Sambol reassured investors that obvious risks associated with Countrywide's growing Pay Option ARMs portfolio were mitigated by Countrywide's use of more stringent underwriting criteria: "These risks are mitigated or addressed in part by the different underwriting criteria which are applied to these loans."

382. Defendants' statements made during the May 24, 2005 meeting that loans it originated "met our credit standards," that its loans were "very high quality" and that it mitigated the risks of Pay Option ARMs by "different underwriting criteria" were materially false and misleading when made because Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality. See Sections V.B and V.C.

**6. June 2, 2005 Sanford Bernstein & Co. Strategic Decisions Conference**

383. On June 2, 2005, Mozilo appeared on behalf of Countrywide at the Sanford Bernstein & Co. Strategic Decisions Conference (the "June 2, 2005 Conference"). At the conference, Mozilo touted the Company's operational results for 2005 and acknowledged that while Countrywide had some high risk mortgage products, Countrywide also had elevated credit requirements for these high risk loans:

> We acknowledge that some of the products offered today carry higher credit risks than traditional GSE 30-year fixed-rate loans. However, it is important [to] note that Countrywide mitigates these risks or addresses them in part by utilizing different underwriting criteria than that is used for traditional fixed-rate product, such as the requirement for higher credit scores and lower loan to value ratios . . . .

384. Further, at the June 2, 2005 Conference, Mozilo once again touted the quality of LHI at Countrywide:

> "Credit quality of the portfolio remains outstanding with a weighted average FICO score that exceeded 730 and a weighted average CLTV loan to value of 80%."

385. Also at the June 2, 2005 Conference, although he extended Countrywide's 30% market share origination goal to 2010, Mozilo once again assured investors that Countrywide's profitability would not suffer as a result of

the Company's aggressive goal: "Questions always asked by you people – are you going to sacrifice profitability to gain market share? The answer you can see for our plans is absolutely not."

386. Moreover, at the June 2, 2005 conference, Mozilo responded to a question from an unidentified speaker regarding the potential loss exposure to mortgage lenders in the event of a correction in the appreciation of housing prices:

> And I can tell you – values going down do not force people out of their homes and does not force people into – never has forced them into delinquency ever. It's the loss of jobs.

387. Mozilo's statements made during the June 2, 2005 Conference were materially false and misleading when made. Specifically, Mozilo's statement that "Countrywide mitigates … risks or addresses them in part by utilizing different underwriting criteria [for ARM loans] than that is used for traditional fixed-rate product, such as the requirement for higher credit scores and lower loan to value ratios" was false and misleading for the same reasons set forth in Sections V.B and V.C above. Mozilo's statement that the "credit quality of the portfolio remains outstanding with a weighted average FICO score that exceeded 703 and a weighted average CLTV loan to value of 80%" was false and misleading for the reasons set forth in Sections V.B and V.C. Mozilo's statement that Countrywide's profitability would not suffer as a result of its aggressive goal to reach 30% market share by 2010 was false and misleading because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality. See Sections V.B and V.C.

**7. Second Quarter 2005 Form 8-K**

388. On July 26, 2005, the Company filed a Form 8-K ("July 26, 2005 Form 8-K"), signed by Milleman, attaching a press release that announced the Company's financial results for the second quarter of 2005, ended June 30, 2005. In the press release, Countrywide reported gain-on-sale of loans and securities of

$1,145,409,000, revenues of $2,307,943,000, net earnings of $566,458,000 and diluted earnings per share of $0.92 for the quarter. The Company also reported net LHI of $62,528,327,000, ALL of $155,962,000, net MSR of $9,367,666,000, total assets of $158,617,821,000, total liabilities of $146,962,187,000 and total shareholders' equity of $11,655,634,000.

**8. Second Quarter 2005 Conference Call**

389. On a conference call held later that day (the "July 26, 2005 Conference Call"), in which Kurland and Defendants Mozilo and Sieracki participated, the Company's senior management discussed the second quarter 2005 financial results and the third quarter 2005 financial outlook. Kurland commented on the quality of loans with prepayment penalties, such as Pay Option ARMs. Kurland reported a "significantly improved level of loans with pre-payment penalties," and added "I think another important point with our pay option portfolio is that actually enjoys one of the lowest levels of delinquency in our entire portfolio just over 1% delinquency rate. And so it is a very high quality product."

390. Similarly, during the July 26, 2005 Conference Call, Mozilo echoed Kurland's claims, touting the purported high quality of Countrywide's Pay Option ARMs. In response to a question from analyst Ken Posner of Morgan Stanley, regarding a recent survey which showed that less-educated and lower-income people were more easily convinced to take out ARM loans without understanding the terms, Mozilo responded:

> Ken, I think that Stan pointed that out. I can't speak for other lenders. I won't speak for other lenders. I can only speak for Countrywide. That product has a FICO score exceeding 700. You don't see the lower end of the economic spectrum with unsophisticated people with that kind of FICO score. So the people that Countrywide is accepting under this program, generally speaking, are of much higher quality

and they're not of the, you know, of the ilk that you may be seeing someplace else in the country or from some other lender.

391. Further, on the July 26, 2005 Conference Call, Kurland and Defendant Mozilo both responded to a question from a Fox-Pitt Kelton analyst about whether Countrywide's lending practices were loosening, given that Countrywide was originating hybrid ARMs and Pay Option ARMs:

> Mozilo: . . . ***I am not aware of any change of substance in underwriting policies. . . . I'm not aware of any loosening of underwriting standards that creates a less of a quality of loan than we did in the past.*** Stan?
>
> Kurland: . . . [We] have not loosened our standards relative to what the bank acquires to the extent that we have standards that reflect and pricing that reflects where we are able to deliver loans into the secondary market.

392. Also, when asked whether Countrywide was loosening its underwriting standards, Mozilo said, "I'm not aware of any change of substance in underwriting policies." In response to a follow-up question, Mozilo added: "[w]e don't view that we have taken any steps to reduce the quality of our underwriting regimen at all."

393. On the same July 26, 2005 Conference Call, Kurland reiterated the high quality of the Pay Option ARMs: "[t]he product itself tends to be highest FICO, very good LTV product . . . ." Also, Sieracki touted the credit quality of the home equity mortgages that Countrywide originates: "The credit quality of our home equities should be emphasized here as well. We are 730 FICO on these home equities, and that's extraordinary throughout the industry."

394. Similarly, Defendants Mozilo and Sieracki stated on the July 26, 2005 Conference Call that the Company retained only high credit quality loans, and there had been no deterioration of the quality of loans originated at

Countrywide. In response to a question from analyst Barry Cohen of Glenview Capital about whether the credit quality in the nonprime mortgage sector was stable or worsening, Defendants Mozilo and Sieracki responded:

> Mozilo: I think it's stable. . . . I do participate every day in originations myself, and it keeps me apprised of what's happening. I think that that situation has stabilized. I don't see any deterioration in the quality of those loans being originated.
>
> Sieracki: I would echo those sentiments. We are running over 80% premier in A minus. We operate at the very top end of the non prime credit spectrum. The FICO scores have remained very steady, just over 600.

395. The statements made during the July 26, 2005 Conference Call were materially false and misleading when made. None of the Officer Defendants issued any corrections to Kurland's statements, thereby ratifying these false public statements. Specifically, Kurland's statements that Pay Option ARMs are "a very high-quality product" and "highest FICO, very good LTV product" were false and misleading for the same reasons set forth in Sections V.E and V.B. Mozilo's statement that "the people that Countrywide is accepting under this program [for Pay Option ARMs] . . . are of much higher quality" was false and misleading for the same reasons stated in Sections V.E and V.B. Sieracki's statements that Countrywide "operate[s] at the very top end of the nonprime credit spectrum and that the FICO scores have remained very steady, just over 600" were false and misleading for the same reasons set forth above and in Sections V.B and V.C. Mozilo's statement that he was "not aware of any loosening of underwriting standards that creates a less . . . quality . . . loan than we did in the past" was also false and misleading because Mozilo knew or was reckless in not knowing that Countrywide severely loosened its underwriting guidelines to originate high risk, poor quality loans. See Section V.C. Mozilo's statements that he was "not aware

of any change of substance in underwriting policies" and that he did not view that the Company had "taken any steps to reduce the quality of our underwriting regimen at all" and Kurland's statement that "we have not loosened our standards" were all false and misleading for the same reasons set forth above and in Sections V.B and V.C.

**9. Second Quarter 2005 Form 10-Q**

396. On August 8, 2005, Countrywide filed its quarterly report on Form 10-Q for the second quarter of 2005, ended June 30, 2005 ("2Q 2005 Form 10-Q"), signed by Sieracki, among others. The Company reported financial results as detailed below.

397. The Company also reported that the impairment of the fair value of its other RIs equaled $97,629,000.

398. In the "Off-Balance Sheet Arrangements and Guarantees" section of the 2Q 2005 Form 10-Q, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, results of operations, liquidity, capital expenditures or capital resources."

399. Countrywide reported consolidated mortgage LHI for the quarter ended June 30, 2005, as follows: prime mortgage loans equaled $40,071,009,000, prime home equity loans equaled $15,890,115,000 and "nonprime" loans equaled $235,838,000 or less than 1% of total mortgage LHI.

400. In the 2Q 2005 Form 10-Q, the Company also reported the volume of Mortgage Banking nonprime mortgage and prime home equity loans produced (which was included in Countrywide's total volume of Mortgage Banking loans produced). Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $6,875,000,000. Mortgage Banking nonprime

mortgage loans originated during the quarter equaled $9,670,000,000 and were 9.5% of the total Mortgage Banking loans produced for the quarter.

401. The Company described its management of credit risk in the following terms: “[w]e manage mortgage credit risk . . . by retaining high credit quality mortgages in our loan portfolio.”

402. The Company also reported in the 2Q 2005 Form 10-Q management’s review of the Company’s disclosure controls and internal controls: “There has been no change in our internal control over financial reporting during the quarter ended June 30, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.”

403. Further assuring investors of the veracity of the information contained in the 2Q 2005 Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the “report does not contain any untrue statement of a material fact” and “the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition” of Countrywide.

404. The Company’s statements regarding financial results as referenced in ¶¶397-399 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R, overstated net earnings and total shareholders’ equity. Moreover, the representation that Countrywide “only retain[ed] high credit quality mortgages in our loan portfolio” was false and misleading because Countrywide severely loosened its underwriting guidelines during the Relevant Period to increase loan volume without regard to loan quality. See Sections V.B and V.C. The statements relating to internal controls were false and misleading for the same reasons set forth in Section V.H.7. Moreover, the SOX certifications signed by Mozilo were false and misleading for the same reasons stated in Section V.H.

**10. September 13, 2005 Lehman Brothers Financial Services Conference**

405. Mozilo participated in a conference call with analysts held at Lehman Brothers Financial Services on September 13, 2005 (the "September 13, 2005 Conference Call"). During that call, Mozilo praised the Company for its ongoing success, which he attributed to diligent credit risk management and conservative underwriting:

> [A]ll business activities are managed with ongoing safety and soundness of Countrywide as our primary concern. Focused, managed growth remains our mandate. With all business lines the majority of credit risk is sold or transferred to third parties with exposure primarily limited to three areas – number one, the bank loan portfolio, while sizable at 56 billion, is limited to prime quality residential mortgage loans only . . . . Conservative underwriting standards are evidenced by the quality of the portfolio. . . .
> Credit risk is also retained primarily from the securitization of prime home equity and nonprime loans. As a matter of policy, we seek the minimize this exposure, which adds 1.4 billion [and] accounts for less than 1% of total company assets. The represents only 2% of the total amount of loans that have been originated and securitized by Countrywide and are still outstanding. Last is our exposure to rep[resentation]s and warranties and all loans originated and sold which are primarily prime quality."

406. Similarly, during the September 13, 2005 Conference Call, Mozilo again touted the high quality of its loans and the conservative underwriting guidelines at the Company:

> From a risk management perspective, loan underwriting guidelines are conservative and under constant review. In addition the bank has

made significant advances in automated underwriting technology, which helps to effectively manage risk . . . In regard to pay option loans and interest only loans, each comprise 27% of the portfolio and have an average FICO score above 700.

407. Mozilo's statements on the September 13, 2005 Conference Call were materially false and misleading when made. Specifically, Mozilo's statement that Countrywide's "[c]onservative underwriting standards are evidenced by the quality of the portfolio" was false and misleading because Countrywide classified its subprime loans as prime loans, and also for the reasons set forth in Section V. Mozilo's statement that Pay Option ARMs have an "average FICO score above 700" was false and misleading for the reasons set forth in Sections V.E and V.B.

**11. Third Quarter 2005 Form 8-K**

408. On October 27, 2005, Countrywide filed a Form 8-K, signed by Milleman, that attached a press release announcing strong growth in the Company's financial results for the third quarter of 2005, ended September 30, 2005. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,284,992,000, revenues of $2,711,618,000, net earnings of $633,885,000 and diluted earnings per share of $1.03 for the quarter. The Company also reported net LHI of $67,775,774,000, ALL of $184,784,000, net MSR of $11,428,404,000, total assets of $171,293,035,000, total liabilities of $159,053,919,000 and total shareholders' equity of $12,239,116,000.

**12. Third Quarter 2005 Conference Call**

409. During a conference call held later the same day (the "October 27, 2005 Conference Call") hosted by Defendants Mozilo and Sieracki, among others, the Company's senior management discussed the third quarter 2005 financial results. Mozilo touted the "high quality" of Countrywide's Pay Option ARMs, stating:

> Pay option ARMs have recently been portrayed negatively. But we view this product as enabling us to better serve qualified customers looking for a more efficient and flexible way to manage their obligations. It is also an excellent asset for our portfolio, given our mortgage loan origination, servicing and risk management competencies. And the prime quality of our pay option borrowers. . . . Our pay option portfolios have very high credit quality, characterized by high FICO scores, solid loan-to-value ratios, and a low debt-to-income ratios."

410. Mozilo's statements that Pay Option ARMs are "prime quality," "have very high credit quality characterized by high FICO scores, solid loan-to-value ratios" and "enabl[e] us to better serve qualified customers" were materially false and misleading when made because Pay Option ARMs were very risky products that were not used to serve "qualified" customers, but rather high risk borrowers. See Sections V.F and V.B.

**13. Third Quarter 2005 Form 10-Q**

411. On November 8, 2005, Countrywide filed its quarterly report on Form 10-Q for the third fiscal quarter of 2005, ended September 30, 2005 ("3Q 2005 Form 10-Q"), signed by Defendant Sieracki, among others. The Company reported financial results as detailed below.

412. In the "Off-Balance Sheet Arrangements and Guarantees" section of the 3Q 2005 Form 10-Q, Countrywide described its R&Ws exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

413. Countrywide represented in its 3Q 2005 Form 10-Q that it had "a portfolio of mortgage LHI, consisting primarily of Prime Mortgage and Prime

Home Equity Loans, which totaled $62.2 billion at September 30, 2005." Specifically, Countrywide reported prime mortgage and prime home equity LHI that equaled $45,664,924,000 and $15,314,508,000, respectively, and nonprime mortgage LHI were reported at $263,973,000, or less than 1% of total mortgage LHI.

414. In its 3Q 2005 Form 10-Q, Countrywide also reported the volume of Mortgage Banking nonprime and prime home equity loans produced (which was included in Countrywide's total volume of Mortgage Banking loans produced). Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $10,344,000,000. Mortgage Banking nonprime loans originated during the quarter equaled $11,399,000,000 and were 8.7% of total Mortgage Banking loans originated during the quarter.

415. Moreover, the Company boasted in its 3Q 2005 Form 10-Q as to the high quality of its loans: The Company "retain[s] high credit quality mortgages in [its] loan portfolio[ ]" and "[o]ur Pay Option loan portfolio has [a] very high initial loan quality, with original average credit rating . . . of 720 and original loan-to value and combined loan-to-values of 74% and 78%, respectively."

416. The Company also reported in its 3Q 2005 Form 10-Q management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended September 30, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

417. Further assuring investors of the veracity of the information contained in its 3Q 2005 Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

418. The Company's statements regarding financial results as referenced in ¶¶ 412-413 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Also, the statements regarding the quality of the volume of loans produced and LHI were false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section V.F. Moreover, the representations that Countrywide "retain[s] high credit quality mortgages in [its] loan portfolio[]" and "[o]ur Pay Option loan portfolio has [a] very high initial loan quality, with original average credit rating . . . of 720" were false and misleading because Countrywide severely loosened its underwriting guidelines to increase loan volume without regard to loan quality. See Sections V.B and V.C. The statements relating to internal controls were false and misleading for the same reasons set forth in Section V.H.7. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section V.H.

**14. Year End 2005 Form 8-K**

419. On January 31, 2006, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release that announced the Company's financial results for the fourth quarter and year ended December 31, 2005. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,069,628,000, revenues of $2,592,262,000, net earnings of $638,895,000 and diluted earnings per share of $1.03 for the quarter. The Company also reported net LHI of $70,071,152,000, ALL of $189,201,000, net MSR of $12,610,839,000, total assets of $175,085,370,000, total liabilities of $162,269,510,000 and total shareholders' equity of $12,815,860,000.

**15. Year End 2005 Conference Call**

420. Defendants Mozilo and Sieracki participated on a conference call held later that same day to discuss the Company's 2005 financial results (the "January 31, 2006 Conference Call"). During the call, Mozilo highlighted the Company's purported "high quality" assets:

> The amount of pay option loans in the Bank's portfolio now stands at 26 billion, up from 22 billion last quarter. . . . It's important to note that our loan quality remains extremely high.

421. Mozilo's statement on the January 31, 2006 Conference Call was materially false and misleading when made because Countrywide loosened and abandoned its underwriting standards to increase the volume of loans originated without regard to quality. See Sections V.B and V.C.

**16. 2005 Form 10-K**

422. On March 1, 2006, Countrywide filed its Annual Report for 2005 with the SEC on Form 10-K ("2005 Form 10-K"). The report was signed by Defendants Mozilo, Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Enis, Heller, Melone, Parry, Robertson, Russell and Snyder. Countrywide reported gain-on-sale of loans and securities of $4,861,780,000, revenues of $10,016,708,000, net earnings of $2,528,090,000 and diluted earnings per share of $4.11 for the quarter. The Company also reported net LHI of $70,071,152,000, ALL of $189,201,000, net MSR of $12,610,839,000, total assets of $175,085,370,000, total liabilities of $162,269,510,000 and total shareholders' equity of $12,815,860,000.

423. In a section of the 2005 Form 10-K titled "Valuation of MSRs and Other Retained Interests," the Company reported that the fair value of the RIs on the Company's balance sheet as of December 31, 2005 was $2,675,461,000. Further, the Company reported impairment in the fair value of its other RIs that equaled $364,506,000.

424. In the "Off-Balance Sheet Arrangements and Guarantees" section of the 2005 Form 10-K, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, results of operations, liquidity, capital expenditures or capital resources."

425. In a section titled "Credit Risk Management," the Company also reported that the liabilities associated with the risk of R&Ws "total[ed] $169.8 million."

426. Countrywide reported in its 2005 Form 10-K that prime mortgages and prime home equity LHI equaled $48,619,590,000 and $14,991,351,000, respectively, and nonprime mortgage LHI equaled $255,677,000, or less than 1% of total mortgage LHI.

427. In the 2005 Form 10-K, the Company also reported the volume of Mortgage Banking nonprime and prime home equity loans produced (which was included in the total volume of loans produced). Specifically, Mortgage Banking prime home equity loans originated during the year equaled $33,334,000,000. Mortgage Banking nonprime mortgage loans originating during the year equaled $40,089,000,000 and were 9.3% of the total Mortgage Banking loans originated for the year ended.

428. Moreover, the Company stated the following in the 2005 Form 10-K as to the purported high quality of its loans:

> The majority of our loan production consists of Prime Mortgage loans[;] . . . [o]ur Pay Option loan portfolio has a relatively high initial loan quality, with original average FICO scores . . . of 720 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively.

429. In a section of the 2005 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process designed to produce "loans [that] are salable in the secondary mortgage market" through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

> **Loan Quality**
>
> Our credit policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures. Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through . . . manual or automated underwriting. . . . Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market. We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers.
>
> These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud controls, funds disbursement controls, training of our employees and ongoing review of their work. . . . We also employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.
>
> We supplement our loan origination standards and procedures with a post-funding quality control process. Our Quality Control Department, under the direction of the Chief Credit Officer, is

responsible for completing loan audits that may consist of a reverification of loan documentation, an underwriting and appraisal review, and if necessary, a fraud investigation.

430. Further, Countrywide represented in its 2005 Form 10-K that it managed its credit risk by retaining high credit quality mortgages: "[w]e manage mortgage credit risk . . . by retaining high credit quality mortgages in our loan portfolio."

431. KPMG issued an audit report on management's assessment of the Company's internal control over financial reporting, in accordance with the standards of the Public Company Accounting Oversight Board. In a report dated February 27, 2006, KPMG stated:

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). . . . In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). . . . We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Countrywide Financial Corporation and subsidiaries as of December 31, 2005 and 2004, and . . . expressed an unqualified opinion on those consolidated financial statements.

432. Further assuring investors of the veracity of the information contained in the Form 10-K, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other

financial information included in this report, fairly present in all material respects the financial condition" of Countrywide and that the Company employed internal disclosure controls and procedures that detect "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management."

433. The Company's statements regarding financial results as referenced in ¶¶422-426 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Further, the statements relating to the volume of prime home equity and nonprime loans produced and the value of prime LHI were false and misleading because Countrywide misclassified subprime loans as prime loans to inflate volumes of prime loans, and for the same reasons set forth in Section V.F. Moreover, the statements that Countrywide "retain[ed] high credit quality mortgages in our loan portfolio" and that its loan origination standards and procedures were designed to produce "loans [that] are salable in the secondary mortgage market" and "[o]ur Pay Option loan portfolio has a relatively high initial loan quality, with original average FICO scores . . . of 720" were false and misleading because Countrywide severely loosened and abandoned its underwriting practices to boost loan volume without regard for loan quality. See Sections V.B and V.C. Defendant KPMG's report on the Company's assessment of internal controls over financial reporting, as referenced in ¶431, was false and misleading for the same reasons stated in Sections V.H.7 and X. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section V.H.

### D. The Company's False Statements Regarding 2006 Results

#### 1. March 21, 2006 Piper Jaffray Financial Services Conference

434. On March 21, 2006, Sieracki spoke at a Financial Services Conference hosted by Bob Napoli of Piper Jaffray. During the conference, Sieracki falsely described the loan portfolio held by Countrywide:

> Touch real briefly on our bank. Basically, our strategy here is to move . . . towards a portfolio strategy, stabilizing our earnings growth and converting that gain on sale into portfolio spread income. And the key driver here is the portfolio. You can see back in December of '01, the portfolio was basically at zero. By December 31, it was up to $64 billion. In terms of composition, it is roughly 40% pay option ARMs . . . hybrids, that is about 30%; HELOCs . . . about 20%; and then fixed-rate which is mostly seconds, very short duration seconds, would be about 10%. Over on the far right, we show you some credit stats which show the extreme conservative nature of the investments that we're making here. The total loan portfolio $63 billion. The original CLTV, now this would include any seconds, thirds, any junior liens, 78%; very, very low. The FICO, 725, very very hi, and of course the delinquencies as a result on this relatively unseasoned portfolio, only 40 basis points. Very, very little risk taken in this portfolio, strictly residential mortgages, no construction loans, no commercial loans, nothing exotic; very, very conservative lending strategy.

435. The statements made during the March 21, 2006 Conference were materially false and misleading when made. Specifically, Sieracki's statements regarding Countrywide's "conservative lending strategy" were false and misleading because Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality and because Countrywide relied on fraudulent appraisals to boost loan production. See Sections V.B-V.D. Further, the statements relating to the classification of loans in Countrywide's loan portfolio were false and misleading because Countrywide

misclassified subprime loans as prime loans to inflate volumes of prime loans, and for the same reasons set forth in Section V.F.

**2. March 30, 2006 Financial Equity Investor's Forum**

436. Countrywide hosted a Financial Equity Investors Forum on March 30, 2006, attended by Mozilo, Kurland, Sambol, Sieracki and Carlos Garcia ("Garcia"), Countrywide's Executive Managing Director for Banking and Insurance. During the conference, in response to a question about how Countrywide expected to maintain the Company's culture in a period of growth, Sambol responded:

> We're extremely competitive in terms of our desire to win, and we have a particular focus on offense, which at the same time is supplemented by a strong defense as well, meaning that we have an intense and ongoing focus on share growth while at the same time maintaining a very strong internal control environment and what we believe is best-of-class governance. . . . ***[O]ur culture is also characterized by a very high degree of ethics and integrity in everything that we do***.

437. In response to a question about whether there was any truth to criticism that Countrywide was under-reserving for its loan portfolio, Garcia noted that Countrywide's reserves were more than sufficient because Countrywide fully understood the risk and because the loans that Countrywide originated were very high quality:

> I would like to start off by commenting on the quality of the loans and the portfolio, although you're right that we have a growing portfolio of pay options, the pay options that we're originating are very high-quality pay options, both in terms of FICO and LTV, as well as other credit attributes that we look at . . . Also, our pay option reduction is originated through Countrywide['s] channels and is a ***beneficiary of strong underwriting*** . . . . So we think we understand the risk very well . . . In the area of delinquency, they are outperforming the other first-lien products by a long shot. . . . In terms of our reserves and charge-offs, I would have you look at our charge-

off experience and relate it to our reserves. Our reserves are around 18 basis points and our charge-off experience is something like in the neighborhood of two to three basis points. And so there's a multiples of the charge-off experience in the reserve, ***we have reserved not based on our historical experience***, because we've been growing a new book, so we've looked at all of these different scenarios and ***made many conservative assumptions and based on our [loan loss] reserves on that***.

438. The statements made during the March 30, 2006 Conference were materially false and misleading when made. None of the Officer Defendants issued any corrections to Garcia's statements, thereby ratifying these false public statements. Specifically, Sambol's statements about Countrywide's "very strong internal controls" and "high degree of ethics" were false and misleading because Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality and because Countrywide relied on fraudulent appraisals to boost loan production. See Sections V.B-V.D. The statements that the Company's loan loss reserves were adequate because the Company's portfolio purportedly contained high credit quality loans was false and misleading because Defendants failed to account for the increased risk of its mortgage loans. See Sections V.H and V.B.

### 3. First Quarter 2006 Form 8-K

439. On April 27, 2006, Countrywide filed a Form 8-K ("April 27, 2006 Form 8-K"), signed by Milleman, attaching a press release that announced the Company's financial results for the first quarter of 2006, ended March 31, 2006. The Company reported a slight decrease in year-over-year earnings. In the press release, Mozilo attributed the decrease to an increasingly challenging environment. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,361,178,000, revenues of $2,835,948,000, net earnings of $683,511,000 and diluted earnings per share of $1.03 for the quarter. The

Company also reported net LHI of $74,107,611,000, ALL of $172,271,000, fair value MSR of $14,171,804,000, total assets of $177,592,056,000, total liabilities of $164,085,803,000 and total shareholders' equity of $13,506,253,000.

### 4. First Quarter 2006 Conference Call

440. On a conference call held later that same day ("April 27, 2006 Conference Call"), in which Defendants Mozilo and Sieracki participated, the Company's senior management discussed the first quarter 2006 financial results and the financial outlook for the second quarter of 2006. During the call, Mozilo falsely stated that the reason for a $44 million increase in the Company's consolidated provision for loan losses "was primarily a result of growth and seasoning of the investment loan portfolio."

441. Also during the April 27, 2006 Conference Call, Mozilo highlighted the purported quality of the Company's Pay Option ARM loans, which had increased from the previous quarter:

> It's important to note that our pay option loan quality remains extremely high. Original CLTVs and original loan to values are 78% and 75% respectively. Average FICO scores on the pay option portfolio are over 720.

442. The statements made during the April 27, 2006 Conference Call were materially false and misleading when made. Specifically, Mozilo's statement regarding the reasons why Countrywide increased its loan loss provision by $44 million was false and misleading for the reasons set forth in Section V.H.3. Mozilo's statements that Countrywide's "pay option loan quality remains extremely high" and its "[a]verage FICO scores on the pay option portfolio are over 720" were false and misleading for the same reasons set forth in Sections V.B and V.C.

**5. First Quarter 2006 Form 10-Q**

443. On May 10, 2006, Countrywide filed its quarterly report on Form 10-Q for the first quarter of 2006, ended March 31, 2006 ("1Q 2006 Form 10-Q"), signed by Defendant Sieracki, among others. The Company reported financial results as detailed below.

444. The Company reported that the impairment of RIs for the quarter equaled $120,654,000.

445. In the "Off-Balance Sheet Arrangements and Guarantees" section of its 1Q 2006 Form 10-Q, Countrywide described the R&Ws exposure associated with the securitization of its loans, as follows: "We do not believe that any of our off-balance sheet arrangements have, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

446. In a section titled "Credit Risk Management," the Company reported the liabilities associated with the risk of R&Ws that "totaled $271.9 million at March 31, 2006."

447. Countrywide also reported LHI, as follows: prime mortgages and prime home equity LHI equaled $53,463,593,000 and $14,963,131,000, respectively. Nonprime mortgage LHI equaled $324,040,000, or less than 1% of total mortgage LHI.

448. In its 1Q 2006 Form 10-Q, the Company also reported the volume of Mortgage Banking nonprime and prime home equity loans produced (which was included in the total Mortgage Banking volume of loans produced for the quarter ended). Mortgage Banking prime home equity loans originated during the quarter equaled $9,528,000,000. Mortgage Banking nonprime mortgage loans originated during the quarter equaled $8,099,000,000, and were 8.7% of the total Mortgage Banking loans originated.

449. Moreover, in its 1Q 2006 Form 10-Q, the Company touted the high quality of its loans:

> [W]e have a portfolio of mortgage loans held for investment, consisting primarily of Prime Mortgage and Prime Home Equity Loans (. . .).
>
> ***
>
> We view [pay option adjustable rate] loans as a profitable product that does not create disproportionate credit risk. Our Pay Option loan portfolio has very high initial loan quality, with original average FICO scores (a measure of credit rating) of 721 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively.

450. With respect to management's review of the Company's disclosure controls and internal controls, it reported: "There has been no change in our internal control over financial reporting during the quarter ended March 31, 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

451. Further assuring investors of the veracity of the information contained in the Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

452. The Company's statements regarding financial results as referenced in ¶¶444-447 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Also, management's statements regarding the quality of the volume of loans produced and LHI were false and misleading

because the Company misclassified subprime loans as prime loans, and also for the reasons set forth in Section V.F. Moreover, the representations that Countrywide "view[s] [Pay Option ARM] loans as a profitable product [with] very high initial loan quality" and "portfolio of mortgage loans held for investment, consisting primarily of Prime Mortgage and Prime Home Equity Loans" were false and misleading because Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality. See Sections V.B and V.C. The statements relating to internal controls were false and misleading because Countrywide's internal controls over financial reporting were ineffective. See Section V.H.7. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section V.H.

### 6. May 17, 2006 American Financial Services Association Finance Industry Conference for Fixed Income Investors

453. On May 17, 2006, Countrywide participated in the American Financial Services Association's Finance Industry Conference for Fixed Income Investors ("May 17, 2006 Conference"). At the conference, Countrywide's Managing Director of Treasury Finance, Vincent Breitenbach ("Breitenbach"), discussed the Company's credit risk management and emphasized that Countrywide limited its credit risk by underwriting loans with "strong FICO scores," high down payments or low LTV's:

> [W]e do have a very healthy conservative approach to credit. . . . We talked about some of the metrics that we look at while underwriting credit. We want strong FICO scores, we want high down payments or low LT[V]s.

454. At the May 17, 2006 Conference, Breitenbach also described the type of borrowers that Countrywide targeted for ARM loans in order to maintain high credit quality:

> In our view the most important risk associated with this [Pay Option ARM] product in negative amortization is to ensure that the borrower is not using that optionality just get in the house. Say it another way, the only way we own that house is by making a minimum payment, we don't want that loan. The type of customer we're looking for is someone who is a salesperson who may have some variability in their monthly pay, an investment banker who has 11 months of reasonably good pay and then hopefully has one really good month when he gets a bonus. We have a lot of fairly rich people in there who are looking at this product as an arbitrage opportunity. If you can borrow money against a $2 or $3 million house at 3, 4, 5%, then you can go out and invest in the market at a significantly greater rate. People we use – some rich people at least – will use this as an arbitrage type of a vehicle. So these are the type of customers that we're looking for.

455. At the May 17, 2006 Conference, Breitenbach also falsely stated that Countrywide had safe-guards against subprime loans in its portfolio:

> The way that we guard against not having subprime people in our portfolio is a couple of different things. First of all the FICO scores would indicate to us that from a historical perspective, this guy has shown the ability and the propensity to pay on time, with a 727 average FICO score. And by the way, the dispersion around that mean is pretty tight. Again, we're not trying to fool you and we're certainly not going to fool ourselves by putting in a bunch of lower quality borrowers into the portfolio.

456. The statements referenced above during the May 17, 2006 Conference Call were materially false and misleading when made. Moreover, none of the Officer Defendants issued any corrections to Breitenbach's statements, thereby ratifying these false public statements. Specifically,

Breitenbach's statements that the Company has "a very healthy conservative approach to credit" and that the Company wanted "strong FICO scores," "high down payments" and "low LT[V]s" were false and misleading because Countrywide severely loosened and eventually abandoned its underwriting standards to increase loan volume without regard to loan quality. See Sections V.B and V.C. In addition, Breitenbach's statements relating to borrowers who are "fairly rich" and sophisticated for the Company's Pay Option ARMs were misleading for the same reasons set forth in Sections V.B and V.C. Lastly, Breitenbach's statement that Countrywide "guards against not having subprime people in our portfolio" at the bank was false and misleading for the same reasons set forth in Sections V.B and V.C above.

#### 7. May 31, 2006 Sanford C. Bernstein Strategic Decisions Conference

457. On May 31, 2006, Mozilo spoke at the Sanford C. Bernstein Strategic Decisions Conference, at which he falsely reassured investors the Pay Option ARMs were a sound, well-understood loan product:

> [T]he amount of pay option loans in the bank's portfolio now stands at 31 billion, up 19% from 26 billion in the last quarter. Despite recent scrutiny to pay option loans, and there's been plenty, Countrywide views the product as ***a sound investment for our bank*** and a sound financial management tool for consumers. Pay Option loans represent the best whole loan type available for portfolio investment from an overall risk and return perspective.

458. Although acknowledging that Pay Option ARMs carry more risk than loans, Mozilo represented that "the margin on this product more than compensates for the additional credit risk" and that Countrywide actively managed this increased risk with "prudent program guidelines" and "sound underwriting":

> The performance profile of this product ***is well understood*** because of its 20-year history, which includes stress tests in very difficult environments.

> Moreover, ***Countrywide actively manages credit risk through prudent program guidelines including negative amortization limits and sound underwriting***.

459. Mozilo also downplayed the impacts of any deterioration in housing prices:

> Yes, the point I failed to cover in that first question, you asked what's the impact of Countrywide if you had deterioration [in home] values. ***Very little*** because these loans are insured mostly a Fannie, Freddie or private mortgage insurance they have. You see the bank [has] very substantial equity [to] loan [] valuation ratios. ***So the impact [to] Countrywide through any of these cycles has been de minimis in terms of what happens when values go lower***.

460. The statements made during the May 31, 2006 Conference were materially false and misleading when made. Specifically, Mozilo's statements about the soundness of Countrywide's Pay Option ARMs portfolio and its active management of credit risk for this portfolio through "prudent program guidelines" and "sound underwriting" were false and misleading because Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality and because Countrywide relied on fraudulent appraisals to boost loan production. See Sections V.B-V.D.

**8. Second Quarter 2006 Form 8-K**

461. On July 25, 2006, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release that announced the Company's financial results for the second quarter of 2006, ended June 30, 2006. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,527,450,000, revenues of $3,000,216,000, net earnings of $722,190,000 and diluted earnings per share of $1.15 for the quarter. The Company also reported net LHI of $79,807,599,000, ALL of $183,581,000, fair value MSR of $15,320,575,000, total

assets of $194,984,463,000, total liabilities of $180,687,506,000 and total shareholders' equity of $14,296,957,000.

**9. Second Quarter 2006 Conference Call**

462. There was a conference call held later the same day ("July 25, 2006 Conference Call"), hosted by Defendants Mozilo and Sieracki, among others, during which the Company's senior management discussed the second quarter 2006 financial results. In response to a question from a Bear Stearns analyst about real estate appraisal values and whether Countrywide used internal or external appraisers, Mozilo touted the quality of the Company's appraisers, stating that Countrywide had very high quality internal and external appraisers:

> [W]e have a panel of appraisers, approved appraisers that work through LandSafe. Each one of these appraisers throughout the country are approved by us. We do have internal appraisers to review the work of outside appraisers. And so the answer to both is yes. Again, our own approved appraisers – we'll only use our own approved appraisers, and that panel is screened very carefully from time to time to make sure that we are getting rid of the bad ones and we are only putting in good ones.

463. Mozilo's statement that Countrywide was "getting rid of the bad [appraisers]" and "only putting in good ones" was materially false and misleading when made for the reasons set forth in Section V.C above.

**10. Second Quarter 2006 Form 10-Q**

464. On August 7, 2006, Countrywide filed its quarterly report on Form 10-Q for the second quarter of 2006, ended June 30, 2006 ("2Q 2006 Form 10-Q"), signed by Defendant Sieracki, among others. The Company reported financial results as detailed below.

465. The Company reported that the recovery of its RIs equaled $51,498,000.

466. In the "Off-Balance Sheet Arrangements and Guarantees" section of its 2Q 2006 Form 10-Q, Countrywide described the R&Ws exposure associated with the securitization of its loans, as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

467. Countrywide also represented that it assumed risk with its R&Ws when it underwrote loans to the secondary market. Management stated that: "[t]he liability associated with this risk totaled $307.6 million at June 30, 2006 and $169.8 million at December 31, 2005."

468. Countrywide reported mortgages held for investment in its 2Q 2006 Form 10-Q. Prime mortgage loans and prime home equity loans equaled $55,433,612,000 and $19,081,303,000, respectively. Nonprime mortgage LHI equaled $9,290,000, or less than 1% of total mortgage LHI.

