**DLA PIPER LLP (US)**
SHIRLI FABBRI WEISS (Bar No. 079225)
shirli.weiss@dlapiper.com
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel: (619) 699-2700 | Fax: (619) 699-2701

NICOLAS MORGAN (Bar No. 166441)
nicolas.morgan@dlapiper.com
1999 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-6022
Tel: (310) 595-3000 | Fax: (310) 595-3300

DAVID PRIEBE (Bar No. 148679)
david.priebe@dlapiper.com
RAJIV DHARNIDHARKA (Bar No. 234756)
rajiv.dharnidharka@dlapiper.com
2000 University Avenue
East Palo Alto, CA 94303-2248
Tel: (650) 833-2000 | Fax: (650) 833-2001

Attorneys for Defendant ERIC P. SIERACKI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

STATE TREASURER OF THE STATE OF MICHIGAN,

*Plaintiff,*

v.

COUNTRYWIDE FINANCIAL CORPORATION *et al.*,

*Defendants.*

No. CV 11-0809-MRP (MANx)

**DEFENDANT ERIC P. SIERACKI'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT**

Date: August 8, 2011
Time: 11 a.m.
Courtroom: 12
Judge: Hon. Mariana R. Pfaelzer

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on August 8, 2011, at 11 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Mariana R. Pfaelzer, United States District Judge, 312 North Spring Street, Los Angeles, California, Eric P. Sieracki will and hereby does move for an order dismissing all claims against him alleged in Plaintiff's Amended Complaint (the "Complaint" or "AC").

Mr. Sieracki moves to dismiss by joining in the motions and grounds for dismissal in the separate motions filed by Countrywide Financial Corporation and the other defendants. Mr. Sieracki also moves on the basis that the Complaint fails to plead scienter as to him, as set forth separately herein.

Pursuant to Local Rule 7-3, counsel for Defendant discussed this motion with counsel for Plaintiff on April 29, in the course of a discussion involving all Defendants. Plaintiff indicated that it would oppose the motion.

This motion is made based on this Notice of Motion; the accompanying Memorandum of Points and Authorities, *infra*; the accompanying Request For Judicial Notice, which includes the Declaration of David Priebe and Exhibits A through O thereto; all papers, pleadings, documents, arguments of counsel, and other materials presented before or during the hearing on this motion; and any other evidence and argument the Court may consider.

Respectfully submitted,

May 6, 2011

DLA PIPER LLP (US)

By: /s/ David Priebe
Attorneys for Defendant ERIC P. SIERACKI

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. PERTINENT ALLEGATIONS ..... 2

III. THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ON THE PART OF MR. SIERACKI ..... 3

- A. Mr. Sieracki's Stock Purchases Negate Any Inference Of Scienter ..... 4
- B. The Public Disclosures Referenced In The Complaint Further Negate Scienter (As Well As Falsity And Loss Causation) ..... 6
  1. The December 7, 2006 Memorandum ..... 6
  2. The Voluntary Monthly Operational Reports ..... 8
  3. Pay Option ARMs ..... 9
  4. June 28, 2005 CCRC Meeting ..... 12
- C. The Complaint Alleges No Specific Facts Supporting Scienter Against Mr. Sieracki ..... 13
  1. The Accounting Decisions Challenged By Plaintiff Inherently Involved Matters Of Judgment ..... 14
  2. The Sarbanes-Oxley Certifications Of Internal Controls Over Financial Reporting Do Not Plead Scienter ..... 16
  3. Mr. Mozilo's March-April 2006 E-Mails Regarding HSBC And Subprime Second Loans Do Not Plead Scienter ..... 17
  4. The March 12, 2007 CCRC Minutes Do Not Plead Scienter ..... 19
  5. The Interagency Guidance Allegations Do Not Plead Scienter ..... 19

IV. THE COMPLAINT DOES NOT PLEAD FALSITY OR SCIENTER BASED ON OTHER ORAL STATEMENTS OR PRESS RELEASES ..... 21

- A. The Data Allegedly Provided On The July 26, 2005 Conference Call Is Not Alleged To Be False ..... 21
- B. The Complaint Relies On Its Unsupported Spin Of A Question And Answer At A September 13, 2006 Investor Forum ..... 21
- C. The Alleged Liquidity Statements At The March 6, 2007 Raymond James Conference Are Nonactionable ..... 22
- D. The August 2, 2007 Liquidity Press Release and August 9 10-Q Are Not Alleged To Be False ..... 23
- E. The Statements On The October 26, 2007 Conference Call Are Not Alleged To Be False ..... 25

V. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

## CASES

*Belmont Holdings Corp. v. SunTrust Banks, Inc.*,
No. 1:09-cv-1185-WSD, 2010 3545389 (N.D. Ga. Sept. 10, 2010) .................. 15

*City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Waters Corp.*,
632 F.3d 751 (1st Cir. 2011) ........................................................ 19-20

*Cooperman v. Individual, Inc.*,
No. Civ. A. 96-12272-DPW, 1998 WL 953726 (D. Mass. May 27, 1998), *aff'd*, 171 F.3d 43 (1st Cir. 1999) .......................................................... 11

*Data Probe Acquisition Corp. v. Datalab, Inc.*,
722 F.2d 1 (2d Cir. 1983) ............................................................ 11

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ......................................................... 15

*First National Bank v. Bellotti*,
435 U.S. 765 (1978) ................................................................... 11

*First Nationwide Bank v. Gelt Funding Corp.*,
820 F. Supp. 89 (S.D.N.Y. 1993), *aff'd*, 27 F.3d 763 (2d Cir. 1994) ................. 14

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ........................................................... 8

*Hill v. Gozani*,
No. 0-1048, ___ F.3d ___, 2011 WL 924242 (1st Cir. Mar. 18, 2011) ............. 10

*In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*,
No. 08 Civ. 11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ........ 12

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................. 5

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ......................................................... 22

*In re First Marblehead Corp. Sec. Litig.*,
639 F. Supp. 2d 145 (D. Mass. 2009) ................................................. 6

*In re Foundry Networks, Inc. Sec. Litig.*,
No. C-00-4823-MMC, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) ........... 15

*In re HomeBanc Corp. Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010) ........................................ 5

*In re Hutchinson Tech., Inc. Sec. Litig.*,
536 F.3d 952 (8th Cir. 2008) ........................................ 14, 22

*In re Invision Technologies, Inc. Sec. Litig.*,
No. C 04-03181 MJJ, 2006 WL 538752 (N.D. Cal. Feb. 22, 2006) .................. 17

*In re Kulicke & Soffa Indus., Inc. Sec. Litig.*,
697 F. Supp. 183 (E.D. Pa. 1988) ........................................ 11

*In re Lukens Inc. Shareholders Litig.*,
757 A.2d 720 (Del. Ch. 1999) ........................................ 12

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ........................................ 3, 7

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996) ........................................ 18-19

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ........................................ 15

*In re Verifone Sec Litig.*,
11 F.3d 865 (9th Cir. 1993) ........................................ 12, 13

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ........................................ 6

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ........................................ 5, 6

*Lapiner v. Camtek, Ltd.*,
No. C 08-01327 MMC, 2011 WL 445849 (N.D. Cal. Feb. 2, 2011) ................... 5

*Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth Third Bancorp*,
731 F. Supp. 2d 689 (S.D. Ohio. 2010) ........................................ 6, 15