469. The volume of Mortgage Banking loans originated for the quarter by mortgage loan type, was reported as follows: prime, prime home equity and nonprime loans amounted to $82,229,000,000, $11,235,000,000 and $10,171,000,000, respectively.

470. Moreover, the Company made a representation in its 2Q 2006 Form 10-Q as to the purported high quality of its loans:

> [W]e have a portfolio of mortgage loans held for investment, consisting primarily of Prime Mortgage and Prime Home Equity Loans (. . .).
>
> ***
>
> Our Pay Option investment loan portfolio borrowers had, at the time the loans were originated, average FICO scores (a measure of borrower creditworthiness) of 721 and original loan-to value and combined loan-to-values of 75% and 78%, respectively.

471. The Company also reported management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended June 30, 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

472. Further assuring investors of the veracity of the information contained in its 2Q 2006 Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

473. The Company's statements regarding financial results as referenced in ¶¶465-468 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Also, management's statements regarding the quality of the volume of loans produced and LHI were also false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section V.F. Moreover, the representations that "[o]ur Pay Option investment loan portfolio borrowers [had] . . . average FICO scores . . . of 721" and "[our] portfolio of mortgage loans held for investment, consist[ed] primarily of Prime Mortgage and Prime Home Equity Loans" were false and misleading because the Company loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality. See Sections V.B and V.C. The statements relating to internal controls were false and misleading because the Company's internal controls over financial reporting were ineffective. See Section V.H.7. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section V.H.

### 11. September 12, 2006 Equity Investors Forum

474. On September 12, 2006, Countrywide held an Equity Investor Forum ("September 12, 2006 Conference") in which Mozilo, Sambol and Sieracki participated. Jim Furash ("Furash"), Countrywide's Senior Managing Director and President of Countrywide Bank, emphasized numerous times during the conference, without correction or explanation by Mozilo, Sambol or Sieracki, the "high quality" of loans held by Countrywide's Bank:

> [W]e have built a very large, fast growing, and very efficient deposit franchise that has enabled Countrywide to invest in a top quality mortgage origination. . . . But essentially our model is investing in very low-risk assets today, and a very low net interest margin.
>
> * * *
>
> [I]incredibly strong asset quality at the bank. I'd like to emphasize again the large, tangible, high quality balance sheet that we build. . . . A very strong portfolio. . . . So we're very pleased with the credit decisions that we're making and the returns that we are receiving as a result of those decisions.

475. Furash also touted that the Company's loan loss reserves sufficiently anticipated any potential threats in its loan portfolio:

> Obviously the bank's total footings and earnings have been growing substantially over the last years, but we've been able to match that growth with our growth and our loan loss reserve. So even though we are growing our balance sheet very quickly, we continue to build our reserves in anticipation of any potential threats that we see in the portfolio. And again I'm very proud of that ability to maintain this loan loss reserve growth while maintaining our earnings productivity that I mentioned earlier. Again today our loan loss reserve's about

> $163 million dollars, 21 basis points on assets and that's up three basis points over the last quarter alone I believe.

476. The statements by Furash referenced above during the September 12, 2006 Conference, which were ratified and approved by the Officer Defendants, were materially false and misleading when made. Specifically, Furash's statement that "Countrywide invests in [ ] top quality mortgage origination . . . in low risk assets" was false and misleading because Countrywide loosened and abandoned its underwriting guidelines during the Relevant Period. See Sections V.B and V.C. Further, Furash's statement that "we continue to build our [loan loss] reserves in anticipation of any potential threats" was false and misleading because Countrywide understated its ALL, overstated LHI on its balance sheet and overstated revenues. See Section V.H.

**12. September 13, 2006 Fixed Income Investor Forum**

477. On September 13, 2006, Countrywide hosted a Fixed Income Investor Forum ("September 13, 2006 Conference") in which Mozilo, Sambol and Sieracki participated. At the conference, Mozilo touted the Company as an industry role model for prudent lending:

> Not only did we drive efficiency in the marketplace, but as an industry leader we served as a role model to others in terms of responsible lending. We take seriously the role of a responsible lender for all of our constituencies. . . . To help protect our bond holder customers, we engage in prudent underwriting guidelines . . . .

478. Mozilo also falsely classified Countrywide's position in nonprime loans as "minor":

> Similarly if the pricing gets tough in a particular product category, we can back off just as we did with nonprime. It's only 9% of our production today, at one point 30%, whereas for monoline nonprime lenders irrational pricing limits their options.

479. At the September 13, 2006 Conference, Sambol responded to a question regarding the growth of prime and subprime mortgage loans at Countrywide, by falsely claiming that the Company did not heavily participate in subprime loans:

> Our profile in the subprime market has been one where we have, for the most part, been on the sidelines. . . . And subprime however, particularly in the third-party channels, the wholesale channel we are in the bottom half of the top 10. And the reason for that is that – is that that market we view to have been subject to some irrational conduct. So, we view the pricing to be somewhat irrational. We view what's happened on the credit front to be very liberal. And so, we opted not to fully participate, and it's for that reason you haven't seen growth in subprime volume as maybe the subprime industry has grown.

480. At the same conference, an audience member asked if Countrywide should consider reducing its capital because the Company's high growth rate was likely to be unsustainable. Sieracki responded by emphasizing that the growth rate at Countrywide was not synonymous with an increase in risk and that Countrywide had not assumed high risk assets:

> We're the last ones to think that we should be aggressive and take high risk, there's no change in our risk appetite here, we're simply perfecting and refining our capital structure and making sure the excess capital doesn't get out of line. We're talking about equity neutral transactions with hybrid securities, so it's really a matter of refining, perfecting and optimizing our capital structure. . . . So I don't want anybody to get the impression that there's been a change in our risk appetite or that we're going to do anything aggressive here.

481. At the same conference, Furash touted the adequacy of Countrywide's loan loss reserves:

> Despite the significant asset growth we've been able to outpace that growth in our loan portfolio with the growth in our reserve. So again I want to emphasize that we reserve a very conservative amount based on our expected losses, and we've been able to outpace our asset growth with our growth in our loan loss reserve provision. So management and myself feel very comfortable that we are well reserved for all sorts of economic cycles that we can be.

482. The statements referenced above, made during the September 13, 2006 Conference, were materially false and misleading when made. Mozilo's statements that "we served as a role model to others in terms of responsible lending," and that "we engage in prudent underwriting guidelines," were false and misleading because Countrywide loosened and abandoned its underwriting guidelines during the Relevant Period. See Sections V.B and V.C. Further, Mozilo's statement that subprime loans only consist of "9% of [Countrywide's] production today" was false and misleading for the reasons set forth in Section V.C. Specifically, subprime loans were being classified as prime loans due to a combination of weakening underwriting standards, exception processing of its loans and managerial policies that encourage quantity of loans, not quality. This resulted in a deterioration in the creditworthiness of Countrywide's portfolio over the Relevant Period and an increase in subprime loans. Sambol's statement that "[o]ur profile in the subprime market has been one where . . . [we are] on the sidelines" and we "opted not to fully participate . . . in subprime" were false and misleading for the reasons set forth in Sections V.B and V.F. Sieracki's statements that there has been no "change in our risk appetite" and "that we're [not] going to do anything aggressive here" were false for the same reasons set forth in Sections V.B and V.C. Likewise, Furash's statement, which was adopted

and ratified by the Officer Defendants, that "we reserve a very conservative amount [for loan losses] based upon our expected loss" was false and misleading because the Company manipulated its earnings by taking inadequate allowances for loan losses. See Section V.H.

**13. Third Quarter 2006 Form 8-K**

483. On October 24, 2006, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release which announced the Company's financial results for the third quarter of 2006, ended September 20, 2006. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,373,901,000, revenues of $2,822,495,000, net earnings of $647,564,000 and diluted earnings per share of $1.03 for the quarter. The Company also reported net LHI of $80,796,708,000, ALL of $207,987,000, fair value MSR of $15,018,415,000, total assets of $193,194,572,000, total liabilities of $178,095,424,000 and total shareholders' equity of $15,099,148,000.

**14. Third Quarter 2006 Conference Call**

484. Later the same day, Mozilo, Sambol and Sieracki participated in a conference call (the "October 24, 2006 Conference Call") in which they discussed the Company's financial results for the third quarter of 2006 and the fourth quarter and year-end outlook. During the call, Mozilo falsely stated that the Company's asset valuation reserves and loan loss reserves were appropriate in light of the increase in delinquencies that had occurred:

> The year-over-year increase in delinquencies and foreclosures are primarily the result of portfolio seasoning, product mix, and changing economic and housing market conditions. . . . The Company believes its asset valuation reserves [for] credit losses are appropriate for the increases in delinquencies.

* * *

> The loan loss provision was $28 million in the third quarter of 2006, a decrease of $45 million in the third quarter of 2005. . . . The allowance for loan losses was $180 million at September 30, 2006, as compared to $107 million at September 30, 2005. . . . The increase in delinquencies was in line with manager's expectations and primarily reflects the seasoning of the bank's loan portfolio.

485. Mozilo's statements that "the Company's asset valuation reserves [for] credit losses are appropriate" and that "the increase in delinquencies was in line with management's expectations" were false and misleading for the reasons set forth in Section V.H above.

### 15. Third Quarter 2006 Form 10-Q

486. On November 7, 2006, Countrywide filed its quarterly report on Form 10-Q for the third quarter of 2006, ended September 30, 2006 ("3Q 2006 Form 10-Q"), signed by Sambol and Sieracki. The Company reported financial results as detailed below.

487. The Company reported in its 3Q 2006 Form 10-Q that the impairment of its RIs equaled $141,857,000.

488. In the "Off-Balance Sheet Arrangements and Guarantees" section of its 3Q 2006 Form 10-Q, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

489. The Company also reported the amount of credit risk it assumed as a result of its R&Ws of its mortgage loans: "The liability associated with this risk totaled $303.5 million at September 30, 2006. . . ."

490. The Company reported allowance for loan losses of $207,987,000, having increased its provision for loan losses by $37,996,000 during the quarter.

491. Countrywide reported prime mortgage and prime home equity LHI that amounted to $55,486,886,000 and $19,625,354,000, respectively. In addition, nonprime mortgage LHI equaled $25,823,000, or less than 1% of total mortgage LHI.

492. The volume of Mortgage Banking prime, prime home equity and nonprime loans originated during the quarter equaled $87,713,000,000, $9,203,000,000 and $9,336,000,000, respectively.

493. Moreover, the Company represented as to the high quality of its loans, "we have a portfolio of mortgage loans held for investment, consisting primarily of Prime Mortgage and Prime Home Equity Loans" and "[o]ur Pay Option investment loan portfolio borrowers had, at the time the loans were originated, average FICO scores (a measure of borrower creditworthiness) of 721 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively."

494. The Company described its management of credit risk in the following terms:

> We manage mortgage credit risk by underwriting our mortgage loan production to secondary market standards and by limiting credit recourse to Countrywide in our loan sales and securitization transactions. We also manage credit risk in our investment loan portfolio by retaining high credit quality loans, through pricing strategies designed to compensate for the risk. . . .

495. The Company also reported management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended September 30, 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

496. Further assuring investors of the veracity of the information contained in its 3Q 2006 Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, which represented that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

497. The Company's statements regarding financial results as referenced in ¶¶ 487-491 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Also, the statements regarding the quality of the volume of loans originated and LHI were false and misleading because Countrywide misclassified subprime loans as prime loans, and also for the reasons set forth in Section V.F. Moreover, the representations that "[o]ur Pay Option investment loan portfolio [had an] . . . average FICO score[] . . . of 721," "[the Company's] portfolio of mortgage loans held for investment consist[s] primarily of Prime Mortgage and Prime Home Equity Loans" and "[w]e also manage credit risk in our investment loan portfolio by retaining high credit quality loans" were false and misleading because Countrywide loosened its underwriting standards to increase loan volume without regard to loan quality. See Sections V.B and V.C. The statements relating to internal controls were false and misleading because the Company's internal controls over financial reporting were ineffective. See Section V.H.7. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section V.H.

**16. Year-End 2006 Form 8-K**

498. On January 30, 2007, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release that announced "record" earnings for 2006, driven by strong fourth quarter results. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,419,318,000, revenues of

$2,758,469,000, net earnings of $621,581,000 and diluted earnings per share of $1.01 for the quarter. The Company also reported net LHI of $78,085,757,000, ALL of $261,054,000, fair value MSR of $16,172,064,000, total assets of $199,946,230,000, total liabilities of $185,628,384,000 and total shareholders' equity of $114,317,846,000.

**17. Year-End 2006 Conference Call**

499. Later that same day, Countrywide held a conference call discussing the fourth quarter and year-end 2006 financial and operational results ("January 30, 2007 Conference Call") in which Mozilo, Sambol and Sieracki participated. A Merrill Lynch analyst, Ken Bruce, questioned Mozilo about whether the addition of so many credit enhancements to the bank's portfolio was a reflection of a cautious approach to credit. In response, Mozilo stated:

> Yes, I mean, GAAP has its limitations on that issue and we are doing our best to expand our reserves in one form or another. And obviously you have cash reserves, and the other is that you discount the assets, and the third is that you can get pool insurance or MI insurance on the assets. We, I think, exercise ourselves to the maximum in that regard and will continue to do so, by the way, throughout 2007.

500. At the January 30, 2007 Conference Call, in response to a question from an analyst at Piper Jaffray regarding current trends in the subprime market, Mozilo stated that the subprime industry was going to be severely hit because of the decreased quality of borrowers. Mozilo added that this would not have a material impact on Countrywide because the Company had backed away from the subprime area due to its focus on credit quality:

> You notice that in both the wholesale channel as well as our consumer channel that our volumes were lower on a market share basis. We picked it up on the correspondent. And it was because we backed away from the subprime area because of our concern over

credit quality. And I think you're seeing the results of that with those competitors who took that product when we backed away.

So I think there's a couple – one is you're seeing two or three a day, there's probably 40 or 50 a day throughout the country going down in one form or another. And I expect that to continue throughout the year. I think that subprime is going to be severely hit primarily because the subprime business was a business of you take inferior credit but you'd have, you'd require superior equity. And so people had to make a substantial down payment or if they had marginal credit.

Well, that all disappeared in the last couple of years and you get a 100% loan with marginal credit and that doesn't work and so – particularly if they have any kind of bumps like we have now in the deterioration of real estate values because people can't get out.

501. The statements referenced above during the January 30, 2007 Conference Call were materially false and misleading when made. Mozilo's statements that the Company was adding additional insurance to protect against loan default to "exercise[ ] ourselves to the maximum" and that "GAAP has its limitations . . . [reserving for loan losses] and we are doing our best to expand our reserves in one form or another" above what GAAP requires were false and misleading for the same reasons set forth in Section V.H. Also, Mozilo's statement that Countrywide "backed away from the subprime area because of our concern over credit quality" was false and misleading because Countrywide was misclassifying subprime loans as prime loans, and also for the reasons set forth in Section V.F.

**18. 2006 Form 10-K**

502. In its 2006 Form 10-K, Countrywide dropped its claim that Pay Option ARMs had "relatively high initial loan quality," but stated that the average original FICO score for such loans as of December 31, 2006 was 718.

503. On March 1, 2007, Countrywide filed its Annual Report for 2006 with the SEC on Form 10-K ("2006 Form 10-K"). The report was signed by Defendants Mozilo, Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Melone, Parry, Russell, Robertson and Snyder. Countrywide reported gain-on-sale of loans and securities of $5,681,847,000, revenues of $11,417,128,000, net earnings of $2,674,846,000 and diluted earnings per share of $4.30 for the quarter. The Company also reported net LHI of $78,085,757,000, ALL of $261,054,000, fair value MSR of $16,172,064,000, total assets of $199,946,230,000, total liabilities of $185,628,384,000 and total shareholders' equity of $12,317,846,000.

504. In a section titled "Valuation of MSRs and Other Retained Interests," the Company reported that the fair value of the RIs on its balance sheet as of December 31, 2006 was $3,040,575,000. Further, the Company reported that the impairment in the fair value of its RIs equaled $73,677,000 for the fourth quarter and $284.7 million for the year.

505. In the "Off-Balance Sheet Arrangements and Guarantees" section of its 2006 Form 10-K, Countrywide described the R&Ws exposure associated with the securitization of its loans, as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

506. In a section titled "Credit Risk Management," the Company also reported the liabilities associated with the risk of representation and warranties totaled $390.2 million.

507. Moreover, the 2006 Form 10-K stated that "contractual liability arises only when . . . representations and warranties are breached." Countrywide also stated that it "attempt[s] to limit our risk of incurring these losses by structuring our operations to ensure consistent production of quality mortgages."

508. The Company reported allowance for loan losses of $261,054,000 as of the end of 2006. The Company also had net charge-offs of $156,841,000. The Company stated that "allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles."

509. Countrywide also made representations concerning the purported high quality of its portfolio and the purportedly sufficient allowances and provision for loan losses in its 2006 Form 10-K:

> The increase in [the Company's] . . . allowance for loan losses reflects prevailing real estate market and economic conditions and the seasoning of the Bank's investment loan portfolio. We expect the allowance for loan losses to increase, both in absolute terms and as a percentage of our loan portfolio as our loan portfolio continues to season and as current market conditions develop. However, we believe that our investment criteria have provided us with a high quality investment portfolio and that our credit losses should stay within acceptable levels. We also believe our allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles.

510. Countrywide reported prime mortgages and prime home equity LHI in the amounts of $230,139,000 and $56,029,000, respectively. Nonprime mortgage LHI amounted to $55,262,000, or less than 1% of total mortgage banking LHI.

511. In its 2006 Form 10-K, the Company reported that the volume of Mortgage Banking nonprime, prime home equity and prime loans originated

during the year equaled $36,752,000,000, $39,962,000,000 and $344,370,000,000, respectively.

512. Countrywide reported in its 2006 Form 10-K its high credit rating and strategy to continue to produce high quality mortgages to the secondary market:

> Our strategy is to ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards.

513. Moreover, the Company represented in its 2006 Form 10-K as to the purported high quality of its loans: "[t]he majority of our loan production consists of Prime Mortgage loans."

514. In a section of its 2006 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process with a rigorous pre-loan screening procedure, post-loan auditing, appraisal and underwriting reviews:

> **Loan Quality**
>
> Our credit policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.
>
> Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through . . . manual or automated underwriting.
>
> ***
>
> Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary

> mortgage market. We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers. These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud controls, funds disbursement controls, training of our employees and ongoing review of their work.
>
> ***
>
> We supplement our loan origination standards and procedures with a post-funding quality control process.
>
> ***
>
> Our Quality Control Department is responsible for completing loan audits that may consist of a re-verification of loan documentation, an underwriting and appraisal review, and, if necessary, a fraud investigation.

515. KPMG included in the 2006 Form 10-K an audit report on management's assessment of the Company's internal control over financial reporting, in accordance with the standards of the Public Company Accounting Oversight Board. In its report dated February 28, 2007, KPMG stated:

> In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
>
> ***
>
> [O]ur report dated February 28, 2007, expressed an unqualified opinion on those consolidated financial statements.

516. Further assuring investors of the veracity of the information contained in the 2006 Form 10-K, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide and that the Company employed internal disclosure controls and procedures that detect "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management."

517. The Company's statements regarding financial results as referenced in ¶¶ 503-510 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Furthermore, the statements relating to the volume of prime loans produced and the value of prime LHI were all false and misleading because Countrywide misclassified subprime loans as prime loans, and also for the same reasons stated in Section V.F. Moreover, Countrywide's statements that it "consistently produc[ed] quality mortgages," that its loan origination standards and procedures are designed to produce "loans [that] are salable in the secondary mortgage market" and "[t]he majority of our loan production consists of Prime Mortgage loans" were false and misleading because Countrywide loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality. See Sections V.B and V.C. KPMG's 2006 report on management's assessment of the Company's internal control over financial reporting, as referenced in ¶515, was false and misleading for the same reasons stated in Sections V.H and X. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section V.H.

### E. The Company's False Statements Regarding 2007 Results Before The Truth Begins To Emerge

#### 1. March 6, 2007 Raymond James Institutional Investor Conference

518. On March 6, 2007, Sieracki, speaking at a Raymond James Institutional Investor Conference, made further false and misleading statements about Countrywide's access to liquidity. Around this time, several of Countrywide's competitors had begun having problems because of their lending practices. Sieracki acknowledged the critical importance of liquidity in light of these recent problems. In particular, he noted that "[l]iquidity is a huge issue. Not all of [Countrywide's competitors] models are going to be able to fund themselves and you are going to see some of these companies go out of business."

519. Later during the same conference, Sieracki stated that "[w]e're very well positioned at Countrywide due to experience in these cycles, expertise, operating controls and our liquidity position. Let's fact it this is a pain phase of a healthy process. We're a top conditioned athlete and I would suggest that the future present value of this outcome, of this pain felt today is greater than stumbling along at the status quo here."

520. The statements referenced above were materially false and misleading. Specifically, Sieracki's statements that "[w]e're very well positioned at Countrywide due to . . . our liquidity position" and "[w]e're a top conditioned athlete" were false and misleading because Countrywide did not have access to the liquidity. See Section V.I.

#### 2. March 13, 2007 CNBC Interview

521. On March 13, 2007, CNBC reporter Maria Bartiromo ("Bartiromo") interviewed Mozilo. During the interview, Mozilo falsely told the marketplace that Countrywide was not like other mono-line subprime lenders because the Company's subprime loans purportedly constituted 7% of its loan originations:

MOZILO: [T]he [lenders] . . . that you see exposed [from the subprime market] at the moment would be the New Centuries, the NovaStars, and the Accredited Home Loans, and those are monocline companies, subprime companies, that did well in the housing boom, in the bubble, but once the tide went out, you can see what's happened. ***I think it's a mistake to apply what's happening to them to the more diversified financial services companies such as Countrywide***, Wells Fargo and others. Certainly, a percentage of our business is subprime. ***We had 7 percent of our*** [loan originations in subprime] . . . .

BARTIROMO: Seven percent? Angelo, so you've got seven percent of originations coming from the subprime area:

MOZILO: That's correct. And about .2 percent of our assets are in subprime. So I think it's very important that this be kept in perspective. So, for us, what our concern is, Maria, is not so much for Countrywide ***because we'll be fine. In fact, this will be great for Countrywide at the end of the day because all the irrational competitors will be gone***.

522. The statements referenced above during the March 13, 2007 interview were materially false and misleading when made. Mozilo's statement that Countrywide was different from monoline subprime lenders was false and misleading. In truth, Countrywide was not different from companies heavily involved in subprime lending. See Sections V.B and V.C. Moreover, Mozilo's statement that Countrywide had about 7% originations and .2 percent assets in subprime was false and misleading because Countrywide classified its subprime loans as prime loans, and also for the same reasons set forth in Section V.F.

**3. First Quarter 2007 Form 8-K**

523. On April 26, 2007, Countrywide filed a Form 8-K attaching a press release that announced its financial results for the first quarter of 2007. Countrywide reported gain-on-sale of loans and securities of $1,234,104,000,

revenues of $2,405,776,000, net earnings of $433,981,000 and diluted earnings per share of $0.72 for the quarter. The Company also reported net LHI of $75,177,094,000, ALL of $374,367,000, fair value MSR of $17,441,860,000, total assets of $207,950,603,000, total liabilities of $193,132,154,000 and total shareholders' equity of $14,818,449,000.

### 4. First Quarter 2007 Conference Call

524. On a conference call held later that day (the "April 26, 2007 Conference Call") in which Mozilo, Sambol and Sieracki participated, senior management discussed the first quarter 2007 financial results and the financial outlook for the second quarter of 2007. During the call, Mozilo touted the Company's growing pipeline of "prime" loans, claiming that Countrywide was poised to capitalize on the implosion of irresponsible lenders in the mortgage-lending industry:

> As a result, you have less competition and as Dave pointed out, rational competition. So when you have that, one is your margins are going to improve. There's no question that there are many players who have entered the business over the last five years that were, you know, had to some degree or another irresponsible behavior, conducted themselves irresponsibly, and that impacted everybody, Gresham's Law.

525. Sambol reiterated that Countrywide's prime business would continue to grow and that Countrywide had gained a competitive advantage in the subprime area now that other lenders had exited that business:

> And as it relates to top-line pricing margins, you know, there was the absence of competitive worsening in pricing. So the outlook is very good for our prime business and prime margins.
>
> As it relates to subprime, as I mentioned in my presentation, we are now pricing our rate sheets to provide for profitability in each of our

> channels, where I would tell you that in '06, for much of '06 and part of '05, competitive conditions were such that in certain of our segments, we were pricing to breakeven."

526. Moreover, on the same call, Mozilo insisted that there was no spillover from the subprime debacle to prime mortgages:

> [T]here has been a lot of talk about contagion or spillover from subprime to Alt-A and so we thought we would comment a little bit on that market and Countrywide's views and exposure to Alt-A. First of all, by way of description, Alt-A generally consists of loans to prime credit borrowers unlike subprime. FICOs generally in excess of 700 who don't qualify for traditional prime programs due to a variety of things; reduced documentation most notably and/or other layering of risk factors, maybe higher LTVs and higher loan amounts.
>
> * * *
>
> As it relates to Alt-A, the conclusion there is that, at least for Countrywide, there has not been any material impact or spillover into Alt-A or for that matter into our prime business.

527. Also during the April 26, 2007 Conference Call, Sambol falsely declared that "of course, Countrywide has the liquidity and the capital and the infrastructure to take advantage of the structural changes that are taking place in this market."

528. The statements referenced above during the April 27, 2006 Conference Call were materially false and misleading when made. Mozilo's statement that Countrywide would benefit from other mortgage companies' irresponsible conduct was false and misleading. In truth, Countrywide was not different from the companies heavily involved in irresponsible lending. See Sections V.B and V.C. Moreover, Sambol's statement that "the outlook is very good for our prime business and prime margins" was false and misleading because

Countrywide classified its subprime loans as prime loans, and also for the same reasons set forth in Section V.F. In addition, Sambol's statement that management was pricing the loans to the secondary market "to breakeven" was false and misleading for the reasons set forth in Section V.H. Further, Mozilo's statement that "there has not been any material impact or spillover [from the subprime fallout] into Alt-A or . . . prime business" was false and misleading for the same reasons set forth above and in Section V.F. Sambol's statement that "Countrywide has the liquidity and the capital and the infrastructure to take advantage of the structural changes that are taking place in this market" was false and misleading because Countrywide did not have access to the liquidity and the Company overstated its capital. See Section V.I.

**5. April 26, 2007 AFSA 7th Finance Industry Conference**

529. On April 26, 2007, Countrywide participated at the AFSA 7th Finance Industry Conference for International Fixed-Income Investors (the "April 26, 2007 Fixed Income Conference"). Jennifer Sandefur ("Sandefur"), Senior Managing Director and Treasurer, attended the conference on behalf of Countrywide. At the conference, Sandefur attempted to distinguish Countrywide from its peer mortgage lenders by stating that the Company was not heavily involved in the subprime mortgage industry. In particular, Sandefur described Countrywide's portfolio as "very high quality" and consisting primarily of prime mortgages:

> There's been a significant amount of turmoil in the market recently as a result of the nonprime mortgage sector. We strategically manage that. We're essentially a prime mortgage originator. We have $400 million in residual investments on our balance sheet. We have a very conservative liquidity profile which insulates us from market events like the subprime origination market events.

* * *

> [D]uring the time that we acquired the bank in 2006, we originated over $2 trillion in mortgages in the United States, prime and a small amount of subprime and we put about $73 billion of very prime mortgages on our own balance sheet.

530. Throughout the conference, Sandefur repeatedly emphasized Countrywide's high quality mortgages:

> Again, over 90% of Countrywide loan origination volume is prime quality. Less than 9% of our production is subprime. . . . The nonprime loans are all held for investment and sold into securitizations with none of those going on our bank's balance sheet.
>
> * * *
>
> A little bit more about the bank. Again, and the high credit quality of that portfolio that we selected. Very low interest rate risk.

531. At the April 26, 2007 Fixed Income Conference, Sandefur also addressed the increased rate of delinquencies in the subprime mortgage industry and the loosened underwriting standards for subprime loans. However, she made a point of distinguishing Countrywide from its competition:

> [M]any of the players that originated . . . [subprime] loans and loosened these standards as they were kind of gasping for breath at the very end of the run in the refi boom, I think lowered a lot of the underwriting standards which caused a lot of these delinquency problems. A lot of these smaller players are exiting the business willingly in many cases and unwillingly in some cases.
>
> . . . I'd like to differentiate Countrywide here. And from a lot of competitors we've seen come and go in the past, you're talking about a kind of one-trick pony, if you will, some of these subprime lenders who all they did was originate subprime loans, enjoyed the wide margins, they weren't properly capitalized. They weren't properly

balanced. They didn't have diversified businesses. They didn't have 38 years of technology. They didn't have the intellectual capital, the hedging capabilities, the ability to price. They did one thing. They originated subprime loans.

Versus a Countrywide who originates a very small component of subprime loans so that they have a full menu of products to offer through the various diversified channels, retail, correspondent, wholesale, through brokers. . . . They underestimated the impact of early payment defaults through the whole loan type of risk transference that they were using unlike the Countrywide who uses a securitization, who has a reputation for high quality originations.

532. At the same conference, Sandefur commented on the adequacy of Countrywide's allowance account for loan losses due to the pristine nature of its portfolio:

. . . Allowances for loan losses which are really a 12 month perspective look at potential losses, we've booked at $229 million for '06. Actual net charge-offs for the bank portfolio were only $34 million. So very conservative allowances for loan losses at very small actual charge offs given the very pristine nature of this portfolio. . . . So, again, the point here, not subprime. Very, very prime. Kind of the opposite of subprime.

533. The statements referenced above and made at the April 26, 2007 Fixed Income Conference were materially false and misleading when made. None of the Officer Defendants issued any corrections to Sandefur's statements, thereby ratifying these false public statements. Specifically, Sandefur's statements that "[w]e're essentially a prime mortgage originator," emphasizing the point with phrases such as "very, very prime," were false and misleading for the same reasons set forth in Section V.F. Moreover, Sandefur's statements that "over 90%

of Countrywide[‘s] loan origination volume is prime quality” and “[l]ess than 9% of our production is subprime” were false and misleading because Countrywide improperly classified subprime mortgage loans as prime loans, and also for the same reasons set forth in Section V.F. In an attempt to distinguish Countrywide from its peers, Sandefur’s statements that Countrywide “originate[d] a very small component of subprime loans” and “has a reputation for high quality loans” were also materially false and misleading for the same reasons set forth in Sections V.B and V.C. Moreover, Sandefur’s statement that Countrywide had “very conservative allowances for loan losses . . . given the very pristine nature of this portfolio” was false and misleading for the reasons set forth above in Section V.H.

**6. First Quarter 2007 Form 10-Q**

534. On May 9, 2007, Countrywide filed its quarterly report on Form 10-Q for the first quarter of 2007, ended March 31, 2007 (“1Q 2007 Form 10-Q”), signed by Sambol and Sieracki. The Company reported financial results as detailed below.

535. In the section titled “Impairment of Retained Interests,” the Company noted that “we recognized impairment of RIs of $429.6 million. Impairment charges of $231.0 million were related to nonprime and related residual interests and $135.3 million were related to subordinated interests on prime home equity lines of credit securitizations.”

536. In the “Off-Balance Sheet Arrangements and Guarantees” section of its 1Q 2007 Form 10-Q, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: “We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources.”

537. The Company described its management of credit risk in the following terms: “We attempt to limit our risk of incurring . . . [representation and

warranty] losses by structuring our operations to ensure consistent production of quality mortgages."

538. In a section titled "Credit Risk Management," the Company also reported that the liabilities associated with the risk of representation and warranties totaled $365.3 million.

539. In a section titled "Securitizations," the Company reported that the fair value of its MSRs at March 31, 2007 was $17,441,860,000. 922. The Company reported allowance for loan losses of $374,367,000, having increased its provision for loan losses by $151,962,000 during the quarter. The Company also had net charge-offs of $38,649,000.

540. Countrywide reported in its 1Q 2007 Form 10-Q that prime mortgage and prime home equity LHI equaled $68,908,462,000, and nonprime mortgage LHI equaled $1,144,184,000.

541. The volume of Mortgage Banking nonprime, prime home equity and prime loans produced during the quarter equaled $7,500,000,000, $9,234,000,000 and $93,833,000,000, respectively.

542. With respect to Countrywide's liquidity and capital resources, the 1Q 2007 Form 10-Q stated that:

> . . . nonprime loans and related securities became much less liquid. However, such assets represent only a small portion of our total assets. The substantial majority of our assets continue to experience ample liquidity in the marketplace. As such, we do not expect the reduction in liquidity for nonprime loans to have a significant adverse effect on our ability to effectively meet our financing requirements.
>
> * * *
>
> . . . We establish reliable sources of liquidity sized to meet a range of potential future funding requirements. We currently have $94.4 billion in available sources of short-term liquidity, which represents a

decrease of $2.0 billion from December 31, 2006. We believe we have adequate financing capacity to meet our currently foreseeable needs.

543. The Company also reported in its 1Q 2007 Form 10-Q management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended March 31, 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

544. Further assuring investors of the veracity of the information contained in its 1Q 2007 Form 10-Q, the report included SOX certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

545. The Company's statements regarding financial results as referenced in ¶¶ 535-540 were materially false and misleading when made as detailed in Section V.H and because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Also, the statements regarding the quality of the volume of loans produced and LHI were false and misleading because Countrywide improperly classified subprime loans as prime loans, and also for the reasons set forth in Section V.F. Moreover, the representation that we "ensure consistent production of quality mortgages" was false and misleading because Countrywide loosened and abandoned its underwriting guidelines when originating loans. See Sections V.B and V.C. Moreover, Countrywide's statements regarding liquidity were false and misleading for the same reasons stated in Section V.I. The statements relating to internal controls were false and misleading because the Company's internal controls over financial reporting were ineffective. See Section

V.H.7. Moreover, the SOX certifications signed by Defendants Mozilo and Sieracki were false and misleading for the same reasons stated in Section V.H.

## VII. THE REGISTRATION STATEMENTS AND PROSPECTUSES FOR COUNTRYWIDE'S OFFERINGS OF DEBT SECURITIES CONTAINED UNTRUE STATEMENTS

546. During the Relevant Period, Countrywide offered certain Notes (*i.e.*, Series B Medium Term-Notes and 6.25% Subordinated Notes Due May 15, 2016 ("6.25% Subordinated Notes")) (collectively, the "Notes") pursuant to materially untrue and misleading a Registration Statement it filed with the SEC February 9, 2006, SEC File Number 333-131707 (the "2006 Registration Statement") filed on Form S-3ASR and Prospectuses and Prospectus Supplements issued thereunder (discussed below) and incorporated therein by reference. The Series B Medium-Term Notes Registration Statement and 6.25% Subordinated Notes Registration Statement, as those terms are defined below, are collectively hereinafter referred to as the "Registration Statements for the Notes." Offerings conducted pursuant to the Registration Statements for the Notes are hereinafter referred to as "Offerings."

### A. Series B Medium-Term Notes

547. On February 15, 2006 (when the Prospectus Supplement for the Series B Medium-Term Notes was filed with the SEC), Countrywide commenced a public offering of Series B Medium-Term Notes to be offered on a continuous basis. The Series B Medium-Term Notes were offered and sold pursuant to the 2006 Registration Statement, Prospectus Supplement filed February 15, 2006, Prospectus dated February 9, 2006 and a series of Pricing Supplements, all filed with the SEC (collectively, the "Series B Medium-Term Notes Registration Statement"). The Series B Medium-Term Notes Registration Statement was signed by Mozilo, Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Enis, Heller, Melone, Parry, Robertson, Russell, Snyder and Sambol.

548. The Series B Medium-Term Notes Registration Statement expressly incorporated by reference Countrywide's 2004 Form 10-K; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2005, June 30, 2005 and September 30, 2005 and future filings with the SEC as described therein until Plaintiff's date of purchase.

549. Defendants Goldman Sachs, CSC, Wells Fargo Securities, J.P. Morgan, ABN AMRO, BNP Paribas, Barclays, RBS Securities, HSBC Securities, and Deutsche Bank acted as underwriters with respect to the offering of Series B Medium-Term Notes.

550. KPMG consented to the use and incorporation of its reports with respect to the consolidated financial statements and all related financial statement schedules, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal controls over financial reporting in the Series B Medium-Term Notes Registration Statement and to the reference to its firm under the heading of "Experts" in the relevant prospectuses. KPMG's reports on Countrywide's consolidated financial statements for the year ended December 31, 2004 and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2004 as audited by KPMG were incorporated by reference into the Series B-Medium Term Notes Registration Statement.

551. As alleged in detail above, Countrywide's 2004 Form 10-K, its consolidated financial statements for the year ended December 31, 2004, and other SEC filings noted above and as incorporated by reference into the Series B Medium-Term Notes Registration Statement were materially false and misleading. Consequently, the Series B Medium-Term Notes Registration Statement, pursuant to which Plaintiff purchased or otherwise acquired its Series B Medium-Term Notes, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements contained therein not misleading.

**B. 6.25% Subordinated Notes Due May 15, 2016**

552. On May 15, 2006 (when the Prospectus Supplement for the 6.25% Subordinated Notes was filed with the SEC), Countrywide commenced a public offering of 6.25% Subordinated Notes. The 6.25% Subordinated Notes were offered and sold pursuant to the 2006 Registration Statement, Prospectus Supplement filed May 15, 2006 and Prospectus dated February 9, 2006, all filed with the SEC (collectively, the "6.25% Subordinated Notes Registration Statement"). The 6.25% Subordinated Notes Registration Statement was signed by Mozilo, Sieracki, Brown, Cisneros, Cunningham, Donato, Dougherty, Enis, Heller, Melone, Parry, Robertson, Russell, Snyder and Sambol.

553. The 6.25% Subordinated Notes Registration Statement expressly incorporated the Company's 2004 Form 10-K; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2005, June 30, 2005 and September 30, 2005 and future filings with the SEC as described therein until Plaintiff's date of purchase.