*Oxford Asset Mgt, Ltd. v. Jaharis*,
297 F.3d 1182 (11th Cir. 2002) .......... 6

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010) .......... 5

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .......... 18

*Rubke v. Capital Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) .......... 3

*SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*,
No. 09 Civ. 5064 (RMB), 2010 WL 2473595 (S.D.N.Y. June 17, 2010) .......... 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .......... 3

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) .......... 18

*Tuchman v. DSC Comm'ns Corp.*,
14 F.3d 1061 (5th Cir. 1994) .......... 9

*Waterford Township General Employees Retirement Sys. v. Suntrust Banks, Inc.*,
No. 1:09-CV-617-TWT, 2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) .......... 14

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......... 11, 16

## STATUTES

15 U.S.C. § 78u-4(b)(1) .......... 7

15 U.S.C. § 78u-4(b)(2) .......... *passim*

## RULES

SEC Rule 13a-15(f), 17 C.F.R. § 240.13a-15(f) .......... 16-17

SEC Rule 15d-15(f), 17 C.F.R. § 240.15d-15(f) .......... 16-1

## COUNTRYWIDE FINANCIAL CORPORATION SEC FILINGS

Report On Form 8-K filed October 27, 2005 (attaching press release announcing unaudited financial results for Third Quarter 2005) ................. 10

Form 10-K for Fiscal Year 2005 filed March 1, 2006 ............................................. 9

Form 10-Q for First Quarter 2006 filed May 9, 2006 ........................................... 15

Report On Form 8-K filed July 25, 2006 (attaching press release announcing unaudited financial results for Second Quarter 2006) ................................. 10

Report On Form 8-K filed January 30, 2007 (attaching press release announcing unaudited financial results for Fourth Quarter 2006) ........... 7, 10

Form 10-K for Fiscal Year 2006 filed March 1, 2007 .............................. 7, 8, 10, 15

Report On Form 8-K filed March 12, 2007 (attaching press release announcing monthly operations report for February 2007) ......................... 19

Report On Form 8-K filed April 26, 2007 (attaching press release announcing unaudited financial results for First Quarter 2007) .................................. 7, 10

Form 10-Q For Second Quarter 2007 filed August 9, 2007.............................. 24, 25

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Eric Sieracki ("Sieracki") joins in the motions to dismiss Plaintiff's Amended Complaint ("AC") filed by Countrywide Financial Corporation ("Countrywide" or "CFC") and the other individual defendants. As those motions demonstrate, the complaint should be dismissed for failure to plead falsity and loss causation, and because several of its claims are untimely.

Sieracki moves and writes separately to show that the complaint does not allege specific facts giving rise to a strong inference of scienter against him. To the contrary, judicially noticeable facts negate any inference of scienter. These judicially noticeable facts start with his stock purchases and lack of stock sales. Sieracki never sold a share of stock during the period in which he served as CFC's Chief Financial Officer and signed its periodic SEC filings. Instead, he purchased and held stock during the time period that Plaintiff alleges that he purportedly was making false statements to artificially inflate its value. By purchasing and holding, Sieracki suffered a multimillion dollar loss in value. As a matter of common sense, it is not reasonable to infer that Sieracki would have engaged in these consistent purchases-without-sales when and if he had known but was concealing the truth about Countrywide's inevitable demise as Plaintiff alleges. Such behavior would have been irrational. *See* Section III(A), *infra*.

The complaint offers nothing to outweigh the common sense conclusion that Sieracki's stock purchases and lack of sales negate scienter. To the contrary, the complaint itself supplies additional facts weighing against an inference of scienter: it references the public disclosures made by Countrywide and its management—including voluntary disclosures beyond the requirements of law. These public statements disclosed the very risks and adverse conditions referenced in the internal documents that the complaint cites (and often distorts) in a futile attempt to plead scienter. These disclosures are inconsistent with an inference that Sieracki intended

to conceal, and hence negate scienter. Indeed, these disclosures—which are undisputedly appropriate for judicial notice and do not require the Court to resolve factual issues—do much more. They show that Plaintiff's story that Countrywide originated loans that Plaintiff deems risky and then concealed the risks and consequences of the loans until the entire mortgage market started to collapse in July 2007 is fundamentally and demonstrably false. *See* Section III(B), *infra*.

Compounding the complaint's allegations that weigh against scienter and the judicially noticeable facts that do the same is the added fact that the accounting decisions Plaintiff challenges inherently involved matters of judgment, not clear-cut rules. Moreover, the complaint erroneously distorts the phrase "internal controls over financial reporting" into a blanket guarantee of fitness thrown over all aspects of a public company's operations. *See* Section III(C), *infra*. Considered as a whole and with the judicially noticed record, the complaint's allegations fail to plead a strong inference of scienter. The complaint also challenges oral statements made by Sieracki that are classic puffing or otherwise too vague to form a basis for fraud allegations and hence are non-actionable as a matter of law (such as a statement that Countrywide was a "well-conditioned athlete"), or that are not alleged to have been false. Similar deficiencies apply to challenged oral statements and a press release regarding liquidity. *See* Section IV, *infra*.

## II. PERTINENT ALLEGATIONS

Sieracki became the Chief Financial Officer of Countrywide in April 2005 and served in that position until the merger with Bank of America in July 2008. AC ¶ 36. As CFO, Sieracki was responsible for overseeing CFC's financial departments, including corporate accounting, treasury, financial planning, strategic planning and taxation. As CFO, Sieracki also was one of the people who signed some of the periodic SEC filings that the complaint alleges were false and misleading, starting in April 2005. The complaint does not allege that Sieracki signed SEC filings or made any statements prior to that month and year.

The complaint also challenges statements allegedly made by Sieracki at four investor conferences between July 26, 2005 and October 26, 2007; and a August 2, 2007 press release quoting Sieracki regarding liquidity. *See* Section IV, *infra*.

## III. THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ON THE PART OF MR. SIERACKI

Plaintiff's Section 10(b) claim requires it to plead and prove scienter. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999). Plaintiff must plead particular facts showing a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). This entails the pleading of specific facts which give rise to an inference that is "powerful or cogent" and "cogent and compelling." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-324 (2007). Specific facts must be pleaded on an individualized, defendant-by-defendant basis; that is, must be based on facts showing what that person, not someone else, knew. *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009) (allegations about a non-employee director who allegedly made false statements to shareholders did not plead that "*the defendants* in this case had the requisite mental state.") (emphasis in original). Even if the allegations of a complaint suggest a powerful, cogent and compelling inference of scienter required by *Tellabs* (which is not the case here), if there are also anti-scienter inferences that may be derived from the complaint and from matters of judicial notice, the inference of scienter must be at least as compelling as the anti-scienter inference. *Tellabs*, 551 U.S. at 325.

Applying these standards, the judicially noticeable record shows that in the same time frame that Sieracki supposedly was deceiving investors about Countrywide's financial results and loan origination standards, Sieracki <u>purchased</u> Countrywide stock and <u>held</u> onto those shares and his other holdings—which eventually resulted in a considerable loss to him. No person who believed that Countrywide's public statements were false or that its prospects were bleak would have engaged in Sieracki's purchase and hold behavior. The Complaint also refers

to public disclosures by Countrywide and its management (including Sieracki) of the very risks and industry conditions that Plaintiff alleges were concealed, including risks and conditions referenced by the internal documents cited in the complaint. In contrast to these facts weighing against an inference of scienter, the Complaint does not allege any specific facts known to Sieracki at the time he made a public statement that contradicted his statement.