554. Defendants Banc of America, J.P. Morgan, CSC, Barclays, Deutsche Bank, HSBC Securities and Wells Fargo Securities acted as underwriters with respect to the offering of 6.25% Subordinated Notes.

555. KPMG consented to the use and incorporation of its reports with respect to the consolidated financial statements and all related financial statement schedules, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal controls over financial reporting in the Series 6.25% Subordinated Notes Registration Statement and to the reference to its firm under the heading of "Experts" in the relevant prospectuses. The consolidated financial statements of Countrywide as of December 31, 2005 and 2004 and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2005 were incorporated by reference in the 6.25% Subordinated Notes Registration Statement in reliance upon the reports by KPMG and upon the authority of KPMG as experts.

556. As alleged in detail above, Countrywide's 2004 Form 10-K, its consolidated financial statements for the years ended December 31, 2004 and 2005 and other SEC filings noted above as incorporated by reference into the 6.25% Subordinated Notes Registration Statement were materially untrue and misleading. Consequently, the 6.25% Subordinated Notes Registration Statement, pursuant to which Plaintiff purchased or otherwise acquired its Series 6.25% Subordinated Notes, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements contained therein not misleading.

## VIII. DESPITE DEFENDANTS' EFFORT TO CONCEAL THE TRUTH, CURATIVE DISCLOSURES SLOWLY REVEALED THE TRUE FACTS

### A. Partial Corrective Disclosures And Continued Misrepresentations In July 2007

557. In a series of partial corrective disclosures, Defendants began to admit that Countrywide's financial results were deteriorating. This began no later than July 16, 2007, when Countrywide's issued a press release and filed a Form 8-K with the SEC in which Countrywide purported to report June 2007 operational results. While the report stated loan originations had increased 4% from June of the previous year, Sambol revealed to the market that "delinquencies and defaults continue to rise." According to published details, foreclosures (as a percentage of unpaid principal amount) had more than doubled from June 2006.

558. Commenting on the growing delinquencies and defaults, Stuart Plesser, an analyst at Standard & Poor's, stated: "It's definitely a worrying trend."

559. Friedman Billings Ramsey & Co. analyst Paul Miller cut his 2007 profit forecast for Countrywide to $3.20 from $3.80 per share and slashed his share-price target from $36 from $42, citing, among other things, "rising delinquencies."

560. As a result of this disclosure, Countrywide's stock price declined from a close on July 13, 2007 at $36.26 to a close on July 16, 2006 at $34.84, for a drop of almost 4% on heavy volume of over 14 million shares.

561. On July 24, 2007, Countrywide filed a Form 8-K and issued a press release announcing its financial results for the second quarter of 2007. Countrywide's quarterly release surprised the market with a series of revelations that partially corrected Defendants' earlier false and misleading statements, and that caused a sharp decline in Countrywide's stock price. However, Defendants dampened the effect of Countrywide's July 24, 2007 partial corrective disclosures by making additional fraudulent statements that day in an effort to bolster the Company's stock price and blunt the impact of the corrective disclosures on the market. Statements made by Mozilo included:

> Looking to the second half of 2007, we expect difficult housing and mortgage market conditions to persist. Nonetheless, management remains optimistic about the long term future growth prospects and profitability of the Company as industry consolidation continues.
>
> ***
>
> Countrywide's results for the second quarter of 2007 reflected strength in our core loan production business, but were adversely impacted by continued weakness in the housing market.

562. Important revelations in Countrywide's second quarter release included dramatic new charges and loan loss provisions, an additional revelation that the quality of Countrywide's loans, especially its prime loans, was weaker than had previously been represented. The report disclosed, for example, that Countrywide had reserved $293 million for loan losses, compared to just $61.9 million in comparable loan loss reserves the prior year. Countrywide attributed $181 million of the increased loan loss reserve to HELOCs in the Company's held-for-investment portfolio. In addition, Countrywide wrote down the value of

"residual securities collateralized by prime home equity loans" by $388 million. These "residual securities" were retained by Countrywide after other securities relating to the prime home equity loans at issue were sold. As a result of these charges and adjustments, Countrywide reported reduced second quarter earnings of $0.81 per share, down from $1.15 per share one year earlier.

563. In addition to affording the market some indication concerning the poor quality of the loans originated by Countrywide, the Company's lax underwriting standards, its inadequate loan loss reserves and the inflated values at which it carried loan-based assets on its balance sheet, in a related disclosure during a conference call that day, July 24, 2007 ("July 24, 2007 Conference Call"), Countrywide suggested for the first time that it had classified loans to borrowers with FICO scores as low as 500 as "prime" – far below the industry norm of requiring a borrower to have a minimum FICO score of 660 in order for a loan to the borrower to be classified as "prime."

564. In particular, during the conference call, CRO McMurray claimed that the term "prime" is one that "covers a very vast spectrum" and referred to "a prime loan with FICOs in the low 500s," thereby disclosing that, contrary to industry norms, Countrywide might classify such a loan as a prime loan for purposes of its SEC filings and other financial reporting.

565. Later in the same conference call, McMurray declared that "[t]here is a belief by many that prime FICOs stop at 620. That is not the case." This second, more explicit, remark by McMurray is striking because it demonstrates that senior Countrywide officials were fully aware that it is a common understanding in the lending industry that loans to borrowers with FICO scores below a certain threshold cannot be classified as "prime" loans. Nevertheless, Countrywide chose to secretly classify loans made to borrowers with dramatically lower FICO scores as "prime" without disclosing to the investing public that it was the Company's practice to do so.

566. In addition, with respect to Countrywide's origination and underwriting standards and its internal controls, the following was disclosed at the July 24, 2007 Conference Call:

(a) Many of the charge-offs and delinquencies "stem from the higher concentration of piggyback financing that we did and that we have in the port[folio]. . ." (according to McMurray); as McMurray also stated at the conference, ***"leverage at origination matters. More leverage means more serious delinquencies";*** and

(b) Countrywide ***"made many changes to [its] product offerings, pricing, underwriting guidelines and processes in order to improve the quality and secondary market execution of our production"*** (according to Chief Investment Officer ("CIO") Kevin Bartlett ("Bartlett")), notwithstanding repeated statements during the Relevant Period as to the conservative and careful manner in which the Company handled these matters, in contrast to its competitors, and McMurray said the Company's automated underwriting system had been ***"recalibrated."***

567. Nonetheless, these losses were tempered by additional misrepresentations made by Defendants the same day. On the July 24, 2007 Conference Call, in which Mozilo, Sambol and Sieracki participated, Mozilo stated that the growing mortgage crisis would allow Countrywide to leverage its strong liquidity position. Mozilo stated in his prepared remarks: [W]e believe that the Company is well positioned to capitalize on opportunities during this transitional period in the mortgage business, which we believe will enhance the Company's long-term earnings growth prospects. We expect to leverage the

strength of Countrywide's capital and liquidity positions . . . to emerge ***in a superior competitive position*** coming out of the current housing down cycle."

568. Similarly, on the July 24, 2007 Conference Call, Mozilo again commented on Countrywide's strong liquidity position. Specifically, Mozilo stated that Countrywide had excess capital in terms of equity and plenty of sources to get through its current situation: [W]e are certainly not going to have any issues funding the Company. . . . we have adequate diversified and reliable sources of liquidity available . . . we still have plenty of liquidity cushion. . . . So, we have abundant excess capital in terms of equity and we have tremendous[ ] liquidity sources to fund ourselves through this situation. And we feel very, very comfortable about our liquidity scenario overall."

569. Also on the July 24, 2007 Conference Call, Mozilo responded sharply to a question about his stock sales, asserting that they were made pursuant to a 10b5-1 Plan established "well over a year ago." Later on the same call, Mozilo returned to the question about his Countrywide stock sales and asserted: [T]he shares that I have, actual stock I have, I have retained for 39 and a half years, not sold a share of the initial stock that I got when David and I started this company – that I got, that I purchased. The only thing that is being sold in 10b5-1 are options with expiration dates."

570. In response to this disclosure, Countrywide's stock price declined a statistically significant 10.45% on volume of 51,251,254 shares, as compared to volume of 12,731,891 shares the prior trading day.

571. The statements referenced above during the July 24, 2007 Conference Call were materially false and misleading when made. Specifically, Mozilo's reassuring statements that "we have abundant excess capital in terms of equity," "[we] have tremendous liquidity sources to fund ourselves through this situation" and "[w]e believe we have adequate funding liquidity to accommodate these marketplace changes" were false and misleading for the same reasons set

forth in Section V.I. Moreover, Mozilo's statements regarding his stock sales were false for the same reasons set forth in Section IX.F.

**B. Misrepresentations On August 2, 2007**

572. On August 2, 2007, Sieracki, Countrywide's CFO, made a series of additional fraudulent statements in a further effort to deceive the investing public about Countrywide's liquidity and its net worth. In a Countrywide press release that day entitled "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition," Sieracki was quoted as saying:

> Countrywide has longstanding and time-tested funding liquidity contingency planning.
>
> ***
>
> These planning protocols were designed to encompass a wide variety of conditions, including recent secondary market volatility. Our liquidity planning proved highly effective earlier during 2007 when market concerns first arose about subprime lending, and remains so today. We place major emphasis on the adequacy, reliability and diversity of our funding sources. . . .
>
> ***
>
> Our mortgage company has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank.

573. In addition, the August 2, 2007 press release contained a false and misleading statement about Countrywide's net worth. Quoting Sieracki, the press release falsely stated that "Countrywide's financial condition remains strong, as evidenced by over $14 billion of net worth." As explained in Section V.H, this "$14 billion" net worth figure was materially inflated.

574. In stark contrast to what Sieracki told the investing public on August 2, 2007, the FCIC Report reveals that Countrywide senior executives knew the

financial condition of the Company was much more serious. According to the report, Mozilo told the FCIC "***When we talk about [August 2] at Countrywide, that's our 9/11***," he said (emphasis added). "We worked seven days a week trying to figure this thing out and trying to work with the banks. . . . Our repurchase lines were coming due billions and billions of dollars."

### C. Corrective Disclosures And Continued Misrepresentations On August 9, 2007

575. After the stock market closed on August 9, 2007, Countrywide filed with the SEC the Company's Form 10-Q quarterly report for the quarter ended June 30, 2007 ("2Q 2007 Form 10-Q"). The Form 10-Q surprised the investing public by noting the existence of "unprecedented market conditions" bearing on Countrywide's liquidity, and by further noting that "[w]hile we believe we have adequate funding liquidity, the situation is rapidly evolving and the impact on the Company is unknown." These statements were a partial corrective disclosure with respect to Countrywide's boasts – made as recently as one week earlier in the Company's August 2, 2007 press release – about the Company's supposedly "highly effective" liquidity planning and about the "reliability" of its sources of liquidity. The Company also stated that its impairment of the fair value of its RIs equaled $268,117,000.

576. As a result of this partial corrective disclosure, Countrywide common stock experienced a material decline on August 10, 2007 of approximately 2.8%, from $28.66 to $27.86 on a volume of 48,657,500 shares, as compared to a volume of 24,502,100 shares the prior trading day.

577. To temper these losses, Defendants made additional misrepresentations on the same day. In the "Off-Balance Sheet Arrangements and Guarantees" section of the 2Q 2007 Form 10-Q, which was signed by Sambol and Sieracki, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-

balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

578. In a section titled "Financial Statements," the Company reported that the fair value of its MSRs for the quarter was $20,087,368,000. The Company also reported an allowance for loan losses of $512,904,000 as of the end of the quarter, having increased its provision for loan losses by $292,924,000 during the quarter, with net charge-offs of $154,387,000.

579. Furthermore, in its 2Q 2007 Form 10-Q, the Company also made the false claim that it had adequate funding liquidity to accommodate marketplace changes:

> We believe we have adequate funding liquidity to accommodate these marketplace changes in the near term.
>
> ***
>
> We also believe that the challenges facing the industry should ultimately benefit Countrywide as the mortgage lending industry continues to consolidate.

580. Also, in the section titled "Controls and Procedures," Countrywide described the adequacy of its internal controls as follows: "There has been no change in our internal control over financial reporting during the quarter ended June 30, 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

581. Further assuring investors of the veracity of the information contained in the 2Q 2007 Form 10-Q, the report included a SOX certification signed by Defendants Mozilo and Sieracki representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

582. The statements referenced above from Countrywide's 2Q 2007 Form 10-Q were materially false and misleading when made because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Countrywide's statement that "[w]e believe we have adequate funding liquidity to accommodate these marketplace changes in the near term" was false and misleading for the same reasons set forth in Section V.I. The statements relating to internal controls were false and misleading for the same reasons set forth in Section V.H. Moreover, the SOX certifications signed by Mozilo and Sieracki were false and misleading for the same reasons stated in Section V.H.

**D. Corrective Disclosure On August 14, 2007**

583. On August 14, 2007, Countrywide issued a press release and filed a Form 8-K releasing its monthly operational data for July 2007. In this report, Countrywide disclosed that by the end of July 2007, its rate of delinquency as a percentage of unpaid principal balance had increased by approximately 35% to 4.89%, compared to a 3.61% rate as of July 31, 2006. Countrywide also disclosed that, similarly, by the end of July 2007, its rate of pending foreclosures as a percentage of unpaid principal balance had more than doubled to 1.04%, compared to 0.46% as of July 31, 2006.

584. The FCIC discloses that on the same day, staff from the Federal Reserve Bank of New York, who had supervised Countrywide's holding company until the bank switched to a thrift charter in March 2007, sent a confidential memo to the its Board of Governors warning about the Company's condition:

> The company is heavily reliant on an originate-to-distribute model, and, given current market conditions, the firm is unable to securitize or sell any of its non-conforming mortgages. . . . Countrywide's short-term funding strategy relied heavily on commercial paper (CP) and, especially, on ABCP. In current market conditions, the viability of that strategy is

> questionable. . . . The ability of the company to use [mortgage] securities as collateral in [repo transactions[ is consequently uncertain in the current market environment. . . . As a result, it could face severe liquidity pressure. Those liquidity pressures conceivably could lead eventually to possible insolvency.

585. The next day, August 15, 2007, the *Los Angeles Times* published an article about the July operating report, commenting: "[i]n a grim report that helped send mortgage stocks reeling, No. 1 home lender Countrywide Financial Corp. said Tuesday that foreclosures and delinquencies jumped in July to the highest levels in more than five years." The article also noted that Countrywide had not filed detailed monthly reports before 2002.

586. Countrywide's stock price closed down on August 14, 2007 by approximately 8.1%, from $26.61 to $24.46, on volume of 35,850,850 compared to 29,081,100 the previous day.

587. Countrywide's August 14, 2007 disclosure of unexpectedly high rates of delinquencies and foreclosures constituted a partial corrective disclosure with regard to Countrywide's prior misstatements that Countrywide's business was sound. that its loan loss reserves were adequate and its assets not overstated, that it was well-positioned to withstand the downturn in the housing market and that it was poised to capture market share from weaker competitors.

**E. Corrective Disclosure On August 15, 2007**

588. According to the FCIC Report, unbeknownst to the market, on August 15, 2007, Mozilo recommended to Countrywide's Board of Directors that the Company notify its lenders of its intention to draw down $11.5 billion on back up lines of credit. Mozilo told the FCIC:

> The only option we had was to pull down those lines. We had a pipeline of loans and we either had to say to the borrowers, the customers, 'we're going out of business, we're not going to fund – and there's great

risk to that, litigation risk, we had committed to fund . . . When it's between your ass and your image, you hold on to your ass.

589. According to the FCIC Report, the Board approved the draw down, but before the news was announced, Merrill Lynch surprised the markets by following up on its August 13, 2007 analyst report expressing liquidity concerns about Countrywide with a further research report that downgraded Countrywide from "buy" to "sell" based on even more serious perceived liquidity problems. An August 17, 2007 *WSJ* article summarized the impact of the August 15 Merrill Lynch analyst report on Countrywide's stock:

When Merrill Lynch & Co. analyst Kenneth Bruce put a surprise "sell" rating on Countrywide Financial Corp. this week, the stock fell 13%. Many on Wall Street clearly felt he knew what he was talking about: He used to work at the troubled mortgage lender.

Mr. Bruce, 40, follows mortgage companies in Merrill's San Francisco office. But for 13 years before his arrival on Wall Street, he worked in the mortgage business in different capacities. One of them was a two-year stint working for Countrywide's home-loans division in Pasadena, Calif. His boss there was David Sambol, who is now the firm's president and heir apparent to its embattled chief executive, Angelo Mozilo.

Mr. Bruce's Wednesday report, entitled "Liquidity is the Achilles Heel" came just two days after he had reiterated his longstanding "buy" rating on the company. Pointing out that "funding markets are deteriorating quickly," he suggested that Countrywide may even face bankruptcy. "Our view has changed, materially," he wrote on the first page of the report.

590. The August 15, 2007 Merrill Lynch analyst report served as a further partial corrective statement about Defendants' false statements that Countrywide

was financially sound, that it was well-positioned to weather the downturn in the housing market, that it was poised to grow during the downturn and to capture market share from weaker competitors, and that it had secure access to ample sources of liquidity.

591. Countrywide's stock price declined a statistically significant amount of 12.96% from $24.46 to $21.29, on volume of 118,552,432 shares, as compared to volume of 35,846,800 shares the prior trading day.

**F. Corrective Disclosures On August 16, 2007**

592. On August 16, 2007, two significant events served as partial corrective disclosures. First, Countrywide made a surprise announcement that it had drawn its ***entire $11.5 billion*** credit facility to "supplement" its cash position. The credit facility that Countrywide drew on was perceived by the market to be an emergency fund to be used only as a last resort, or a close to last resort source of liquidity.

593. Second, and as a result of the draw down, all three major credit rating agencies – Standard & Poor's, Moody's Investors Service and Fitch Ratings – issued downgrades on August 16, 2007 with regard to Countrywide securities. Moody's sharply downgraded Countrywide's senior debt rating to Baa3 from A3, just one notch above junk grade. Fitch sharply downgraded Countrywide's long-term issuer default rating two notches to BBB+ from A, just two notches above junk grade. S&P downgraded Countrywide from A to A-.

594. Countrywide's stock price declined by approximately 11% on that day, from $21.29 to $18.95, on extraordinary volume of 201,476,816 shares.

595. Countrywide's decision to access its $11.5 billion credit facility and the rating agency downgrades constituted partial corrective disclosures to the investing public of Defendants' false statements that Countrywide was financially sound, that its portfolio was comprised of high-quality assets and that it had secure access to ample sources of liquidity. These also were partially corrective

statements concerning Defendants' false statements that Countrywide was well-positioned to weather the downturn in the housing market and that it was able to grow to thrive and gain market share from weaker competitors during the housing market downturn.

**G. Positive News And Misrepresentations On August 23, 2007**

596. On August 23, 2007, BofA announced a $2 billion investment in Countrywide. According to media reports, in return for its investment BofA received non-voting Countrywide preferred security yielding 7.25% annually and convertible to common stock at $18 per share. However, seeking to temper the announcement, Mozilo was quoted as saying that "Countrywide would have survived without help from BofA" in an August 23, 2007 article in *WSJ*.

597. The same day, August 23, 2007, Mozilo was also interviewed on CNBC by Bartiromo. During the interview, Mozilo falsely assured the marketplace that the Company was not at risk of bankruptcy:

> Well, first of all let me comment [on a] couple things. One is the, just the irresponsible behavior on part of that analyst from Merrill Lynch to, yell fire in a very crowded theater in [an] environment where you had panic already setting in the overall markets unrelated to Countrywide. Was ***totally irresponsible and baseless. . . .*** Has no basis whatsoever.
>
> * * *
>
> ***. . . I can tell you there is no more chance for bankruptcy today for Countrywide than it was six months ago***, two years ago, when the stock was $45 a share. [We] are a very solid company.

598. Mozilo's statements referenced above were materially false and misleading when made. Specifically, Mozilo's reassuring statements that "Countrywide would have survived without help from Bank of America" and that the Company had "no more chance for bankruptcy today . . . than it was six

months ago" were false and misleading for the reasons set forth in Section V.I. Additionally, Mozilo's statement that his "interest[s] are firmly aligned with those of our other investors" was false and misleading for the reasons set forth above in Section IX.F.

**H. Corrective Disclosure On August 24, 2007**

599. On August 24, 2007, Fitch Ratings downgraded CHL's servicer ratings with respect to a series of loan categories and placed the ratings on "Rating Watch Evolving" status – a signal that the ratings could be cut again. In its press release announcing the downgrades, Fitch noted that there were "delinquency" challenges as well as "continued pressure on CHL's liquidity position and financial flexibility." On this news, Countrywide's stock price declined by approximately 4.6%, from $22.02 to $21.00, on high volume of 66,189,400 shares.

600. Fitch's downgrade constituted an additional partial corrective disclosure concerning prior false and misleading statements by Defendants with respect to Countrywide's access to liquidity, lax loan origination and underwriting standards, as well as the soundness and stability of Countrywide's business and finances, its ability to weather the downturn in the housing market and its ability to thrive and gain market share from weaker competitors during the housing market downturn.

**I. Corrective Disclosure On September 10, 2007**

601. After the market closed on Friday, September 7, 2007, Countrywide made another surprise announcement about a plan to lay off between "10,000 to 12,000 [employees] over the next three months, representing up to 20 percent of its current workforce."

602. The announcement of massive layoffs by Countrywide constituted a further partial correction of multiple prior false statements by Countrywide officials, including statements that Countrywide was well positioned to weather the credit crisis, that its financial condition was sound and that it would strengthen its position within the lending industry during the crisis by capturing market share from weaker competitors.

603. In response to this news, the Company's stock price declined by 5.5% on September 10, 2007 – the next business day after the news came out – from $18.21 to $17.21, on high volume.

**J. Corrective Disclosure On September, 2007**

604. On September 11, 2007, *The New York Post* reported that Countrywide was continuing to face finance difficulties and that it was "desperate." According to the article, the Company was scrambling to put together a bailout package before it had to repay billions of debt.

> Countrywide Financial Corp. is putting together another multibillion dollar bailout plan as the nation's largest home lender continues to struggle amid the global credit crunch and declines in the housing market, *The Post* has learned.
>
> * * *
>
> "***Countrywide is in desperate need of cash right now to continue funding mortgages and the credit markets are still largely closed to them***," said one source familiar with the company.
>
> * * *

> Countrywide, which handles one of every five new U.S. mortgages, has been hurt by falling home prices and record foreclosures. ***The company has billions in medium-term debt coming due in about 90 days and needs to cash to continue operating***.

605. Upon investors' growing concerns as the true risks of Countrywide's lending practices were made apparent, Countrywide's stock dropped from a close of $17.21 on September 10, 2007 to a close of $16.88 on September 11, 2007, on high volume of over 82 million shares

**K. Corrective Disclosure On October 24, 2007**

606. On October 24, 2007, further partial revelations to the investing public disclosed the truth regarding Countrywide's loan origination and underwriting practices. Specifically, the October 24, 2007 *WSJ* Exposé revealed a series of important pieces of information to the investing public, much of which related to Countrywide's Pay Option ARMs.

607. The October 24, 2007 *WSJ* Exposé began by explaining that:

> Subprime mortgages aren't the only challenge facing Countrywide Financial Corp., the nation's biggest home-mortgage lender. Some loans classified as prime when they were originated are now going bad at a rapid pace.

608. *WSJ* further revealed:

> An analysis prepared for *WSJ* by UBS AG shows that 3.55% of option ARMs originated by Countrywide in 2006 and packaged into securities sold to investors are at least 60 days past due. That compares with an average option-ARM delinquency rate of 2.56% for the industry as a whole and is the highest of six companies analyzed by UBS.

609. *WSJ* also noted that:

> Among option ARMs held in its own portfolio, 5.7% were at least 30 days past due as of June 30, the measure Countrywide uses. That's up from 1.6% a year earlier. Countrywide held $27.8 billion of option ARMs as of June 30, accounting for about 41% of the loans held as investments by its savings bank. An additional $122 billion have been packaged into securities sold to investors, according to UBS.

610. *WSJ* declared that "[t]he deteriorating performance of option ARMs is evidence that lax underwriting that led to problems in subprime loans is showing up in the prime market, where defaults typically are minimal." In addition, *WSJ* quoted UBS analyst Shumin Li, who stated that "at Countrywide 'they were giving these loans to riskier and riskier borrowers.'"

611. In response to this news, the Company's stock price declined by 8.1% in one day on single day volume of 66,182,838 shares, as compared to 29,945,110 shares the prior trading day.

612. The October 24, 2007 *WSJ* Exposé partially corrected prior material false and misleading statements, including Countrywide's and Mozilo's repeated representations that Countrywide maintained prudent and conservative loan origination and underwriting standards, that it was well-positioned to weather a downturn in the real estate market and that it would thrive during the downturn by capturing market share from weaker competitors.

**L. Corrective Disclosure And Continued Misrepresentations On October 26, 2007**

613. On October 26, 2007, Countrywide issued a press release and filed a Form 8-K reporting its financial results for the third quarter of 2007. For the first time in 25 years, Countrywide reported a quarterly loss of $1.2 billion. In addition, Countrywide disclosed a $1 billion write-down of the Company's loans and MBS; an increase in loan loss provisions to $934 million, compared to $293 million in the prior quarter and $38 million in the third quarter of 2006; and an

increase in the provisions for R&Ws to $291 million, compared to $79 million in the prior quarter and $41 million in the third quarter of 2006.

614. However, in an attempt to temporarily dampen the poor performance reported by Countrywide on October 26, various Defendants – led by Mozilo – made a series of false statements, in both the press release and during an earnings conference call that day, to reassure the investing public. In the press release that same day, Mozilo stated that "during the period [the third quarter] we . . . laid the foundation for a return to profitability in the fourth quarter," and in the earnings call that "we expect to return to profitability in the fourth quarter and we anticipate that 2008 will also be profitable." Similarly, the press release quoted Sambol as saying that "[w]e . . . anticipate that the Company will be profitable in the fourth quarter and in 2008."

615. During the earnings call that same day, Mozilo denied that he had engaged in insider trading: "I would like to state ***categorically*** that at ***no*** time did I make ***any*** trading decisions based on any material non-public information and I fully complied with all . . . applicable securities laws in connection with my trading plans." Also during the earnings call, Sambol stated that "we see long-term prospects for . . . Countrywide to remain very attractive. The company has sufficient capital, liquidity and financing capacity for its operating needs and its growth needs. And coming through this environment, CFC continues to possess all of its key historical competitive advantages . . . ." Sieracki also made a similar statement during the earnings call that "[w]e now have ample and growing funding liquidity. . . . The mortgage company has adequate liquidity to fund all debt maturities through 2008, without raising any new debt. . . . So you can see the liquidity situation is very strong at Countrywide at September 30, 2007." Finally, during the call, Sambol seconded the views of an analyst who touted the Company's loan loss reserve methodology, claiming that it is better than its peers:

> But one other aspect of our reserves that is worth mentioning is we have a reserve methodology, at least we've had to date . . . that we think is somewhat conservative relative to what most of our peers do and what we do is where maybe some of our peers book in their reserve what they believe to be one year's worth of forward charge-offs, maybe five quarters in the case I think as we have looked at the landscape, the most conservative guys, we have a reserve methodology that books more than five quarters of expected losses. And it is because what we do is we book kind of a reserve for the lifetime losses on loans that are delinquent today, 90+ delinquent, as well as the lifetime expected losses on loans that will go delinquent within the next 12 months.

616. Mozilo's and Sambol's statements referenced above were materially false and misleading when made. Specifically, the reassuring statements made by Mozilo and Sambol that, for example, "we expect to return to profitability in the fourth quarter" and "[t]he Company has sufficient capital, liquidity and financing capacity," and the similar statements by Mozilo, Sambol and Sieracki that "[t]he Company's liquidity is stable and improving" and "[w]e now have ample and growing funding liquidity" were false and misleading for the reasons set forth in Section V.I. Also, Mozilo's denial of insider trading was false for the reasons detailed in Section IX.F. Further, Sambol's statements that Countrywide "ha[s] a reserve methodology that books more than five quarters of expected losses" and "is somewhat conservative relative to what most of our peers do" were false and misleading. See Section V.H.

**M. Corrective Disclosure On October 30, 2007**

617. Before the markets opened on Tuesday, October 30, *WSJ* published another article that partially corrected prior material false and misleading statements by Defendants.

618. Most notably, *WSJ* reported that "some analysts warn that [Countrywide] . . . hasn't gone far enough in marking down the value of mortgage securities it holds." *WSJ* noted that in addition to "question[ing] whether Countrywide has gone far enough in marking down assets," two specific analysts that it cited – Frederick Cannon of Keefe, Bruyette & Woods, and Paul J. Miller Jr. of Friedman, Billings, Ramsey & Co. – also questioned whether Countrywide had adequately "provid[ed] for future loan losses." The *WSJ* article represented a further partial corrective disclosure with regard to the veracity of Countrywide's accounting, in particular with respect to the value of the assets that Countrywide reported based on mortgages that it held and the adequacy of Countrywide's loan loss reserves.

619. *WSJ* also asserted that Countrywide "may have trouble delivering on" what *WSJ* termed its "profit vow" in the Company's October 26, 2007 press release – that it would return to profitability in the fourth quarter of 2007 and through 2008 – thereby partially correcting Countrywide's and Mozilo's false October 26 profit representations.

620. As a result of this disclosure, Countrywide's stock price declined on October 30 by approximately 5.3%, from $16.83 to $15.94, on volume of 26,472,400.

621. The *Journal*'s October 30 article also partially corrected prior false statements by Countrywide about its access to liquidity, its institutional stability and its ability to thrive during the housing downturn. The *Journal* noted in that regard that "lenders like Countrywide can no longer fund themselves with short-term borrowings in the capital markets, such as by issuing commercial paper." Quoting analyst Cannon, the *Journal* further noted, among other matters, that "Countrywide has yet to show that it can 'earn above its cost of capital,'" and that it appeared that Countrywide "can raise funds 'only at very high prices.'"

**N. Corrective Disclosure On November 7, 2007**

622. On November 7, 2007, Gradient Analytics, Inc. ("Gradient"), an independent equity research firm, issued a 27-page report detailing six techniques "for misstating the earnings and net assets at firms that are heavily invested in mortgages and related securities." The Gradient report analyzed five major U.S. mortgage businesses, including Countrywide. The report concluded, *inter alia*, that based on its investigation, Countrywide appeared to be "at risk from virtually all of the mortgage accounting games highlighted in this report." The Gradient report elaborated about certain dubious features of Countrywide's financial reporting, including:

> - [W]e expect to see more losses reported down the road from write-downs of CFC's retained interests.
>
> - Gradient believes that the company's MSRs [mortgage servicing rights] may be materially overstated.
>
> - CFC's loans held for investment – and particularly its Option ARMs – may be subject to a high risk of misstatement at the present time.
>
> - [W]e would expect negative amortization to be a significant problem.
>
> - [T]here may be a substantially larger impairment that has been avoided by [Countrywide] changing the classification of . . . loans to the held for investment category.

623. As a result of this report, Countrywide's stock price declined by approximately 9.3%, from $15.02 to $13.63, on high volume.

**O. Misrepresentations On November 9, 2007 - Third Quarter 2007 Form 10-Q**

624. On November 9, 2007, Countrywide filed its Form 10-Q report for the third quarter of 2007, ended September 30, 2007 ("3Q 2007 Form 10-Q"). In the Form 10-Q, which Sambol and Sieracki signed, Countrywide once again

stated that during the industry downturn, "[w]e also believe that many opportunities will present themselves to the Company as a result of the market transition taking place, and that Countrywide is well positioned to capitalize on these opportunities."

625. In a section titled "Impairment of Retained Interests," the Company reported that the fair value of the RIs on its balance sheet as of September 30, 2007 was $2,463,528,000. The impairment taken on the fair value of its RIs equaled $716,658,000.

626. In the "Off-Balance Sheet Arrangements and Aggregate Contractual Obligations" section, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

627. In a section titled "Credit Risk Management," the Company also stated the liabilities associated with the risk of representation and warranties $688,900,000.

628. In Note 11 of the Consolidated Balance Sheet, titled "Mortgage Servicing Rights," the Company reported that the fair value of MSRs as of September 30, 2007 was $20,068,153,000.

629. Also, in the section entitled "Controls and Procedures," Countrywide described the adequacy of its internal controls:

> There has been no change in our internal control over financial reporting, other than discussed above, during the quarter ended September 30, 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

630. Further assuring investors of the veracity of the information contained in its 3Q 2007 Form 10-Q, the report included a SOX certification signed by Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

631. The statements referenced above in the 3Q 2007 Form 10-Q were materially false and misleading when made because the Company overstated the fair value of its LHI and MSR, understated ALL, understated liabilities related to R&Ws, overstated net earnings and total shareholders' equity. Countrywide's statement that it "is well positioned to capitalize on . . . opportunities" was false and misleading for the same reasons set forth in Section V.I. The statements relating to internal controls were false and misleading for the same reasons set forth in Section V.H. The SOX certifications signed by Mozilo and Sieracki were false and misleading for the same reasons stated in Section V.H above.

**P. Corrective Disclosure On November 19, 2007**

632. On November 19, 2007, Moody's announced that it had established a "negative outlook" on Countrywide's credit, meaning it was "considering a downgrade." According to this announcement, Moody's stated that it "expects [Countrywide] to write off more of its portfolio" to bolster its ability to repay its debts.

633. In response to this news, the Company's stock price declined by 12.43% in one day on single-day volume of 70,228,183 shares, as compared to 32,251,331 shares the prior trading day.

**Q. Corrective Disclosure On November 26, 2007**

634. On November 26, 2007, *WSJ* published an article that described Countrywide's heavy dependence on the Federal Home Loan Bank of Atlanta ("FHLB") as an important source of liquidity for the Company since mid-August

2007. The article also disclosed that Countrywide's ability to use the FHLB as a source of liquidity was nearly over.

635. Specifically, the *Journal* reported that:

> When Countrywide Financial Corp. Chief Executive Angelo Mozilo needs cash to fund home loans these days, he doesn't look to investment banks in New York or London. He relies mainly on the quasigovernmental Federal Home Loan Bank in Atlanta.
>
> * * *
>
> The Atlanta home loan bank has helped to keep Countrywide in business since mid August, when investors' fears over default risk shut off mortgage lenders' ability to raise money through commercial paper or other short-term borrowings. Countrywide has replaced that funding mainly by tapping the Atlanta bank, where its borrowings totaled $51.1 billion as of Sept. 30, up 77% from three months earlier."

636. The *Journal* also reported that "the home loan bank . . . limit[s] any member's total advances to 50% of that member's assets." The *Journal* explained that "Countrywide's savings bank had assets of $106 billion at the end of October, which suggests that its advances are near that ceiling."

637. The FHLB's limitation on members borrowing more than 50% of their assets meant that Countrywide was very close to its borrowing ceiling because, as noted, Countrywide had assets of $106 billion. According to the *Journal* article, Countrywide had already borrowed $51.1 billion from the FHLB, or 96.4% of its $53 billion borrowing limit.

638. On this news, Countrywide's stock declined by approximately 10.5%, from $9.65 to $8.64, on a volume of 54,939,937 shares, as compared to a volume of 21,636,844 shares on the prior trading day.

639. The *Journal*'s disclosures in its article about Countrywide's dependence on the FHLB as a source of liquidity and of the probable likelihood that Countrywide would exhaust its borrowing limit was a partial correction of several false and misleading statements by Defendants about Countrywide's institutional stability, its ability to weather the downturn in the housing market, its ability to gain market share from competitors and its access to liquidity.

**R. Corrective Disclosure On December 13, 2007**

640. Two partial corrective disclosures occurred on December 13, 2007. First, Countrywide issued a press release and filed a Form 8-K releasing its November 2007 operational data. In its monthly operating report, Countrywide disclosed that as of November 30, 2007, its rate of delinquency as a percentage of loans serviced had increased to 6.34%. This disclosure of increasing delinquency rates and foreclosures was a further partial corrective disclosure with regard to Countrywide's false and misleading representations about the quality of its loan origination and underwriting standards. In addition, the report partially corrected false and misleading aspects of Countrywide's financial reporting, including Countrywide's loan loss reserves and its reported assets. The report was also a partial corrective disclosure of Countrywide's false and misleading statements that its business was sound, that it was well-positioned to withstand the downturn in the housing market and that it was poised to capture market share from weaker competitors.

641. Second, *NYT* reported on December 13, 2007 that "[t]he Illinois attorney general is investigating the home loan unit of Countrywide Financial as part of the state's expanding inquiry into dubious lending practices that have trapped borrowers in high-cost mortgages they can no longer afford." *NYT* further noted that "Lisa Madigan, the attorney general, has subpoenaed documents from Countrywide relating to its loan origination practices." In addition, *NYT* quoted Illinois Attorney General Madigan as saying about "a Chicago mortgage broker"

for which Countrywide was the "primary lender" that "[t]his company's conduct is a prime example of unscrupulous mortgage brokers that has led to a foreclosure crisis for many Illinois homeowners." The *NYT* article represented a further disclosure that partially corrected Defendants' prior material false and misleading statements regarding Countrywide's loan origination and underwriting practices; the accuracy and integrity of its accounting including, in particular, the adequacy of its loan loss reserves and the valuation of loans that it reflected as assets on its balance sheet; its business ethics; its institutional strength and stability; its ability to thrive during the housing downturn; and its ability to sustain itself as a viable independent business.

642. In response to these disclosures, Countrywide's stock declined by approximately 4.3%, from $10.53 to $10.08 on high volume.

### S. Corrective Disclosure And Continued Misrepresentations On January 8, 2008

643. On January 8, 2008, *NYT* published an article that reported that Countrywide had fabricated documents related to the bankruptcy case of a Pennsylvania homeowner. *NYT* noted that the fabricated documents, which it described as "three letters from Countrywide addressed to . . . [a] homeowner," were written in connection with "one of 300 bankruptcy cases in which Countrywide's practices have come under scrutiny in western Pennsylvania." *NYT* quoted U.S. Bankruptcy Judge Thomas P. Agresti, who presided over the case, as saying that "[t]hese letters are a smoking gun that something is not right in Denmark."

644. The January 8, 2008 *NYT* article served as a partial corrective disclosure with respect to a series of false representations by Countrywide, including statements about Countrywide's business ethics, and about the competence and accuracy of both Countrywide's management and its information and financial reporting systems.