**A. <u>Mr. Sieracki's Stock Purchases Negate Any Inference Of Scienter</u>**

Sieracki served as Countrywide's CFO for over four years, from April 2005 until July 2008. He never sold a share of Countrywide stock during this period, which incorporates the period in which he allegedly made false statements. Rather, Sieracki purchased stock during this period, and hence experienced a significant loss along with all other shareholders as Countrywide's fortunes declined.[1] On May 26, 2005, Sieracki acquired 31,062 shares by exercise of options, shares which he did not sell at the then-current closing market price of $36.65 / share or at any time in the period at issue. By retaining rather than selling these shares, Sieracki chose to forego a profit of $1,139,751. On July 11, 2006, Sieracki paid cash to exercise options and acquire 60,000 shares, which he did not sell at the then-current closing market price of $38.08 / share or at any time in the period at issue. By retaining rather than selling these shares, Sieracki chose to forego a profit of $1,936,800. On May 31, 2007, Sieracki acquired 13,806 shares by the exercise of options, which he did not sell at the then-current closing market price of $38.94 / share or at any time in the period at issue. By retaining rather than selling these shares, Sieracki chose to forego a profit of $441,139. All in all, Sieracki suffered a loss in value of nearly $20 million by not selling his holdings on the date of his last stock purchase-without-sale, and retaining his holdings until Countrywide was

---

[1] The stock purchase and holdings information in this section was reported on Forms 4 and a proxy statement filed with the SEC. They are attached as Exhibits A through D to the Declaration of David Priebe.

acquired at $4.25 per share and ceased to be an independent company.

Common sense tells us that fraud cannot plausibly be attributed to a person who purchases and holds during the time he supposedly is misleading investors and is supposedly aware that the stock in which he is investing is artificially inflated. The only reasonable inference to be drawn from Sieracki's purchase-and-hold pattern is that he believed that Countrywide's disclosures, which would have been reflected in the price of the stock he was consistently buying, did not understate its risk or inflate its prospects. Courts consistently have agreed that retaining stock holdings weighs against any inference of scienter. In *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407 (9th Cir. 1994), the court granted summary judgment for defendants on §10(b) claims against company officers and others, paying special heed to the pattern of net stock holding that rebutted any inference of scienter. As the court reasoned: "if, as Plaintiffs allege, the Officers knew that WOW was heading for financial disaster, they probably would have bailed out of their substantial holdings. Each of the Officer Defendants, by contrast, held onto most of their WOW stock and incurred the same large losses as did the Plaintiffs themselves." *Id.* at 1424-25. As another court reasoned in dismissing a securities fraud complaint, where an individual defendant increases his or her holdings during the class period, this is "a fact wholly inconsistent with fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).[2]

---

[2] Numerous cases recognize that a lack of stock sales during the time of the alleged fraud is inconsistent with scienter. *See Lapiner v. Camtek, Ltd.,* No. C 08-01327 MMC, 2011 WL 445849, *8, *10 (N.D. Cal. Feb. 2, 2011) (no scienter because CFO during much of the relevant period did not sell any stock; dismissing complaint); *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1359 (N.D. Ga. 2010) ("Here, Defendants retained their stock even as the price of HomeBanc's stock collapsed during the class period. It is counterintuitive to think that one would fraudulently inflate a stock price without a concomitant intent to sell the stock at an artificially high price."); *accord*, *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("It is nonsensical to impute dishonest motives to the Individual Defendants when each of them suffered significant losses in their stock holdings

### B. The Public Disclosures Referenced In The Complaint Further Negate Scienter (As Well As Falsity And Loss Causation)

Also counseling against an inference of scienter are the public disclosures contained in documents that are referenced in the complaint and hence are amendable to judicial notice. *See Worlds of Wonder*, 35 F.3d at 1425 (if a company's "officers were bent on committing fraud, it is not likely that they would have provided such detailed risk disclosure.").[3] In this motion, we call attention to just some of the disclosures that are inconsistent with scienter. We concentrate on the disclosures of the risks and challenges that the complaint alleges were mentioned in internal e-mails or memoranda sent to Sieracki. These disclosures put the lie to Plaintiff's assertions that Sieracki intended to and did conceal the general expansion of loan standards, challenging conditions in the loan industry, and the adverse effects of these factors, until the "truth" about these matters was supposedly suddenly first revealed in July 2007. As such, the disclosures negate not only scienter, but also falsity and loss causation.

#### 1. The December 7, 2006 Memorandum

A telling example of how Countrywide's public disclosures undermine the complaint's assertions of scienter concerns an alleged December 7, 2006 internal memorandum from Angelo Mozilo (Countrywide's CEO) and John McMurray (its Chief Risk Officer). AC ¶ 692. The alleged text of the memorandum mentions subprime loans, noting the relatively poor performance of loans that had been

---

and executive compensation.").

[3] *See also Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 727 (S.D. Ohio. 2010) ("Also cutting strongly against a finding of scienter is the fact that much of the information Plaintiffs claim was concealed was actually reported."); *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155-56, 163 (D. Mass. 2009) (detailed disclosures in securitization prospectuses "negate any inference of scienter."); *Oxford Asset Mgt, Ltd. v. Jaharis*, 297 F.3d 1182, 1193 (11th Cir. 2002) (claim that company misrepresented safety of drug negated by the "candid statements" about patient adverse reactions in prospectus); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1164-65 (C.D. Cal. 2007) (risk disclosures negate scienter).

originated in 2006. Plaintiff spins the memorandum as an internal communication that an undisclosed expansion in (subprime) loan standards had occurred and had led to adverse consequences for delinquencies and defaults.[4]

The judicially noticeable record demonstrates otherwise. The complaint admits that Countrywide held quarterly investor conference calls after reporting unaudited financial results. The next call after the December 7 memorandum was on January 30, 2007. AC ¶ 499. Earlier that day, Countrywide issued a press release (which was attached to an 8-K and hence is amenable to judicial notice) which warned that Countrywide was "preparing for increased borrower delinquencies and continued credit deterioration" and that the industry "will experience…increased defaults and foreclosures…" Priebe Decl. Ex. K (emphasis added). On the call, in response to a question whether Countrywide's guidance for 2007 "reflect your expectations for increased delinquencies and continued credit deterioration," Sieracki said that it did: "…we also expect this loan season…that delinquencies will go up. And so that's typically baked into our probability models as well." Another officer, COO David Sambol, disclosed that "a liberal credit environment over the last several years all of which is now–as rates are going up, as credit is tightening, is going to contribute in our view to continued pressure on delinquencies and defaults and associated credit risk." Priebe Decl. Ex. L (transcript of call) at 27, 28 (emphasis added).