645. In response, Countrywide stock plummeted by approximately 28.4% that day, from $7.64 to $5.47, on extraordinary volume of 178,828,816 shares compared to 38,088,773 shares the prior trading day.

646. Nonetheless, these losses were tempered by additional misrepresentations by Defendants made on the same day. On January 8, 2008, *Reuters* reported in an article titled "*Countrywide Rejects Bankruptcy Rumor*" that Countrywide had stated that "[t]here is no substance to the rumor that Countrywide is planning to file for bankruptcy, and we are not aware of any basis for the rumor that any of the major rating agencies are contemplating negative action relative to the company."

**T. Corrective Disclosure On January 9, 2008**

647. On January 9, 2008, Countrywide issued a press release and filed a Form 8-K releasing its operational data for December 2007. According to this monthly operating report, by December 31, 2007, Countrywide's rate of pending foreclosures as a percentage of unpaid principal balance had more than doubled to 1.44%, compared to 0.70% as of December 31, 2006. Similarly, Countrywide also disclosed that by December 31, 2007, its rate of delinquency as a percentage of unpaid principal balance had increased by more than 50% to 7.20%, compared to 4.6% as of December 31, 2006.

648. As a *Reuters* article published on January 9 explained, that "foreclosures and late payments rose in December to the highest on record, sending [Countrywide's] shares tumbling for a second day to their lowest in nearly 13 years." *Reuters* noted that "[a]nalysts attributed Wednesday's drop to deteriorating credit quality reflected in Countrywide's monthly operating report, and renewed concern the lender might not survive the housing crunch and could seek bankruptcy protection." *Reuters* also quoted Lehman Brothers analyst Bruce Harting's that "[t]he extent of the deterioration is a surprise and does not bode

well for the fourth-quarter results of companies with mortgage credit exposure that may have to further add to reserves."

649. As a result of this partial corrective disclosure, Countrywide's stock closed down on January 9, 2008 by approximately 6.4%, from $5.47 to $5.12, on heavy volume of 164,158,592 shares.

**U. January 11, 2008 Merger Announcement**

650. Before the securities markets opened on Friday, January 11, 2008, BofA announced a definitive agreement to purchase Countrywide in an all-stock transaction worth approximately $4 billion. Specifically, BofA agreed to offer 0.1822 shares of its stock to Countrywide shareholders for every Countrywide share they held.

651. The approximately $4 billion that BofA announced on January 11 that it was paying for Countrywide represented only about 26% of Countrywide's most recently reported book value of approximately $15.3 billion, which was reported as of September 30, 2007.

652. BofA's decision to purchase Countrywide for only approximately 26% of Countrywide's book value following the completion of comprehensive due diligence represented a partial corrective disclosure with respect to a series of false and misleading statements that had been made by Defendants. The low purchase price of Countrywide relative to book value represented a disclosure that Countrywide's financial statements continued to falsely overvalue Countrywide's assets (including, in particular, residual securities, LHI and loans held for sale) and continued to understate Countrywide's loan loss reserves.

653. Countrywide's stock price declined on January 11, 2008 by approximately 18.3%, from $7.75 to $6.33, on heavy volume of 234,155,264 shares, on this news.

**V. Misrepresentation On January 29, 2008**

654. On January 29, 2008, Bloomberg reported, in an article titled "*Countrywide KB Home Loans Accused of Fraud by Whistleblower*," that Mark Zachary, the former regional vice president of Countrywide and KB Homes joint venture, claimed he had been "fired for rejecting unqualified borrowers and reporting illegal and unethical lending practices to management." The article also reported that Countrywide issued a statement denying the claims, stating that it "has policies and procedures in place that aim to prevent the type of activities Zachary is alleging." Countrywide's statement in response to Zachary's allegations was false and misleading for the reasons set forth in Section V.D.

**W. Corrective Disclosure On March 6, 2008**

655. On March 6, 2008, the CHICAGO SUN-TIMES reported that Illinois Attorney General Lisa Madigan had issued subpoenas to, among others, Countrywide, "to determine if they unfairly steered African American and Latino borrowers into higher cost or otherwise inappropriate home loans in violation of fair lending and civil rights laws." The Illinois Attorney General was quoted as saying that "[t]he difference in cost between the home loans sold to white borrowers and those sold to African-American and Latino borrowers is alarming." In addition, her office said in a statement that "[i]ncome level does not appear to account for the difference in pricing." Reportedly, "[t]he wealthiest African-American homeowners were still more likely than the poorest white borrowers to get placed in high-cost loans."

656. These statements by the Illinois Attorney General about the investigation served as a partial corrective disclosure with regard to a series of defendants' false and misleading statements, including statements denying that Countrywide engaged in predatory lending, statements affirming that Countrywide maintained appropriate loan origination and underwriting standards

and statements regarding Countrywide's ethical standards and the quality of its management.

657. On this news, Countrywide's stock price declined on March 6, 2008 by approximately 8.8%, from $5.70 to $5.20, on volume of 32,113,990.

**X. Corrective Disclosure On March 8, 2008**

658. On Saturday, March 8, 2008, *WSJ* reported that "[t]he Federal Bureau of Investigation is probing . . . Countrywide Financial Corp. for possible securities fraud." *WSJ* further reported that "[t]he inquiry involves whether company officials made misrepresentations about the Company's financial position and the quality of its mortgage loans in securities filings, four people with knowledge of the matter said." *WSJ* also noted that "Countrywide issued more than $100 billion in mortgage-backed securities between 2004 and 2007" and that "[m]ore than two dozen Wall Street firms helped construct those deals, making it possible that some of them will also face law-enforcement scrutiny." *WSJ* also reported that:

> Federal investigators are looking at evidence that may indicate widespread fraud in the origination of Countrywide mortgages, said one person with knowledge of the inquiry. If borne out, that could raise questions about whether company executives knew about the prospect that Countrywide's mortgage securities would suffer many more defaults than predicted in offering documents. Another potential issue facing the company is whether it has been candid in its accounting for losses. People familiar with the matter said that Countrywide's losses may be several times greater than it has disclosed.

659. *WSJ*'s March 8, 2008 story was a further partial corrective disclosure with regard to a series of prior false and misleading statements by Defendants. Among other matters, the March 8 *WSJ* story constituted a partial corrective disclosure with regard to false and misleading representations made by defendants

in Countrywide's financial statements and related SEC filings, including, but not limited to, representations concerning Countrywide's loan loss reserves, earnings and assets. The story also constituted a partial corrective disclosure with regard to Countrywide's prior false and misleading representations about its business ethics and the quality of its management. In addition, the March 8 *WSJ* story partially corrected Defendants' prior false and misleading statements about Countrywide's institutional stability and its ability to weather the housing crisis and to capture market share at the expense of purportedly weaker competitors. The story further partially corrected, among other matters, Defendants' prior false and misleading statements about the quality of Countrywide's loan origination and underwriting standards.

660. On Monday, March 10, 2008, the first day that the securities markets were open following the publication of *WSJ*'s March 8 story, Countrywide stock declined by approximately 14%, from $5.07 to close at $4.36 – its lowest level since April 1995 – on volume of 35,329,447.

## IX. ADDITIONAL ALLEGATIONS SUPPORTING THE OFFICER DEFENDANTS' SCIENTER

661. Additional facts further evidence the Officer Defendants' scienter including the facts that: (a) the misstatements related to the Company's core business; (b) the Officer Defendants specifically made representations touting the Company's underwriting standards; (c) numerous documents demonstrate the Officer Defendants' knowledge of credit risks to Countrywide's loan portfolio and risks resulting from improper underwriting standards; (d) CWs and other witnesses confirm the Officer Defendants' knowledge of the lessening of underwriting standards; (e) the nature of the accounting improprieties related to the Company's core business; and (f) several of the Officer Defendants sold Countrywide securities during the Relevant Period.

### A. Since Mortgage Banking Was Countrywide's "Core Business," The Officer Defendants Closely Monitored The Company's Underwriting Standards, Lending Practices And Credit Risk Exposure

662. During the Relevant Period, Countrywide's Mortgage Banking segment was its core business. For the years 2004 through 2007, Mortgage Banking generated 65%, 59%, 48% and 50% of the Company's pre-tax earnings, respectively. The Mortgage Banking, Banking and Capital Markets segments, collectively, consistently generated more than 90% of the Company's pre-tax earnings during the Relevant Period.

663. As alleged above, by virtue of their high-level positions, the Officer Defendants were directly involved in the daily management of all aspects of Countrywide's core operations, including the Company's policies, procedures and standards for underwriting loans and the assessment and management of credit risk. Moreover, Countrywide's day to day management was overseen by an Executive Strategy Committee whose members included the Officer Defendants as well as the Company's CRO, Chief Economist, Chief Legal Officer and head of the Banking segment (Countrywide Bank), all of whom were executive officers of the Company.

664. Both Sambol and Sieracki were members of Countrywide's Credit Risk Committee which had quarterly meetings. According to the SEC Complaint, at these meetings, members were provided with detailed presentations highlighting Countrywide's increased credit risk. By way of example, and as early as April 6, 2005, at a meeting of this committee attended by Sambol, McMurray, Countrywide's CRO, reported that: (a) Countrywide non-conforming loans originated in May 2002 were twice as likely to default as loans originated in January 2000; (b) the risk of HELOCs defaulting had doubled over the past year, mainly due to the prevalence of reduced documentation in these loans; and (c) Countrywide was now a leader in the subprime market in four of six categories,

whereas in December 2004, Countrywide had only been a leader in two of six categories.

665. With respect to loan loss reserves in particular, Countrywide made clear in its Form 10-K reports that "[o]ur senior management is actively involved in the review and approval of our allowance for loan losses."

666. Countrywide also maintained an Asset/Liability Committee ("ALCO") during the Relevant Period that was comprised of "several of [the Company's] senior financial executives" including the CRO. Additionally, ALCO was co-chaired by Sieracki. According to the Company's 10-K reports, ALCO, "ultimately" determined the Company's valuation of retained interests and MSR. These filings made clear that ***"[s]enior financial management exercises extensive and active oversight"*** of valuation of retained interests and MSRs.

667. As stated in the Company's Form 10-K for 2006, executive management reviewed the Company's compliance with liquidity requirements on a monthly basis beginning in 2006: "To ensure compliance with the LMP [Liquidity Management Plan], CHL, CSC and Countrywide Bank are required to maintain adequate contingent liquidity regardless of conditions and to diversify funding sources. Each business unit has detailed metrics which are appropriate to its business line. The metrics are compared with performance positions and ***reported to executive management monthly***."

### B. The Officer Defendants' Own Statements Touting The Company's Loan Origination And Underwriting Policies Demonstrate Their Intimate Knowledge Of The Company's Core Business

668. During the Relevant Period, the Officer Defendants made statements touting the Company's underwriting practices in which they demonstrate their day-to-day knowledge of these core activities. For example, during the Relevant Period, the Officer Defendants publicly described Countrywide's loan underwriting in SEC filings and during conference calls as tightly controlled and supervised and "designed to produce high quality loans." Moreover, Mozilo and

the other Officer Defendants repeatedly described the Company's underwriting practices, particularly its "strong discipline in the origination of sub-prime loans," as markedly superior to those of competing lenders. Countrywide's consistent and essential message to investors and analysts, as Mozilo stated early in the Relevant Period, was that the Company is "a very different, focused company that understands this product very well, how to originate, how to manage it, how to underwrite, how to service it," and that other lenders are fly-by-night outfits that don't know the mortgage business and are best avoided.

669. Mozilo held himself out as a hands-on CEO who was personally involved "every day" in loan originations and, as such, kept close tabs on credit quality. When asked during the Company's July 26, 2005 conference call with analysts whether "credit quality in the nonprime mortgage sector" was stable or worsening, Mozilo confidently replied:

> I think it's stable. . . . ***I do participate every day in originations myself, and it keeps me apprised of what's happening.*** I think that that situation has stabilized. ***I don't see any deterioration in the quality of those loans being originated.***

670. When asked during the same conference call whether Countrywide was loosening underwriting standards, Mozilo said "I'm not aware of any change of substance in underwriting policies" and, focusing on Pay Option ARMs and interest-only loans, stated that "I'm not aware of any loosening of underwriting standards that creates less of a quality loan than we did in the past." In response to a follow-up question, Mozilo added: "We don't view that we have taken ***any steps*** to reduce the quality of our underwriting regimen ***at all***."

671. During the May 31, 2006 Conference, Mozilo again held himself out as personally involved in day-to-day loan originations at Countrywide as he touted Countrywide's expanding Pay Option ARM portfolio: "I originate loans every day

just so I stay close to the ground and I try to continue to understand what's happening in the field."

672. However, at the time, Countrywide – in a quest to meet Mozilo's goal of 30% market share – had been steadily loosening and abandoning its underwriting guidelines in order to capture less creditworthy borrowers and was ramping up production of what one former employee, CW3, described as "Fast and Easy Loans" that required no income documentation and were profitable for the Company but carried a high degree of risk. According to CW3, as well as other witnesses described in Section V.C above, senior management pushed employees to make these loans regardless of the long-term consequences.

### C. Numerous Documents Confirm The Officer Defendants' Knowledge Of Credit Risks And Risks Resulting From Improper Underwriting Standards

#### 1. The Officer Defendants Were Aware Of Deteriorating Standards In Loan Origination

673. As early as September 2004, Mozilo was aware that Countrywide had placed increased loan origination quality above credit quality. In a September 1, 2004 email made public by the FCIC sent to Kurland and Countrywide's Executive Managing Director and Chief Financial Officer Keith McLaughlin ("McLaughlin"), Mozilo stated: "As I look at production trends, not only at Countrywide, but also with other lenders, ***there is a clear deterioration in the credit quality of loans being originated over the past several years.*** In addition, from my point of view, ***the trend is getting worse*** as the competition for sub-prime, Alt-A and non-conforming in general continues to accelerate." (Emphasis added.)

674. Around that same time, in a September 9, 2004 memorandum disclosed by the FCIC, McMurray warned McLaughlin and others that certain aggressive features of the Company's guidelines (*e.g.*, high loan to value programs, ARM loans, interest only loans, reduced documentation loans) seriously increased the Company's credit risk. He also noted that the economic environment for credit

risks was deteriorating as house price appreciation was not likely to continue and the market's compensation for credit risks had declined. McMurray further noted that Countrywide was doing more executions where it retained credit risk, such as HELOC and subprime production. According to the transmittal e-mail, the memorandum was shared with senior management, including Garcia, and was discussed with, if not forwarded to, Mozilo himself.

675. That same email annexing the summary specifically stated that "[l]oan quality is a significant credit risk factor" and that the Company's "move to more aggressive underwriting guidelines have increased risk."

**2. Documents Demonstrate That The Officer Defendants Knew Problems Associated With Pay Option ARMs**

676. Despite touting the safety and soundness of Pay Option ARMS, the Officer Defendants received ample warnings concerning the risks posed by the Company's underwriting of Pay Option ARMS.

677. According to minutes of the Corporate Risk Management Committee dated June 28, 2005, disclosed by the FCIC, this Committee began to warn senior executives, including Sieracki, that action was needed to address the increasing pace of negative amortization and the potential for payment shock associated with Pay Option ARMS. The Committee noted that 70% of new originations were experiencing negative amortization within the first three months of the loan. The COO noted that Countrywide was taking on "too much" balance sheet risk in HELOCs and subprime loans and had taken on "unacceptable risk" from non-owner occupied loans made at 95% combined loan to value ratios, which were an exception to Countrywide's then existing underwriting guidelines. Risk Management also reported at that meeting that non-conforming loan programs accounted for 40% of Countrywide's loan originations and that subprime production had tripled, rising from 4% to 14% of total production. At the same meeting, Risk Management reported to the committee on evidence of borrowers misrepresenting their income and occupation on reduced documentation loan applications, and the increasing credit risks associated with Pay Option ARMs, for

example, negative amortization, payment shock and the necessity of raising the initial interest to reduce the speed of negative amortization on the loans.

678. Another string of e-mails disclosed by the FCIC reveals that Mozilo was informed, on April 3, 2006, that percentage of Pay Option ARMs customers choosing to make the minimum payment on their loan had increased to 72% in February 2006, up from 60% in August 2005. Mozilo thereafter sent an email to Sambol and Kurland that reflected how well he understood the potentially serious ramifications that increasing negative amortization would have for Countrywide's loan portfolio:

> This is important data that could portend serious problems with this product. Since over 70% have opted to make the lower payment it is just a matter of time that we will be faced with a substantial amount of resets and therefore much higher delinquencies. ***We must limit this product to high FICOs otherwise we could face both financial and regulatory consequences***.

679. However, notwithstanding his knowledge of this information, Mozilo continued to tout the high credit quality and low delinquency rates of Countrywide's Pay Option ARM loan portfolio, as set forth in Section VI above. More e-mails from the FCIC's investigation demonstrate Mozilo's concern about Countrywide's Pay Option ARM portfolio. In a May 18, 2006 email from Mozilo to Sambol and Sieracki, and others, Mozilo stated that "as for pay options the Bank faces potential unexpected losses because higher rates will cause these loans to reset much earlier than anticipated and as result causing mortgagors to default due to the substantial increase in their payments[.]" On May 19, 2006, Mozilo sent another email to Sambol and Sieracki noting that "payoptions continue to present a long term problem "unless [interest] rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."

680. However, less than two weeks later, Mozilo falsely reassured investors, at the May 31, 2006 Conference, that Pay Option ARMs were a "sound investment" for Countrywide and that they were "well understood" by the

Company. In reality, as these e-mails reveal, the Officer Defendants were desperately trying to get a handle on out-of-control negative amortization and delinquencies from Countrywide's Pay Option ARM portfolio.

681. One day after Mozilo's positive public statements about Pay Option ARMs at the May 31, 2006 Conference, Mozilo sent an e-mail Sambol and other executives, noting that the majority of the Pay Option ARMs originated by Countrywide were based on stated income, and that there was evidence of borrowers misrepresenting their income. In an e-mail dated June 2, 2006, which was disclosed by the FCIC, Mozilo again expressed concern that in an environment of rising interest rates, resets were going to occur much sooner than scheduled, and that because at least 20% of the Pay Option ARM borrowers had FICO scores less than 700, borrowers "***are going to experience a payment shock which is going to be difficult if not impossible for them to manage.***" (Emphasis added.) Mozilo resolved that the Company needed to act quickly to address these issues because "we know or can reliably predict what's going to happen in the next couple of years."

682. More warnings about the credit quality of Countrywide's loan portfolio continued to be sent directly to the Officer Defendants in 2006. For example, according to the SEC Complaint, on June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide Bank that showed that 50% of the stated income loans audited by the Bank showed a variance in income from the borrowers' IRS filings of greater than 10%. Of those, 69% had an income variance of greater than 50%. These material facts were never disclosed to investors.

683. Also according to the SEC Complaint, on July 10, 2006, Mozilo received an internal monthly report, called a "flash report," that tracked the delinquencies in the Pay Option ARM portfolio, as well as the percentage of borrowers choosing to make the minimum payment and the amount of accumulated negative amortization on each loan. According to the SEC Complaint, Mozilo learned that from September 2005 through June 2006, the

percentage of Pay Option ARM borrowers choosing to make the minimum payment had virtually doubled, from 37% to 71%. The SEC Complaint revealed that Mozilo believed that these statistics were significant enough that he requested that the Company include a letter in bold type with every new Pay Option ARM loan to inform borrowers of the dangers of negative amortization and to encourage full payment.

684. Nearly one month later, on August 16, 2006, according to the SEC Complaint, Mozilo received an e-mail from a member of Countrywide's Board of Directors, asking whether Countrywide expected any significant problems with the Pay Option ARM portfolio. Mozilo responded by reiterating concerns he had previously shared with senior management earlier in 2006. According to the SEC Complaint, at this point in time, over 75% of the Pay Option ARM borrowers were opting for the minimum payment, which, along with rising interest rates, continued to accelerate negative amortization. Mozilo explained that, as a result, the loans would reset much faster than borrowers expected with accompanying payment shock. Mozilo wrote that the only solution was to refinance loans before reset, but that this would be difficult in light of decreasing home values and rising interest rates. Only "unlikely" events, such as a dramatic drop in interest rates, would assuage future payment shock.

685. The FCIC Report also reveals that in September 2006, just days before the regulators issued the *Interagency Guidance*, Mozilo and Sambol discussed Countrywide's management of its increased credit risk resulting from its Pay Option ARM portfolio. Mozilo sent an e-mail to Sambol, Garcia and Sieracki, on September 26, 2006, in which he acknowledged the "angst currently expressed by regulators" about how lenders were managing credit risk for Pay Option ARMs and other "exotic loans." Mozilo also expressed concern about Countrywide's Pay Option ARM portfolio, stating:

> We have no way, with any reasonable certainty, to assess the real risk of holding these loans on our balance sheet. The only history we can look to is that of World Savings however their portfolio was fundamentally different

than ours in that their focus was equity and our focus is fico. In my judgement [sic], as a long time lender, I would always trade off fico for equity. The bottom line is that we are flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales.

686. In that same email, Mozilo also stated that "pay options are currently mispriced in the secondary market and that spread could disappear quickly if there is an forseen [sic] headline event such as another lender getting into deep trouble with this product or because of negative investor occurance [sic]." Mozilo indicated that the "timing [wa]s right" to sell Countrywide Bank's portfolio of loans. To mitigate these anticipated losses, Mozilo proposed that the Bank "sell all newly originated pay options and begin rolling off the bank balance sheet, in an orderly manner, pay options currently in their port[folio]." McMurray responded to Mozilo's September 26, 2006 email and agreed that Countrywide "should be shedding rather than adding Pay Option credit risk to the portfolio."

687. However, as alleged above, Countrywide continued to originate and hold more Pay Option ARMs as LHI. Pay Option ARMs were ultimately a substantial factor in the Company's collapse as it had recklessly underwritten the loans. In a November 4, 2007 email to Garcia and Sambol, Mozilo admitted that "Pay options have hurt the Company and the Bank badly . . . . World Savings culture permits them to make these loans in a sound manner and our culture does not." Furthermore, contrary to his public assurances throughout the relevant period that Countrywide's Pay Option ARM portfolio was of a higher quality than other subprime lenders because of higher FICO scores, Mozilo stated in this internal e-mail that "fico scores are no indication of how these loans will perform."

**3. The Officer Defendants' Were Aware of Risks of HELOCS**

688. The FCIC Report also reveals that the Officer Defendants were also aware that HELOCS and 100% financing were extremely problematic. First, in an e-mail dated May 22, 2005, McMurray warned Sambol that "[m]any of our exception transactions we do are structured as a piggy-back transaction where

we're providing a second lien." He further queried, "Are we comfortable with the current approach where [Countrywide] takes much of the credit risk on exceptions?" About a month later, as revealed in the Credit Risk Committee meeting minutes dated June 28, 2005, the Committee recommended to Sambol that a new rule be adopted to prevent the SLD from making an exception loan with a HELOC.

689. However, the Officer Defendants were aware that deviations from underwriting guidelines regarding HELOCs were continuing in 2006. In an e-mail disclosed by the FCIC dated March 27, 2006 from Mozilo to Sambol, Sieracki and others, Mozilo directed them to undertake certain actions to "avoid the errors of both judgment and protocol that have led to the issues that we face today caused by the buybacks mandated by HSBC." Mozilo indicated further that the 100% loan-to-value (also known as 80/20) subprime product is "the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."

690. In an April 13, 2006 email to Sieracki, Sambol and others, Mozilo indicated that there were numerous issues that needed to be addressed relating to the 100% subprime seconds business in light of the losses associated with a buyback of loans sold to HSBC. Mozilo noted that loans had been originated "through our channels with serious disregard for process [and] compliance with guidelines." Mozilo further stated that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan [sic].'" He continued that "[i]n my conversations with Sambol he calls the 100% sub prime seconds as the 'milk' of the business. Frankly, I consider that product line to be the poison of ours."

691. In another email disclosed by the FCIC dated April 17, 2006 from Mozilo to Sambol and others regarding the Company's "Subprime seconds," Mozilo stated that "[i]n all of my years in the business I have never seen a more toxic prduct [sic]. It's not only subordinated to the first but the first is sub-prime.

In addition the fico's[sic] are below 600, below 500 and some below 400[.] …. With real estate values coming down . . . this product will become increasingly worse. There has to be major changes in the program including substantial increases in the minimum fico. . . . . Whether you consider this business milk or not I am prepared to go without milk irrespective of the consequences to our production."

692. However, rather than tighten underwriting guidelines for HELOCs, Countrywide continued to expand them. On December 7, 2006, as set forth in the SEC Complaint, Mozilo circulated a memorandum drafted for him by McMurray to the Board of Directors and all Countrywide managing directors, including Sambol and Sieracki in which he made the following observations:

- Countrywide had expanded its subprime underwriting guidelines in every conceivable area, lowering minimum FICOs, raising maximum loan size and LTV and making interest only, stated income and piggyback second loans available to subprime borrowers.
- Countrywide expected that subprime loans originated in 2006 (the "2006 Vintage") would be the worst performing on record, driven by wider guidelines and the worsening economic environment, which included rising interest rates and declining home values.
- The percentage of 60-and 90-day delinquencies in the 2006 Vintage (at 8.11% and 4.03%, respectively), exceeded the percentages from each of the previous six years, and the Company expected these percentages to rise.
- 62% of Countrywide's subprime originations in the second quarter of 2006 had a loan to value ratio of 100%.

#### 4. The Officer Defendants Received Warnings Regarding Loan Exceptions

693. The Officer Defendants were also aware, during the Relevant Period, that Countrywide's high-risk loan originations were increasing as a result of unjustified loan exceptions.

694. As revealed by Sambol's deposition testimony in the action filed against him by the SEC, every month, Countrywide produced a report called the "Credit Risk Leadership Reporting Package" which measured various metrics of Countryside's loan production, among them the number of loans originated pursuant to exceptions to the Company's underwriting policies.

695. In May, 2005, Sambol was made aware by McMurray of the likelihood of significantly higher default rates on loans that were made on an exception basis. In an e-mail disclosed by the FCIC dated May 22, 2005, McMurray warned Sambol that, regarding Countrywide's approach to making exception loans: "the main issue to [sic] make sure everyone's aware that we will see higher default rates . . . ." McMurray stated that "exceptions are generally done at terms more aggressive than our guidelines," and that "[g]iven the expansion in guidelines and growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions." He further predicted that a rise in defaults would trigger a rise in repurchase and indemnification requests from secondary market purchasers.

696. The Officer Defendants continued to tout Countrywide's conservative underwriting standards in 2006 and 2007. However, by March 2007, the Credit Risk Committee reported a serious deterioration in the performance of exception loans. According to the SEC Complaint, in materials distributed at a March 12, 2007 meeting of the Credit Risk Committee attended by Sambol and Sieracki, Risk Management reported that nearly 12% of the loans reviewed by Countrywide in an internal quality control process were rated "severely unsatisfactory" or "high risk," because, among other things, such loans had debt-

to-income, loan to value or FICO scores outside Countrywide's already wide underwriting standards.

697. The Officer Defendants also received ample warnings regarding the Company's matching strategy and further erosion of Countrywide's exception loan guidelines. According to the SEC Complaint, in a June 25, 2005 email to Sambol concerning guideline expansion and the Company's growing credit risks, McMurray addressed the matching strategy and explained that "because the matching process includes comparisons to a variety of lenders, our [guidelines] will be a composite of the outer boundaries across multiple lenders[,]" and that because comparisons are only made to competitor guidelines where they are more aggressive and not used where they are less aggressive, Countryside's "composite guides [sic] are likely among the most aggressive in the industry."

698. However, according to a November 2, 2006 email disclosed by the FCIC, McMurray informed Countrywide's CIO, Kevin Bartlett that the matching strategy had caused Countrywide to cede its underwriting standards to the most aggressive lenders in the market. McMurray asked "Do we want to effectively cede our policy and is this approach 'saleable' from a risk perspective to those constituents who may worry about our risk profile?" Bartlett forwarded the e-mail to Sambol, stating concern that McMurray was not signing off on new products pursuant to the matching strategy: "I'm a little worried about John. He's been withholding sign offs on certain issued that should be priced for."

699. In another e-mail disclosed by the FCIC, dated November 16, 2006, McMurray complained to Sambol about guidelines and products being introduced in contravention of credit policy. By way of example, McMurray cited the fact that the loan production divisions were offering Extreme Alt-A loans, even though Extreme Alt-A was never officially approved.

700. Finally, according to the SEC Complaint, on February 11, 2007, McMurray wrote to Sambol noting that the production divisions continued to advocate for, and operated pursuant to, an approach based upon the matching

strategy alone, and repeated his concern that the strategy would cause Countrywide's guidelines to be considered a composite of the riskiest underwriting guidelines used by Countrywide's competitors. McMurray warned also that "I doubt this approach would play well with the regulators, investors, rating agencies etc. To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines."

### D. CWs Confirm The Officer Defendants' Knowledge Of The Loosening Underwriting Standards

701. Management was also apprised of the clear industry guidance contained in the *Interagency Guidance*, which recommended extreme caution in originating risky loans such as Countrywide's Pay Option ARM and HELOC products. As alleged above, Countrywide provided detailed written comments to the regulators on the proposed guidance on March 27, 2006 and the Office of Thrift Supervision sent a copy of the *Interagency Guidance* and supplemental information (which all the Officer Defendants were required to be familiar with in any event) to CEO Mozilo on October 10, 2006. Moreover, the FCIC documents reveal that a few days before the *Interagency Guidance* was issued, Mozilo met with Sambol to discuss Countrywide's response to regulators' concerns about "exotic loans" such as Pay Option ARMs. As more fully alleged above, the *Interagency Guidance*, among other things, specifically criticized the sale of low-doc or no-doc Pay Option ARMs and other nontraditional mortgage loans. The *Interagency Guidance* further observed that a lender that did not extensively inquire into the ability of borrowers to repay these loans is more likely to grant them to borrowers who will default.

702. Confidential witnesses confirm that the Officer Defendants clearly knew about – and endorsed – Countrywide's rampant deviations from its underwriting policies and procedures. Mozilo actively endorsed Countrywide's risky loan products himself via e-mails to loan officers, such as the one received by CW5: "Angelo [Mozilo] wants you to tell customers about a great new

program to promote to realtors to help homebuyers get into more houses." According to CW2, employees also often received "unscheduled audio recordings that were sent via email from [Mozilo]" urging employees to follow certain directives and "to make more sub-prime loans, which were among the more profitable products the company sold."

703. Countrywide's management was not only aware of the Company's loosening underwriting standards, it was pushing employees to sell more and more subprime loans under the new, looser standards. CW5 confirmed that by spring of 2005, senior management were actively pushing loan officers to promote "a lot of risky types of loans," including "pay option ARMS" and "negative amortization loans" that "were endorsed by Angelo Mozilo." According to another witness, CW2, "[i]t was all about making the units," referring to the number of loans set as a goal each month. "The branch manager would have Friday morning meetings and offer $50 gift cards and lunch to the teams that sold the most."

704. Mozilo also made personal appearances to check on his employees and their production levels. For instance, according to CW6, Mozilo visited the Plano, Texas office where CW6 had just started. Mozilo complained that the office was not efficient enough and then asked the rhetorical question, "How come I can go out and buy a new Bentley for $175,000 in 45 minutes and it takes me 30 days to buy a house?"

705. According to CW1, senior management "had the entire company trying to sell sub-prime loans" in order to increase sales. CW1 said, "the real pressure came from above" to target potential buyers with FICO scores lower than 580. CW1 "received daily emails from the National Director of Sales, Scott Bridges, which said things like: 'We're at the bottom of the 9th. We've got to get a hit here. You're not even on first base. Pull everyone's 580 reports.'" These so-called "580 reports" were created by running credit reports to find customers in the region who had FICO scores of 580 and below. Managers then

produced a report listing everyone within the region by name, address and phone number. Account executives were expected to call each person on the report and sell them a loan.

706. According to CW2, the top sales executive at headquarters, Bridges, sent out FSL Notify, a notification via email kept in an Excel spreadsheet which ranked all of the branches according to their progress in meeting their goals, from the "top dogs to the lowest on the totem pole." The ranking usually came with a message from Bridges lauding those who made their numbers and urging improvement in others.

707. However, as reported by *WSJ* in February 2008, internal Company documents show that as of mid-2006, as a result of Countrywide's loose lending practices, defaults of subprime loans were starting to run far higher than the rate projected by the Company's computer model. Countrywide used highly sophisticated computer models to project delinquencies and other critical measures of loan performance. Subprime loan production did not slow, however, and when risk analysts brought the rising defaults to Sambol's attention, he brushed aside their concerns. Indeed, notwithstanding Mozilo's statement at a July 24, 2007 conference call that "nobody saw this coming," the storm that was gathering in mid-to-late 2006 was discussed at the Company's highest levels.

708. In fact, it was not until July 2007, that Countrywide's Chief Credit Officer candidly acknowledged that the Company should never have extended no-documentation loans, and particularly not to subprime borrowers: "***The takeaway is . . . that documentation matters***: the less documentation, the higher the serious delinquency, all else equal." He also acknowledged that the Company's high "concentration of piggyback financing that we did" during the Relevant Period had a devastating effect, because ***"leverage at origination matters. More leverage means more serious delinquencies."***

### E. Nature Of The GAAP Violations Further Evidence That The Officer Defendants Were Aware Of, Or Recklessly Disregarded, The Company's Violations Of GAAP And Reporting Of False Financial Statements

709. The Officer Defendants repeatedly signed the Company's filings with the SEC that correctly described the controlling GAAP requirements for setting ALL, valuing and accounting for RI and MSR in securitized loans and setting an appropriate reserve for R&Ws made to the secondary market.

710. Countrywide's SEC filings stated that the Company had established accounting policies that governed the application of GAAP in the preparation of its financial statements and labeled its accounting policies involving, among other areas, ALL and valuation and accounting for MSR and other RI as "Critical Accounting Policies."

711. At the same time, the Officer Defendants repeatedly failed to follow these GAAP requirements and the Company's own Critical Accounting Policies. Each of these Defendants has substantial educational, financial and industry experience, including the application of these specific GAAP requirements.

712. Countrywide's senior management, as alleged above, was "actively involved in the review and approval" of the Company's allowances for loan losses. The Officer Defendants knew that delinquencies in Pay Option ARMs and HELOCs, the loans that presented the greatest risk of default, and accumulated negative amortization from unpaid debt on Pay Option ARMs, were all increasing substantially during the Relevant Period.

713. In 2006, Mozilo specifically ordered the Company to look into why negative amortization was growing so quickly. Mozilo told investors at the September 13, 2006 Conference that he was "shocked" to find that so many people were making the minimum payment. When Mozilo called borrowers to ask why, he learned that he "was talking to a group . . . that had never seen in their adult life real-estate values go down."

714. Despite the Officer Defendants' knowledge that a decline in housing prices and an increase in interest rates could substantially and detrimentally impact the Company's loan portfolio (which, in fact, was made clear in the Company's SEC filings) and that the Company's loan underwriting standards had been loosened and abandoned, the Officer Defendants did not increase the Company's allowance for loan losses to a sufficient level.

715. Moreover, as noted above, the federal banking regulators issued the extensive *Interagency Guidance* in October 2006. The guidance expressed serious concerns about the increased use of reduced-documentation Pay Option ARMs and other nontraditional loans, and urged lenders to take a hard look at the sufficiency of their loan loss reserves, observing that a lender that does not extensively inquire into borrowers' ability to repay is more likely to provide them to borrowers who cannot keep up with the interest payments:

> Institutions should establish an appropriate allowance for loan and lease losses (ALLL) for the estimated credit losses inherent in their nontraditional mortgage loan portfolios. They should also consider the higher risk of loss posed by layered risks when establishing their ALLL.
>
> ***
>
> When establishing an appropriate ALLL and considering the adequacy of capital, institutions should segment their nontraditional mortgage loan portfolios into pools with similar credit risk characteristics. The basic segments typically include collateral and loan characteristics, geographic concentrations, and borrower qualifying attributes. Segments could also differentiate loans by payment and portfolio characteristics, such as loans on which borrowers usually make only minimum payments, mortgages with existing balances above original balances, and mortgages subject to

sizable payment shock. The objective is to identify credit quality indicators that affect collectability for ALLL measurement purposes.

716. Despite this knowledge, the Officer Defendants took no steps to substantially increase Countrywide's allowance for loan losses, or tighten or improve loan underwriting standards.

717. The Officer Defendants also failed, despite this knowledge, to properly ascertain the reasonableness of the assumptions underlying the Company's valuations of RI and MSR, or to increase the Company's reserve for R&Ws made to the secondary market.

718. In its 2004 Form 10-K, Countrywide admitted that its accounting for gain-on-sale revenue had been incorrect in 2003 and 2004 by recognizing certain revenue too early, and acknowledged that the Company's internal controls over financial reporting had material weaknesses as of the end of 2004. Accordingly, Countrywide restated its financial results for the second and third quarters of 2003 and the first three quarters of 2004, reversing the gain-on-sale income recorded and eliminating the RI taken at the time of the securitizations.

719. The sworn certifications made by Defendants Mozilo and Sieracki during the Relevant Period pursuant to SOX, also support a strong inference of scienter. These Defendants repeatedly signed certifications attesting to the Company's compliance with GAAP and the adequacy of Countrywide's internal controls, and reaffirming that they had designed sufficient disclosure controls and procedures to ensure that "material information" concerning the Company was made known to them. The facts set forth herein, as well as Countrywide's admissions on and after July 24, 2007, reveal the falsity of these repeated certifications. The undisclosed facts concerning Countrywide's deteriorating underwriting standards and increasingly risky lending practices constituted "material information," the disclosure of which would have affected, and did affect, the fair presentation of Countrywide's financial statements in compliance

with GAAP and which was contrary to certain disclosures in Countrywide's annual and quarterly reports. These Defendants acted intentionally or in a deliberately reckless manner in repeatedly issuing sworn certifications attesting to the Company's compliance with GAAP, when Countrywide's financial results were not presented in accordance with GAAP, and as to the adequacy of Countrywide's internal controls, when the Company suffered from material weaknesses in its internal controls.