The next periodic SEC filing (the 2006 10-K, attached as Priebe Decl. Ex. M) expanded on these points. Most notably, it explicitly disclosed the point about 2006 vintage subprime loans referenced in the alleged December 7 memorandum: "In 2007, we have observed a decline in credit performance (as adjusted for age) in

[4] The complaint asserts that the memorandum discussed HELOCs. However, the text from the memorandum does not mention HELOCs and the complaint does not plead any fact supporting an assertion that the memorandum concerned HELOCs. *See* 15 U.S.C. § 78u-4(b)(1) (complaint must plead all facts underlying allegations of falsity); *Silicon Graphics*, 183 F.3d at 985 (unsupported assertions about alleged internal documents insufficient).

the non-prime loans we produced, especially those funded in 2006." *Id.* at 126. It also noted that "changing borrower profiles and higher combined loan-to-value ratios contributed to the increased nonprime delinquency" in Countrywide's large loan servicing portfolio. *Id.* at 114. And it disclosed that the increased delinquencies and defaults already had led to an increase in loan loss reserves for the portfolio of loans held at Countrywide Bank, and that these adverse conditions would continue in the future: "The increase in our nonperforming assets and the increase in the allowance for loan losses reflect prevailing real estate market and economic conditions and the seasoning of our investment loan portfolio. We expect the level of nonperforming assets and credit losses to increase, both in absolute terms and as a percentage of our loan portfolio as our loan portfolio seasons and as current market conditions develop." *Id.* at 108.

Thus, management (including Sieracki) publicly disclosed the matters mentioned in the alleged December 7 memorandum—explicitly including the performance of vintage 2006 subprime loans.

**2. <u>The Voluntary Monthly Operational Reports</u>**

The Complaint references another means by which Countrywide publicly disclosed the risk characteristics of the loans it originated during Sieracki's tenure as CFO. Countrywide disclosed operational results every month in a press release that also was an exhibit to an 8-K filed on EDGAR. The Complaint acknowledges that observers paid attention to this monthly disclosure: it cites an August 15, 2007 Los Angeles Times article that commented on the operations report for July 2007 and noted that Countrywide had been providing this type of detailed information since 2002. AC ¶ 585. Of course, these monthly disclosures were voluntary: the federal securities laws require disclosure only on a quarterly basis. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007).

A sample of these reports shows that they reported loan origination for the previous month by several categories, including nonprime loans, pay option ARMs,

home equity loans, and adjustable-rate loans. Priebe Decl. Exs. E-G. Thanks to these voluntary disclosures, investors could assess for themselves, in close to real time, the type of loans Countrywide was originating—including those types that Plaintiff alleges were riskier—and any trend in those originations. No company that was intent on hiding the risk characteristics of the loans it made would have chosen to report this information three times more frequently than was required by law. The monthly operations reports strike a devastating blow against Plaintiff's assertions of scienter.

**3. <u>Pay Option ARMs</u>**

The complaint alleges that Mr. Mozilo sent two internal e-mails in May 2006 raising questions regarding a type of loan called "pay option ARMs." AC ¶ 679. It also alleges that in a third e-mail dated September 26, 2006, Mr. Mozilo opined that Countrywide was "flying blind" about the pay option ARMs in the Bank's portfolio to some extent due to the lack of historical experience with the product in a (potential) time of economic stress. *Id.* ¶ 685.

Countrywide's public disclosures dispel any inference of scienter regarding pay option ARMs. Its 10-Ks disclosed the very matter about which Mr. Mozilo had expressed concern: lack of historical experience with pay option ARMs. The 10-Ks for Fiscal Years 2005 and 2006 disclosed that "due to the lack of significant historical experience at Countrywide, the credit performance of these loans has not been established for the Company." *See* 2005 10-K (Priebe Decl. Ex. I) at F-36; 2006 10-K at 107. One district court already has held that as a matter of law, the latter public disclosure refutes any argument that Mr. Mozilo's "flying blind" e-mail was concealed from investors. *SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, No. 09 Civ. 5064 (RMB), 2010 WL 2473595, **8-10 (S.D.N.Y. June 17, 2010). This decision is well reasoned and correct. The securities laws do not require corporations to use particular adjectives or words that may be urged by plaintiffs. *Tuchman v. DSC Comm'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994).

Apart from these disclosures, the 10-K filed after these e-mails stated, referencing pay option ARMs: "While we believe that we have prudently underwritten these loans, such loans present additional risks." 2006 10-K at 106 (emphasis added). The 10-K then presented a slew of additional risks, including that pay option ARMs were different than "traditional" loans in that they allowed borrowers to pay less than full interest payments in the early periods of a loan's life; and that they presented risks of negative amortization, reset, payment shock, and an increased risk of loss in the event of default. *Id.* at 106-107. It also disclosed the outstanding loan balance, amount of accumulated negative amortization, and 90-day delinquencies for the Bank's pay option portfolio. This data showed that negative amortization and delinquency rates had increased since 2004. *Id* at 64.

Countrywide's qualification for its support of pay option ARMs as a "belief," followed immediately by fulsome risk disclosures, constitute disclosure choices inconsistent with scienter. *Hill v. Gozani*, No. 0-1048, ___ F.3d ___, 2011 WL 924242, *7 (1st Cir. Mar. 18, 2011) (affirming dismissal where company's positive statements about reimbursement were not only characterized as "belief," but were immediately followed by cautionary language). Moreover, the 2006 10-K was not the first instance in which Countrywide had disclosed data showed increasing accumulated negative amortization for pay option ARM borrowers—conditions Plaintiff alleges that Sieracki intended to conceal. This data was disclosed in the quarterly financial result press releases referenced in the complaint, as well as in other SEC filings, throughout Sieracki's tenure as CFO.[5]

[5] The press release announcing Third Quarter 2005 results stated that the Bank's portfolio included $22 billion in pay option loans, and disclosed the principal amount of pay option loans with negative amortization ($7.9 billion) and the amount of the accumulated negative amortization ($25.5 million). *See* press release dated Oct. 27, 2005 at 9 (Priebe Decl. Ex. H). The same metrics were disclosed in the July 25, 2006 press release announcing Second Quarter 2006 results; the January 30, 2007 press release announcing Fourth Quarter 2006 results; and the April 26, 2007 press release announcing First Quarter 2007 results.

Hence, Countrywide's public disclosures vitiate the complaint's reliance on Mr. Mozilo's e-mails regarding pay option ARMs to plead scienter against Sieracki. The nature of these communications buttresses this point. Courts recognize that in any large organization, there will be a spectrum of opinions. *First National Bank v. Bellotti*, 435 U.S. 765, 785 n.22 (1978) ("Corporations, like individuals or groups, are not homogeneous," and do not have a monolithic view). The existence of a spectrum of opinions about pay option ARMs or any other product, vigorously expressed within a company, is a sign of a healthy organization, not securities fraud. Hence, it is not securities fraud for there to be differences of opinion in a company and for the company not to publish the most negative opinion. Thus, in *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981 (9th Cir. 2009), where a complaint alleged that management openly questioned the formulae used by the company's internal accounting system to account for software development costs, the court reasoned that this established at best disagreement and questioning within the company about the system, not that the auditors had counseled against using the system or that management admitted that its use of the system was wrong. Such disagreement was "far from the deliberate, conscious recklessness required for a strong inference of scienter…" *Id*. at 999.[6]

Indeed, the complaint does not allege that <u>anyone</u> determined that the issues