**F. The Officer Defendants Engaged In Insider Selling**

720. Two of the Officer Defendants also engaged in insider stock sales during the Relevant Period to take advantage of their knowledge that Countrywide's stock was trading at artificially inflated prices for the reasons described above.

721. While Plaintiff does not primarily rely upon allegations of insider selling to establish scienter, Mozilo's and Sambol's unusually large insider sales during the Relevant Period are consistent with and augment an already strong inference of scienter pleaded herein. Attached hereto as Exhibit B is a chart evidencing their large insider trading during the Relevant Period.

722. In addition, the Officer Defendants' high rate of selling during the Relevant Period is particularly suspicious because it occurred just as Countrywide initiated two stock repurchase programs, the first on October 24, 2006 and the second on May 16, 2007.

723. While certain of Mozilo's sales were made pursuant to an SEC Rule 10b5-1(c) stock trading plan ("10b5-1 Plan"), this fact does not vitiate the inference that he was motivated to commit fraud.

(a) First, Mozilo initially established a 10b5-1 Plan early in the Relevant Period, on April 26, 2004, which provided for sale of 210,000 shares (on a split-adjusted basis) each month. Mozilo, however, repeatedly modified his 10b5-1 Plan during the latter part of the Relevant Period, to increase his sales to

350,000 shares per month, as evidenced in Exhibit B. These increases were highly suspicious in nature and timing.

(b) Second, there is no evidence that the plan was enacted in "good faith," or that Mozilo did not use material nonpublic information in his trading decisions.

724. On October 11, 2007, *NYT* ran a story by noted columnist Gretchen Morgenson, focusing on investor scrutiny of Mozilo's stock sales and whether he had sold on the basis of inside information:

> The Securities and Exchange Commission has been asked to investigate stock sales made by Angelo R. Mozilo, chief executive of the mortgage lender Countrywide Financial, in the months before its shares plummeted amid the deepening mortgage crisis. In an Oct. 8 letter to the S.E.C. chairman, Christopher Cox, the state treasurer of North Carolina, Richard H. Moore, questioned changes Mr. Mozilo made to his arranged stock selling program, adjustments that allowed him to increase significantly his sales of Countrywide shares. After starting a plan in October 2006, Mr. Mozilo twice raised the number of shares that could be sold: once in December 2006, when Countrywide stock was $40.50, and again in February, when it hit a high of $45.03. He has had gains of $132 million since starting the October 2006 plan and expects to sell his remaining shares by the end of the week, a move that will generate millions more.

725. In light of this highly suspicious selling activity during the Relevant Period, it is unsurprising that Mozilo has agreed to pay $45 million in disgorgement of ill-gotten gains to settle the SEC's disclosure violation and insider trading charges against him.[13]

[13] Sambol agreed to pay $5 million in disgorgement and a $520,000 penalty.

## X. KPMG's NEGLIGENT OR RECKLESS FAILURE TO CONDUCT AUDITS IN ACCORDANCE WITH GAAS.

726. KPMG violated GAAS and acted with deliberate recklessness, or, in the alternative, with negligence, in conducting its audits of Countrywide's financial statements and issuing unqualified, "clean" audit opinions thereon. Countrywide's audited financial statements for 2004, 2005 and 2006, as alleged in Section V.H, violated GAAP because it failed to disclose and materially misrepresented the (a) fair value for its RI and MSRs; (b) accrual for its breaches in R&Ws; and (c) adequacy of its ALL.

727. As Countrywide's independent registered public accounting firm, KPMG signed off on the Company's financial statements attesting that the consolidated financial statements present fairly, in all material respects, the financial position of Countrywide in conformity with GAAP. In order to make such an attestation, KPMG was required to be familiar with the many risk factors that faced Countrywide and other lenders in the proper presentation of their financial statements. Risk factors identify areas of an audit that have an increased level of risk, and may present areas of the audit that require additional testing. During the Relevant Period, KPMG failed to appropriately consider or simply ignored relevant risk factors, including those related to deficiencies in the Company's internal controls, in auditing Countrywide's financial statements.

728. "Red flags" are fraud risk factors that indicate a high risk of material misstatement. Red flags come to the attention of the auditor through its testing required under GAAS, and place a reasonable auditor on notice that the audited company could potentially be engaged in wrongdoing. During the Relevant Period, various red flags were apparent to KPMG, but, as alleged in detail below, KPMG either failed to properly inquire further into such red flags or ignored them outright. Either way, KPMG violated GAAS and allowed the Company to materially overstate its earnings for fiscal years 2004, 2005 and 2006, in violation of GAAP.

**A. The Standards Of GAAS And The AICPA Audit & Accounting Guide**

729. The Public Company Accounting Oversight Board ("PCAOB"), established by SOX, is responsible for the development of auditing and related professional practice standards that must be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted GAAS as its interim standards as described by the AICPA Auditing Standards Board's SAS No. 95, *Generally Accepted Auditing Standards*, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Company Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. For clarity, all references to GAAS herein include the standards of the PCAOB.

730. GAAS is comprised of ten basic standards that establish the quality of an auditor's performance and the overall objectives to be achieved in a financial statement audit. Auditors are required to follow these standards in each and every audit they conduct. GAAS also includes Statements on Auditing Standards ("SAS") issued by the ASB of the American Institute of Certified Public Accountants ("AICPA"), which are codified in *AICPA Professional Standards* under the prefix "AU."

731. The GAAS standards fall into three basic categories: General Standards, Fieldwork Standards and Reporting Standards. The General Standards provide guidance to the auditor on the exercise of due professional care in the performance of the audit. The Fieldwork Standards provide guidance on audit planning, proper evaluation of internal control and the collection of evidential matter in order to be able to form a reasonable basis for the auditor's opinion regarding the financial statements under audit. The Reporting Standards provide guidance to the auditor on the content of the audit report and the auditor's responsibility contained therein. AU 150.02.

732. The AICPA's AAG for lending institutions is designed to provide guidance for independent accountants primarily on the application of the standards of fieldwork. Specifically, it provides guidance on the risk assessment process and the design of audit procedures, as well as general audit considerations for deposit and lending institutions like Countrywide. The AAG is approved by both the FASB, which promulgates SFASs, as well as the ASB, which issues SASs.

733. The AICPA issues ARA, which are used by industry participants, such as Countrywide and its auditor, KPMG, to address areas of concern and identify the significant business risks that may result in the material misstatement of the financial statements. The ARA provide auditors with an overview of recent economic, industry, regulatory and professional development and, in particular, those that may affect audit engagements. These ARA should have focused the KPMG audit team on those specific aspects of Countrywide's financial statements where an increased level of risk of material misstatement was present and additional considerations were warranted.

**B. Audit Risk Factors In 2004**

734. The ARA for 2004 cautioned auditors that competition to increase loan origination volume had contributed to the softening of credit criteria, which increased credit risk (AAM 8050.12). In conjunction with AU 316, "Consideration of Fraud in a Financial Statement Audit," the AAG also provided KPMG with specific environmental factors that were likely to increase the potential for fraud in a mortgage lender, which included the following (AAG Ch. 5):

(a) relaxation of credit standards;

(b) excessive extension of credit standards with approved deviation from policy;

(c) excessive concentration of lending (particularly new lending);

(d) excessive lending in new products; and

(e) frequent or unusual exceptions to credit policy.

735. During its audit of Countrywide in 2004, KPMG ignored various red flags that would have prompted the auditors to either test further or require management to adjust the Company's financial statements so as to be free of material misstatements.

**1. Red Flag: Implementation Of Aggressive Goal To Capture 30% Market Share**

736. During 2004, in order to comply with AU 311, "Planning and Supervision," KPMG was required to perform specific audit procedures to obtain an understanding of Countrywide and its environment. Accordingly, KPMG should have learned that Countrywide had publicly announced and implemented a very aggressive firm-wide goal of capturing 30% of the residential mortgage market share by 2008. In order to achieve this goal, Countrywide was likely to compromise its lending standards, thus further testing should have been performed (AAM 8050.12).

737. In light of Countrywide's aggressive goal and in accordance with AU 319, "Consideration of Internal Control in a Financial Statement Audit," KPMG's testing of Countrywide's internal controls should have included a review of Countrywide's underwriting guidelines. KPMG should have also tested the operating effectiveness of internal controls over financial information; in other words, whether management was approving and granting loans in accordance with its written underwriting standards. These routine tests would have enabled KPMG to understand the procedures by which transactions were processed, if the transactions were being processed in accordance with the Company's policies, and if there was any change from the prior year.

**2. Red Flag: Improper Documentation For Loans, Misclassification Of Subprime Loans As Prime Loans And Management Overrides**

738. Testing of Countrywide's internal controls, in accordance with AU 319 and AU 316, "Consideration of Fraud in a Financial Statement Audit," also required a detailed testing of the Company's loan files. For example, KPMG should have tested whether Countrywide's loans were being approved in accordance with the Company's written lending policies, whether credit investigations were being performed, whether credit limits were adhered to,[14] whether Countrywide's procedure for capturing all required loan documentation was functioning and whether the information recorded in Countrywide's data processing system and used for management reporting was being tested by personnel independent of the preparer and was accurate. Had KPMG properly reviewed Countrywide's loan files, KPMG would have discovered that Countrywide routinely originated high-risk loans to borrowers with the weakest credit.

739. Had KPMG performed Countrywide's audit in accordance with GAAS, KPMG would have discovered that Countrywide was not performing appropriate levels of due diligence on its loans. Through its testing of Countrywide's loan files, KPMG would have learned that Countrywide classified loans that were subprime loans as "prime" loans. KPMG also would have seen that loans were being granted without verification of borrower income, employment or net worth, and that loans were being granted with appraisals and other important documents missing from the loan files. This pattern of management's override of its own internal controls, which, as noted above, was a pervasive fraud risk (AU 316.08, AU 319.22) and should have alerted KPMG. Moreover, the failure to appropriately document these loans should have raised

[14] AAG Ch. 5 observes that "[e]xcessive extension of credit standards" is a fraud risk factor.

serious concerns about whether borrowers could re-pay their loans and whether the value of the underlying collateral was sufficient (AU 328; AAG Ch. 9).

**3. Red Flag: 99% Increase In Nonprime Loans, 108% Increase In ARM Loans, 71% Increase In HELOC Loans**

740. In conducting analytical testing to determine whether Countrywide was aggressively originating high-risk loans and, if so, whether the additional risks of those loans were appropriately reflected in its financial statements, KPMG, pursuant to 2004 AAM 8050.12 and AU 329, "Analytical Procedures," should have examined the percentage of each loan type produced in comparison to the total loans produced. This determination should have been made with respect to the number of each type of loan produced compared to the total number of loans produced, as well as the total dollar amount of each type of loan produced compared to the total dollar amount of loans produced. These ratios measure the composition of the loan portfolio, lending strategy and corresponding level of risk (AAG Ch. 5).

741. In response to this red flag, in accordance with AU 316 and 2004 AAM 8050.12, KPMG should then have undertaken further procedures to understand Countrywide's methods of classifying its loan portfolio (prime versus nonprime loans) and to verify that Countrywide applied and disclosed these methods appropriately and consistently.

742. KPMG should have approached its audit of Countrywide with increased professional skepticism (AU 230, "Due Professional Care in the Performance of Work." ) In particular, KPMG should have expanded its audit testing of Countrywide's accounts that had a high risk of misstatement, such as those requiring fair value measurements in accordance with AU 328, "Auditing Fair Value Measurements and Disclosures," and AU 342, "Auditing Accounting Estimates," to ensure that the increased risk of defaults that could have been identified were adequately incorporated into Countrywide's accounting estimates. KPMG should have conducted procedures such as those described below, to

ensure that Countrywide's accounts for ALL and R&Ws reflected an appropriately increased accrual rate commensurate with the increased credit risk referred to above, and that, for the same reason, the valuations of MSRs and RI had been adjusted by means of sufficiently decreased fair value assumptions.

#### 4. Red Flag: ALL As A Percentage Of LHI Remained Flat Despite Increase In Higher Risk Loans

743. In accordance with AU 329 and AU 342, KPMG should have compared its ALL with the total value of LHI to measure portfolio credit risk coverage. Had KPMG properly performed this testing, it would have discovered that Countrywide's ALL as a percentage of LHI stayed flat from 0.30% to 0.31%, despite the fact that the Company was rapidly producing higher risk loans. As a result, KPMG failed to exercise an appropriate degree of skepticism by failing to challenge the assumptions employed by management in its accounting estimate (AU 230, 316 and 342.09).

744. Further, GAAS states that, with respect to accounting estimates, "methods that rely solely on mathematical calculations, such as a percentage of total loans based on historical experience . . . generally fail to contain the essential elements because they do not involve a detailed analysis of an institution's particular transactions or consider the current economic environment." AAG Ch. 9. Similarly, GAAS requires accounting estimates to include "effects of any changes in lending policies and procedures" and that management should avoid "old, incomplete, or inconsistent data to assess operating performance or financial capacity." AAG Ch. 9. These provisions of GAAS are entirely consistent with applicable GAAP, such as SAB 102. Specifically, KPMG should have tested management's key assumptions for calculating ALL. Had KPMG performed such a test, KPMG would have determined that Countrywide was using an unreliable model for calculating ALL based upon historical results, one that failed to account for the changes Countrywide had implemented as to its lending practices.

### 5. Red Flag: Increase In MSR Balance, But Decrease In Valuation Allowance

745. KPMG showed a similar failure to exercise professional skepticism related to Countrywide's reported valuation of MSRs and RI. The historical rate of default was a key assumption Countrywide used to calculate MSRs and RI. Had KPMG properly assessed Countrywide's accounting estimates, it would have made a determination that management did not adjust the historical rate to factor in the increased risk that the Company was assuming through its aggressive production of nonconforming loans, loosening underwriting practices and increased credit risk.

746. GAAS, including AU 328 and AU 342, required KPMG to compare the value of Countrywide's MSRs from year to year to identify changes in the assumptions underlying fair value determinations. KPMG would have determined that the value of MSRs increased by 22% from 2003 to 2004. A valuation allowance is established to track and account for the impairment risk related to MSRs, and as such is recorded as an offset to the gross balance of MSRs (SFAS 140). Yet, despite this significant increase in the balance of MSRs, Countrywide ***decreased*** its valuation allowance for impairment of MSRs from approximately 15% of MSRs in 2003 to only 11% in 2004. The decrease in the valuation allowance was illogical and presented yet another red flag because as a lender assumes more credit risk, its valuation allowance for impairment has a negative effect on MSR, not a positive effect. In the absence of evidence that Countrywide's loan portfolio was becoming less risky rather than more risky, AU 316, 326 and 329 required KPMG to seek evidence to determine why Countrywide was decreasing its valuation allowance and thereby increasing the value of its MSRs. AU 329.02 ("A basic premise underlying the application of analytical procedures is that plausible relationships among data may reasonably be expected to exist and continue in the absence of known conditions to the contrary."). Additionally, Countrywide was using an old model to calculate the fair value of its MSRs, which focused on historical trends. In this regard, KPMG

failed to appropriately consider GAAS, which stated that "historical information may not be representative of future conditions . . . if management intends to engage in new activities or circumstances change" (AU 328.37).

### 6. Red Flag: Based On Credit Risk Increases, Flawed Assumptions Used To Value RI

747. Pursuant to AU 328, KPMG was also required to assess management's key assumptions used to value its RI. For example, KPMG should have reviewed management's assumptions used to calculate Countrywide's net lifetime credit losses. Despite the increasing origination of nonprime loans, the assumption for net lifetime credit losses in 2003 was 1.9% and was only raised to 2.0% in 2004, as alleged in Section V.H.4. The fair value of RI was increased from 2003 to 2004 because the assumption was made that the weighted average life of securitized loans increased from 2.0 years to 2.5 years. However, when credit risk increases, net lifetime credit losses are expected to increase accordingly and the weighted average life of the underlying loans is expected to decrease. This red flag should have prompted KPMG to inquire further into management's assumptions or perform its own testing of RI. In doing so, KPMG would have determined that Countrywide's RI was overstated because changes in the Company's credit risk strategy and loosened underwriting practices were not appropriately included in the assumptions for weighted average life and net lifetime credit losses that were used to value RI.

748. If, in 2004, the procedures set forth above had been properly performed, KPMG would have determined that a "clean" audit opinion on Countrywide's financial statements would have been false and misleading. Thus, KPMG acted with deliberate recklessness, or, in the alternative, with negligence, in conducting its 2004 audit of Countrywide's financial statements and failed to conduct its audit in accordance with GAAS.

### C. Audit Risk Factors In 2005

749. The risk factors present in 2004 were equally relevant for 2005. Additionally, the AAG (Chs. 5, 8 and 9) and the ARA highlighted the following risk factors, present at Countrywide, which KPMG should have considered: (a) aggressive measures undertaken to increase market share in nonprime markets; (b) inadequate documentation supporting loan origination decisions; (c) inappropriate classification of nonprime transactions as prime transactions; (d) unusual or inadequate review of the valuation of underlying collateral and associated appraisals; (e) increasing interest rates (AAM 8050.10); and (f) "housing bubble effects." This was a caution that the calculation of risk should include consideration of the possibility that the "housing bubble" would burst. AAM 8050.22. For Countrywide, the appropriate considerations would have been the potential effects of such a housing bubble burst on valuations of its LHI, MSRs and RIs, as well as the proper reserves for breaches of R&W.

750. In 2005, KPMG would have seen the same red flags that were apparent in 2004, and would have been required, in the face of those red flags, to perform the same procedures it was required to perform in 2004.

#### 1. Red Flag: Implementation Of Countrywide's Exception Processing System

751. AU 319 and AAG Ch. 5 required KPMG to test the adequacy of internal controls, and the operating effectiveness of internal controls over financial information. KPMG should have had continuing discussions with management and IT personnel to determine the types of IT systems used at Countrywide in 2005 (AU 319.59). Accordingly, KPMG should have been aware of the implementation of EPS in 2005.

752. Being aware of EPS, KPMG should have performed audit procedures to test the types of transactions processed by EPS because those transactions had a

greater risk of misstatement (AU 319.30).[15] GAAS recognizes that risks related to the processing and recording of financial data increase when "new or revamped information systems" are introduced (AU 319.38). Additionally, KPMG's procedures to test EPS should have included the assessment of how EPS differed from Countrywide's routine loan processing system.

753. The existence of EPS by itself should have been a signal to KPMG of the continued rising risk of fraud at Countrywide. Specifically, the AAG observed that "frequent or unusual exceptions to credit policy" is a fraud risk factor. AAG Ch. 5. Here, the very name of the system "Exception Processing System" explicitly coincided with the fraud risk factors highlighted by GAAS.

754. In accordance with AU 319 and AU 316, KPMG was required to inquire further with Countrywide's employees and expand the nature, timing and extent of its testing on EPS. KPMG should have determined that EPS had been set up by management to override the Company's underwriting standards rather than adhere to them. An effective control environment includes a well-defined lending approval and review system that includes ***established credit limits***, as well as limits and controls over the types of loans made (AAG Ch. 8). Moreover, applicable GAAS instructs that "[e]ffective internal control over financial reporting . . . should provide reasonable assurance that errors or fraud in management's financial statement assertions about the loan portfolio – ***including those due to the failure to execute lending transactions in accordance with management's written lending policies – are prevented or detected***." AAG Ch. 8.

755. KPMG should have also discovered that the transactions authorized by EPS created a high degree of risk of material misstatement because numerous loans were granted to borrowers that did not qualify under Countrywide's already

[15] AU 319.30 ("As an entity's operations and systems become more complex and sophisticated, it becomes more likely that the auditor would need to increase his or her understanding of the internal control components to obtain the understanding necessary to design tests of controls, when applicable, and substantive tests.").

loosened written underwriting standards. AU 312, "Audit Risk and Materiality in Conducting an Audit," ¶ 16 ("The auditor's understanding of internal control may heighten or mitigate the auditor's concern about the risk of misstatement."). Moreover, the implementation of this system demonstrated the Officer Defendants' commitment to achieving financial objectives at any cost and without regard to preexisting internal controls.

**2. Red Flag: Shocking 335% Increase In Pay Option ARM Loan Origination**

756. In 2005, KPMG's detailed testing of the Company's loan files would have provided evidence similar to the evidence that would have been found in 2004. In addition, such testing would have provided evidence that Countrywide was issuing increasing numbers of Pay Option ARMs to less creditworthy borrowers, without proper documentation of income or assets or adequate appraisals.

757. Through its detailed loan testing in accordance with AU 319, KPMG also should have determined whether appraisals were included in Countrywide's files and were supportive of a reasonable collateral value. This analysis should have been conducted on an ongoing basis (AU 328). Specifically, "an inspection of loan documentation should include tests of the adequacy of both the current value of collateral in relation to the outstanding loan balance and, if needed, insurance coverage on the loan collateral." AAG Ch. 8. This red flag should have alerted KPMG that Countrywide might be exposed to increased credit risk and as a result, the financial statements were at a high risk of material misstatement.

758. In testing the composition of the loan portfolio in 2005, KPMG would have encountered evidence similar to that presented in Section V.H.3.b. above, which compared loans originated in 2004 to 2005. In making this comparison, the auditors would have determined that approximately 56% of loans originated by Countrywide in 2005 were nonconforming loans, up from 50% in

2004. This was a red flag to KPMG that Countrywide was increasing its rate of origination of high-risk loans at a rapid pace. Also, KPMG would have detected that origination of Pay Option ARMs had increased at the alarming rate of 335% over the prior year. This was also a red flag.

759. In response to these red flags, and in accordance with AU 316 and 2004 AAM 8050.12, KPMG should have once again reviewed methods of classifying its loan portfolio (prime versus nonprime loans) and to verify that Countrywide applied and disclosed these methods appropriately and consistently. Had KPMG properly performed such procedures, it would have determined that Countrywide was classifying a substantial number of loans with FICO scores below 660, below 620 and indeed sometimes as low as 500 as prime loans.

**3. Red Flag: 99% Increase In HELOC Delinquencies**

760. As a result of the red flags listed above, KPMG was required to perform additional testing of its loans to determine if delinquencies were rising in high risk loans. AU 316, 326 and 329; AAG Chs. 5 and 9. For example, KPMG would have seen, as the chart below illustrates, that delinquencies at Countrywide were increasing at a rapid pace. In particular, HELOC delinquencies nearly doubled in 2005, and nonprime delinquencies rose substantially to 15.20%. KPMG was required to perform additional testing to determine the reasons for increasing delinquencies, including whether the rise in delinquencies was a function of external economic conditions or whether the nature of Countrywide's lending policies was also implicated.

| | **2004** | **2005** | **% Increase** |
|---|---|---|---|
| **Total Delinquencies** | 3.83% | 4.61% | 20.4% |
| **Nonprime Delinquencies** | 11.29 % | 15.20 % | 34.6% |
| **Prime Home Equity Delinquencies** | 0.79% | 1.57% | 98.7% |

### 4. Red Flag: Despite Increased Credit Risks, ALL As A Percentage Of LHI Decreased

761. As in 2004, the risk factors highlighted above, in conjunction with the red flags that should have become apparent, required KPMG to approach its audit of Countrywide with increased skepticism. Accordingly, KPMG should have performed tests similar to those it should have performed in 2004. Among other things, KPMG would have learned that Countrywide's ALL as a percentage of LHI continued to decrease from 0.31% in 2004 to 0.27% in 2005. KPMG should have deemed illogical the decrease in the reserve rate applied in 2005 as compared to 2004, especially because KPMG, had it properly conducted the various testing set forth above, would have been aware of the increased credit risks.

### 5. Red Flag: Increase In Prime Rate From 2004

762. By the end of 2005, the prime rate of interest increased to 7.25% from 5.25% at the end of 2004. This external economic factor posed a risk that KPMG should have considered as to the difficulty that borrowers would face in refinancing their ARM loans, which would raise the potential for increasing the rate of default, thus affecting the accounting estimates necessarily underlying Countrywide's ALL and R&W and its valuation of MSRs and RI.

### 6. Red Flag: Valuation Allowance For Impairment Of Countrywide's MSRs Dropped From 11% To Only 3% Of Gross MSRs

763. Despite the significant increase in credit risk assumed by Countrywide, the valuation allowance for impairment of Countrywide's MSRs ***dropped*** from 11% to only 3% of gross MSRs. KPMG should have determined that the valuation allowance was inadequate in light of the rising credit risk and that the Officer Defendants failed to incorporate expected increasing operating costs to service these loans (AU 230, 316, 328 and 342; and AAG Chs. 9 and 10).

**7. Red Flag: Decrease in Net Lifetime Credit Losses And Unreasonable Weighted Average Life Of Retained Interests**

764. With respect to the valuation of RIs, by performing tests such as it had been required to perform in 2004, KPMG would have learned that the net lifetime credit losses rate dropped 15%, from 2.0% in 2004 to 1.7% in 2005. Once again, this was a red flag to KPMG that management's assumptions were incorrect because as delinquencies and credit risk increased, net credit losses should have also increased accordingly.

765. In addition to the above, KPMG should have also examined Countrywide's weighted average life assumption. Had KPMG done so, KPMG would have determined that Countrywide continued to maintain a highly aggressive position with respect to the expected weighted average life of the RIs that it had initially raised in 2004. KPMG should have determined that, in consideration of the expected rise in defaults driven by Countrywide's new strategy, it would have been unreasonable to presume that the weighted average life of RI of 2.4 years in 2005 would have been greater than the weighted average life of RI of 2.0 years in 2003 when there was substantially less credit risk. As such, KPMG failed to adhere to applicable GAAS, including AU 230, 316 and 328, and AAG Chs. 5 and 10.

**8. Red Flag: 27% Drop In New R&W Provisions As A Percentage Of Relevant Securitizations**

766. In view of Countrywide's marketing strategy, one that significantly increased credit risk, AU 342 required KPMG to test the adequacy of Countrywide's reserves for breaches in R&W. KPMG would have determined through its testing of management's key assumptions in 2005 that even though Countrywide substantially increased the nature and extent of the credit risk associated with the loans it originated, it did not appropriately increase its accruals for breaches in R&Ws. Countrywide increased securitizations of prime home

equity and nonprime loans from $57.8 billion in 2004 to $61.4 billion in 2005, a growth rate of 6%. However, in 2005, Countrywide actually decreased its provisions for new R&W by 22%, from $85 million in 2004 to $66 million in 2005. This year-over-year change in 2005 represented an inexplicable 27% drop in new R&W provisions as a percentage of relevant securitizations. This should have been a red flag to KPMG to further inquire into management's assumptions for accruing reserves for breaches in R&W.

767. If, in 2005, KPMG had properly performed the procedures set forth above, KPMG would have determined that a "clean opinion" on Countrywide's financial statements would have been false and misleading. Thus, KPMG acted with deliberate recklessness, or, in the alternative, with negligence, in conducting its 2005 audit of Countrywide's financial statements and failed to conduct its audit in accordance with GAAS.

**D. Audit Risk Factors In 2006**

768. In 2006, all of the risk factors that were present in 2004 and 2005 were equally relevant. In 2006, the risk of the "Housing bubble effects" was noted in AAM 8050.37.

769. In 2006, KPMG should have been aware of the same fraud risk factors and risks of material misstatements that were relevant in 2004 and 2005. AAG Ex. 5-1, Chs. 8 and 9. However, because there was a substantial increase in the production of Pay Option ARMs (an increase of 335%) and HELOCs (an increase of 45%) in 2005, KPMG should have been aware as well of a risk factor that was raised in the 2006 AAG. This AAG stated that a risk of material misstatement can arise from "[s]ignificant concentrations of loan products with terms that give rise to credit risk, ***such as negative amortization loans***, loans with high loan-to-value ratios, ***multiple loans on the same collateral*** that when combined result in a high loan-to-value ratio, and interest-only loans." AAG Ch. 8.

770. In 2006, KPMG should have seen the same red flags as were present in 2005 and 2004, and would have been required, in the face of those red flags, to perform the same procedures it was required to perform in 2005 and 2004.

**1. Red Flag: Accumulated Negative Amortization On Pay Option ARMS Increased 775%**

771. Accumulated negative amortization on Pay Option ARMs grew nearly eight-fold during 2006, from $74.7 million in 2005 to $654 million in 2006. This 775% increase was a glaring red flag which provided further evidence of the increasingly poor quality of such loans and an increase in the risk of material misstatement in Countrywide's financial statements. AAG Ch. 5 specifically observed that a risk of material misstatement can arise from "negative amortization loans."

772. Based upon the continued increase in the origination of Pay Option ARMs and 2006 AAM 8050.35, KPMG should have determined whether Countrywide had developed an appropriate risk management policy to avoid negative amortization.

**2. Red Flag: 87% Increase In HELOC Delinquencies**

773. As a result of the red flags listed above, KPMG was required to perform additional testing of its loans to determine if delinquencies were rising in high risk loans. AU 316, 326 and 329; AAG Chs. 5 and 9. For example, KPMG would have seen, as the chart below illustrates, that delinquencies at Countrywide were increasing at a rapid pace. In particular, HELOC delinquencies nearly doubled in 2005, and nonprime delinquencies rose substantially to 15.20%. KPMG was required to perform additional testing to determine the reasons for increasing delinquencies, including whether the rise in delinquencies was a function of external economic conditions or whether the nature of Countrywide's lending policies were also implicated.

774. In accordance with the red flags listed above and AU 329, KPMG was required to perform additional testing of Countrywide's loans to determine if delinquency rates on such risky loans were increasing. The table below shows the accelerating delinquency rates in 2006. Given the sheer volume of Countrywide's loan portfolio, even small increases in the delinquency rates indicated significant absolute dollar value changes in the amounts at risk:

| | 2005 | 2006 | % Increase |
|---|---|---|---|
| **Total Delinquencies** | 4.61% | 5.02% | 8.9% |
| **Nonprime Delinquencies** | 15.20% | 19.03% | 25.2% |
| **Prime Home Equity Delinquencies** | 1.57% | 2.93% | 86.6% |

### 3. Red Flag: ALL As A Percentage Of LHI Remained Flat

775. As in 2005, the risk factors highlighted above in conjunction with the red flags required KPMG to approach its audit of Countrywide with increased skepticism in the same manner as it was required to do in 2005 and 2004. KPMG should thus have performed tests similar to those it should have performed in 2005. Among other things, KPMG would then have learned that Countrywide's ALL as a percentage of loans held for investment stayed essentially flat as compared to 2005, at a rate of 0.33%, as illustrated in Section V.H.3.a. above. This static reserve rate was one of a multitude of fraud risks exhibited by Countrywide throughout 2004, 2005 and 2006. AAG Ch. 5, Ex. 5-1 ("Rapid growth or unusual profitability, especially compared to that of other peer financial institutions; for example unusually large growth in the loan portfolio without a commensurate increase in the size of the [ALL].").

### 4. Red Flag: No Modification To Fair Value Assumptions Used In MSR Model

776. Similarly, KPMG failed to exercise professional skepticism in evaluating MSRs. Despite the significant increase in the level of credit risk that

by then had been accumulated by Countrywide, the Company's reported balance of MSRs reflected a $432 million increase in fair value solely derived from modified assumptions applied in its pricing model relating to SFAS 156. However, Countrywide did not significantly modify the fair value assumptions used in its model, which is corroborative of the fact that the Company failed to incorporate the increased credit risk of its lending strategies in its value determinations (including those used in evaluating the expected costs of servicing those loans) or failed to do so appropriately. As a result, KPMG failed to exercise professional skepticism when auditing management's assumptions to calculate the fair value of its MSRs.

**5. Red Flag: Historical Performance Used To Calculate Fair Value Of Retained Interests**

777. In addition to these failures, KPMG failed to exercise professional skepticism when evaluating management's assumptions for purposes of its fair value measurements related to RI. While Countrywide did increase its expectation of net lifetime credit loss from 1.7% in 2005 to 2.6% in 2006, this increase did not reasonably capture total credit-related losses expected as of that time due to the continuing increase in riskier loans, given that this rate continued to be based upon the historical performance of Countrywide's loans. KPMG should have been aware that management was using an incorrect assumption to calculate its RI, because the historical performance of Countrywide's loans was not a reliable indicator of future performance. Indeed, as alleged above, KPMG knew that in 2006 many relevant delinquency trends indicated that credit risk was increasing and Countrywide was unlikely to be able to avoid significant credit losses, particularly on the most subordinated of equity interests in its securitizations.

778. Moreover, KPMG should have examined Countrywide's weighted average life assumption. Had KPMG done so, KPMG would have determined

that Countrywide continued to maintain a highly aggressive position with respect to the expected weighted average life of the RI. KPMG should have determined, in consideration of the expected rise in defaults driven by Countrywide's new strategy, that it would have been unreasonable to have presumed that the weighted average life of RI of 2.8 years in 2006 would have been greater than the weighted average life of RI of 2.4 years in 2005. As such, KPMG failed to adhere to applicable GAAS, including AU 230, 316 and 328, and AAG Chs. 5 and 10.

### 6. Red Flag: Insufficient R&W Reserve Relative To Skyrocketing Delinquency Rates

779. In combination with KPMG's knowledge that the Company had embarked on a marketing strategy that significantly increased credit risk, KPMG should have concluded that Countrywide's liability for R&W continued to increase commensurately. In accordance with AU 342, KPMG was required to test management's assumptions used to reserve for breaches in R&W. Default rate is an important assumption. Had KPMG properly tested management's assumptions, KPMG would have determined that in 2006, the Company had assumed more risky loans and the delinquency rate on such loans was skyrocketing. KPMG should have concluded, based upon this red flag, that while Countrywide increased its R&W reserve for 2006, that increase was insufficient in view of the Company's continued origination and securitization of substantial numbers of loans to less creditworthy borrowers with loosened underwriting guidelines, lax or nonexistent due diligence and rising delinquencies in such high risk loans.

780. If, in 2006, KPMG had properly performed the procedures set forth above, KPMG would have determined that a "clean opinion" on Countrywide's financial statements would have been false and misleading. Thus, KPMG acted with deliberate recklessness, or, in the alternative, with negligence, in conducting

its 2006 audit of Countrywide's financial statements and failed to conduct its audit in accordance with GAAS.

## XI. ADDITIONAL FACTS REGARDING THE FAILURE OF THE UNDERWRITER DEFENDANTS TO CONDUCT ADEQUATE DUE DILIGENCE

781. In connection with the registration and initial sale of debt securities alleged in Section XI, the Underwriter Defendants had the obligation to perform a reasonable due diligence investigation of Countrywide's business and operations to independently verify that the statements in the relevant registration statements and prospectuses were not untrue, including those accounting-related representations in the unaudited interim financial statements incorporated in the registration statements.

782. However, as alleged below, the Underwriter Defendants did not properly conduct their due diligence reviews and did not properly disclose risk in the subject registration statements and prospectuses, despite having full access to Countrywide's non-public records. Thus, the Underwriter Defendants are liable for the untrue statements in the subject registration statements and prospectuses for the sale of the subject debt securities offered to Plaintiff.

783. Although the Underwriter Defendants were generally entitled to rely on KPMG's certifications as to the portions of the registration statements involving accounting-related representations in the audited financial statements incorporated therein, such reliance was governed by a standard of reasonableness required of a prudent person, in the respective positions of the Underwriter Defendants.

784. In performing their due diligence procedures and investigations, the Underwriter Defendants ignored the following "red flags" that required further investigation of the audited financial statements:

(a) Countrywide's public announcement, starting in 2003, that it had implemented a very aggressive firm-wide goal of obtaining

30% market share by 2006-2007 (later revised to 2008), given the risk that the means to achieve that goal would include deterioration of underwriting standards, with implications as to the ALL, MSRs, RI, R&Ws, and the effectiveness of internal controls.

(b) The sample loan documentation that the Underwriter Defendants would be required to inspect, which would have revealed that Countrywide was both originating loans to very high-risk borrowers without appropriate due diligence on such loans.

(c) An examination in each year until the end of 2005 of Countrywide's loan composition, which would have shown, beginning in 2003, yearly increases in subprime loans, Pay Option ARMs and HELOCs by very substantial percentages, revealing a heightened portfolio risk profile by such a material amount that the use of historical information in calculating financial reporting valuations was inappropriate.

(d) An examination of Countrywide's allowance for loan loss reserves as a percentage of LHI, which would have shown it to be fairly static beginning in 2003 until 2007, during a time when the Company was rapidly producing higher risk loans.

(e) An examination of the amount of loans that were 90 days or more delinquent, which would have shown that they began to sharply increase as early as 2005, including very substantial increases in defaults of HELOCs and Pay Option ARMs, which should also have raised questions as to the static ratio of ALL as a percentage of LHI.

(f) An examination of Countrywide's internal controls, which

would have led to the discovery of its EPS begun in 2005 and used to identify and route highly risky loans out of the regular loan approval process so that they could be approved, notwithstanding the fact that they failed to meet Countrywide's already deteriorating loan origination and underwriting standards, which should have raised questions as to the accuracy of all valuation financial reporting items.

(g) An examination of Countrywide's accumulated negative amortization on Pay Option ARMs, which would have shown that it grew dramatically from 2004 to 2005, another red flag indicating the increasingly poor quality and extremely high risk of such loans and the need to question the assumptions used in calculating financial reporting valuations.

## XII. LOSS CAUSATION AND DAMAGES

785. The scheme alleged herein operated as a fraud or deceit on Plaintiff because the false and misleading statements artificially inflated Countrywide's securities prices throughout the Relevant Period. Indeed, the false and misleading representations concerning Countrywide's underwriting standards and loan origination practices, financial results and internal controls – plus the non-disclosures of material facts concerning the Company's violation of GAAP accounting and IRS regulations – caused and maintained the artificial inflation in the Company's securities prices throughout the Relevant Period and until the truth was slowly revealed to the market.

786. When the truth about the Company became known, the prices of Countrywide securities declined precipitously as the artificial inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant damages to Plaintiff.