---

6 *See also Data Probe Acquisition Corp. v. Datalab, Inc.*, 722 F.2d 1, 5 (2d Cir. 1983) (reversing judgment predicated upon the erroneous assumption that "boards of directors have monolithic viewpoints," all of which must be disclosed); *In re Kulicke & Soffa Indus., Inc. Sec. Litig*., 697 F. Supp. 183, 188 (E.D. Pa. 1988) (dismissing fraud claim asserting that a company made optimistic statements, even though one officer had expressed concerns that the company's business would suffer a downturn); *Cooperman v. Individual, Inc*., No. Civ. A. 96-12272-DPW, 1998 WL 953726, *10 (D. Mass. May 27, 1998) (no duty to disclose dispute between CEO\director and other directors over future direction of company, "because reasonable investors anticipate the possibility of such disputes and therefore understand that descriptions of 'the Company's' objectives do not always-indeed, rarely-reflect the unanimous opinion of the board of directors."), *aff'd*, 171 F.3d 43, 52 (1st Cir. 1999).

raised by Mr. Mozilo's e-mails warranted selling the pay option ARMs in the Bank's portfolio, which Countrywide's next 10-K explained continued to be held (with insurance). Plaintiff's claim thus devolves to an assertion that Countrywide was required to disclose that someone had asked about a course of action that the company had decided not to take. Such a duty is foreign to the securities laws. Indeed, imposing such a duty would remove any limits to the duty to disclose, as every company's management vets opinions and as every company faces business choices every day and hence makes decisions not to undertake some courses of action. *See In re Verifone Sec Litig.*, 11 F.3d 865, 869 (9th Cir. 1993) (no duty to disclose alternative internal forecasts); *accord, In re Lukens Inc. Shareholders Litig.*, 757 A.2d 720, 736 (Del. Ch. 1999) ("requiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless.").

### 4. June 28, 2005 CCRC Meeting

The allegation that someone opined at the June 28, 2005 meeting of the Corporate Credit Risk Committee that Countrywide was "taking too much balance sheet risk" for certain subcategories of loans (AC ¶ 677) provides another example of how Countrywide's public disclosures undermine the assertions of scienter.

Countrywide's periodic filings disclosed the risk on its balance sheet, like all elements of its financial statements, in each and every quarter. Hence, investors could assess for themselves whether risk was too high, too low, or something in between; nothing was or could have been misrepresented or concealed. *Accord, In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, *14 (S.D.N.Y. Dec. 14, 2009) (while complaint complained that bank never described its lack of internal controls over lending, "that omission is irrelevant once [its] actual exposure to its lending counterparties

was disclosed to the market.").[7] As a matter of law, Countrywide had no duty to further disclose its internal assessments of the "proper" level of balance sheet risk as compared to the level that was actually reported. *Verifone*, 11 F.3d at 869. Imposing such an obligation would require companies to speculate on hypothetical situations and disclose soft information that is inherently less reliable.

Apart from this point, the allegation is impossibly vague and not logically or factually linked in time to any challenged statement. The complaint does not allege what was meant by the opinion that balance sheet risk was "too high." The complaint does not plead the relationship (if any) between the level of risk on the balance sheet at any given time and the riskiness of the loans originated by Countrywide. A lender could originate only the most pristine loans, yet some company personnel could believe that it had too much risk if he or she did not want to retain any risk on the books. Conversely, a lender could originate riskier loans, yet be satisfied with the level of risk on its balance sheet if it was able to mitigate the risk by insurance or some other mechanism. The complaint's incantation of the mantra "risk" does not provide actual content about the riskiness of the loans originated by Countrywide.

### C. The Complaint Alleges No Specific Facts Supporting Scienter Against Mr. Sieracki

As against the anti-scienter record described above, the complaint cites no "confidential witnesses" who accuse Sieracki of anything or who even speak to the preparation of Countrywide's financial statements. The allegations regarding the remaining internal documents not already addressed above do not plead that Sieracki knew information that rendered false any public statement he made.

---

[7] Likewise, Countrywide's SEC filings and monthly operations reports disclosed the percentages of loans it classified nonprime, vitiating any assertion that there was an intent to conceal an alleged report at the June 28 meeting that subprime loan originations had risen from 4% to 14%. The complaint does not cite any text from the purported minutes supporting its characterization of the document's contents.

### 1. The Accounting Decisions Challenged By Plaintiff Inherently Involved Matters Of Judgment

Countrywide's financial statements under Sieracki's watch were never restated, and the complaint alleges no internal communication to Sieracki that even so much as questions their preparation or contents. Rather, the only party that claims that the statements were wrong is Plaintiff. *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 960 (8th Cir. 2008) (dismissing claims where company "has never restated its financials, and there are no people, documents, or sources that say [its] numbers were false").[8] Moreover, as Countrywide brief explains, the complaint does not properly allege facts showing that the statements were false because it relies on fundamentally flawed allegations from anonymous sources.

Plaintiff's challenge to the financial statements suffers further infirmities with respect to scienter for two reasons. First, the matters of which Plaintiff complains involve matters of judgment and opinion, not the violation of clear-cut accounting rules. Plaintiff questions the setting of loan loss reserves and the valuation of loan-related assets. AC ¶ 41. Even the complaint recognizes that these matters involve opinion and judgment: it alleges that after Countrywide announced unaudited financial statements for the Third Quarter 2007 on October 26, 2007, two analysts opined that the reserves were too low. *Id.* ¶ 618. That the setting of reserves involves opinion and judgment that may be second-guessed in hindsight is a factor that counsels against drawing an inference of scienter. *See First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 95 (S.D.N.Y. 1993) ("[T]he taking of loan loss reserves is based on managerial guesswork about the

---

[8] *See also Waterford Township General Employees Retirement Sys. v. Suntrust Banks, Inc.*, No. 1:09-CV-617-TWT, 2010 WL 3368922, *2 (N.D. Ga. Aug. 19, 2010) (dismissing claim alleging fraudulently low loan loss reserves where "[t]he Plaintiff does not allege that anyone—other than the Plaintiff—has said that [the bank] should restate its financial reports…."). Conclusory Internet-post opinions by obscure accounting professors do not count.

future."), *aff'd*, 27 F.3d 763 (2d Cir. 1994).[9]

Second, the complaint does not plead that Countrywide failed to take the characteristics of its loans into account in preparing its financial statements. The complaint alleges nothing about how the financial statements were prepared, and instead merely assumes that Countrywide deliberately violated accounting rules. This fact-free assumption cannot suffice under the Reform Act. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1089 (9th Cir. 2002); *In re Foundry Networks, Inc. Sec. Litig.*, No. C-00-4823-MMC, 2003 WL 22077729, *11 (N.D. Cal. Aug. 29, 2003); *see also* KPMG Brief at 26-28. This is not an abstract flaw: the documents cited in the complaint show that Countrywide did increase loan loss reserves (in absolute and percentage terms) to reflect the performance of loans retained in Countrywide Bank. For example, the 2006 10-K explained: "The Banking Operation's provision for loan losses increased by $72.4 million during 2006 compared to 2005. This increase reflects increased delinquencies and loss levels resulting from seasoning of loans acquired during the past years of rapid portfolio growth, as well as prevailing real estate and market conditions." 2006 10-K at 63 (emphasis added). Likewise, while the complaint alleges that CFC failed "to increase the Company's reserve for R&Ws made to the secondary market" (AC ¶ 717), the Form 10-Q for the First Quarter 2006 disclosed that in just that quarter alone, the reserve was increased by 60%, from $169.8 million to $271.9 million. *See* 10-Q filed May 9, 2006 at 60 (Priebe Decl. Ex. J).