787. Countrywide's stock price reacted swiftly and in statistically significant ways to Countrywide's and other market announcements during the Relevant Period that corrected or partially revealed the false nature of prior Company disclosures. Specific dates of adverse disclosures, and corresponding declines in the price of Countrywide common stock, are set forth in Section VIII above

788. Based on these announcements and disclosures, as well as others, Plaintiff suffered significant damages as a direct and proximate result of Defendants' false and misleading statements issued throughout the Relevant Period. The totality of the circumstances around the common stock price drops combine to negate any inference that the economic loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to defendants' fraudulent conduct. While there was some rebound of stock price after the first partial disclosures, these price increases were attributable to defendants' statements downplaying the fraud and additional statements concealing other fraudulent schemes, new market conditions, macroeconomic or other factors and Company-specific facts unrelated to the fraudulent conduct alleged herein. Had Plaintiff known of the material adverse information not disclosed by Defendants herein, or been aware of the truth behind these Defendants' material misstatements, it would not have purchased Countrywide securities at artificially inflated prices.

## XIII. APPLICABLILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

789. The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Throughout the Relevant Period:

(a) Countrywide's common stock was actively traded in an efficient

market on the NYSE;

(b) Countrywide's common stock traded at high weekly volumes during the Relevant Period;

(c) as a regulated issuer, Countrywide filed periodic public reports with the SEC;

(d) Countrywide was eligible to file, and did file, registration statements with the SEC on Form S-3;

(e) Countrywide regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f) the market price of Countrywide securities reacted promptly to the dissemination of public information regarding the Company; and

(g) securities analysts followed and published research reports regarding Countrywide that were publicly available to investors.

790. Throughout the Relevant Period, the Company was consistently followed by the market, including securities analysts as well as the business press. The market relied upon the Company's financial results and management to accurately present the Company's financial results. During this period, the Company continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors and assimilated into the price of the Company's securities.

791. As a result of the misconduct alleged herein, the market for Countrywide securities was artificially inflated. Under such circumstances, the

presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Plaintiff is presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are each responsible.

792. Plaintiff justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of its purchases of Countrywide securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

793. Had Plaintiff known of the material adverse information not disclosed by the Company, or been aware of the truth behind the material misstatements alleged herein, it would not have purchased Countrywide securities at artificially inflated prices.

## XIV. NO SAFE HARBOR

794. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The safe harbor expressly exempts from its protection financial statements and results. In addition, many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there was no meaningful cautionary language adequately identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor would otherwise apply to any statement pleaded herein, Defendants are liable for those materially false forward-looking statements because, at the time each of those forward-looking statements was made, the speaker knew the statement was false or the statement was authorized or approved by an executive officer of Countrywide who knew that those statements were false.

## XV. COUNTS

### COUNT I

### Liability Of All Defendants For Violations Of Section 11 of the Securities Act

795. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, by Plaintiff who purchased or otherwise acquired Notes issued pursuant to or traceable to the Registration Statements for the Notes against Countrywide, the Officer Defendants, the Individual Defendants, the Underwriter Defendants and KPMG ("Section 11 Defendants"), in connection with the Offerings with which it was involved as set forth above.

796. Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the Offerings pursuant to the Registration Statements for the Notes, which contained untrue statements and omissions of material fact. This Count does not sound in fraud. Any allegations or claims of fraud, fraudulent conduct, intentional misconduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that the Defendants acted with scienter or fraudulent intent. Plaintiff asserts only strict liability and negligence claims.

797. The Registration Statements for the Notes were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading and omitted to state material facts required to be stated therein as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statements for the Notes.

798. The Section 11 Defendants owed Plaintiff the duty to make a reasonable and diligent investigation of statements contained in the Registration Statements for the Notes to ensure that the statements contained therein and

incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

799. These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Registration Statements for the Notes and did not possess reasonable grounds for believing that the Registration Statements for the Notes did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

800. Countrywide as issuer of the Notes, as described above, is strictly liable for the material misstatements and omissions contained in the Registration Statements for the Notes.

801. The Officer Defendants and Individual Defendants each signed one or more Registration Statements for the Notes or were directors on the date of one of more of the Registration Statements for the Notes. By virtue of signing one or more of the Registration Statements for the Notes, they issued, caused to be issued and participated in the issuance of the Registration Statements for the Notes, which contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading and omitted to state material facts required to be stated therein. These Defendants failed to conduct a reasonable investigation of the statements in one or more of the Registration Statements for the Notes and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

802. The Underwriter Defendants each acted as an underwriter with respect to one or more of the Offerings pursuant to the Registration Statements for the Notes. The Registration Statements for the Notes specifically named the Underwriter Defendants as underwriters for their respective offerings. The Underwriter Defendants did not conduct a reasonable investigation of the

statements contained in and incorporated by reference into the Registration Statements for the Notes for which they acted as underwriter and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

803. Defendant KPMG was the auditor for Countrywide and consented to being named in the Series B Medium-Term Notes Registration Statement and the 6.25% Subordinated Notes Registration Statement as a party that certified the audited financial statements contained or incorporated by reference therein as discussed above. KPMG's audit report incorrectly stated that its audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP. KPMG, which consented to the inclusion of its opinions in the Series B Medium-Term Notes Registration Statement and 6.25% Subordinated Notes Registration Statement, negligently failed to perform its audits of Countrywide in a reasonable manner and, thus, its audits did not constitute a reasonable investigation of whether the Company's financial statements were presented in compliance with GAAP and whether management's assessment of internal controls was properly and accurately presented.

804. Plaintiff purchased or otherwise acquired Notes issued pursuant or traceable to the Registration Statements for the Notes and were damaged thereby.

805. Plaintiff did not know, or in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the Registration Statements for the Notes when it purchased or acquired its respective Notes.

806. Both the original class action complaint that was filed in Case No. 07-05295 MRP (C.D. Cal.) on August 14, 2007 and the consolidated class action complaint that was filed in that action on April 14, 2008, were filed less than one year after plaintiffs discovered or reasonably could have discovered the facts upon

which this Count is based, and less than three years after the securities upon which this Count is brought were bona fide offered to the public. The filing of the class action complaint in Case No. 07-05295 MRP served to toll the statute of limitations for the claim set forth in this Count.

807. By reason of the foregoing, the Section 11 Defendants named in this Count are liable to Plaintiff for violation of Section 11 of the Securities Act.

## COUNT II

### Liability of Countrywide, Deutsche Bank, J.P. Morgan and Goldman Sachs For Violation of Section 12(a)(2) of the Securities Act

808. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. Plaintiff expressly excludes and disclaims any allegations or claims of fraud, fraudulent conduct, intentional misconduct and/or motive. Plaintiff asserts only strict liability and/or negligence claims.

809. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, by Plaintiff who purchased or otherwise acquired Notes in one or more of the Offerings against Deutsche Bank, J.P. Morgan, Goldman Sachs ("Section 12(a)(2) Underwriter Defendants") and Countrywide (collectively, the Section 12(a)(2) Defendants).

810. Countrywide and the Section 12(a)(2) Underwriter Defendants offered, solicited, promoted and/or sold Notes to Plaintiff by the use of means or instrumentality of interstate commerce by means of defective Prospectuses and Prospectus Supplements for their own financial gain. The Prospectuses and Prospectuses for the Offerings contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading and concealed and failed to disclose material facts. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statements for the Notes.

811. As set forth in the Series B Medium-Term Registration Statement and the 6.25% Subordinated Notes Registration Statement, "[f]or the purpose of determining liability of a registrant [Countrywide] under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, each undersigned registrant undertakes that in a primary offering of securities . . . regardless of the underwriting method used to sell the securities to the purchaser . . . the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser."

812. Countrywide and the Section 12(a)(2) Underwriter Defendants owed to Plaintiff who purchased Notes pursuant to Prospectuses and Prospectus Supplements in connection with the Offerings a duty to make a reasonable and diligent investigation of the statements contained therein, to ensure that such statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

813. Countrywide and the Section 12(a)(2) Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained in the Prospectuses and Prospectus Supplements in connection with the Offerings and did not possess reasonable grounds for believing that the Prospectuses and Prospectus Supplements in connection with the Offerings did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. Accordingly, the Section 12(a)(2) Defendants are liable to Plaintiff who purchased Notes from them in the Offerings.

814. Plaintiff purchased or otherwise acquired Notes pursuant to the defective Prospectus Supplements and Prospectuses. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the

misstatements and omissions contained in the Prospectuses and Prospectus Supplements when it purchased or acquired the Notes.

815. By reason of the conduct alleged herein, Countrywide and the Section 12(a)(2) Underwriter Defendants violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiff who purchased Notes from them pursuant to the defective Prospectuses and Prospectus Supplements.

816. Plaintiff was damaged by Countrywide's and/or the Section 12(a)(2) Underwriter Defendants' conduct. With respect to Notes that Plaintiff had retained, Plaintiff has the right to rescind and recover the consideration paid for their Notes. Plaintiff is entitled to rescission by tendering the Notes, or proceeds from the sale thereof, to Countrywide and/or the Section 12(a)(2) Underwriter Defendants in exchange for the value of the consideration paid for such Notes, plus interest. In the alternative, Plaintiff is entitled to damages in an amount to be proven at trial.

817. Both the original class action complaint that was filed in Case No. 07-05295 MRP (C.D. Cal.) on August 14, 2007, and the consolidated class action complaint that was filed in that action on April 14, 2008, were filed less than one year after plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based, and less than three years after the securities upon which this Count is brought were bona fide offered to the public. The filing of the class action complaint in Case No. 07-05295 MRP served to toll the statute of limitations for the claim set forth in this Count.

## COUNT III

### Liability of The Officer Defendants For Violation of Section 15 of the Securities Act

818. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. Plaintiff expressly excludes and disclaims any allegations or claims of fraud, fraudulent conduct,

intentional misconduct and/or motive. Plaintiff asserts only strict liability and/or negligence claims.

819. This Count is brought pursuant to Section 15 of the Securities Act against the Officer Defendants ("Section 15 Defendants") as controlling persons of Countrywide. Each of the Section 15 Defendants, by virtue of his control, ownership, offices, directorship and specific acts set forth above, was, during the Relevant Period, a controlling person of Countrywide within the meaning of Section 15 of the Securities Act. Each of the Section 15 Defendants had the power and influence and control, and used such power to influence and control, directly or indirectly, the decision-making of Countrywide and to cause Countrywide to engage in violations of the Securities Act, as described herein. The Section 15 Defendants' control, ownership and position made them privy to the material facts concealed from Plaintiff.

820. Each of the Section 15 Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statements for the Notes and/or having otherwise participated in the consummation of the Offerings detailed herein.

821. Countrywide violated Section 11 of the Securities Act by issuing the Registration Statements for the Notes which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statements for the Notes.

822. Countrywide violated Section 12(a)(2) of the Securities Act by offering, soliciting the purchase of and/or selling the Notes by means of defective Prospectuses and Prospectus Supplements which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The facts

misstated and omitted would have been material to a reasonable person reviewing the Registration Statements for the Notes.

823. The Section 15 Defendants acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Registration Statements for the Notes and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

824. Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the Registration Statements for the Notes when it purchased or acquired the securities.

825. By virtue of the conduct alleged herein, the Section 15 Defendants are liable to Plaintiff for its sustained damages.

**COUNT IV**

**Liability Of Countrywide and the Officer Defendants For Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

826. Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

827. This Count is asserted against Countrywide and the Officer Defendants.

828. Throughout the Relevant Period, Countrywide and the Officer Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the U.S. mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Countrywide, including its true financial condition and results, underwriting and loan origination practices and internal controls and prospects, as specified herein. This plan, scheme and course of conduct was intended to and, throughout the Relevant Period, did: (a) deceive the investing public, including

Plaintiff, as alleged herein; (b) artificially inflate the market price of Countrywide securities; and (c) cause Plaintiff to purchase Countrywide securities at artificially inflated prices.

829. In furtherance of this unlawful scheme, plan and course of conduct, the Officer Defendants, individually and jointly, took the actions set forth herein. Indeed, while in possession of material, adverse non-public information, these defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; (c) sold shares while in possession of material, adverse non-public information; and (d) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of the Company’s securities in an effort to create and maintain artificially high market prices for Countrywide’s securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Each of the Officer Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein.

830. The Officer Defendants knew or, but for their deliberate recklessness, should have known, that the Company’s reported financial conditions and results during the Relevant Period, as filed with the SEC and disseminated to the investing public, were materially misstated and were not presented in accordance with GAAP. Further, these defendants knew of existing adverse facts which undermined their representations about Countrywide’s existing business, underwriting and loan origination practices, internal controls and prospects during the Relevant Period.

831. In addition to the duties of full disclosure imposed on the Officer Defendants, as a result of their responsibility for the Company’s financial statements and making affirmative statements and reports to the investing public, the Officer Defendants had a duty to promptly disseminate truthful information

that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.1-01, *et seq*.) and Regulation S-K (17 C.F.R. § 229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's financial condition, earnings and expenses so that the market price of the Company's securities would be based on truthful, complete and accurate information.

832. Countrywide and the Officer Defendants, the top executive officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of the Company, each of these Defendants was able to and did control the content of the public statements disseminated by Countrywide. With knowledge of the falsity and/or misleading nature of the statements contained therein and in reckless disregard of the true financial results of the Company, these Defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.

833. Countrywide and the Officer Defendants acted with scienter throughout the Relevant Period in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Officer Defendants were among the senior management of the Company and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

834. Countrywide and the Officer Defendants' misrepresentations and/or omissions were intentional or reckless and in some instances done for the purpose of enriching themselves at the expense of the Company's investors, including

Plaintiff, and to conceal the Company's true operating condition from the investing public. Defendants Countrywide and the Officer Defendants engaged in this scheme to inflate the Company's reported revenues and prospects in order to create the illusion that Countrywide was a successful, strong and growing company.

835. As a result of those deceptive practices and false and misleading statements and/or omissions, the market price of Countrywide's securities was artificially inflated throughout the Relevant Period. In ignorance of the false and misleading nature of the representations and/or omissions described above and the deceptive and manipulative devices employed by Countrywide and the Officer Defendants, Plaintiff, in reliance on the integrity of the market and/or directly on the statements and reports of Defendants and the statements for which they are responsible, purchased Countrywide's securities at artificially inflated prices and was damaged thereby.

836. Had Plaintiff known of the material adverse information not disclosed by Countrywide and the Officer Defendants or been aware of the truth behind these Defendants' material misstatements, they would not have purchased Countrywide securities at artificially inflated prices, or at all.

837. By virtue of the foregoing, Countrywide and the Officer Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT V

### Liability Of the Officer Defendants For Violations Of Section 20(a) of the Exchange Act

838. Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

839. This Count is asserted against the Officer Defendants.

840. Mozilo, by virtue of his position with Countrywide and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Countrywide within the meaning of Section 20(a) of the Exchange Act. He had

the power and influence, and even exercised same, to cause Countrywide to engage in the illegal conduct and practices complained of herein. Mozilo was the Company's co-founder and the Chairman of the Board, and actively managed the Company, its reporting to investors and its accounting practices. Mozilo was thereby and otherwise liable as a control person under Section 20(a) for the fraud perpetrated by Defendants as alleged herein.

841. Sambol, by virtue of his position with Countrywide and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Countrywide within the meaning of Section 20(a) of the Exchange Act. He had the power and influence, and even exercised same, to cause Countrywide to engage in the illegal conduct and practices complained of herein. Sambol became the Company's President and COO in September 2006 and a member of the Board from 2007 through the Merger, and actively managed the Company, its reporting to investors and its accounting practices. Sambol was thereby and otherwise liable as a control person under Section 20(a) of the Exchange Act for the fraud perpetrated by Defendants as alleged herein.

842. Sieracki, by virtue of his position with Countrywide and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Countrywide within the meaning of Section 20(a) of the Exchange Act. He had the power and influence, and even exercised same, to cause Countrywide to engage in the illegal conduct and practices complained of herein. Sieracki was the Company's Executive Managing Director and CFO, and actively managed the Company, its reporting to investors and its accounting practices. Sieracki was thereby and otherwise liable as a control person under Section 20(a) of the Exchange Act for the fraud perpetrated by Defendants as alleged herein.

843. By reason of the conduct of Countrywide as alleged in this Complaint, the Officer Defendants are liable for the aforesaid wrongful conduct of Countrywide and liable to Plaintiff for the substantial damages which it suffered

in connection with its purchases or acquisitions of securities as a result of Countrywide's violations of the Exchange Act.

## COUNT VI

### Liability Of Countrywide, Mozilo and Sambol Under Cal. Corp. Code § 25500 For Violations Of Cal. Corp. Code § 25400

844. Plaintiff repeats and realleges each and every allegation as if set forth in full herein.

845. This Count is asserted against Countrywide, Mozilo and Sambol. These Defendants are liable under Cal. Corp. Code §25500 because each of them willfully participated with the other Defendants in acts that violated Cal. Corp. Code §25400(d) and each engaged in market activities.

846. Countrywide engaged in market activities during and following the period in which Countrywide made false and misleading statements of material fact and issued statements with material omissions. Countrywide either sold, offered to sell or solicited the sale of Countrywide debt securities, either itself or through a wholly owned subsidiary, including, but not limited to, the following:

a. Series B Medium Term Notes; and

b. 6.25% Subordinated Notes Due May 15, 2016.

847. In addition to the market activity alleged above, Countrywide either sold or offered to sell shares of Countrywide common stock or options to purchase Countrywide common stock to Countrywide employees, directors and officers, including the Officer Defendants.

848. As a result of offering employee stock options and stock purchase plans, Countrywide was selling its stock during the time period of the fraud.

849. Countrywide made false and misleading statements of material fact that were designed to inflate the price at which its stock and other debt securities were traded on NYSE. As a result, Countrywide was able to sell or offer to sell its shares or options to purchase its shares and other debt securities at artificially

inflated prices. In addition, Plaintiff, as purchaser of shares and other debt securities of Countrywide, purchased its shares and other debt securities at artificially inflated prices.

850. Mozilo engaged in market activities during and following the period in which he made and approved false and misleading statements of material fact and approved statements with material omissions. Specifically, as noted above, Mozilo either sold (or purchased), offered to sell (or purchase) or solicited the sale (or purchase) of Countrywide shares.

851. Sambol engaged in market activities during and following the period in which Sambol made and approved false and misleading statements of material fact and approved statements with material omissions. Specifically, as noted above, Sambol either sold (or purchased), offered to sell (or purchase) or solicited the sale (or purchase) of Countrywide shares.

852. During the Relevant Period, Countrywide, Mozilo and Sambol issued statements or participated in the issuance of statements regarding Countrywide's business and financial results and omitted to state material facts for the purpose of inducing the purchase of such securities by investors such as Plaintiff.

853. As discussed in greater detail above, the statements made were, at the time and in the light of the circumstances under which they were made, false and misleading with respect to material facts regarding Countrywide's financial results or omitted to state material facts which were necessary in order to make the statements made not misleading.

854. Countrywide, Mozilo and Sambol knew or had reasonable grounds to believe that the statements set out herein were false and misleading or contained material omissions because they each had access to the material, adverse, non-public information about Countrywide's financial results and then-existing business conditions, which were not disclosed.

855. California Corporations Code § 25400(d) provides that it is unlawful for any person to offer or sell a security by means of a written or oral communication that contains a statement of material fact which was, at the time and in light of the circumstances under which it was made, false or misleading, or which omits to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not false or misleading. Cal. Corp. Code § 25500 provides that any person who willfully participates in any act or transaction in violation of Cal. Corp. Code § 25400(d) shall be liable to any other person who purchases any security at a price that was affected by such act or transaction.

856. As set forth in detail in Exhibit A hereto, Plaintiff and/or its agents purchased shares and other debt securities of Countrywide during the period in which these false and misleading statements were made. Because of Countrywide's, Mozilo's and Sambol's conduct, the fair market value of said stock and other debt securities was substantially less than the prices paid by Plaintiff at the time of the acquisitions.

857. As a result of the wrongful conduct of Countrywide, Mozilo and Sambol, Plaintiff has sustained and will sustain substantial economic losses and other general and specific damages. Accordingly, Plaintiff is entitled to damages and prejudgment interest under Cal. Corp. Code § 25500, all in an amount to be determined according to proof at time of trial.

## COUNT VII

### Liability Of Countrywide, the Officer Defendants, Deutsche Bank, J.P. Morgan, Goldman Sachs and KPMG Under Cal. Corp. Code § 25501, *et seq*. For Violations Of Cal. Corp. Code § 25401

858. Plaintiff repeats and realleges each and every allegation as if set forth in full herein.

859. This Count is asserted against Countrywide, the Officer Defendants Deutsche Bank, J.P. Morgan, Goldman Sachs and KPMG. These Defendants are

liable under Cal. Corp. Code §§ 25501, 25504, 25504.1 and/or 25504.2 because each of them sold the Notes pursuant to untrue statements in violated Cal. Corp. Code § 25401, participated in the sale of such Notes or, in the case of KPMG, consented to the inclusion of audit reports in the Registration Statements.

860. During the Relevant Period, these Defendants issued statements or participated in the issuance of written and oral communications regarding Countrywide's business and financial results and omitted to state material facts for the purpose of inducing the purchase of such securities by investors such as Plaintiff.

861. As discussed in greater detail above, the statements made were, at the time and in the light of the circumstances under which they were made, false and misleading with respect to material facts regarding Countrywide's financial results or omitted to state material facts which were necessary in order to make the statements made not misleading.

862. As set forth in detail in Exhibit A hereto, Plaintiff SMRS and/or its agents purchased the Countrywide Notes during the period in which these false and misleading statements were made.

863. As a result of the wrongful conduct of Countrywide, the Officer Defendants, Deutsche Bank, J.P. Morgan. Goldman Sachs and KPMG, Plaintiff has sustained and will sustain substantial economic losses and other general and specific damages. Accordingly, Plaintiff is entitled to damages and prejudgment interest at the legal rate under § 25501 *et seq.*, all in an amount to be determined according to proof at time of trial.

## COUNT VIII

### Liability Of Countrywide and the Officer Defendants In Connection With Violations Of Cal. Civ. Code §§ 1709 And 1710 And Common Law Fraud And Deceit - Intentional Misrepresentation

864. Plaintiff repeats and realleges each and every allegation as if set forth in full herein.

865. This Count is asserted against Countrywide and the Officer Defendants.

866. Countrywide and each of the Officer Defendants individually and in concert, directly and indirectly, made representations to Plaintiff and/or its agents regarding the financial condition of Countrywide.

867. As detailed above, the representations of Countrywide and each of the Officer Defendants were false and misleading.

868. Countrywide and each of the Officer Defendants made these representations knowing them to be false, or with reckless disregard for their truth, and made them with the intent to induce Plaintiff and/or its agents to act in reliance upon such, or with the expectation that Plaintiff would so act.

869. At the time of the representations, Plaintiff did not know of the falsity of these Defendants' representations and could reasonably believe them to be true. Plaintiff and its agents read and/or were aware of the false and misleading representations and actually and justifiably relied on the misrepresentations of material fact in making its substantial investments and retaining its shares and other debt securities of Countrywide. The representations relied upon by Plaintiff included, without limitation, those made in annual and quarterly reports filed with the SEC, press releases to the public and other statements complained of herein. Had Plaintiff and/or its agents known the truth, it would not have paid such an inflated price for the securities or possibly not invested at all, and would not have retained its securities.

870. As a result of this wrongful conduct alleged herein, Plaintiff suffered damages in an amount to be determined according to proof at the time of trial. The acts and omissions by Countrywide and the Officer Defendants, as described above, were done with malice, fraud and oppression, as defined in California Civil Code Section 3294, and Plaintiff should recover, in addition to actual damages,

damages to make an example of and punish Countrywide and the Officer Defendants.

## COUNT IX

### Liability Of Countrywide and the Officer Defendants In Connection With Violations Of Cal. Civ. Code §§ 1709 And 1710 And Common Law Fraud and Deceit - Suppression Of Fact

871. Plaintiff repeats and realleges each and every allegation as if set forth in full herein.

872. This Count is asserted against Countrywide and the Officer Defendants.

873. Countrywide and the Officer Defendants individually and in concert, directly and indirectly, made representations to Plaintiff and/or its agents without disclosing material facts regarding the financial condition of Countrywide. The suppression of these facts, which included suppression of facts in annual and quarterly reports filed with the SEC, press releases to the public and other statements complained of herein, was likely to mislead investors and did mislead Plaintiff and/or its agents.

874. The failures of Countrywide and the Officer Defendants to disclose information and their suppression of information were made with the intent to induce investors, including Plaintiff and/or its agents, to act in reliance upon such omissions and suppressions of fact by purchasing Countrywide securities and retaining such securities.

875. At the time of these failures to disclose and the suppression of fact, and at the time Plaintiff acted in reliance thereon, Plaintiff was ignorant of the facts that Countrywide and the Officer Defendants suppressed and failed to disclose. Had Plaintiff been aware of the existence of the facts not disclosed by Countrywide and the Officer Defendants, it would not have paid such an inflated price for the securities, or possibly not invested at all, and would not have retained its securities.

876. In committing the wrongful acts alleged herein, Countrywide and the Officer Defendants have pursued a common course of conduct and acted in concert and conspired with one another in furtherance of their common plan, scheme or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Countrywide and the Officer Defendants further aided and abetted and knowingly gave substantial assistance to each other in breach of their respective duties as herein alleged.

877. During all relevant times hereto, Countrywide and the Officer Defendants, and each of them, initiated and/or joined in a course of conduct which was designed to and did (a) deceive Plaintiff and/or its agents regarding the accuracy of Countrywide's financial statements and Countrywide's financial condition; (b) artificially inflate the market price of Countrywide's publicly traded securities; and (c) cause Plaintiff to purchase or make a decision to retain Countrywide common stock and other debt securities at artificially inflated prices. In furtherance of this plan, conspiracy and course of conduct, Countrywide and the Officer Defendants, and each of them, took the actions as set forth herein.

878. Countrywide and the Officer Defendants accomplished their conspiracy or common course of conduct of artificially inflating the price of Countrywide's publicly traded securities through the issuance of a series of false and misleading quarterly and year-end reports, press releases to the public and other statements complained of herein, which misrepresented and failed to disclose material facts regarding Countrywide's revenue and earnings, and created a false impression of growth and profitability. Countrywide and the Officer Defendants were direct, necessary and substantial participants in the conspiracy and common course of conduct complained of herein.

879. Countrywide and the Officer Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking the actions, as particularized herein, to substantially assist the commission of the

fraud complained of, Countrywide and the Officer Defendants each acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that fraud and was aware of his overall contribution to and furtherance of the fraud. The acts of aiding and abetting of Countrywide and the Officer Defendants include, *inter alia*, the acts they are alleged to have committed in furtherance of the conspiracy and common course of conduct complained of herein.

880. Countrywide and the Officer Defendants either knew or should have known the fact that the illegal acts and practices and misleading statements and omissions described herein would artificially inflate the prices of those securities. Countrywide and the Officer Defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiff.

881. As a result of this wrongful conduct alleged herein, Plaintiff suffered damages in an amount to be determined according to proof at the time of trial. The acts and omissions by Countrywide and the Officer Defendants, as described above, were done with malice, fraud and oppression, as defined in California Civil Code Section 3294, and Plaintiff should recover, in addition to actual damages, damages to make an example of and punish Countrywide and the Officer Defendants.

**COUNT X**

**Liability Of Countrywide, the Officer Defendants and KPMG In Connection With Violations Of Cal. Civil Code §§ 1709 And 1710 And Common Law Negligent Misrepresentation**

882. Plaintiff repeats and realleges each and every allegation as if set forth in full herein.

883. This Count is asserted against Countrywide, the Officer Defendants and KPMG.

884. Countrywide and the Officer Defendants individually and in concert, directly and indirectly, made representations to Plaintiff and/or its agents

regarding the financial condition of Countrywide including false and misleading annual and quarterly reports filed with the SEC, press releases to the public and other statements complained of herein.

885. KPMG individually and in concert, directly and indirectly, made representations to Plaintiff and/or its agents regarding the financial condition of Countrywide in its audit reports and expert opinions included in the Registration Statements. Having consented to the use and incorporation of its reports and expert opinions in the Registration Statements, KPMG knew and could foresee that those reports and expert opinions would be used by Countrywide to influence and induce investors to purchase the Countrywide Notes offered. Having consented to the use and incorporation of its reports and expert opinions in the Registration Statements, KPMG knew and could foresee with substantial certainty that Plaintiff, or a group of investors to which Plaintiff belonged, would rely on KPMG's audit reports and expert opinions in deciding whether to purchase or retain the Countrywide Notes offered in the Registration Statements. Consequently, Plaintiff, or a group of investors to which Plaintiff belonged, was a specifically intended beneficiary of KPMG's reports and expert opinions and was substantially likely to receive the information, as it was foreseeable that Plaintiff would reasonably come to receive and rely on KPMG's audit reports and expert opinions.

886. Countrywide's, the Officer Defendants' and KPMG's representations were false and misleading.

887. Countrywide, the Officer Defendants and KPMG made these representations without any reasonable ground for believing them to be true and made them with the intent to induce Plaintiff and/or its agents to act in reliance upon such, or with the expectation that Plaintiff would so act.

888. At the time of the representations, Plaintiff did not know of the falsity of the representations of Countrywide, the Officer Defendants and KPMG and

reasonably believed them to be true. Plaintiff and/or its agents read and/or were aware of the false and misleading representations and actually and justifiably relied on the misrepresentations of material fact in making substantial investments and retaining Countrywide securities. The representations and omissions relied upon included, without limitation, those made in annual and quarterly reports filed with the SEC, press releases to the public and other statements complained of herein. Had Plaintiff and/or its agents known the truth, it would not have paid such an inflated price for the securities, or possibly not invested at all, and would not have retained such securities.

889. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Countrywide, the Officer Defendants and KPMG knew with substantial certainty that Plaintiff would rely upon the false and misleading representations in making substantial investments and retaining its Countrywide securities.

890. As a result of this wrongful conduct alleged herein, Plaintiff suffered damages in an amount to be determined according to proof at the time of trial.

**COUNT XI**

**Liability Of Countrywide For Unfair, Unlawful And Fraudulent Business Practices In Connection With Violations Of Cal. Bus. And Prof. Code §§17200 *et. seq.***

891. Plaintiff repeats and realleges each and every allegation as if set forth in full herein.

892. This Count is asserted against Countrywide.

893. The acts, omissions, misrepresentations, practices and non-disclosures of Countrywide, as alleged in this Complaint, were likely to, and did, mislead investors, including Plaintiff and/or its agents, and constituted unfair, unlawful and fraudulent business practices within the meaning of Cal. Bus. and Prof. Code § 17200, *et seq*.

894. Accordingly, Plaintiff is entitled to equitable relief in the form of injunctive relief, restitution and/or disgorgement in an amount to be proven at trial.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. Awarding Plaintiff compensatory and general damages, including rescissionary damages where applicable, according to proof;

2. Awarding special damages according to proof;

3. Awarding punitive and exemplary damages according to proof;

4. Awarding Plaintiff pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

5. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the appropriate state law remedies; and

6. Awarding such other relief as this Court may deem just and proper.

DATED: April 22, 2011

Respectfully submitted,

**BERMAN DEVALERIO**

By: ____________________
Nicole Lavallee

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
One California Street
San Francisco, CA 94111
Telephone (415) 433-3200
Facsimile: (415) 433-6382
jtabacco@bermandevalerio.com
cheffelfinger@bermandevalerio.com
nlavallee@bermandevalerio.com

*Attorneys for Plaintiff State Treasurer Of The State Of Michigan, As Custodian Of The Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System And Michigan Judges' Retirement System*

## XVII. JURY DEMAND

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED: April 22, 2011

Respectfully submitted,

**BERMAN DEVALERIO**

By: ______________________________
Nicole Lavallee

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
One California Street
San Francisco, CA 94111
Telephone (415) 433-3200
Facsimile: (415) 433-6382
jtabacco@bermandevalerio.com
cheffelfinger@bermandevalerio.com
nlavallee@bermandevalerio.com

*Attorneys for Plaintiff State Treasurer Of The State Of Michigan, As Custodian Of The Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System And Michigan Judges' Retirement System*

# CERTIFICATE OF SERVICE

I, Sheralyn Tuiasosopo, hereby declare as follows:

I am employed by Berman DeValerio, One California, Suite 900, San Francisco, California, 94111. I am over the age of 18 years and am not a party to this action. On April 22, 2011, I served true and correct copies of:

**AMENDED COMPLAINT**

by transmitting a true and correct Portable Document Format (PDF) copy via email the document(s) listed above on this date before 5:00 p.m. PDT to the person(s) at the email address(es) set forth below:

**SEE ATTACHED SERVICE LIST**

I declare under penalty of penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed at San Francisco, California, on April 22, 2011.

Sheralyn Tuiasosopo

*State Treasurer of the State of Michigan v. Countrywide Financial Corporation,*
Case No. 2:11-cv-00809-MRP–MAN

**SERVICE LIST**

Brian E. Pastuszenski *Via Email*
Alexis L. Shapiro
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109
Telephone: 617-570-1000
Facsimile: 617-523-1231
bpastuszenski@goodwinprocter.com
ashapiro@goodwinprocter.com

Lloyd Winawer *Via Email*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street
41st Floor
Los Angeles, CA 90017
Telephone: 213-426-2500
Facsimile: 213-623-1673
lwinawer@goodwinprocter.com

*Attorneys for Defendants*
*Countrywide Financial Corporation*
*and Countrywide Securities Corporation*

David Siegel *Via Email*
Daniel Lefler
Charles Elder
Jacob Kreutzer
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: 310-277-1010
Facsimile: 310-203-7199
dsiegel@irell.com
dlefler@irell.com
pgraham@irell.com
jkreutzer@irell.com

*Attorneys for Defendant Angelo R. Mozilo*

Michael C. Tu *Via Email*
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
777 S. Figueroa Street, Suite 3200
Los Angeles, CA 90017
Telephone: 213-629-2020
Facsimile: 213-612-2499
mtu@orrick.com

Michael D. Torpey
Penelope A. Graboys Blair *Via Email*
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
The Orrick Building

405 Howard Street
San Francisco, CA 94105-2669
Telephone: 415-773-5700
Facsimile: 415-773-5759
mtorpey@orrick.com
pgraboysblair@orrick.com

Charles J. Ha *Via Email*
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
701 5th Avenue
Suite 5600
Seattle, WA 98104-7097
Telephone: 206-839-4300
Facsimile: 206-839-4301
charlesha@orrick.com

*Attorneys for Defendant David Sambol*

Shirli Fabbri Weiss *Via Email*
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone: 619-699-2700
Facsimile: 619-699-2701
shirli.weiss@dlapiper.com

Nicolas Morgan *Via Email*
**DLA PIPER LLP (US)**
1999 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-6022
Telephone: 310-595-3000
Facsimile: 310-595-3300
nicolas.morgan@dlapiper.com

David Priebe *Via Email*
Jeffrey B. Coopersmith
**DLA PIPER LLP (US)**
2000 University Avenue
East Palo Alto, CA 94303-2248
Telephone: 650-833-2000
Facsimile: 650-833-2001
david.priebe@dlapiper.com
jeff.coopersmith@dlapiper.com

*Attorneys for Defendant Eric P. Sieracki*

Jordan Eth
Judson E. Lobdell
D. Anthony Rodriguez
**MORRISON & FOERSTER LLP**
425 Market Street
San Francisco, CA 94105
Telephone: 415-268-7000
Facsimile: 415-268-7522
JEth@mofo.com
JLobdell@mofo.com
drodriguez@mofo.com

*Via Email*

*Attorneys for Defendants Henry Cisneros, Jeff Cunningham, Robert Donato, Ben M. Enis, Edwin Heller, Martin Melone, Robert Parry, Oscar Robertson, Keith Russell, and Harley Snyder*

Eric S. Waxman
Peter B. Morrison
Virginia F. Milstead
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
300 South Grand Avenue
Los Angeles, CA 90071-3144
Telephone: 213-687-5000
Facsimile: 213-687-5600
eric.waxman@skadden.com
peter.morrison@skadden.com
virginia.milstead@skadden.com

*Via Email*

*Attorneys for Defendants Kathleen Brown and Michael E. Dougherty*

Gwyn Quillen
J. Warren Rissier
**BINGHAM MCCUTCHEN LLP**
The Water Garden
Fourth Floor, North Tower
1620 26th Street
Santa Monica, CA 90404-4060
Telephone: 310-907-1000
Facsimile: 310-907-2000
gwyn.quillen@bingham.com
warren.rissier@bingham.com

*Via Email*

Todd E. Gordinier *Via Email*
Edward S. Kim
**BINGHAM MCCUTCHEN LLP**
600 Anton Boulevard, 18th Floor
Costa Mesa, CA 92626-1924
Telephone: 714-830-0600
Facsimile: 714-830-0700
todd.gordinier@bingham.com
edward.kim@bingham.com

*Attorneys for Defendant KPMG LLP*

Dean J. Kitchens *Via Email*
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213-229-7000
Facsimile: 213-229-7520
DKitchens@gibsondunn.com

Jonathan C. Dickey *Via Email*
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue, 48th Floor
New York, NY 10166-0193
Telephone: 212-351-2399
Facsimile: 212-351-6399
JDickey@gibsondunn.com

*Attorneys for Defendants Banc of America Securities LLC, J.P. Morgan Securities Inc., Barclays Capital Inc., Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., Wells Fargo Securities, LLC, RBS Securities Inc., Goldman, Sachs & Co., ABN AMRO Incorporated, and BNP Paribas Securities Corp.*