---

[9] *See also Belmont Holdings Corp. v. SunTrust Banks, Inc.*, No. 1:09-cv-1185-WSD, 2010 3545389, *6 (N.D. Ga. Sept. 10, 2010) ("Whether [a bank] had adequate reserves for its predicted loan losses generally is not a matter of objective fact, but rather a statement of [the bank's] opinion regarding what portion of its loan portfolio would be uncollectable."); *Local 295/Local 851 IBT Employer Group Pension Trust and Welfare Fund*, 731 F. Supp. 2d at 724-25 ("Moreover, accounting for loan loss reserves is not the sort of simple accounting concept the violation of which creates an inference of scienter"); *DiLeo v. Ernst & Young*, 901 F.2d 624, 626-28 (7th Cir. 1990).

**2. The Sarbanes-Oxley Certifications Of Internal Controls <u>Over Financial Reporting Do Not Plead Scienter</u>**

Plaintiff also asserts that an inference of scienter is supported because Sieracki, as CFO, signed quarterly certifications required by Section 302 of the Sarbanes-Oxley Act stating that he had reviewed Countrywide's internal controls over financial reporting. AC ¶¶ 278-79, 719. However, numerous courts have held that where a complaint does not allege specific facts giving rise to an inference that officers knew that a company's financial statements were false, the allegation that they signed Sarbanes-Oxley certifications does not plead scienter. *See, e.g.*, *Zucco Partners*, 552 F.3d at 1002-1004 (collecting cases). Here, as explained above, there are no allegations that Sieracki was informed that the financial statements or internal controls thereof were false.

Plaintiff's argument also has a deeper flaw: it stretches a Sarbanes-Oxley certification regarding <u>financial</u> <u>reporting</u> controls into a blanket assurance of fitness that covers <u>all</u> aspects of a company's business. Plaintiff argues that the certifications were false due to allegedly undisclosed poor underwriting standards. AC ¶ 279 (blaming "lax underwriting standards and increased approval of exception loans"); *id.* ¶ 719 (blaming "deteriorating underwriting standards and increasingly risky lending practices."). But "internal controls over financial reporting" is a defined phrase for purposes of Section 302 certifications. It is defined under SEC Rules 13a-15(f) and 15d-15(f) as follows:

> a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

> (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the registrant are being made only in accordance with authorizations of management and directors of the issuer; and
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

17 C.F.R. §§ 240.13a-15(f), 15d-15(f). Plaintiff's allegations regarding loan underwriting standards and processes have nothing to do with the maintenance of records, recording of transactions, or unauthorized use of company's assets. As one court explained in rejecting the position that Plaintiff asserts here:

> Under Plaintiffs' apparent reading, the Court would have to read Defendants' statement to say that Defendants warranted the presence of systems which were adequate to uncover any and all improper conduct, even conduct outside the realm of financial reporting. Defendants said no such thing.

*In re Invision Technologies, Inc. Sec. Litig*., No. C 04-03181 MJJ, 2006 WL 538752, *6 & n.2 (N.D. Cal. Feb. 22, 2006).

**3. Mr. Mozilo's March-April 2006 E-Mails Regarding HSBC And Subprime Second Loans Do Not Plead Scienter**

The Complaint also alleges that on March 27 and April 13, 2006, Mr. Mozilo sent e-mails expressing displeasure with a particular subcategory of loans (subprime second mortgages) that had been sold to and then repurchased from a particular company, HSBC. AC ¶¶ 689-90. (The complaint alleges that the March 27 e-mail concerned HELOCs, but pleads no facts (including text from the alleged

e-mail) supporting that assertion.)

These allegations fail to plead scienter on the part of Sieracki. The complaint alleges nothing about the magnitude or significance of the loans addressed by Mr. Mozilo. It does not allege the value of the loans; the percentage of Countrywide's total business the loans represented; or anything else that would indicate that Mr. Mozilo had raised any objectively significant issues in the context of Countrywide's public statements. It is Plaintiff's burden, at the pleading stage, to allege specific facts about the loans addressed in Mr. Mozilo's e-mails that rendered a statement in an SEC filing false or materially misleading by omission, such that it could constitute deliberate recklessness for Sieracki not to include those facts. The absence of any allegations about the magnitude of the alleged facts about HSBC or subprime second loans means that the complaint does not meet this burden. As far as can be told, Mr. Mozilo was referring to a trivial portion of Countrywide's multibillion loan business for which no disclosure was required. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-40 (1976) (management need not "bury the shareholders in an avalanche of trivial information.").

Apart from this factor, even if Mr. Mozilo had opined that there were issues in how the loans addressed in his e-mail had been handled, there was no duty to disclose his personal opinion (as explained above) and it is not fraud for a disclosure not to be made while a company is addressing the issue (assuming it was an issue at all). "Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any alleged false statement." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). Hence, companies are allowed to attempt to remedy their problems and assume they will be successful by the time a disclosure event arrives. Thus, in *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922 (9th Cir. 1996), the court held that even if a pharmaceutical company knew of the problems in its drug testing procedure alleged by plaintiffs, it could conclude that it would fix the problems and obtain FDA approval on schedule, and hence that it

could not be liable for not disclosing the problems when it learned of them. *Id*. at 930. Mr. Mozilo's raising of issues or concerns is nothing more than that; it does not create a disclosure event.

**4. The March 12, 2007 CCRC Minutes Do Not Plead Scienter**

The complaint also alleges that at a CCRC March 12, 2007 meeting, it was stated that 12% of loans were rated as severely unsatisfactory or high risk. AC ¶ 696. The Complaint does not explain the significance of the 12% metric or what it means for a loan to be assessed as severely unsatisfactory or high risk. Moreover, on the same day, Countrywide filed its operations report for February 2007 on EDGAR. *See* Priebe Decl. Ex. N. It stated that "[t]he nonprime lending industry is currently experiencing significant volatility and instability" and that "[a]s a result, many nonprime competitors have recently exited the market and other lenders have suggested their continued viability is in question." It disclosed that "[a]ggressive industry underwriting guidelines and lower home price appreciation have resulted in increasing delinquencies and defaults." And it warned that "as a result of investor concerns about nonprime loan performance, yield requirements have increased and secondary market liquidity has been reduced. These factors will adversely impact residual valuations and gains on sale of nonprime loans until market conditions improve." These are hardly the disclosures one would expect from a company that was intent on concealing mortgage market turmoil, the past industry-wide expansion in guidelines, or delinquencies and defaults.

**5. The Interagency Guidance Allegations Do Not Plead Scienter**

The complaint also alleges that the Officer Defendants possessed scienter because regulatory Interagency Guidance proposed in late 2006 "recommended extreme caution in originating risky loans such as Countrywide's Pay Option ARM and HELOC products." AC ¶ 701; *see also id.* ¶ 715.

The First Circuit recently addressed a similar type of allegation in *City of*

*Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Waters Corp.*, 632 F.3d 751 (2011). Plaintiffs alleged that officers of a water testing equipment company knew that the Japan government had relaxed its testing regulations, and hence knew that demand in that key market would decline. The officers later admitted that they had known of the regulatory change and had seen a reduction in business as a result. *Id*. at 756. The court reasoned that while it was fair to infer the defendants knew of the regulatory change, "this is not sufficient to meet plaintiff's burden on scienter." *Id.* at 758. The proper inquiry was "whether defendants knew or should have known that their failure to disclose those facts presented a danger of misleading buyers or sellers" of the company's securities. *Id*. (internal quotations omitted). The allegations of the complaint did not plead this for several reasons, including the fact that they did not show that the magnitude and speed of the reduction in sales was predictable from the regulatory change. *Id*. at 759.