# EXHIBIT A

**Countrywide Financial Corp.**

**Common Stock (Cusip 222372104)**

**Transactions Between March 12, 2004 and March 7, 2008 [1]**

**Shareholder:** State of Michigan Retirement Systems ("SMRS")

| Trade Date | Trans. | Number of Shares | Price / Share |
|---|---|---|---|
| 03/12/04 | **Holdings** | **279,168** | |
| 03/19/04 | Sell | (2,200) | $91.9805 |
| 03/22/04 | Buy | 2,600 | $90.9523 |
| 04/13/04 | Stock Split | 83,450 | $0.0000 |
| 04/13/04 | Stock Split | 56,334 | $0.0000 |
| 05/10/04 | Buy | 75,100 | $55.2738 |
| 05/11/04 | Buy | 5,000 | $56.0000 |
| 05/12/04 | Buy | 65,000 | $56.7509 |
| 05/18/04 | Buy | 61,100 | $59.5406 |
| 05/19/04 | Buy | 75,000 | $60.8742 |
| 06/18/04 | Buy | 2,300 | $71.0000 |
| 08/31/04 | Stock Split | 531,550 | $0.0000 |
| 08/31/04 | Stock Split | 171,302 | $0.0000 |
| 09/17/04 | Buy | 4,100 | $37.9149 |
| 10/25/04 | Buy | 192,600 | $31.3021 |
| 11/08/04 | Buy | 140,000 | $30.5635 |
| 11/09/04 | Buy | 140,000 | $31.0479 |
| 12/17/04 | Buy | 5,000 | $35.5000 |
| 12/17/04 | Buy | 3,700 | $36.0500 |
| 12/20/04 | Buy | 3,600 | $35.5056 |
| 01/05/05 | Buy | 38,700 | $35.7472 |
| 01/13/05 | Buy | 27,800 | $37.5485 |
| 01/19/05 | Buy | 28,600 | $37.2194 |
| 03/18/05 | Sell | (1,500) | $32.6360 |
| 03/18/05 | Sell | (2,300) | $32.1500 |
| 03/28/05 | Sell | (5,700) | $32.0940 |
| 04/27/05 | Sell | (6,200) | $35.6723 |
| 05/02/05 | Buy | 10,400 | $35.7472 |
| 05/20/05 | Sell | (500) | $36.3056 |
| 06/01/05 | Sell | (1,400) | $37.5022 |
| 06/03/05 | Sell | (1,600) | $38.1867 |
| 06/08/05 | Sell | (1,100) | $38.7954 |
| 06/09/05 | Buy | 25,400 | $38.3323 |
| 06/16/05 | Sell | (1,600) | $38.8085 |
| 06/17/05 | Buy | 6,000 | $38.7945 |
| 06/21/05 | Sell | (1,400) | $39.5115 |
| 06/22/05 | Sell | (1,100) | $39.9965 |
| 06/27/05 | Sell | (800) | $38.7604 |
| 06/28/05 | Sell | (900) | $38.9812 |
| 07/07/05 | Buy | 32,500 | $38.2850 |
| 09/16/05 | Buy | 10,400 | $35.0555 |
| 12/16/05 | Sell | (11,800) | $35.4580 |
| 01/18/06 | Sell | (36,400) | $36.4987 |
| 02/21/06 | Sell | (83,600) | $33.6697 |
| 03/17/06 | Buy | 22,400 | $35.9300 |

| Trade Date | Trans. | Number of Shares | Price / Share |
|---|---|---|---|
| 03/17/06 | Buy | 22,400 | $35.9300 |
| 03/17/06 | Buy | 16,700 | $36.5300 |
| 03/23/06 | Buy | 10,200 | $36.2722 |
| 03/23/06 | Buy | 5,300 | $36.3864 |
| 03/28/06 | Buy | 7,800 | $36.0162 |
| 03/28/06 | Buy | 5,200 | $35.6744 |
| 03/31/06 | Buy | 19,900 | $36.7871 |
| 04/24/06 | Sell | (79,800) | $37.4517 |
| 06/12/06 | Sell | (5,800) | $36.5575 |
| 06/16/06 | Buy | 5,100 | $36.8603 |
| 09/15/06 | Buy | 5,700 | $34.9118 |
| 12/15/06 | Buy | 10,200 | $41.4882 |
| 02/21/07 | Sell | (29,400) | $40.6900 |
| 03/15/07 | Buy | 33,000 | $35.4684 |
| 03/16/07 | Buy | 8,400 | $35.9273 |
| 03/19/07 | Buy | 200,000 | $35.1641 |
| 03/28/07 | Buy | 209,900 | $33.6531 |
| 03/29/07 | Buy | 250,000 | $34.0138 |
| 06/15/07 | Buy | 4,000 | $38.4135 |
| 07/18/07 | Buy | 422,300 | $34.2668 |
| 07/18/07 | Buy | 275,900 | $34.2473 |
| 07/18/07 | Buy | 257,000 | $34.3664 |
| 07/18/07 | Buy | 60,112 | $34.2673 |
| 07/18/07 | Buy | 16,400 | $34.3664 |
| 07/18/07 | Buy | 6,400 | $34.9400 |
| 07/18/07 | Buy | 4,900 | $34.9400 |
| 07/18/07 | Buy | 4,200 | $34.4300 |
| 07/18/07 | Buy | 700 | $34.9400 |
| 07/19/07 | Buy | 83,200 | $35.2850 |
| 07/19/07 | Buy | 44,569 | $34.8776 |
| 07/19/07 | Buy | 3,300 | $34.7700 |
| 07/19/07 | Buy | 388 | $34.8776 |
| 07/20/07 | Buy | 180,231 | $33.9897 |
| 07/20/07 | Sell | (12,900) | $34.3845 |
| 07/24/07 | Buy | 180,000 | $30.2362 |
| 07/25/07 | Buy | 100,000 | $29.7887 |
| 07/26/07 | Buy | 70,000 | $28.9326 |
| 08/28/07 | Buy | 250,000 | $19.4024 |
| 09/21/07 | Sell | (17,900) | $19.8200 |
| 10/11/07 | Buy | 14,600 | $18.5800 |
| 11/21/07 | Sell | (2,300) | $8.9694 |
| 11/21/07 | Sell | (2,600) | $9.6264 |
| 11/21/07 | Sell | (4,800) | $9.5854 |
| 11/21/07 | Sell | (4,900) | $9.2075 |
| 12/21/07 | Sell | (7,100) | $8.8556 |
| 01/10/08 | Buy | 10,000 | $8.2300 |
| 01/10/08 | Sell | (20,000) | $5.1010 |
| 01/11/08 | Sell | (100,000) | $6.5027 |
| 01/14/08 | Sell | (100,000) | $6.2550 |

| Trade Date | Trans. | Number of Shares | Price / Share |
|---|---|---|---|
| 01/15/08 | Sell | (100,000) | $5.9288 |
| 01/16/08 | Sell | (100,000) | $6.0204 |
| 01/17/08 | Sell | (100,000) | $5.7139 |
| 01/22/08 | Sell | (200,000) | $5.3386 |
| 01/23/08 | Sell | (300,000) | $5.7930 |
| 01/24/08 | Sell | (100,000) | $6.1579 |
| 01/25/08 | Sell | (200,000) | $6.0897 |
| 01/28/08 | Sell | (300,000) | $5.9626 |
| 01/29/08 | Sell | (1,000,000) | $6.2923 |
| 01/29/08 | Sell | (1,541,400) | $6.3426 |
| 02/25/08 | Buy | 900 | $6.7625 |

[1] The "Number of Shares" and "Price / Share" are not adjusted for the 4/13/04 3:2 stock split or the 08/31/04 2:1 stock split.

**Countrywide Financial Corp.**

**Bond Transactions Between March 12, 2004 and March 7, 2008**

**Shareholder:** State of Michigan Retirement Systems ("SMRS")

| Trade Date | CUSIP | Trans. | Number of Units | Price / 1,000 Units |
|---|---|---|---|---|
| 03/12/04 | 22238HGR5 | Holdings | 0 | |
| 06/04/07 | 22238HGR5 | Buy | 5,000,000 | $100.0000 |
| | | | | |
| 03/12/04 | 222372AJ3 | Holdings | 0 | |
| 05/11/06 | 222372AJ3 | Buy | 250,000 | $997.2900 |
| 09/15/06 | 222372AJ3 | Buy | 585,000 | $1,003.2800 |
| 12/13/06 | 222372AJ3 | Buy | 70,000 | $1,028.4800 |
| 08/15/07 | 222372AJ3 | Buy | 105,000 | $840.9000 |
| 08/15/07 | 222372AJ3 | Buy | 195,000 | $880.0600 |
| 05/12/06 | 222372AJ3 | Sell | (250,000) | $995.6000 |
| 06/25/07 | 222372AJ3 | Sell | (70,000) | $982.4400 |
| 01/11/08 | 222372AJ3 | Sell | (47,000) | $890.0000 |
| 01/11/08 | 222372AJ3 | Sell | (47,000) | $890.0000 |
| 01/11/08 | 222372AJ3 | Sell | (74,000) | $870.0000 |
| 01/11/08 | 222372AJ3 | Sell | (92,000) | $887.5000 |
| 01/11/08 | 222372AJ3 | Sell | (91,000) | $885.0000 |
| 01/11/08 | 222372AJ3 | Sell | (47,000) | $855.0000 |
| | | | | |
| 03/12/04 | 22238HGQ7 | Holdings | 0 | |
| 06/04/07 | 22238HGQ7 | Buy | 400,000 | $998.0700 |
| 06/13/07 | 22238HGQ7 | Buy | 780,000 | $988.0800 |
| 08/02/07 | 22238HGQ7 | Buy | 200,000 | $957.3000 |
| 08/03/07 | 22238HGQ7 | Buy | 20,000 | $932.1600 |
| 01/11/08 | 22238HGQ7 | Buy | 180,000 | $950.0000 |
| 01/11/08 | 22238HGQ7 | Buy | 270,000 | $960.0000 |
| 02/04/08 | 22238HGQ7 | Buy | 300,000 | $915.0000 |
| 02/12/08 | 22238HGQ7 | Buy | 225,000 | $905.0000 |

# EXHIBIT B

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

**Angelo R. Mozilo ("Mozilo")**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo[1] | 04/26/04 | M | | 25,698 | $11.67 | ($299,895.66) |
| Mozilo | 05/05/04 | M | | 75,000 | $11.67 | ($875,250.00) |
| Mozilo | 05/05/04 | S | 04/26/04 | (75,000) | $60.14 | $4,510,500.00 |
| Mozilo | 05/19/04 | M | | 30,000 | $11.67 | ($350,100.00) |
| Mozilo | 05/19/04 | S | 04/26/04 | (30,000) | $60.83 | $1,824,900.00 |
| Mozilo | 06/02/04 | M | | 105,000 | $11.67 | ($1,225,350.00) |
| Mozilo | 06/02/04 | S | 04/26/04 | (105,000) | $63.47 | $6,664,350.00 |
| Mozilo | 07/07/04 | M | | 105,000 | $11.67 | ($1,225,350.00) |
| Mozilo | 07/07/04 | S | 04/26/04 | (105,000) | $70.76 | $7,429,800.00 |
| Mozilo | 08/04/04 | M | | 105,000 | $11.67 | ($1,225,350.00) |
| Mozilo | 08/04/04 | S | 04/26/04 | (105,000) | $68.92 | $7,236,600.00 |
| Mozilo | 09/07/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 09/07/04 | S | 04/26/04 | (52,500) | $37.30 | $1,958,250.00 |
| Mozilo | 09/17/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 09/17/04 | S | 04/26/04 | (52,500) | $37.95 | $1,992,375.00 |

[1] By Mozilo Living Trust.

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 09/22/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 09/22/04 | S | 04/26/04 | (52,500) | $37.49 | $1,968,225.00 |
| Mozilo | 09/28/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 09/28/04 | S | 04/26/04 | (52,500) | $38.25 | $2,008,125.00 |
| Mozilo | 10/04/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 10/04/04 | S | 04/26/04 | (52,500) | $38.25 | $2,008,125.00 |
| Mozilo | 10/15/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 10/15/04 | S | 04/26/04 | (52,500) | $38.25 | $2,008,125.00 |
| Mozilo | 10/20/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 10/20/04 | S | 04/26/04 | (52,500) | $33.63 | $1,765,575.00 |
| Mozilo | 10/28/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 10/28/04 | S | 04/26/04 | (52,500) | $32.26 | $1,693,650.00 |
| Mozilo | 11/09/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 11/09/04 | S | 04/26/04 | (52,500) | $31.04 | $1,629,600.00 |
| Mozilo | 11/12/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 11/12/04 | S | 04/26/04 | (52,500) | $30.98 | $1,626,450.00 |
| Mozilo | 11/17/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 11/17/04 | S | 04/26/04 | (52,500) | $32.25 | $1,693,125.00 |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 11/29/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 11/29/04 | S | 04/26/04 | (52,500) | $32.88 | $1,726,200.00 |
| Mozilo | 12/06/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 12/06/04 | S | 04/26/04 | (52,500) | $33.82 | $1,775,550.00 |
| Mozilo | 12/16/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 12/16/04 | S | 04/26/04 | (52,500) | $35.77 | $1,877,925.00 |
| Mozilo | 12/17/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 12/17/04 | S | 04/26/04 | (52,500) | $35.72 | $1,875,300.00 |
| Mozilo | 12/28/04 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 12/28/04 | S | 04/26/04 | (52,500) | $36.47 | $1,914,675.00 |
| Mozilo | 01/04/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 01/04/05 | S | 12/29/04 | (52,500) | $36.71 | $1,927,275.00 |
| Mozilo | 01/05/05 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 01/05/05 | S | 04/26/04 | (52,500) | $35.65 | $1,871,625.00 |
| Mozilo | 01/10/05 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 01/10/05 | S | 04/26/04 | (52,500) | $35.82 | $1,880,550.00 |
| Mozilo | 01/07/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 01/07/05 | S | 12/29/04 | (52,500) | $35.40 | $1,858,500.00 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 01/13/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 01/13/05 | S | 12/29/04 | (52,500) | $37.16 | $1,950,900.00 |
| Mozilo | 01/19/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 01/19/05 | S | 12/29/04 | (52,500) | $37.25 | $1,955,625.00 |
| Mozilo | 01/21/05 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 01/21/05 | S | 04/26/04 | (52,500) | $37.25 | $1,955,625.00 |
| Mozilo | 01/24/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 01/24/05 | S | 12/29/04 | (52,500) | $36.99 | $1,941,975.00 |
| Mozilo | 01/25/05 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 01/25/05 | S | 04/26/04 | (52,500) | $36.95 | $1,939,875.00 |
| Mozilo | 01/28/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 01/28/05 | S | 12/29/04 | (52,500) | $36.99 | $1,941,975.00 |
| Mozilo | 02/03/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 02/03/05 | S | 12/29/04 | (52,500) | $36.10 | $1,895,250.00 |
| Mozilo | 02/08/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 02/08/05 | S | 12/29/04 | (52,500) | $36.10 | $1,895,250.00 |
| Mozilo | 02/07/05 | M | | 52,500 | $5.84 | ($306,600.00) |
| Mozilo | 02/07/05 | S | 04/26/04 | (52,500) | $36.50 | $1,916,250.00 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 02/14/05 | M | | 52,500 | $0.00[2] | $0.00 |
| Mozilo | 02/14/05 | S | 12/29/04 | (52,500) | $35.69 | $1,873,725.00 |
| Mozilo | 02/15/05 | M | | 6,106 | $5.84 | ($35,659.04) |
| Mozilo | 02/15/05 | S | 04/26/04 | (6,106) | $0.00[3] | $0.00 |
| Mozilo | 02/17/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 02/17/05 | S | 12/29/04 | (52,500) | $36.82 | $1,933,050.00 |
| Mozilo | 02/23/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 02/23/05 | S | 12/29/04 | (52,500) | $34.61 | $1,817,025.00 |
| Mozilo | 02/28/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 02/28/05 | S | 12/29/04 | (52,500) | $34.79 | $1,826,475.00 |
| Mozilo | 03/03/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 03/03/05 | S | 12/29/04 | (52,500) | $35.11 | $1,843,275.00 |
| Mozilo | 03/08/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 03/08/05 | S | 12/29/04 | (52,500) | $35.15 | $1,845,375.00 |
| Mozilo | 03/14/05 | M | | 52,500 | $5.70 | ($299,250.00) |

[2] Acquisition price reflected as $0. No subsequent amendment to Form 4 dated 02/14/05 filed with SEC.

[3] Sale price reflected as $0. No subsequent amendment to Form 4 dated 02/15/05 filed with SEC.

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 03/14/05 | S | 12/29/04 | (52,500) | $32.87 | $1,725,675.00 |
| Mozilo | 03/18/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 03/18/05 | S | 12/29/04 | (52,500) | $32.51 | $1,706,775.00 |
| Mozilo | 03/23/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 03/23/05 | S | 12/29/04 | (52,500) | $31.59 | $1,658,475.00 |
| Mozilo | 03/29/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 03/29/05 | S | 12/29/04 | (52,500) | $31.78 | $1,668,450.00 |
| Mozilo | 03/30/05 | M | | 10,420 | $9.60 | ($100,032.00) |
| Mozilo | 03/30/05 | M | | 10,416 | $9.60 | ($99,993.60) |
| Mozilo | 03/30/05 | S[4] | | (6,260) | $31.94 | $199,944.40 |
| Mozilo | 04/01/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 04/01/05 | S | 12/29/04 | (52,500) | $33.01 | $1,733,025.00 |
| Mozilo | 04/08/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 04/08/05 | S | 12/29/04 | (52,500) | $33.21 | $1,743,525.00 |
| Mozilo | 04/13/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 04/13/05 | S | 12/29/04 | (52,500) | $32.78 | $1,720,950.00 |
| Mozilo | 04/18/05 | M | | 52,500 | $5.70 | ($299,250.00) |

[4] Shares withheld to cover cost of stock swap of 10,420 and 10,416 shares.

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 04/18/05 | S | 12/29/04 | (52,500) | $31.96 | $1,677,900.00 |
| Mozilo | 04/25/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 04/25/05 | S | 12/29/04 | (52,500) | $32.40 | $1,701,000.00 |
| Mozilo | 04/28/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 04/28/05 | S | 12/29/04 | (52,500) | $35.76 | $1,877,400.00 |
| Mozilo | 05/02/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 05/02/05 | S | 12/29/04 | (52,500) | $36.11 | $1,895,775.00 |
| Mozilo | 05/06/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 05/06/05 | S | 12/29/04 | (52,500) | $35.32 | $1,854,300.00 |
| Mozilo | 05/10/05 | M | | 52,500 | $5.70 | ($299,250.00) |
| Mozilo | 05/10/05 | S | 12/29/04 | (52,500) | $35.25 | $1,850,625.00 |
| Mozilo | 05/13/05 | M | | 11,464 | $5.70 | ($65,344.80) |
| Mozilo | 05/13/05 | M | | 41,036 | $5.80 | ($238,008.80) |
| Mozilo | 05/13/05 | S | TBD[5] | (52,500) | $33.94 | $1,781,850.00 |
| Mozilo | 05/16/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 05/16/05 | S | TBD[6] | (52,500) | $34.63 | $1,818,075.00 |

[5] Sale reported as pursuant to a trading plan established under Rule 10b5-1, but date of plan not disclosed on Form 4.

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 05/19/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 05/19/05 | S | TBD[7] | (52,500) | $36.40 | $1,911,000.00 |
| Mozilo | 06/01/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 06/01/05 | S | 12/29/04 | (52,500) | $37.39 | $1,962,975.00 |
| Mozilo | 06/08/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 06/08/05 | S | 12/29/04 | (52,500) | $39.03 | $2,049,075.00 |
| Mozilo | 06/13/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 06/13/05 | S | 12/29/04 | (52,500) | $38.80 | $2,036,805.75 |
| Mozilo | 06/17/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 06/17/05 | S | 12/29/04 | (52,500) | $39.00 | $2,047,374.00 |
| Mozilo | 06/23/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 06/23/05 | S | 12/29/04 | (52,500) | $39.61 | $2,079,756.00 |
| Mozilo | 06/28/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 06/28/05 | S | 12/29/04 | (52,500) | $38.69 | $2,031,303.75 |

[6] Sale reported as pursuant to a trading plan established under Rule 10b5-1, but date of plan not disclosed on Form 4.

[7] Sale reported as pursuant to a trading plan established under Rule 10b5-1, but date of plan not disclosed on Form 4.

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 07/06/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 07/06/05 | S | 12/29/04 | (52,500) | $38.98 | $2,046,198.00 |
| Mozilo | 07/08/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 07/08/05 | S | 12/29/04 | (52,500) | $38.71 | $2,032,275.00 |
| Mozilo | 07/13/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 07/13/05 | S | 12/29/04 | (52,500) | $38.56 | $2,024,442.00 |
| Mozilo | 07/18/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 07/18/05 | S | 12/29/04 | (52,500) | $38.29 | $2,010,445.50 |
| Mozilo | 07/22/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 07/22/05 | S | 12/29/04 | (52,500) | $37.09 | $1,947,450.75 |
| Mozilo | 07/28/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 07/28/05 | S | 12/29/04 | (52,500) | $36.13 | $1,896,940.50 |
| Mozilo | 08/01/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 08/01/05 | S | 12/29/04 | (52,500) | $35.76 | $1,877,604.75 |
| Mozilo | 08/08/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 08/08/05 | S | 12/29/04 | (52,500) | $35.04 | $1,839,720.75 |
| Mozilo | 08/15/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 08/15/05 | S | 12/29/04 | (52,500) | $35.05 | $1,840,382.25 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 08/19/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 08/19/05 | S | 12/29/04 | (52,500) | $34.60 | $1,816,431.75 |
| Mozilo | 08/23/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 08/23/05 | S | 12/29/04 | (52,500) | $33.99 | $1,784,375.25 |
| Mozilo | 08/30/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 08/30/05 | S | 12/29/04 | (52,500) | $32.68 | $1,715,490.00 |
| Mozilo | 09/01/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 09/01/05 | S | 12/29/04 | (52,500) | $33.72 | $1,770,399.75 |
| Mozilo | 09/08/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 09/08/05 | S | 12/29/04 | (52,500) | $34.00 | $1,784,926.50 |
| Mozilo | 09/13/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 09/13/05 | S | 12/29/04 | (52,500) | $35.31 | $1,853,591.25 |
| Mozilo | 09/19/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 09/19/05 | S | 12/29/04 | (52,500) | $34.43 | $1,807,554.00 |
| Mozilo | 09/23/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 09/23/05 | S | 12/29/04 | (52,500) | $33.97 | $1,783,666.50 |
| Mozilo | 09/28/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 09/28/05 | S | 12/29/04 | (52,500) | $33.15 | $1,740,369.75 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 10/03/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 10/03/05 | S | 12/29/04 | (52,500) | $32.68 | $1,715,878.50 |
| Mozilo | 10/10/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 10/10/05 | S | 12/29/04 | (52,500) | $30.96 | $1,625,190.00 |
| Mozilo | 10/13/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 10/13/05 | S | 12/29/04 | (52,500) | $29.60 | $1,554,141.75 |
| Mozilo | 10/18/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 10/18/05 | S | 12/29/04 | (52,500) | $31.53 | $1,655,272.50 |
| Mozilo | 10/24/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 10/24/05 | S | 12/29/04 | (52,500) | $32.30 | $1,695,492.75 |
| Mozilo | 10/28/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 10/28/05 | S | 12/29/04 | (52,500) | $31.31 | $1,643,859.00 |
| Mozilo | 11/01/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 11/01/05 | S | 12/29/04 | (52,500) | $31.04 | $1,629,626.25 |
| Mozilo | 11/08/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 11/08/05 | S | 12/29/04 | (52,500) | $31.99 | $1,679,590.50 |
| Mozilo | 11/14/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 11/14/05 | S | 12/29/04 | (52,500) | $33.95 | $1,782,243.75 |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,*
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 11/18/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 11/18/05 | S | 12/29/04 | (52,500) | $35.06 | $1,840,781.25 |
| Mozilo | 11/22/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 11/22/05 | S | 12/29/04 | (52,500) | $35.68 | $1,873,347.00 |
| Mozilo | 11/29/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 11/29/05 | S | 12/29/04 | (52,500) | $35.74 | $1,876,491.75 |
| Mozilo | 12/01/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 12/01/05 | S | 12/29/04 | (52,500) | $34.67 | $1,819,959.75 |
| Mozilo | 12/08/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 12/08/05 | S | 12/29/04 | (52,500) | $34.63 | $1,818,311.25 |
| Mozilo | 12/13/15 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 12/13/15 | S | 12/29/04 | (52,500) | $33.87 | $1,778,138.25 |
| Mozilo | 12/16/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 12/16/05 | S | 12/29/04 | (52,500) | $35.41 | $1,858,783.50 |
| Mozilo | 12/19/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 12/19/05 | S | 12/29/04 | (52,500) | $35.39 | $1,857,938.25 |
| Mozilo | 12/29/05 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 12/29/05 | S | 12/29/04 | (52,500) | $34.21 | $1,795,946.25 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 01/06/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 01/06/06 | S | 12/29/04 | (52,500) | $35.58 | $1,868,107.50 |
| Mozilo | 01/10/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 01/10/06 | S | 12/29/04 | (52,500) | $35.27 | $1,851,916.50 |
| Mozilo | 01/18/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 01/18/06 | S | 12/29/04 | (52,500) | $36.33 | $1,907,094.00 |
| Mozilo | 01/23/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 01/23/06 | S | 12/29/04 | (52,500) | $34.36 | $1,804,099.50 |
| Mozilo | 01/27/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 01/27/06 | S | 12/29/04 | (52,500) | $34.50 | $1,811,176.50 |
| Mozilo | 01/31/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 01/31/06 | S | 12/29/04 | (52,500) | $33.45 | $1,756,188.00 |
| Mozilo | 02/03/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 02/03/06 | S | 12/29/04 | (52,500) | $32.10 | $1,685,297.25 |
| Mozilo | 02/08/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 02/08/06 | S | 12/29/04 | (52,500) | $32.31 | $1,696,369.50 |
| Mozilo | 02/13/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 02/13/06 | S | 12/29/04 | (52,500) | $32.98 | $1,731,434.25 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 02/16/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 02/16/06 | S | 12/29/04 | (52,500) | $33.81 | $1,775,061.75 |
| Mozilo | 02/22/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 02/22/06 | S | 12/29/04 | (52,500) | $34.13 | $1,791,636.00 |
| Mozilo | 02/28/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 02/28/06 | S | 12/29/04 | (52,500) | $34.75 | $1,824,280.50 |
| Mozilo | 03/01/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 03/01/06 | S | 12/29/04 | (52,500) | $34.55 | $1,814,001.00 |
| Mozilo | 03/08/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 03/08/06 | S | 12/29/04 | (52,500) | $34.82 | $1,828,181.25 |
| Mozilo | 03/13/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 03/13/06 | S | 12/29/04 | (52,500) | $34.84 | $1,828,979.25 |
| Mozilo | 03/20/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 03/20/06 | S | 12/29/04 | (52,500) | $36.71 | $1,927,380.00 |
| Mozilo | 03/24/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 03/24/06 | S | 12/29/04 | (52,500) | $36.49 | $1,915,546.50 |
| Mozilo | 03/28/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 03/28/06 | S | 12/29/04 | (52,500) | $36.00 | $1,890,168.00 |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 04/03/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 04/03/06 | S | 12/29/04 | (52,500) | $36.40 | $1,911,110.25 |
| Mozilo | 04/07/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 04/07/06 | S | 12/29/04 | (52,500) | $37.43 | $1,964,870.25 |
| Mozilo | 04/10/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 04/10/06 | S | 12/29/04 | (52,500) | $37.27 | $1,956,423.00 |
| Mozilo | 04/18/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 04/18/06 | S | 12/29/04 | (52,500) | $36.99 | $1,942,143.00 |
| Mozilo | 04/24/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 04/24/06 | S | 12/29/04 | (52,500) | $37.42 | $1,964,329.50 |
| Mozilo | 04/28/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 04/28/06 | S | 12/29/04 | (52,500) | $39.38 | $2,067,187.50 |
| Mozilo | 05/01/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 05/01/06 | S | 12/29/04 | (52,500) | $40.54 | $2,128,360.50 |
| Mozilo | 05/05/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 05/05/06 | S | 12/29/04 | (52,500) | $40.60 | $2,131,620.75 |
| Mozilo | 05/08/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 05/08/06 | S | 12/29/04 | (52,500) | $42.82 | $2,247,981.75 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 05/12/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 05/12/06 | S | 12/29/04 | (52,500) | $41.45 | $2,176,377.00 |
| Mozilo | 05/15/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 05/15/06 | S | 12/29/04 | (52,500) | $41.62 | $2,184,924.00 |
| Mozilo | 05/18/06 | M | | 52,500 | $5.80 | ($304,500.00) |
| Mozilo | 05/18/06 | S | 12/29/04 | (52,500) | $40.47 | $2,124,438.75 |
| Mozilo | 05/19/06 | M | | 14,793 | $5.80 | ($85,799.40) |
| Mozilo | 05/19/06 | S | 12/29/04 | (14,793) | $39.75 | $588,021.75 |
| Mozilo | 05/22/06 | M | | 14,793 | $5.80 | ($85,799.40) |
| Mozilo | 05/22/06 | S | 12/29/04 | (14,793) | $39.00 | $576,927.00 |
| Mozilo | 05/23/06 | M | | 14,793 | $5.80 | ($85,799.40) |
| Mozilo | 05/23/06 | S | 12/29/04 | (14,793) | $38.26 | $565,980.18 |
| Mozilo | 05/24/06 | M | | 14,793 | $5.80 | ($85,799.40) |
| Mozilo | 05/24/06 | S | 12/29/04 | (14,793) | $37.86 | $560,062.98 |
| Mozilo | 05/25/06 | M | | 14,792 | $5.80 | ($85,793.60) |
| Mozilo | 05/25/06 | S | 12/29/04 | (14,792) | $37.75 | $558,398.00 |
| Mozilo | 06/08/06 | M | | 6,805 | $14.69 | ($99,965.45) |
| Mozilo | 11/01/06 | M | | 70,000 | $9.60 | ($672,000.00) |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,*
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 11/01/06 | S | 10/27/06 | (70,000) | $38.34 | $2,683,975.00 |
| Mozilo | 11/01/06 | S | 10/27/06 | (23,000) | $38.31[8] | $881,074.80 |
| Mozilo | 11/06/06 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 11/06/06 | S | 10/27/06 | (23,000) | $38.84[9] | $893,379.80 |
| Mozilo | 11/06/06 | S | 10/27/06 | (70,000) | $38.46 | $2,692,130.00 |
| Mozilo | 11/10/06 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 11/10/06 | S | 10/27/06 | (70,000) | $38.93 | $2,725,184.00 |
| Mozilo | 11/13/06 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 11/13/06 | S | 10/27/06 | (70,000) | $40.13 | $2,809,268.00 |
| Mozilo | 11/16/06 | S | 10/27/06 | (23,000) | $40.65 | $934,968.40 |
| Mozilo | 11/16/06 | S | 11/13/06 | (25,000) | $40.65 | $1,016,280.00 |
| Mozilo | 11/20/06 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 11/20/06 | S | 10/27/06 | (70,000) | $40.20 | $2,813,727.00 |
| Mozilo | 11/21/06 | S | 10/27/06 | (22,999) | $39.79 | $915,146.31 |
| Mozilo | 11/21/06 | S | 11/13/06 | (25,000) | $39.79 | $994,782.50 |
| Mozilo[10] | 11/29/06 | S | 11/13/06 | (25,000) | $39.88 | $997,072.50 |

[8] Sale price range of shares listed were between $38.10 – $38.59.

[9] Sale price range of shares listed were between $37.80 – $39.12.

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 12/04/06 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 12/04/06 | S | 10/27/06 | (70,000) | $39.98 | $2,798,768.00 |
| Mozilo[11] | 12/04/06 | S | 11/13/06 | (25,000) | $39.99 | $999,735.00 |
| Mozilo | 12/08/06 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 12/08/06 | S | 10/27/06 | (70,000) | $39.93 | $2,795,135.00 |
| Mozilo | 12/11/06 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 12/11/06 | S | 10/27/06 | (70,000) | $40.06 | $2,803,990.00 |
| Mozilo | 12/15/06 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 12/15/06 | S | 10/27/06 | (70,000) | $14.46 | $1,011,962.00 |
| Mozilo | 12/18/06 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 12/18/06 | S | 10/27/06 | (70,000) | $41.66 | $2,916,039.00 |
| Mozilo | 01/04/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 01/04/07 | S | 10/27/06 | (70,000) | $42.22 | $2,955,351.00 |
| Mozilo | 01/05/07 | M | | 23,000 | $9.60 | ($220,685.00) |
| Mozilo | 01/05/07 | S | 12/12/06 | (23,000) | $42.37 | $974,427.20 |
| Mozilo | 01/08/07 | M | | 70,000 | $9.60 | ($672,000.00) |

[10] By Mozilo Living Trust.

[11] By Mozilo Living Trust.