The same deficiencies apply to the allegations regarding the Interagency Guidance. The complaint does not allege anything about how the proposed guidance informed Countrywide of any predictable but undisclosed reduction in origination of the types of loans addressed in the guidance. Plaintiff also ignores what Countrywide <u>did</u> disclose on this point. From July 2005 through May 2007, the monthly operations reports referenced in Section III(B)(2), *supra*, specifically disclosed originations of pay option ARMs. This data informed investors that originations steadily <u>declined</u> throughout 2006 and 2007. *See* Appendix, "Selected Data From Monthly Operations Reports Filed As 8-Ks." Indeed, October 2006—the month in which Countrywide allegedly commented on the Interagency Guidance—was the last month in which pay options exceeded 10% of originations; at 10.5%, the percentage represented almost a 50% decline from the high rate of 20.3% in September 2005. By May 2007, the number was down to 5.2%; thereafter, the volume was too low to warrant reporting. So much for Plaintiff's allegation that the Interagency Guidance reflected an unheeded, secret warning.

**IV. THE COMPLAINT DOES NOT PLEAD FALSITY OR SCIENTER <u>BASED ON OTHER ORAL STATEMENTS OR PRESS RELEASES</u>**

The foregoing sections demonstrate that the complaint does not plead specific facts giving rise to strong inference of scienter as to any statement made by Sieracki. In this section, we demonstrate the additional deficiencies of the allegations regarding oral statements allegedly made by Sieracki at investor conferences, and an August 2, 2007 press release regarding liquidity.

**A. The Data Allegedly Provided On The July 26, 2005 Conference <u>Call Is Not Alleged To Be False</u>**

The complaint alleges that on a July 26, 2005 conference call, Sieracki stated that with respect to the nonprime credit spectrum, Countrywide "operate[s] at the very top end of the nonprime credit spectrum and that the FICO scores have remained very steady, just over 600." AC ¶¶ 394-95. The complaint does not allege that any of this information was false. It does not allege that the actual average FICO score of Countrywide's nonprime loans was not over 600 at the time. It does not allege that a set of nonprime loans with an average FICO score of just over 600 would not sit on the very top end of the "nonprime credit spectrum."

**B. The Complaint Relies On Its Unsupported Spin Of A Question <u>And Answer At A September 13, 2006 Investor Forum</u>**

The complaint asserts that at a September 13, 2006 investor forum, Sieracki was asked if Countrywide should consider reducing its capital because the Company's high growth rate was likely to be unsustainable. AC ¶ 480. The complaint, however, does not set forth the text of the purported question to this effect (even as it cites a transcript), and hence does not plead that Sieracki was asked that question as distinguished from how Plaintiff would spin the question. The complaint then asserts that "Sieracki responded by emphasizing that the growth rate at Countrywide was not synonymous with an increase in risk and that Countrywide had not assumed high risk assets." *Id.* But the actual text of the

answer, as alleged in the complaint, does not support Plaintiff's spin. AC at 162:20-27. Sieracki referred to transactions which had nothing to do with mortgage loans or loan assets ("equity neutral transactions with hybrid securities"). A common sense reading of the text shows that the colloquy concerns CFC's capital structure, not loan standards or loan risk.

### C. The Alleged Liquidity Statements At The March 6, 2007 Raymond James Conference Are Nonactionable

The complaint alleges that Sieracki made false statements about Countrywide's access to liquidity at a March 6, 2007 Raymond James Institutional Investor Conference. But the challenged statements are classic examples of nonactionable expressions of optimism: "[w]e're very well positioned at Countrywide due to ... our liquidity position" and "[w]e're a top conditioned athlete." AC ¶ 519. These statements are too vague to be actionable because their truth or falsity cannot be objectively determined, and because investors do not ascribe meaning to them. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations, however, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation."); *see also Hutchinson Tech.*, 536 F.3d at 960-61 (statement that company was "well positioned for the future" non-actionable on these bases).[10]

Apart from this, the complaint's challenges to all of Sieracki's liquidity statements suffers from a fatal flaw: reality. Plaintiff's argument that the liquidity statements were false is that Countrywide's access to liquidity was threatened because it supposedly made riskier loans starting in 2003. AC ¶ 283. Yet the complaint admits that despite this supposed ongoing threat, Countrywide continued to fund a multibillion dollar loan business—one that funded over ***$2.2 trillion*** in

[10] The same point applies to the statement in the November 9, 2007 10-Q that Countrywide was "well positioned to capitalize on opportunities." AC ¶ 567.

mortgage loans—for over five years: in 2003, 2004, 2005, 2006, the first months of 2007 leading up to the March 6 Raymond James conference, and in the succeeding months of 2007 through July 2008, until Countrywide's merger with the Bank of America. It is inconceivable that Countrywide could have funded trillions of dollars in mortgage loans without access to liquidity.[11]

Nor can Plaintiff plausibly allege that Sieracki knew or was reckless to any undisclosed, multi-year threat to liquidity, for purposes of scienter. Sieracki purchased and held Countrywide stock during this lengthy period, which is contrary to any notion that he was aware of what Plaintiff asserts was the inevitable but undisclosed doom facing the company. *See* Section III(A), *supra*. The complaint does not allege that Sieracki received any information prior to the March 6 Raymond James Conference, or at the time of an other liquidity statement attributed to him, to the effect that Countrywide lacked liquidity plans or that any liquidity sources represented to have existed at the time of the statement did not exist.

**D. The August 2, 2007 Liquidity Press Release and August 9 10-Q Are Not Alleged To Be False**

The complaint challenges an August 2, 2007 press release quoting Sieracki on liquidity planning and sources, and the Form 10-Q for the Second Quarter 2007 filed seven days later (on August 9). Again, the complaint fails to plead falsity as well as scienter. To the contrary, the judicially noticeable record refutes scienter.

The August 2 press release allegedly misrepresented that "Countrywide has longstanding and time-tested funding liquidity contingency planning," including "planning protocols … designed to encompass a wide variety of conditions, including recent secondary market volatility"; that the liquidity planning had

[11] No facts are pleaded to support Plaintiff's assertion that Countrywide's access to liquidity from the secondary market was curtailed due to the disclosure of the performance of Countrywide loans on July 24, 2007. AC ¶ 284. Plaintiff apparently is unaware that in August 2007, the entire secondary market for non-GSE securitizations—not just the market for Countrywide-originated securitizations—essentially froze.

proven highly effective earlier during 2007; and that Countrywide's mortgage company "has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank." It also purportedly misrepresented the Company's net worth of over $14 billion. AC ¶¶ 572-73. But the complaint does not explain or allege how the liquidity statements were false when made. It does not allege what Countrywide's actual position was with respect to liquidity sources or plans at the time of the statements, or its actual net worth. It does not allege any facts showing that the sources of liquidity that were represented to exist did not in fact exist. It does not allege that Countrywide was unable to fund its short-term liquidity needs as of August 2. And it does not allege that Countrywide's liquidity planning had not proven effective earlier in 2007. To the contrary, that Countrywide even existed on August 2 to make the challenged press release when (as the complaint admits) other loan originators had fallen by the wayside for lack of liquidity supports the truth of the press release.