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 01/08/07 | S | 10/27/06 | (70,000) | $42.05 | $2,943,836.00 |
| Mozilo | 01/10/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 01/10/07 | S | 10/27/06 | (70,000) | $42.12 | $2,948,638.00 |
| Mozilo | 01/11/07 | M | | 23,000 | $9.60 | ($220,685.00) |
| Mozilo | 01/11/07 | S | 12/12/06 | (23,000) | $42.18 | $970,123.90 |
| Mozilo | 01/18/07 | M | | 23,000 | $9.60 | ($220,685.00) |
| Mozilo | 01/18/07 | S | 12/12/06 | (23,000) | $40.35 | $928,040.80 |
| Mozilo | 01/19/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 01/19/07 | S | 10/27/06 | (70,000) | $41.24 | $2,886,779.00 |
| Mozilo | 01/22/07 | M | | 23,000 | $9.60 | ($220,685.00) |
| Mozilo | 01/22/07 | S | 12/12/06 | (23,000) | $41.27 | $949,237.60 |
| Mozilo | 01/24/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 01/24/07 | S | 10/27/06 | (70,000) | $41.65 | $2,915,682.00 |
| Mozilo | 01/26/07 | M | | 23,000 | $9.60 | ($220,685.00) |
| Mozilo | 01/26/07 | S | 12/12/06 | (23,000) | $40.40 | $929,094.20 |
| Mozilo | 02/02/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 02/02/07 | S | 10/27/06 | (70,000) | $44.52 | $3,116,057.00 |
| Mozilo | 02/05/07 | M | | 46,000 | $9.60 | ($441,370.00) |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 02/05/07 | S | 12/12/06 02/02/07 | (46,000) | $44.61 | $2,051,954.20 |
| Mozilo | 02/08/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 02/08/07 | S | 10/27/06 | (70,000) | $43.47 | $3,043,208.00 |
| Mozilo | 02/09/07 | M | | 46,000 | $9.60 | ($441,600.00) |
| Mozilo | 02/09/07 | S | 12/12/06 02/02/07 | (46,000) | $43.69 | $2,009,546.80 |
| Mozilo | 02/12/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 02/12/07 | S | 10/27/06 | (70,000) | $41.19 | $2,882,992.00 |
| Mozilo | 02/13/07 | M | | 46,000 | $9.60 | ($441,600.00) |
| Mozilo | 02/13/07 | S | 12/12/06 02/02/07 | (46,000) | $41.26 | $1,897,812.80 |
| Mozilo | 02/15/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 02/15/07 | S | 10/27/06 | (70,000) | $41.88 | $2,931,887.00 |
| Mozilo | 02/21/07 | M | | 46,000 | $9.60 | ($441,600.00) |
| Mozilo | 02/21/07 | S | 12/12/06 02/02/07 | (46,000) | $40.77 | $1,875,562.60 |
| Mozilo | 02/21/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 02/22/07 | S | 10/27/06 | (70,000) | $40.45 | $2,831,591.00 |
| Mozilo | 02/28/07 | M | | 46,000 | $9.60 | ($441,600.00) |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,*
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 02/28/07 | S | 12/12/06 02/02/07 | (46,000) | $37.91 | $1,743,910.60 |
| Mozilo | 03/01/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 03/01/07 | S | 10/27/06 | (70,000) | $37.10 | $2,596,727.00 |
| Mozilo | 03/02/07 | M | | 46,000 | $9.60 | ($441,600.00) |
| Mozilo | 03/02/07 | S | 12/12/06 02/02/07 | (46,000) | $37.18 | $1,710,082.20 |
| Mozilo | 03/05/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 03/05/07 | S | 10/27/06 | (70,000) | $35.19 | $2,463,468.00 |
| Mozilo | 03/06/07 | M | | 46,000 | $9.60 | ($441,600.00) |
| Mozilo | 03/06/07 | S | 12/12/06 02/02/07 | (46,000) | $36.32 | $1,670,572.80 |
| Mozilo | 03/08/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 03/08/07 | S | 10/27/06 | (70,000) | $37.47 | $2,622,865.00 |
| Mozilo | 03/12/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 03/12/07 | S | 10/27/06 | (70,000) | $35.00 | $2,450,140.00 |
| Mozilo | 03/15/07 | M | | 46,000 | $9.60 | ($441,600.00) |
| Mozilo | 03/15/07 | S | 12/12/06 02/02/07 | (46,000) | $35.63 | $1,638,901.80 |
| Mozilo | 03/20/07 | M | | 70,000 | $9.60 | ($672,000.00) |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 03/20/07 | S | 10/27/06 | (70,000) | $35.34 | $2,473,674.00 |
| Mozilo | 03/23/07 | M | | 46,000 | $9.60 | ($441,600.00) |
| Mozilo | 03/23/07 | S | 12/12/06 02/02/07 | (46,000) | $36.40 | $1,674,616.20 |
| Mozilo | 03/30/07 | M | | 46,000 | $9.60 | ($441,600.00) |
| Mozilo | 03/30/07 | S | 12/12/06 02/02/07 | (46,000) | $33.83 | $1,556,092.60 |
| Mozilo | 04/02/07 | M | | 46,000 | $9.60 | ($441,600.00) |
| Mozilo | 04/02/07 | S | 12/12/06 02/02/07 | (46,000) | $32.69 | $1,503,625.00 |
| Mozilo | 04/04/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 04/04/07 | S | 10/27/06 | (70,000) | $33.33 | $2,332,813.00 |
| Mozilo | 04/11/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 04/11/07 | S | 10/27/06 | (70,000) | $33.46 | $2,342,445.00 |
| Mozilo | 04/13/07 | M | | 19,420 | $10.89 | ($211,483.80) |
| Mozilo | 04/13/07 | M | | 26,580 | $9.60 | ($255,168.00) |
| Mozilo | 04/13/07 | S | 12/12/06 02/02/07 | (46,000) | $33.60 | $1,545,756.40 |
| Mozilo | 04/16/07 | M | | 46,000 | $10.89 | ($500,940.00) |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,*
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 04/16/07 | S | 12/12/06 02/02/07 | (46,000) | $34.93 | $1,606,591.40 |
| Mozilo | 04/18/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 04/18/07 | S | 10/27/06 | (70,000) | $37.25 | $2,607,157.00 |
| Mozilo | 04/20/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 04/20/07 | S | 12/12/06 02/02/07 | (46,000) | $37.84 | $1,740,433.00 |
| Mozilo | 04/23/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 04/23/07 | S | 10/27/06 | (70,000) | $37.33 | $2,612,778.00 |
| Mozilo | 04/27/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 04/27/07 | S | 10/27/06 | (70,000) | $38.35 | $2,684,227.00 |
| Mozilo | 04/30/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 04/30/07 | S | 12/12/06 02/02/07 | (46,000) | $38.45 | $1,768,746.00 |
| Mozilo | 05/02/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 05/02/07 | S | 10/27/06 | (70,000) | $37.54 | $2,627,779.00 |
| Mozilo | 05/04/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 05/04/07 | S | 12/12/06 02/02/07 | (46,000) | $38.03 | $1,749,168.40 |
| Mozilo | 05/07/07 | M | | 46,000 | $10.89 | ($500,940.00) |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 05/07/07 | S | 12/12/06 02/02/07 | (46,000) | $38.48 | $1,770,195.00 |
| Mozilo | 05/08/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 05/08/07 | S | 10/27/06 | (70,000) | $38.78 | $2,714,873.00 |
| Mozilo | 05/10/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 05/10/07 | S | 10/27/06 | (70,000) | $40.68 | $2,847,390.00 |
| Mozilo | 05/14/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 05/14/07 | S | 10/27/06 | (70,000) | $40.26 | $2,818,102.00 |
| Mozilo | 05/16/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 05/16/07 | S | 12/12/06 02/02/07 | (46,000) | $40.25 | $1,851,628.80 |
| Mozilo | 05/18/07 | M | | 70,000 | $9.60 | ($672,000.00) |
| Mozilo | 05/18/07 | S | 10/27/06 | (70,000) | $41.14 | $2,879,513.00 |
| Mozilo | 05/21/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 05/21/07 | S | 12/12/06 02/02/07 | (46,000) | $40.64 | $1,869,518.20 |
| Mozilo | 05/31/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 05/31/07 | S | 12/12/06 02/02/07 | (46,000) | $39.80 | $1,830,882.80 |
| Mozilo | 06/01/07 | M | | 70,000 | $9.60 | ($672,000.00) |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 06/01/07 | S | 10/27/06 | (70,000) | $39.01 | $2,730,497.00 |
| Mozilo | 06/04/07 | M | | 69,586 | $9.60 | ($668,025.60) |
| Mozilo | 06/04/07 | M | | 414 | $9.94 | ($4,115.16) |
| Mozilo | 06/04/07 | S | 10/27/06 | (70,000) | $39.15 | $2,740,332.00 |
| Mozilo | 06/06/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 06/06/07 | S | 12/12/06<br>02/02/07 | (46,000) | $39.06 | $1,796,769.20 |
| Mozilo | 06/08/07 | M | | 70,000 | $9.94 | ($695,800.00) |
| Mozilo | 06/08/07 | S | 10/27/06 | (70,000) | $37.95 | $2,656,759.00 |
| Mozilo | 06/11/07 | M | | 70,000 | $9.94 | ($695,800.00) |
| Mozilo | 06/11/07 | S | 10/27/06 | (70,000) | $37.67 | $2,636,991.00 |
| Mozilo | 06/13/07 | M | | 70,000 | $9.94 | ($695,800.00) |
| Mozilo | 06/13/07 | S | 10/27/06 | (70,000) | $37.81 | $2,647,008.00 |
| Mozilo | 06/14/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 06/14/07 | S | 12/12/06<br>02/02/07 | (46,000) | $37.83 | $1,740,239.80 |
| Mozilo | 06/15/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 06/15/07 | S | 12/12/06<br>02/02/07 | (46,000) | $37.99 | $1,747,673.40 |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 06/18/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 06/18/07 | S | 12/12/06 02/02/07 | (46,000) | $38.48 | $1,770,149.00 |
| Mozilo | 06/19/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 06/19/07 | S | 12/12/06 02/02/07 | (46,000) | $38.90 | $1,789,432.20 |
| Mozilo | 07/11/07 | M | | 70,000 | $9.94 | ($695,800.00) |
| Mozilo | 07/11/07 | S | 10/27/06 | (70,000) | $35.68 | $2,497,929.00 |
| Mozilo | 07/12/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 07/12/07 | S | 12/12/06 02/02/07 | (46,000) | $36.45 | $1,676,700.00 |
| Mozilo | 07/13/07 | M | | 70,000 | $9.94 | ($695,800.00) |
| Mozilo | 07/13/07 | S | 10/27/06 | (70,000) | $36.64 | $2,565,073.00 |
| Mozilo | 07/16/07 | M | | 70,000 | $9.94 | ($695,800.00) |
| Mozilo | 07/16/07 | S | 10/27/06 | (70,000) | $35.83 | $2,508,436.00 |
| Mozilo | 07/18/07 | M | | 46,000 | $10.89 | ($500,940.00) |
| Mozilo | 07/18/07 | S | 12/12/06 02/02/07 | (46,000) | $34.32 | $1,578,586.60 |
| Mozilo | 07/20/07 | M | | 70,000 | $9.94 | ($695,800.00) |
| Mozilo | 07/20/07 | S | 10/27/06 | (70,000) | $34.12 | $2,388,253.00 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 07/23/07 | M | | 70,000 | $9.94 | ($695,800.00) |
| Mozilo | 07/23/07 | S | 10/27/06 | (70,000) | $34.22 | $2,395,099.00 |
| Mozilo | 07/25/07 | M | | 32,580 | $10.89 | ($354,796.20) |
| Mozilo | 07/25/07 | M | | 13,420 | $14.69 | ($197,139.80) |
| Mozilo | 07/25/07 | S | 12/12/06<br>02/02/07 | (46,000) | $30.52 | $1,404,035.00 |
| Mozilo | 07/27/07 | M | | 46,000 | $14.69 | ($675,740.00) |
| Mozilo | 07/27/07 | S | 12/12/06<br>02/02/07 | (46,000) | $29.59 | $1,360,979.00 |
| Mozilo | 07/31/07 | M | | 46,000 | $14.69 | ($675,740.00) |
| Mozilo | 07/31/07 | S | 12/12/06<br>02/02/07 | (46,000) | $29.89 | $1,374,921.60 |
| Mozilo | 08/01/07 | M | | 30,000 | $9.94 | ($298,200.00) |
| Mozilo | 08/01/07 | S | 10/27/06 | (30,000) | $28.16 | $844,893.00 |
| Mozilo | 08/07/07 | M | | 110,000 | $9.94 | ($1,093,400.00) |
| Mozilo | 08/07/07 | S | 10/27/06 | (110,000) | $28.06 | $3,086,666.00 |
| Mozilo | 08/08/07 | M | | 92,000 | $14.69 | ($1,351,480.00) |
| Mozilo | 08/08/07 | S | 12/12/06<br>02/02/07 | (92,000) | $28.74 | $2,643,997.20 |
| Mozilo | 08/13/07 | M | | 46,000 | $14.69 | ($675,740.00) |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Mozilo | 08/13/07 | S | 12/12/06 02/02/07 | (46,000) | $28.40 | $1,306,400.00 |
| Mozilo | 10/08/07 | M | | 139,918 | $9.94 | ($1,390,784.92) |
| Mozilo | 10/08/07 | S | 10/27/06 | (139,918) | $20.14 | $2,818,368.27 |
| Mozilo | 10/09/07 | M | | 139,918 | $9.94 | ($1,390,784.92) |
| Mozilo | 10/09/07 | S | 10/27/06 | (139,918) | $19.87 | $2,780,632.39 |
| Mozilo | 10/10/07 | M | | 139,918 | $9.94 | ($1,390,784.92) |
| Mozilo | 10/10/07 | S | 10/27/06 | (139,918) | $18.77 | $2,626,820.53 |
| Mozilo | 10/11/07 | M | | 139,918 | $9.94 | ($1,390,784.92) |
| Mozilo | 10/11/07 | S | 10/27/06 | (139,918) | $18.36 | $2,569,160.32 |
| Mozilo | 10/12/07 | M | | 139,918 | $9.94 | ($1,390,784.92) |
| Mozilo | 10/12/07 | S | 10/27/06 | (139,918) | $18.38 | $2,571,678.85 |
| **Total Sold:** | | | | **(12,778,419)** | | |
| **Gross Proceeds:** | | | | | | **$464,701,978.79** |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,*
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

**David Sambol ("Sambol")**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 03/12/04 | M | | 3,200 | $35.04 | ($112,128.00) |
| Sambol | 03/12/04 | S | 06/11/03 | (3,200) | $93.09 | $297,888.00 |
| Sambol | 03/16/04 | M | | 3,200 | $35.04 | ($112,128.00) |
| Sambol | 03/16/04 | S | 06/11/03 | (3,200) | $92.89 | $297,248.00 |
| Sambol | 03/25/04 | M | | 3,200 | $35.04 | ($112,128.00) |
| Sambol | 03/25/04 | S | 06/11/03 | (3,200) | $91.20 | $291,840.00 |
| Sambol | 03/30/04 | M | | 3,200 | $35.04 | ($112,128.00) |
| Sambol | 03/30/04 | S | 06/11/03 | (3,200) | $94.08 | $301,056.00 |
| Sambol | 04/06/04 | M | | 5,332 | $35.04 | ($186,833.28) |
| Sambol | 04/06/04 | S | | (5,332) | $88.95 | $474,281.40 |
| Sambol | 04/12/04 | M | | 13,333 | $35.04 | ($467,188.32) |
| Sambol | 04/12/04 | S | 06/11/03 | (13,333) | $85.55 | $1,140,638.15 |
| Sambol | 04/13/04 | M | | 2,753 | $23.36 | ($64,310.08) |
| Sambol | 04/13/04 | M | | 14,447 | $21.78 | ($314,655.66) |
| Sambol | 04/13/04 | S | 06/11/03 | (17,200) | $57.39 | $987,108.00 |
| Sambol | 04/14/04 | M | | 3,750 | $19.19 | ($71,962.50) |
| Sambol | 04/14/04 | S | 03/23/04 | (3,750) | $56.06 | $210,225.00 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 04/19/04 | M | | 3,000 | $19.19 | ($57,570.00) |
| Sambol | 04/19/04 | S | 03/23/04 | (3,000) | $55.97 | $167,910.00 |
| Sambol | 04/30/04 | M | | 4,125 | $19.19 | ($79,158.75) |
| Sambol | 04/30/04 | S | 03/23/04 | (4,125) | $59.82 | $246,757.50 |
| Sambol | 05/03/04 | M | | 4,125 | $19.19 | ($79,158.75) |
| Sambol | 05/03/04 | S | 03/23/04 | (4,125) | $59.89 | $247,046.25 |
| Sambol | 05/12/04 | M | | 3,750 | $19.19 | ($71,962.50) |
| Sambol | 05/12/04 | S | 03/23/04 | (3,750) | $57.14 | $214,275.00 |
| Sambol | 05/20/04 | M | | 4,125 | $19.19 | ($79,158.75) |
| Sambol | 05/20/04 | S | 03/23/04 | (4,125) | $60.64 | $250,140.00 |
| Sambol | 05/26/04 | M | | 625 | $19.19 | ($11,993.75) |
| Sambol | 05/26/04 | M | | 3,875 | $21.78 | ($84,397.50) |
| Sambol | 05/26/04 | S | 03/23/04 | (4,500) | $63.92 | $287,640.00 |
| Sambol | 06/04/04 | M | | 4,500 | $19.89 | ($89,505.00) |
| Sambol | 06/04/04 | S | 03/23/04 | (4,500) | $63.58 | $286,110.00 |
| Sambol | 06/08/04 | M | | 4,800 | $19.89 | ($95,472.00) |
| Sambol | 06/08/04 | S | 03/23/04 | (4,800) | $62.25 | $298,800.00 |
| Sambol | 06/16/04 | M | | 4,800 | $19.89 | ($95,472.00) |
| Sambol | 06/16/04 | S | 03/23/04 | (4,800) | $68.56 | $329,088.00 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 06/24/04 | M | | 4,800 | $19.89 | ($95,472.00) |
| Sambol | 06/24/04 | S | 03/23/04 | (4,800) | $71.33 | $342,384.00 |
| Sambol | 06/29/04 | M | | 4,800 | $19.89 | ($95,472.00) |
| Sambol | 06/29/04 | S | 03/23/04 | (4,800) | $69.90 | $335,520.00 |
| Sambol | 07/08/04 | M | | 4,800 | $19.89 | ($95,472.00) |
| Sambol | 07/08/04 | S | 03/23/04 | (4,800) | $70.57 | $338,736.00 |
| Sambol | 07/15/04 | M | | 4,800 | $19.89 | ($95,472.00) |
| Sambol | 07/15/04 | S | 03/23/04 | (4,800) | $72.44 | $347,712.00 |
| Sambol | 07/19/04 | M | | 4,800 | $19.89 | ($95,472.00) |
| Sambol | 07/19/04 | S | 03/23/04 | (4,800) | $72.08 | $345,984.00 |
| Sambol | 07/28/04 | M | | 4,800 | $19.89 | ($95,472.00) |
| Sambol | 07/28/04 | S | 03/23/04 | (4,800) | $71.24 | $341,952.00 |
| Sambol | 08/03/04 | M | | 4,800 | $19.89 | ($95,472.00) |
| Sambol | 08/03/04 | S | 03/05/04 | (4,800) | $71.97 | $345,456.00 |
| Sambol | 08/12/04 | M | | 2,300 | $19.89 | ($45,747.00) |
| Sambol | 08/12/04 | M | | 2,500 | $21.78 | ($54,450.00) |
| Sambol | 08/12/04 | S | 03/23/04 | (4,800) | $66.72 | $320,256.00 |
| Sambol | 08/20/04 | M | | 4,800 | $21.78 | ($104,544.00) |
| Sambol | 08/20/04 | S | 03/23/04 | (4,800) | $68.69 | $329,712.00 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 08/24/04 | M | | 4,800 | $21.78 | ($104,544.00) |
| Sambol | 08/24/04 | S | 03/05/04 | (4,800) | $68.47 | $328,656.00 |
| Sambol | 08/30/04 | M | | 4,800 | $21.78 | ($104,544.00) |
| Sambol | 08/30/04 | S | 03/23/04 | (4,800) | $69.33 | $332,784.00 |
| Sambol | 09/09/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 09/09/04 | S | 03/23/04 | (9,600) | $36.71 | $352,416.00 |
| Sambol | 09/16/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 09/16/04 | S | 03/23/04 | (9,600) | $37.68 | $361,728.00 |
| Sambol | 09/20/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 09/20/04 | S | 03/23/04 | (9,600) | $37.37 | $358,752.00 |
| Sambol | 09/28/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 09/28/04 | S | 04/26/04 | (9,600) | $38.32 | $367,872.00 |
| Sambol | 10/05/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 10/05/04 | S | 03/23/04 | (9,600) | $39.00 | $374,400.00 |
| Sambol | 10/15/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 10/15/04 | S | 04/26/04 | (9,600) | $38.33 | $367,968.00 |
| Sambol | 10/22/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 10/22/04 | S | 03/23/04 | (9,600) | $31.91 | $306,336.00 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 10/19/04[12] | M | | 9,000 | $10.89 | ($98,010.00) |
| Sambol | 10/26/04 | S | 03/23/04 | (9,000) | $32.15 | $289,350.00 |
| Sambol | 11/01/04 | M | | 9,000 | $10.89 | ($98,010.00) |
| Sambol | 11/01/04 | S | 03/23/04 | (9,000) | $32.43 | $291,870.00 |
| Sambol | 11/09/04 | M | | 8,250 | $10.89 | ($89,842.50) |
| Sambol | 11/09/04 | S | 03/23/04 | (8,250) | $31.01 | $255,832.50 |
| Sambol | 11/17/04 | M | | 9,000 | $10.89 | ($98,010.00) |
| Sambol | 11/17/04 | S | 03/23/04 | (9,000) | $32.65 | $293,850.00 |
| Sambol | 11/23/04 | M | | 8,250 | $10.89 | ($89,842.50) |
| Sambol | 11/23/04 | S | 03/23/04 | (8,250) | $31.14 | $256,905.00 |
| Sambol | 12/02/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 12/02/04 | S | 04/26/04 | (9,600) | $33.65 | $323,040.00 |
| Sambol | 12/07/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 12/07/04 | S | 03/23/04 | (9,600) | $33.84 | $324,864.00 |
| Sambol | 12/15/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 12/15/04 | S | 03/23/04 | (9,600) | $35.87 | $344,352.00 |

[12] Transaction date reported as 10/19/04, but exercise date at Form 4 Table II reported as 10/26/04.

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 12/20/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 12/20/04 | S | 03/23/04 | (9,600) | $35.57 | $341,472.00 |
| Sambol | 12/28/04 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 12/28/04 | S | 03/23/04 | (9,600) | $36.59 | $351,264.00 |
| Sambol | 01/05/05 | M | | 9,600 | $10.89 | ($104,544.00) |
| Sambol | 01/05/05 | S | 03/23/04 | (9,600) | $35.70 | $342,720.00 |
| Sambol | 03/15/05 | M | | 1,187 | $10.89 | ($12,926.43) |
| Sambol | 03/15/05 | M | | 8,813 | $9.60 | ($84,604.80) |
| Sambol | 03/15/05 | S | 03/01/05 | (10,000) | $33.70 | $337,000.00 |
| Sambol | 03/21/05 | M | | 5,000 | $9.60 | ($48,000.00) |
| Sambol | 03/21/05 | S | 03/01/05 | (5,000) | $0.00[13] | $0.00 |
| Sambol | 03/30/05 | M | | 10,420 | $9.60 | ($100,032.00) |
| Sambol | 03/30/05 | S[14] | 03/01/05 | (3,130) | $31.94 | $99,972.20 |
| Sambol | 03/31/05 | M | | 5,000 | $9.60 | ($48,000.00) |
| Sambol | 03/31/05 | S | 03/01/05 | (5,000) | $32.53 | $162,650.00 |
| Sambol | 04/08/05 | M | | 5,000 | $9.60 | ($48,000.00) |

[13] Sale price reflected as $0. No subsequent amendment to Form 4 dated 03/21/05 filed with SEC.

[14] Shares withheld to cover cost of stock swap of 10,420 shares.

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 04/08/05 | S | 03/01/05 | (5,000) | $33.19 | $165,950.00 |
| Sambol | 04/12/05 | M | | 5,000 | $9.60 | ($48,000.00) |
| Sambol | 04/12/05 | S | 03/01/05 | (5,000) | $32.52 | $162,600.00 |
| Sambol | 04/21/05 | M | | 5,000 | $9.60 | ($48,000.00) |
| Sambol | 04/21/05 | S | 03/01/05 | (5,000) | $32.24 | $161,200.00 |
| Sambol | 04/25/05 | M | | 2,769 | $9.60 | ($26,582.40) |
| Sambol | 04/25/05 | M | | (2,231) | $13.24 | $29,538.44 |
| Sambol | 04/25/05 | S | 03/01/05 | (5,000) | $32.57 | $162,850.00 |
| Sambol | 05/04/05 | M | | 5,000 | $13.24 | ($66,200.00) |
| Sambol | 05/04/05 | S | 03/01/05 | (5,000) | $35.45 | $177,250.00 |
| Sambol | 05/09/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 05/09/05 | S | 03/01/05 | (10,000) | $35.74 | $357,400.00 |
| Sambol | 05/17/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 05/17/05 | S | TBD[15] | (10,000) | $34.74 | $347,400.00 |
| Sambol | 05/24/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 05/24/05 | S | TBD[16] | (10,000) | $36.30 | $363,000.00 |

[15] Sale reported as pursuant to a trading plan established under Rule 10b5-1, but date of plan not disclosed on Form 4.

[16] Sale reported as pursuant to a trading plan established under Rule 10b5-1, but date of plan not disclosed on Form 4.

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 06/03/05 | M | | 12,400 | $13.24 | ($164,176.00) |
| Sambol | 06/03/05 | S | 03/01/05 | (12,400) | $38.19 | $473,595.68 |
| Sambol | 06/07/05 | M | | 12,400 | $13.24 | ($164,176.00) |
| Sambol | 06/07/05 | S | 03/01/05 | (12,400) | $38.86 | $481,864.00 |
| Sambol | 06/15/05 | M | | 12,400 | $13.24 | ($164,176.00) |
| Sambol | 06/15/05 | S | 03/01/05 | (12,400) | $38.84 | $481,616.00 |
| Sambol | 06/20/05 | M | | 12,400 | $13.24 | ($164,176.00) |
| Sambol | 06/20/05 | S | 03/01/05 | (12,400) | $39.08 | $484,625.48 |
| Sambol | 06/29/05 | M | | 12,400 | $13.24 | ($164,176.00) |
| Sambol | 06/29/05 | S | 03/01/05 | (12,400) | $38.48 | $477,154.48 |
| Sambol | 07/08/05 | M | | 12,400 | $13.24 | ($164,176.00) |
| Sambol | 07/08/05 | S | 03/01/05 | (12,400) | $38.90 | $482,332.72 |
| Sambol | 07/15/05 | M | | 12,400 | $13.24 | ($164,176.00) |
| Sambol | 07/15/05 | S | 03/01/05 | (12,400) | $38.53 | $477,784.40 |
| Sambol | 07/19/05 | M | | 12,400 | $13.24 | ($164,176.00) |
| Sambol | 07/19/05 | S | 03/01/05 | (12,400) | $37.41 | $463,824.48 |
| Sambol | 07/28/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 07/28/05 | S | 03/01/05 | (10,000) | $36.16 | $361,585.00 |
| Sambol | 08/03/05 | M | | 10,000 | $13.24 | ($132,400.00) |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 08/03/05 | S | 03/01/05 | (10,000) | $35.35 | $353,477.00 |
| Sambol | 08/12/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 08/12/05 | S | 03/01/05 | (10,000) | $35.16 | $351,630.00 |
| Sambol | 08/15/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 08/15/05 | S | 03/01/05 | (10,000) | $35.07 | $350,745.00 |
| Sambol | 08/25/05 | M | | 5,000 | $13.24 | ($66,200.00) |
| Sambol | 08/25/05 | S | 03/01/05 | (5,000) | $33.21 | $166,026.00 |
| Sambol | 08/30/05 | M | | 5,000 | $13.24 | ($66,200.00) |
| Sambol | 08/30/05 | S | 03/01/05 | (5,000) | $32.82 | $164,077.00 |
| Sambol | 09/08/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 09/08/05 | S | 03/01/05 | (10,000) | $34.03 | $340,258.00 |
| Sambol | 09/14/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 09/14/05 | S | 03/01/05 | (10,000) | $35.30 | $353,022.00 |
| Sambol | 09/23/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 09/23/05 | S | 03/01/05 | (10,000) | $34.04 | $340,375.00 |
| Sambol | 09/26/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 09/26/05 | S | 03/01/05 | (10,000) | $34.00 | $340,048.00 |
| Sambol | 10/06/05 | M | | 5,000 | $13.24 | ($66,200.00) |
| Sambol | 10/06/05 | S | 03/01/05 | (5,000) | $31.42 | $157,076.00 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**<u>Exercises and Sales of Insider Shares</u>**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 10/10/05 | M | | 5,000 | $13.24 | ($66,200.00) |
| Sambol | 10/10/05 | S | 03/01/05 | (5,000) | $31.09 | $155,456.00 |
| Sambol | 10/20/05 | M | | 5,000 | $13.24 | ($66,200.00) |
| Sambol | 10/20/05 | S | 03/01/05 | (5,000) | $32.03 | $160,151.00 |
| Sambol | 10/25/05 | M | | 5,000 | $13.24 | ($66,200.00) |
| Sambol | 10/25/05 | S | 03/01/05 | (5,000) | $32.02 | $160,121.00 |
| Sambol | 10/31/05 | M | | 5,000 | $13.24 | ($66,200.00) |
| Sambol | 10/31/05 | S | 03/01/05 | (5,000) | $31.86 | $159,311.00 |
| Sambol | 11/10/05 | M | | 5,000 | $13.24 | ($66,200.00) |
| Sambol | 11/10/05 | S | 03/01/05 | (5,000) | $32.35 | $161,761.00 |
| Sambol | 11/15/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 11/15/05 | S | 03/01/05 | (10,000) | $34.44 | $344,351.00 |
| Sambol | 11/21/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 11/21/05 | S | 03/01/05 | (10,000) | $35.02 | $350,226.00 |
| Sambol | 11/30/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 11/30/05 | S | 03/01/05 | (10,000) | $35.17 | $351,737.00 |
| Sambol | 12/09/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 12/09/05 | S | 03/01/05 | (10,000) | $34.84 | $348,388.00 |
| Sambol | 12/13/05 | M | | 10,000 | $13.24 | ($132,400.00) |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 12/13/05 | S | 03/01/05 | (10,000) | $34.04 | $340,351.00 |
| Sambol | 12/22/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 12/22/05 | S | 03/01/05 | (10,000) | $35.60 | $355,961.00 |
| Sambol | 12/27/05 | M | | 10,000 | $13.24 | ($132,400.00) |
| Sambol | 12/27/05 | S | 03/01/05 | (10,000) | $35.03 | $350,331.00 |
| Sambol | 01/05/06 | M | | 1,903 | $13.24 | ($25,195.72) |
| Sambol | 01/05/06 | M | | 8,097 | $10.89 | ($88,176.33) |
| Sambol | 01/05/06 | S | 03/01/05 | (10,000) | $35.63 | $356,342.00 |
| Sambol | 01/10/06 | M | | 10,000 | $10.89 | ($108,900.00) |
| Sambol | 01/10/06 | S | 03/01/05 | (10,000) | $35.37 | $353,725.00 |
| Sambol | 01/19/06 | M | | 10,000 | $10.89 | ($108,900.00) |
| Sambol | 01/19/06 | S | 03/01/05 | (10,000) | $35.27 | $352,656.00 |
| Sambol | 01/27/06 | M | | 10,000 | $10.89 | ($108,900.00) |
| Sambol | 01/27/06 | S | 03/01/05 | (10,000) | $34.28 | $342,847.00 |
| Sambol | 02/02/06 | M | | 10,000 | $10.89 | ($108,900.00) |
| Sambol | 02/02/06 | S | 03/01/05 | (10,000) | $33.13 | $331,349.00 |
| Sambol | 02/07/06 | M | | 5,000 | $10.89 | ($54,450.00) |
| Sambol | 02/07/06 | S | 03/01/05 | (5,000) | $32.30 | $161,515.00 |
| Sambol | 02/14/06 | M | | 10,000 | $10.89 | ($108,900.00) |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 02/14/06 | S | 03/01/05 | (10,000) | $33.74 | $337,380.00 |
| Sambol | 02/22/06 | M | | 10,000 | $10.89 | ($108,900.00) |
| Sambol | 02/22/06 | S | 03/01/05 | (10,000) | $34.71 | $347,091.00 |
| Sambol | 04/06/06 | M | | 14,000 | $10.89 | ($152,460.00) |
| Sambol | 04/06/06 | S | 03/21/06 | (14,000) | $37.45 | $524,336.40 |
| Sambol | 04/11/06 | M | | 14,000 | $10.89 | ($152,460.00) |
| Sambol | 04/11/06 | S | 03/21/06 | (14,000) | $36.98 | $517,687.80 |
| Sambol | 04/20/06 | M | | 14,000 | $10.89 | ($152,460.00) |
| Sambol | 04/20/06 | S | 03/21/06 | (14,000) | $37.59 | $526,258.60 |
| Sambol | 04/26/06 | M | | 4,570 | $10.89 | ($49,767.30) |
| Sambol | 04/26/06 | M | | 9,430 | $13.24 | ($124,853.20) |
| Sambol | 04/26/06 | S | 03/21/06 | (14,000) | $37.96 | $531,494.60 |
| Sambol | 05/04/06 | M | | 14,000 | $13.24 | ($185,360.00) |
| Sambol | 05/04/06 | S | 03/21/06 | (14,000) | $40.01 | $560,130.20 |
| Sambol | 05/12/06 | M | | 14,000 | $13.24 | ($185,360.00) |
| Sambol | 05/12/06 | S | 03/21/06 | (14,000) | $41.66 | $583,199.40 |
| Sambol | 05/16/06 | M | | 14,000 | $13.24 | ($185,360.00) |
| Sambol | 05/16/06 | S | 03/21/06 | (14,000) | $42.29 | $592,011.00 |
| Sambol | 05/25/06 | M | | 14,000 | $13.24 | ($185,360.00) |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 05/25/06 | S | 03/21/06 | (14,000) | $37.66 | $527,297.40 |
| Sambol | 06/01/06 | M | | 14,000 | $13.24 | ($185,360.00) |
| Sambol | 06/01/06 | S | 03/21/06 | (14,000) | $38.70 | $541,798.60 |
| Sambol | 06/02/06 | M | | 7,548 | $13.24 | ($99,935.52) |
| Sambol | 06/07/06 | M | | 14,000 | $13.24 | ($185,360.00) |
| Sambol | 06/07/06 | S | 03/21/06 | (14,000) | $37.41 | $523,707.80 |
| Sambol | 06/16/06 | M | | 14,000 | $13.24 | ($185,360.00) |
| Sambol | 06/16/06 | S | 03/21/06 | (14,000) | $36.78 | $514,896.20 |
| Sambol | 06/21/06 | M | | 14,000 | $13.24 | ($185,360.00) |
| Sambol | 06/21/06 | S | 03/21/06 | (14,000) | $37.07 | $519,019.20 |
| Sambol | 06/29/06 | M | | 14,000 | $13.24 | ($185,360.00) |
| Sambol | 06/29/06 | S | 03/21/06 | (14,000) | $37.73 | $528,199.00 |
| Sambol | 07/07/06 | M | | 14,000 | $13.24 | ($185,360.00) |
| Sambol | 07/07/06 | S | 03/21/06 | (14,000) | $38.26 | $535,649.80 |
| Sambol | 07/19/06 | M | | 9,690 | $13.24 | ($128,295.60) |
| Sambol | 07/19/06 | M | | 4,310 | $14.69 | ($63,313.90) |
| Sambol | 07/19/06 | S | 03/21/06 | (14,000) | $38.28 | $535,893.40 |
| Sambol | 07/25/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 07/25/06 | S | 03/21/06 | (14,000) | $38.72 | $542,102.40 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,**
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 08/03/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 08/03/06 | S | 03/21/06 | (14,000) | $36.52 | $511,345.80 |
| Sambol | 08/11/06 | M | | 10,000 | $14.69 | ($146,900.00) |
| Sambol | 08/11/06 | S | 03/21/06 | (10,000) | $33.19 | $331,909.00 |
| Sambol | 08/17/06 | M | | 10,000 | $14.69 | ($146,900.00) |
| Sambol | 08/17/06 | S | 03/21/06 | (10,000) | $34.46 | $344,648.00 |
| Sambol | 08/22/06 | M | | 10,000 | $14.69 | ($146,900.00) |
| Sambol | 08/22/06 | S | 03/21/06 | (10,000) | $33.51 | $335,087.00 |
| Sambol | 08/31/06 | M | | 10,000 | $14.69 | ($146,900.00) |
| Sambol | 08/31/06 | S | 03/21/06 | (10,000) | $33.70 | $337,001.00 |
| Sambol | 09/06/06 | M | | 10,000 | $14.69 | ($146,900.00) |
| Sambol | 09/06/06 | S | 03/21/06 | (10,000) | $34.43 | $344,257.00 |
| Sambol | 09/12/06 | M | | 10,000 | $14.69 | ($146,900.00) |
| Sambol | 09/12/06 | S | 03/21/06 | (10,000) | $34.48 | $344,835.00 |
| Sambol | 09/22/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 09/22/06 | S | 03/21/06 | (14,000) | $35.02 | $490,301.00 |
| Sambol | 09/28/06 | M | | 10,000 | $14.69 | ($146,900.00) |
| Sambol | 09/28/06 | S | 03/21/06 | (10,000) | $34.86 | $348,611.00 |
| Sambol | 10/04/06 | M | | 14,000 | $14.69 | ($205,660.00) |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,*
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 10/04/06 | S | 03/21/06 | (14,000) | $35.55 | $497,665.00 |
| Sambol | 10/12/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 10/12/06 | S | 03/21/06 | (14,000) | $36.30 | $508,139.80 |
| Sambol | 10/20/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 10/20/06 | S | 03/21/06 | (14,000) | $35.09 | $491,262.80 |
| Sambol | 10/25/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 10/25/06 | S | 03/21/06 | (14,000) | $38.40 | $537,637.80 |
| Sambol | 11/03/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 11/03/06 | S | 03/21/06 | (14,000) | $38.05 | $532,687.40 |
| Sambol | 11/09/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 11/09/06 | S | 03/21/06 | (14,000) | $38.80 | $543,198.60 |
| Sambol | 11/16/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 11/16/06 | S | 03/21/06 | (14,000) | $40.62 | $568,674.40 |
| Sambol | 11/21/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 11/21/06 | S | 03/21/06 | (14,000) | $39.81 | $557,401.60 |
| Sambol | 11/29/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 11/29/06 | S | 03/21/06 | (14,000) | $39.89 | $558,458.60 |
| Sambol | 12/07/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 12/07/06 | S | 03/21/06 | (14,000) | $41.54 | $581,527.80 |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 12/13/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 12/13/06 | S | 03/21/06 | (14,000) | $40.43 | $566,077.40 |
| Sambol | 12/18/06 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 12/18/06 | S | 03/21/06 | (14,000) | $41.51 | $581,131.60 |
| Sambol | 12/28/06 | M | | 14,000 | $14.69 | ($205,713.20) |
| Sambol | 12/28/06 | S | 03/21/06 | (14,000) | $42.85 | $599,866.40 |
| Sambol | 01/05/07 | M | | 14,000 | $14.69 | ($205,713.20) |
| Sambol | 01/05/07 | S | 03/21/06 | (14,000) | $42.42 | $593,833.80 |
| Sambol | 01/10/07 | M | | 14,000 | $14.69 | ($205,713.20) |
| Sambol | 01/10/07 | S | 03/21/06 | (14,000) | $42.10 | $589,419.60 |
| Sambol | 01/16/07 | M | | 14,000 | $14.69 | ($205,713.20) |
| Sambol | 01/16/07 | S | 03/21/06 | (14,000) | $41.47 | $580,610.80 |
| Sambol | 01/25/07 | M | | 14,000 | $14.69 | ($205,713.20) |
| Sambol | 01/25/07 | S | 03/21/06 | (14,000) | $40.70 | $569,849.00 |
| Sambol | 01/31/07 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 01/31/07 | S | 03/21/06 | (14,000) | $43.20 | $604,731.40 |
| Sambol | 02/08/07 | M | | 14,000 | $14.69 | ($205,660.00) |
| Sambol | 02/08/07 | S | 03/21/06 | (14,000) | $43.62 | $610,703.80 |
| Sambol | 02/13/07 | M | | 2,690 | $14.69 | ($39,516.10) |

***State Treasurer of the State of Mich. v. Countrywide Fin. Corp.,***
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 02/13/07 | M | | 11,310 | $18.98 | ($214,663.80) |
| Sambol | 02/13/07 | S | 03/21/06 | (14,000) | $41.34 | $578,814.60 |
| Sambol | 02/22/07 | M | | 14,000 | $18.98 | ($265,720.00) |
| Sambol | 02/22/07 | S | 03/21/06 | (14,000) | $40.33 | $564,575.20 |
| Sambol | 02/27/07 | M | | 13,500 | $18.98 | ($256,230.00) |
| Sambol | 02/27/07 | S | 03/21/06 | (13,500) | $37.86 | $511,115.40 |
| Sambol | 03/07/07 | M | | 14,000 | $18.98 | ($265,720.00) |
| Sambol | 03/07/07 | S | 03/21/06 | (14,000) | $37.08 | $519,082.20 |
| Sambol | 03/15/07 | M | | 14,000 | $18.98 | ($265,720.00) |
| Sambol | 03/15/07 | S | 03/21/06 | (14,000) | $35.51 | $497,207.20 |
| Sambol | 03/21/07 | M | | 14,000 | $18.98 | ($265,720.00) |
| Sambol | 03/21/07 | S | 03/21/06 | (14,000) | $35.93 | $502,957.00 |
| Sambol | 06/06/07 | M | | 6,375 | $13.24 | ($84,405.00) |
| Sambol | 06/06/07 | S | 05/20/07 | (6,375) | $38.99 | $248,570.81 |
| Sambol | 06/14/07 | M | | 6,375 | $13.24 | ($84,405.00) |
| Sambol | 06/14/07 | S | 05/20/07 | (6,375) | $37.79 | $240,882.56 |
| Sambol | 06/19/07 | M | | 6,375 | $13.24 | ($84,405.00) |
| Sambol | 06/19/07 | S | 05/20/07 | (6,375) | $38.45 | $245,127.04 |
| Sambol | 06/27/07 | M | | 4,250 | $13.24 | ($56,270.00) |

*State Treasurer of the State of Mich. v. Countrywide Fin. Corp.*,
**No. 2:11-cv-00809-MRP -MAN (C.D. Cal.)**
**Exhibit B to Amended Complaint**
**Exercises and Sales of Insider Shares**

| Insider | Date | Code | Per Trading Plan Dated | Shares | Price | (Cost)/ Proceeds |
|---|---|---|---|---|---|---|
| Sambol | 06/27/07 | S | 05/20/07 | (4,250) | $35.96 | $152,812.58 |
| Sambol | 07/03/07 | M | | 4,250 | $13.24 | ($56,270.00) |
| Sambol | 07/03/07 | S | 05/20/07 | (4,250) | $37.02 | $157,329.90 |
| Sambol | 07/13/07 | M | | 4,250 | $13.24 | ($56,270.00) |
| Sambol | 07/13/07 | S | 05/20/07 | (4,250) | $36.50 | $155,131.38 |
| Sambol | 07/19/07 | M | | 4,250 | $13.24 | ($56,270.00) |
| Sambol | 07/19/07 | S | 05/20/07 | (4,250) | $35.26 | $149,855.00 |
| **Total Sold:** | | | | **(1,461,195)** | | |
| **Gross Proceeds:** | | | | | | **$58,549,648.30** |