The complaint's challenge to the August 9 10-Q for the Second Quarter 2007 also fails. AC ¶ 575. The complaint does not allege that any liquidity sources referenced in the document in fact did not exist or that Countrywide was unable to fund its short-term liquidity needs as of that date.[12] Moreover, the 10-Q contained extensive disclosures of liquidity challenges. It stated that due to the "current environment of rapidly changing and evolving markets," Countrywide may experience "[c]ontinued disruptions in the secondary mortgage and debt capital markets," "[r]educed access to secondary mortgage and debt capital markets," and "[i]ncreased cost of debt." *See* Priebe Decl. Ex. O at 95. It explained that "funding liquidity in the financial services sector was constrained primarily due to changes in

---

[12] Plaintiff also challenges a statement that the lower liquidity status of nonprime loans and related securities was not expected to have a significant adverse effect on Countrywide's ability to effectively meet its financing requirements because those assets were a relatively small item on the balance sheet. *Id*. The complaint does not allege that nonprime assets actually represented a large portion of the balance sheet or that other sources of liquidity did not exist.

secondary mortgage market investor demand." *Id*. at 98. And it stated that "[w]hile we believe we have adequate funding liquidity, the situation is rapidly evolving and the impact on the Company is unknown." *Id*. at 98 (emphasis added). This highly qualified expression of belief cannot be read as an assurance of liquidity. It is another example of a disclosure choice that cuts against any inference of scienter.

### E. The Statements On The October 26, 2007 Conference Call Are Not Alleged To Be False

Finally, the complaint alleges that on an October 26, 2007 conference call, Sieracki stated: "[w]e now have ample and growing funding liquidity .... The mortgage company has adequate liquidity to fund all debt maturities through 2008, without raising any new debt. … So you can see the liquidity situation is very strong at Countrywide at September 30, 2007." AC ¶ 615. Once again, the complaint does not allege that Sieracki misrepresented the amount of liquidity available, from any source, as of September 30, 2007. Indeed, the complaint admits that Countrywide accessed $11.5 billion of liquidity from a hitherto unused credit facility in August 2007 (*id*. ¶ 286), which is inconsistent with the notion that it lacked liquidity sources as of September 2007. Nor does the complaint allege that Countrywide Bank lacked funds to satisfy its debt maturities in the time frame that was stated, or to fund its business. Countrywide's continued existence after this call as an origination source for tens of billions of dollars of mortgage loans belies Plaintiff's assertion that it lacked liquidity.

## V. CONCLUSION

The complaint does not state a claim against Sieracki, and should be dismissed.

Respectfully submitted,

May 6, 2011

DLA PIPER LLP (US)

By: /s/ David Priebe

Attorneys for Defendant ERIC SIERACKI

# APPENDIX: SELECTED DATA FROM MONTHLY OPERATION REPORTS FILED AS 8-Ks

| *Date of 8-K* | *Month* | *Total Mortgage Loan Fundings* | *Monthly Pay Option ARM Fundings* | *Pay Option ARMs as % of monthly fundings* | *Nonprime Fundings* | *Nonprime as % of monthly fundings* |
|---|---|---|---|---|---|---|
| 2/9/05 | Jan-05 | $28,245 | | | $3,851 | 13.6% |
| 3/8/05 | Feb-05 | $26,906 | | | $2,605 | 9.7% |
| 4/8/05 | Mar-05 | $36,309 | | | $3,364 | 9.3% |
| 5/9/05 | Apr-05 | $34,405 | | | $2,922 | 8.5% |
| 6/9/05 | May-05 | $38,676 | | | $3,312 | 8.6% |
| 7/14/05 | Jun-05 | $47,266 | | | $4,202 | 8.9% |
| 8/11/05 | Jul-05 | $44,109 | $8,600 | 19.5% | $3,661 | 8.3% |
| 9/12/05 | Aug-05 | $53,067 | $10,400 | 19.6% | $4,504 | 8.5% |
| 10/11/05 | Sep-05 | $48,834 | $9,900 | 20.3% | $4,036 | 8.3% |
| 11/8/05 | Oct-05 | $46,772 | $8,500 | 18.2% | $3,876 | 8.3% |
| 12/8/05 | Nov-05 | $42,244 | $7,900 | 18.7% | $3,899 | 9.2% |
| 1/11/06 | Dec-05 | $44,114 | $8,000 | 18.1% | $4,405 | 10.0% |
| 2/9/06 | Jan-06 | $32,633 | $6,800 | 20.8% | $3,042 | 9.3% |
| 3/9/06 | Feb-06 | $30,937 | $5,600 | 18.1% | $2,845 | 9.2% |
| 4/11/06 | Mar-06 | $39,848 | $7,200 | 18.1% | $3,318 | 8.3% |
| 5/11/06 | Apr-06 | $36,038 | $6,700 | 18.6% | $3,292 | 9.1% |
| 6/12/06 | May-06 | $38,574 | $6,600 | 17.1% | $3,807 | 9.9% |
| 7/13/06 | Jun-06 | $41,997 | $6,300 | 15.0% | $4,107 | 9.8% |
| 8/9/06 | Jul-06 | $35,731 | $5,100 | 14.3% | $3,354 | 9.4% |
| 9/14/06 | Aug-06 | $40,181 | $5,400 | 13.4% | $3,722 | 9.3% |
| 10/11/06 | Sep-06 | $37,795 | $4,300 | 11.4% | $3,058 | 8.1% |
| 11/9/06 | Oct-06 | $41,108 | $4,300 | 10.5% | $3,254 | 7.9% |
| 12/12/06 | Nov-06 | $37,788 | $3,200 | 8.5% | $3,058 | 8.1% |
| 1/12/07 | Dec-06 | $41,730 | $2,900 | 6.9% | $3,739 | 9.0% |
| 2/9/07 | Jan-07 | $37,113 | $2,700 | 7.3% | $2,939 | 7.9% |
| 3/12/07 | Feb-07 | $34,569 | $2,400 | 6.9% | $2,587 | 7.5% |
| 4/12/07 | Mar-07 | $43,282 | $3,500 | 8.1% | $2,355 | 5.4% |
| 5/9/07 | Apr-07 | $40,480 | $2,700 | 6.7% | $1,682 | 4.2% |
| 6/12/07 | May-07 | $44,420 | $2,300 | 5.2% | $2,186 | 4.9% |
| 7/16/07 | Jun-07 | $45,263 | | | $1,853 | 4.1% |
| 8/14/07 | Jul-07 | $39,061 | | | $1,804 | 4.6% |
| 9/13/07 | Aug-07 | $34,351 | | | $1,267 | 3.7% |
| 10/11/07 | Sep-07 | $21,219 | | | $255 | 1.2% |
| 11/13/07 | Oct-07 | $21,963 | | | $42 | 0.2% |
| 12/13/07 | Nov-07 | $23,127 | | | $17 | 0.1% |
| 1/9/08 | Dec-07 | $23,386 | | | $6 | 0.0% |
| 2/15/08 | Jan-08 | $21,885 | | | $0 | 0.0% |
| 3/13/08 | Feb-08 | $25,587 | | | $0 | 0.0% |