DEAN J. KITCHENS, SBN 82096
DKitchens@gibsondunn.com
ALEXANDER K. MIRCHEFF, SBN 245074
AMircheff@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Underwriter Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

STATE TREASURER OF THE STATE OF MICHIGAN,

Plaintiff,

v.

COUNTRYWIDE FINANCIAL CORPORATION, et al.,

Defendants.

Case No. CV 11-00809-MRP (MANx)

**NOTICE OF MOTION AND MOTION OF UNDERWRITER DEFENDANTS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT, JOINDER IN COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hon. Mariana R. Pfaelzer

Hearing Date: July 18, 2011
Time: 11:00 a.m.
Place: Courtroom 12

## Notice of Motion and Motion

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on July 18, 2011, at 11:00 a.m. or as soon thereafter as the matter may be heard, before the Honorable Mariana R. Pfaelzer, United States District Judge, located at 312 N. Spring Street, Courtroom 12, Los Angeles, California 90012, Defendants ABN AMRO Incorporated, Banc of America Securities LLC, Barclays Capital Inc., BNP Paribas Securities Corp., Deutsche Bank Securities Inc., Goldman, Sachs & Co., HSBC Securities (USA) Inc., RBS Securities Inc., J.P. Morgan Securities LLC (formerly known and named in this action as J.P. Morgan Securities Inc.), and Wells Fargo Securities, LLC, (collectively, the "Underwriter Defendants"), will and hereby do move to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b) on the grounds that, (i) as to accounting-related statements in the offering documents for the securities at issue, the Underwriter Defendants' due diligence defense is apparent from the face of the complaint pursuant to Section 11(b)(3)(C) of the Securities Act of 1933; (ii) as to certain claims based on the 6.25% Subordinated Note, Plaintiff has failed to adequately plead reliance or materiality; (iii) Plaintiff has failed to adequately plead privity as required for statutory standing under Section 12(a)(2) and Cal. Corp. Code § 25501; and (iv) Plaintiff fails to allege a sale of securities in California as required for its claim under Cal. Corp. Code § 25501. This Motion is based on the accompanying Memorandum of Points and Authorities and such other written or oral argument as may be presented.

Further, the Underwriter Defendants will and hereby do join the Motion pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b) of the Countrywide Defendants to dismiss Plaintiff's Complaint in its entirety, for the reasons set forth in that Motion, its supporting Memorandum of Points and Authorities, the Countrywide

Defendants' Request for Judicial Notice in Support of the Motion, and such other written or oral argument as may be presented.

This Motion is made following a conference of counsel pursuant to Local Rule 7-3 on April 4, 2011 and April 29, 2011, which did not lead to an agreement regarding these issues.

DATED: May 6, 2011

Dean J. Kitchens
Alexander K. Mircheff
GIBSON, DUNN & CRUTCHER LLP

By: /s Dean J. Kitchens
Dean J. Kitchens

Attorneys for Underwriter Defendants

# TABLE OF CONTENTS


I. INTRODUCTION AND BACKGROUND ..... 1

II. PLAINTIFF'S ALLEGATIONS ..... 3

III. ANALYSIS ..... 4

A. The Underwriters' Due Diligence Defense As To Accounting-Related Statements Is Apparent On The Face Of The Complaint ..... 4

1. Facts Not Allegedly Known By The Underwriters Cannot Constitute "Red Flags" ..... 6

2. Even Assuming The Underwriters Knew About Them, The Purported Red Flags Are Innocuous In Any Event ..... 7

B. The Timing of Michigan's Purchases For The 6.25% Subordinated Note Defeat Its Claims ..... 9

1. Section 11 Does Not Presume Reliance On The Registration Statement When Reliance Would Be Impossible Or Unlikely As Demonstrated By The Timing Of The Plaintiff's Purchase ..... 9

2. Plaintiff Cannot Avoid The Burden To Show Reliance Under Section 11(a) Simply By Alleging That The Intervening 12-Month Earning Statement Was Misleading ..... 11

a) The Purpose Of Section 11(a)'s Reliance Requirement ..... 11

b) The *WorldCom* Court Was Mistaken In Reading The Reliance Element Out Of The Statute ..... 13

C. Plaintiff Has Not Adequately Pleaded Privity As Required For Standing Under Section 12(a)(2) or Cal. Corp. Code § 25501 ..... 16

D. The Claim Under Cal. Corp. Code § 25501 Fails Because Plaintiff Does Not Allege An Offer or Sale In California ..... 18

IV. CONCLUSION ..... 19

## TABLE OF AUTHORITIES

Page(s)

### CASES

*APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261 (11th Cir. 2007)....9, 13, 14

*Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226 (2007)....17

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)....11

*Central Bank of Denver*, *N.A. v. First Interstate Bank of Denver*, 511 U.S. 164 (1994)....14

*Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837 (1984)....15

*Chris-Craft Industries*, *Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir. 1973)....15

*DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003)....10

*Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458 (S.D.N.Y. 2002)....12

*Hammond for Hammond v. Hendrickson*, 1986 WL 8437 (N.D. Ill. July 30, 1986)....12

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983)....11

*Hertzberg v. Dignity Partners*, *Inc.*, 191 F.3d 1076 (9th Cir. 1999)....13

*Hudson v. Sherwood Sec. Corp.*, 1987 U.S. Dist. LEXIS 16019 (N.D. Cal. 1987)....18



Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Activision Sec. Litig.*,
621 F. Supp. 415 (N.D. Cal. 1985) ... 18

*In re Countrywide Fin. Corp. Sec. Litig.*,
2009 WL 943271 (C.D. Cal. Apr. 6, 2009) ... 1, 2

*In re Countrywide Fin. Corp. Sec. Litig.*,
--- F.R.D. ----, 2009 WL 7322254 (C.D. Cal. Dec. 9, 2009) ... 14

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ... 2, 12, 17

*In re Enron Sec. Deriv. & ERISA Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ... 14

*In re HealthSouth Corp. Sec. Litig.*,
261 F.R.D. 616 (N.D. Ala. 2009) ... 9

*In re Levi Strauss & Co. Sec. Litig.*,
527 F. Supp. 2d 965 (N.D. Cal. 2007) ... 9

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ... 9

*In re Software Toolworks Sec. Litig.*,
50 F.3d 615 (9th Cir. 1994) ... 5, 8

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
382 F. Supp. 2d 1173 (N.D. Cal. 2004) ... 6

*In re Victor Technologies Sec. Litigation*,
102 F.R.D. 53 (N.D. Cal. 1984) ... 18

*In re WorldCom, Inc. Sec. Litig.*,
219 F.R.D. 267 (S.D.N.Y. 2003) ... 13, 14, 15, 16

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ... 5, 8

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Io Group, Inc. v. Veoh Networks, Inc.*,
586 F. Supp. 2d 1132 (N.D. Cal. 2008) .......... 6

*Lee v. Ernst & Young, LLP*,
294 F.3d 969 (8th Cir. 2002) .......... 13

*Moore v. Kayport Package Express*,
885 F.2d 531 (9th Cir. 1989) .......... 17

*MTC Elec. Techs. Co., Ltd. v. Leung*,
876 F. Supp. 1143 (C.D. Cal. 1995) .......... 18

*Nw. Envtl. Advocates v. EPA*,
537 F.3d 1006 (9th Cir. 2008) .......... 15

*Pell v. Weinstein,*
759 F. Supp. 1107 (M.D. Pa. 1991) .......... 9

*Pinter v. Dahl*,
486 U.S. 622 (1988) .......... 17

*Reiger v. PricewaterhouseCoopers LLP*,
117 F. Supp. 2d 1003 (S.D. Cal. 2000) .......... 6

*Rich v. Shrader*,
2010 WL 3717373 (S.D. Cal. Sept. 17, 2010) .......... 17

*Viterbi v. Wasserman*,
191 Cal. App. 4th 927, 2011 WL 72203 (Jan. 11. 2007) .......... 9

### STATUTES

15 U.S.C. § 77k(a) .......... 10, 12, 14

15 U.S.C. § 77k(b)(3)(C) .......... 5

15 U.S.C. § 77k(c) .......... 5

15 U.S.C. § 77*l*(a)(2) .......... 17

## TABLE OF AUTHORITIES
**(continued)**

Page(s)

Cal. Corp. Code § 25401 .......... 18

Cal. Corp. Code § 25501 .......... 3, 9, 17, 18

Fed. R. Civ. P. 12(b)(6) .......... i

Fed. R. Civ. P. 9(b) .......... i

## OTHER AUTHORITIES

6 Witkin, Summary of California Law 8th (1974) .......... 18

9 Witkin, Summary of California Law 10th (2005) § 411 .......... 18

H.R. Rep. No. 1838, 73d Cong., 2d Sess. 41 (1934) .......... 13

H.R. Rep. No. 85, 73d Cong., 1st Sess. 9 (1933) .......... 13

William O. Douglas & George E. Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 176 (1933) .......... 12

## REGULATIONS

17 C.F.R. § 210.4-01(a) .......... 14

17 C.F.R. § 230.158(a) .......... 15

17 C.F.R. § 230.158(a)(2) .......... 10

## Memorandum of Points and Authorities

Defendants ABN AMRO Incorporated, Banc of America Securities LLC, Barclays Capital Inc., BNP Paribas Securities Corp., Deutsche Bank Securities Inc., Goldman, Sachs & Co., HSBC Securities (USA) Inc., RBS Securities Inc., J.P. Morgan Securities LLC (formerly known and named in this action as J.P. Morgan Securities Inc.), and Wells Fargo Securities, LLC (collectively, the "Underwriter Defendants" or "Underwriters") respectfully submit this Memorandum of Points and Authorities in support of their Motion to Dismiss Plaintiff's Complaint. The Underwriter Defendants further join in the Countrywide Defendants' Motion to Dismiss and adopt by reference the arguments and authorities set forth in that Motion, its supporting Memorandum of Points and Authorities, the Countrywide Defendants' Request for Judicial Notice in Support of the Motion, and such other written or oral argument as may be presented.

## I. INTRODUCTION AND BACKGROUND

As the Court is aware, this matter is an "opt-out" of the class settlement concerning Countrywide common stock and corporate bonds, and the Complaint filed by the Michigan State Treasurer is based heavily on the Second Consolidated Amended Class Action Complaint filed by the Lead Plaintiffs in the class action. Most pertinent to this Motion, the Michigan Complaint repeats a fatal defect from the Lead Plaintiffs' pleadings that twice led this Court to dismiss certain allegations against the Underwriter Defendants. Namely, like the complaints in the class action, the Michigan Complaint reveals on its face that the Underwriter Defendants have a complete due diligence defense as to allegations of accounting-related misstatements in the registration statements for the Countrywide bonds. This is because the Complaint fails to plead any basis the Underwriters had to believe that the expertised statements of Countrywide's outside auditor, KPMG, upon which they were entitled by law to rely, were untrue. *See In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *3 (C.D. Cal. Apr. 6, 2009) (Pfaelzer, J.) (holding that the due diligence defense for

accounting-related statements was "apparent from the face of the [Second Consolidated Amended Complaint]," just as was the case with the [Consolidated Amended Complaint]"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1182 (C.D. Cal. 2008) (Pfaelzer, J.) ("[T]he present CAC does not adequately allege that Underwriter Defendants' reliance on KPMG and Countrywide management's accounting-related statements during this period was unreasonable.").

Indeed, if anything, the Michigan Complaint's allegations concerning the accounting-related statements are even weaker than the Lead Plaintiffs'. In the class case, this Court initially held that the due diligence defense for accounting-related statements was apparent through fiscal year 2006. 588 F. Supp. 2d at 1182. Then, after allowing the Lead Plaintiffs to replead their allegations, this Court reaffirmed that the defense was apparent through FY 2005, but concluded that, on balance, the Lead Plaintiffs had adequately pleaded around the due diligence defense for FY 2006 and later, despite the Underwriter Defendants' "not-unreasonable arguments" to the contrary. 2009 WL 943271, at *3. Here, however, the Michigan Complaint omits several of the purported "red flags" that the Lead Plaintiffs had added to purportedly demonstrate problems with Countrywide's FY 2006 financial statements (perhaps because they share the Underwriter Defendants' view that the Lead Plaintiffs' purported red flags were ultimately innocuous). Moreover, two additional years have passed since the Court previously considered the question, during which there has still been no restatement of Countrywide's financials.

Accordingly, given the Court's prior views that the question was a close one, the Underwriter Defendants respectfully submit that the Michigan Complaint demonstrates on its face that the Underwriters have the due diligence defense through FY 2006, and that claims for accounting-related misstatements through these years should be dismissed. At a minimum, however, the Court should dismiss claims for accounting-related misstatements through FY 2005.

Moreover, the Court should also dismiss certain portions of the Complaint because of the timing of Michigan's investments. Several of Michigan's purchases were either before the effective date of the registration statement (making it impossible that the purchase was pursuant to that statement, as required to invoke Section 11's normal presumption of reliance) or after the issuance of an intervening earning statement covering 12-months after the registration statement (making reliance a requisite but unpleaded element of Plaintiff's claim under Section 11(a)). Although Section 11 ordinarily presumes reliance on the registration statement, it does not do so in circumstances such as these, which demonstrate that reliance is either impossible or unlikely.

Additionally, the claims under Section 12(a)(2) and Cal. Corp. Code § 25501 fail for lack of privity and (as to the Section 25501 claim) failure to allege a purchase of securities in California.

## II. PLAINTIFF'S ALLEGATIONS

The Michigan Complaint asserts claims against the Underwriter Defendants arising under the Securities Act of 1933 and Section 25501 of the California Corporations Code for alleged misstatements in the registration statements and prospectuses of certain Countrywide corporate bonds. Following successful negotiations between Plaintiff and the Underwriter Defendants, the scope of the action has been dramatically reduced, and now centers on just three bonds—a ten-year 6.25% Subordinated Note issued in May 2006 and due in 2016 (CUSIP 222372AJ3), and two five-year Series B Medium Term Notes issued in June 2007 and due in 2012 (CUSIPs 22238HGQ7 and 22238HGR5). *See* Compl. Ex. A ("Bond Transactions Between

March 12, 2004 and March 7, 2008").[1] These bonds were issued pursuant to shelf registration statements, which incorporated by reference Countrywide's then-most recent SEC filings.

Plaintiff claims the SEC filings included two types of material misstatements or omissions. *First*, Plaintiff claims the management discussion and analysis concerning the volume of prime loans originated and held for investment ("LHI") were misstated because Countrywide purportedly misclassified non-prime loans as prime and loosened or abandoned its underwriting standards. *Second*, Plaintiff claims Countrywide's financial statements were also misstated because of poor loan underwriting, which resulted in overstating the value of the Company's LHI portfolio and mortgage servicing rights, understating liabilities related to representations and warranties on loans sold in the secondary market, understating of the Allowance for Loans and Lease Losses ("ALLL"), and overstating net earnings and shareholder equity. *See, e.g.*, Am. Compl. ¶ 433 (FY 2005 Form 10-K); Am. Compl. ¶ 517 (FY 2006 Form 10-K).

## III. ANALYSIS

### A. The Underwriters' Due Diligence Defense As To Accounting-Related Statements Is Apparent On The Face Of The Complaint

The second category of alleged misstatements in Plaintiff's Complaint—the accounting-related statements—is subject to a due diligence defense on the face of the Complaint. Section 11(b)(3)(C) of the Securities Act provides that an underwriter is entitled to rely on an expert "as regards any part of the registration statement purporting to be made on the authority of an expert" so long as the underwriter

> had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements

---

[1] By stipulation, Plaintiff has been ordered not to seek damages or any other remedy on the remaining bonds referenced in its Complaint and the Exhibit A thereto. Docket No. 58 ¶ 2.

> therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

15 U.S.C. § 77k(b)(3)(C). Accountants are "experts" for purposes of this defense and the financial statements they pass upon are considered "expertised" portions of a registration statement. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421 (9th Cir. 1994); *In re Software Toolworks Sec. Litig.*, 50 F.3d 615, 623 (9th Cir. 1994). The standard for what constitutes a "reasonable ground" to believe (or disbelieve) a statement is "that required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c).

Here, in the face of the Court's prior rulings that the Underwriters were entitled to dismissal under Section 11(b)(3)(C) for failure to plead that the Underwriters had reason to question Countrywide's and KPMG's accounting-related statements, the Michigan Complaint also fails to allege "red flags" that should have supposedly alerted them to some deficiency in either the 2005 or 2006 financials. Indeed, the Michigan Complaint specifically *omits* many of the supposed red flags that were alleged in the Lead Plaintiffs' pleading, upon which the Michigan Complaint is otherwise based. Compl. ¶ 784; *see also* Mircheff Decl., Ex. A (Excerpts of Class Action SAC). The Michigan Complaint drops nearly a third of the "red flag" allegations relied upon in the class action, tacitly agreeing with the Underwriters that the omitted allegations could not constitute "red flags."[2] The Underwriters submit that the remaining claims similarly fail to pierce the Underwriters' defense under Section 11(b)(3)(C).

---

[2] Unlike the Lead Plaintiffs, Michigan does not allege that Countrywide's "underwriting matrices," securitizations, or collateral appraisal practices could have put the Underwriters on notice of any errors in the accounting-related portions of the registration statements. *See* Mircheff Decl., Ex. A ¶ 605(b), (c), (g).

### 1. Facts Not Allegedly Known By The Underwriters Cannot Constitute "Red Flags"

As an initial matter, virtually all of the purported red flags are facts that are not alleged to have been known by the Underwriters, but rather that allegedly "would" have been known *if* an "examination" into certain matters had been made. *See* Compl. ¶ 784(b)-(g). Such "facts" cannot constitute red flags. Implicit in the concept of a "red flag" triggering a duty to inquire is that the information was actually known to the defendant—a fact does not become a "red flag" until the defendant actually sees it. *E.g.*, *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1185-86 (N.D. Cal. 2004) ("[W]here a transaction derives its suspiciousness from specific details associated with the audited company's business, the plaintiff must plead facts suggesting the [defendant's] awareness of those details or 'red flags.'"); *Reiger v. PricewaterhouseCoopers LLP*, 117 F. Supp. 2d 1003, 1009 (S.D. Cal. 2000) ("Plaintiffs leave a critical gap unbridged by failing to allege any facts suggesting Pricewaterhouse knew" of red flags indicating a suspicious transaction); *cf. Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1148-49 (N.D. Cal. 2008) (holding that hidden trademark was not a "red flag" indicating possible infringement where no evidence showed defendant was "aware of" the trademark).

Indeed, by pleading what "would" have been known to the Underwriters *if* an "examination" would have occurred, Plaintiff has confused the due diligence defense under Section 11(b)(3)(A) (which provides a defense if an affirmative investigation into the accuracy of the misstatements has been made) with the defense at issue here under Section 11(b)(3)(C) (which provides a defense where reliance is placed on experts, unless the defendant is aware of facts undermining the experts' views). The Section 11(b)(3)(C) defense imposes no affirmative duty to investigate or "examine." It only asks whether a defendant had reason to disbelieve the statements of the experts so as to render its entitlement to rely on the experts otherwise unreasonable.

Accordingly, the Underwriter Defendants submit that the following allegations cannot constitute "red flags":

- Paragraph 784(b) (concerning the "sample loan documentation" that the Underwriter Defendants "would be required to inspect," which allegedly would have shown loans originated to "very high risk borrowers without appropriate due diligence")
- Paragraph 784(c) (an "examination" of "Countrywide's loan composition," which allegedly "would have shown" a heightened portfolio risk profile)
- Paragraph 784(d) (an "examination" of Countrywide's ALLL as a percentage of LHI, which allegedly "would have shown" it to be static in 2003 until 2007, despite Countrywide "producing higher risk loans")
- Paragraph 784(e) (an "examination" of the amount of loans that were 90 days or more delinquent, which "would have shown" an increase beginning in 2005)
- Paragraph 784(f) (an "examination" of Countrywide's internal controls, which "would have led to the discovery of" avenues for exception loans)
- Paragraph 784(g) (an "examination" of Countrywide's "accumulated negative amoritization on Pay Option ARMs, which would have shown" an increase between 2004 and 2005).

Absent allegations that the Underwriters *actually* had the information Plaintiff thinks they "would" have had, these allegations cannot suggest that the Underwriters should have disbelieved the accounting-related portions of the registration statements.

**2. Even Assuming The Underwriters Knew About Them, The Purported Red Flags Are Innocuous In Any Event**

Even if Plaintiff had pleaded that the Underwriters actually knew about its purported red flags, the information alleged simply does not create a basis for a reasonably prudent person to question KPMG's views concerning the accounting-related statements. The mortgage lending business and its accounting is highly complex and specialized, and it is entirely appropriate for the Underwriters to have relied on the expert assessments that Countrywide's financial statements reasonably

applied GAAP. Again, to this day there has been no restatement of Countrywide's financial statements, and Plaintiff does not allege otherwise. This means that even with the full benefit of hindsight, there has been no determination that there were any prior material misstatements.

Against this backdrop, the Underwriters submit that Plaintiff's "red flags" do not reasonably indicate anything that should have caused them to question the accuracy of the accounting-related statements. For example, Paragraph 784(a) is simply an announcement of an aggressive business goal—that Countrywide was embarking on a goal of "30% market share" does not suggest that it would not accurately account for its endeavor. And the allegations concerning origination of loan products that in general were relatively riskier than traditional loans (Paragraph 784(b)-(g)) suggest nothing about Countrywide's efforts to mitigate that risk—for example, through loan pricing, lending to qualified borrowers or based on adequate collateral, through its pricing of such loans on the secondary market, or through any number of other potential risk-mitigation strategies. Certainly nothing suggests that Countrywide was not accounting properly for the risk.

This case involves complex accounting rules and the application of factual material to those rules in a setting requiring a high degree of professional judgment. In this context, the Ninth Circuit has recognized that an auditor's decisions on complex issues of revenue recognition are "precisely the type of 'certified' information on which section 11 permits non-experts to rely." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1421 (citation omitted). Reliance on experts in such situations is reasonable absent actual awareness of some blatant dishonesty or misapplication of GAAP. *Cf. In re Software Toolworks*, 50 F.3d at 623-24 (noting that backdated contract found during diligence made a blind reliance on auditors unreasonable). Plaintiff simply has pleaded no such red flag here.

### B. The Timing of Michigan's Purchases For The 6.25% Subordinated Note Defeat Its Claims

#### 1. Section 11 Does Not Presume Reliance On The Registration Statement When Reliance Would Be Impossible Or Unlikely As Demonstrated By The Timing Of The Plaintiff's Purchase

Michigan's complaint contains another defect—it reveals that certain purchases of the 6.25% Subordinated Note could not have been pursuant to or in reliance on the registration statement. Although reliance is normally presumed under Section 11, there are two exceptions. First, a plaintiff cannot recover under Section 11 when its purchase occurred prior to the filing of the registration statement, because in such cases reliance on the registration statement is impossible. *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1272-73 (11th Cir. 2007) ("[A]s a matter of common sense, Plaintiffs are not entitled to the presumption [of reliance] in light of the timing of their investment decision and commitment. To hold otherwise would mean that an impossible fact will be presumed in Plaintiff's favor."); *accord In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 623 (N.D. Ala. 2009); *see also In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 974-78 (N.D. Cal. 2007) (locating *APA Excelsior*'s reliance analysis in the materiality element); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1260-62 (N.D. Cal. 2000) (treating purchase before registration statement as establishing Section 11 "negative causation" defense).[3]

[3] Purchases before the prospectus supplement similarly defeat Michigan's claims under Section 12(a)(2) and Cal. Corp. Code § 25501. *See Levi Straus*, 527 F. Supp. 2d at 981-82 (dismissing Section 12(a)(2) claims where allegedly misleading prospectus was not material to purchase); *Pell v. Weinstein,* 759 F. Supp. 1107, 1113-14 (M.D. Pa. 1991) (dismissing claim under former Section 12(2) based on prospectus that was filed only after there was commitment to the sale of securities, because "the sale could not possibly have been made by means of [the] prospectus"); *Viterbi v. Wasserman*, 191 Cal. App. 4th 927, 2011 WL 72203, at *7 (Jan. 11. 2007) (noting that Section 25501 "was modeled after Section 12(2)" and that "the two are construed together").

Moreover, Section 11(a) requires proof of reliance for purchasers who acquired the security after the issuer had made available an earning statement covering the 12-month period following the effective date of the registration statement. 15 U.S.C. § 77k(a). Section 11(a) states that if a plaintiff:

> acquired the security after the issuer [Countrywide] has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security *relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission*, but such reliance may be established without proof of the reading of the registration statement by such person.

15 U.S.C. § 77k(a) (emphasis added). In other words, plaintiffs that purchase the securities after the 12-month period "must prove reliance on the registration statement." *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003). The express language of Section 11 requires proof of *actual* reliance on the content of the registration statement (acquired either from reading the document or some other source of information).

Here, several of Michigan's purchases of the 6.25% Subordinated Notes fail for lack of reliance. The registration statement for the 6.25% Subordinated Notes became effective with the prospectus supplement filed with the SEC on May 15, 2006 (Am. Compl. ¶ 552), and a subsequent 12-month earning statement was issued when Countrywide filed its Second Quarter Form 10-Q on August 9, 2007 (Am. Compl. ¶ 575).[4] Michigan alleges that its first purchase of the 6.25% Subordinated Note occurred on May 11, 2006, which was before the registration statement, and that two

---

[4] The "earning statement" that triggers the requirement of proof of reliance may consist of "one report or any combination of reports" either on SEC Forms 10-K, 10-KSB, 10-Q, 10-QSB, and 8-K, or in the annual report to securities holders issued pursuant to Rule 14a-3 of the Exchange Act. 17 C.F.R. § 230.158(a)(2).

of its other purchases occurred on August 15, 2007, a week after the 12-month earning statement. And Michigan does not plead that it relied on the registration statement, instead only pleading that it relied "on the integrity of the market price." Am. Compl. ¶ 792. This is inadequate under Section 11(a), and so the claims on these purchases must be dismissed.

**2. Plaintiff Cannot Avoid The Burden To Show Reliance Under Section 11(a) Simply By Alleging That The Intervening 12-Month Earning Statement Was Misleading**

In an attempt to save its claims on its final two purchases of the 6.25% Note, Michigan may argue that Section 11(a) is inapplicable because it has alleged that the 12-month earning statement was itself misleading. Although this Court accepted this argument in the class action, it was only for purposes of class certification and, indeed, the argument was only raised in the Lead Plaintiffs' Reply Brief. The Underwriter Defendants respectfully submit that the result as it relates to them may have been different had they been able to submit a brief in response, as there is no statutory basis to hold underwriters liable for post-offering statements in which they were not involved.

**a) The Purpose Of Section 11(a)'s Reliance Requirement**

The content of the subsequent earning statements are fundamentally irrelevant to Section 11, as demonstrated by the plain language of the statute and the very purpose and structure of the Securities Act. It is bedrock law that, unlike the Exchange Act of 1934, the Securities Act of 1933 is concerned only with misstatements contained in offerings by an issuer, not the "aftermarket," and the only pertinent statements are those made within the four corners of the issuer's offering documents—not subsequent statements. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752 (1975). The policy of ensuring truth in the offering materials is so strong that Section 11 provides virtually strict liability for misstatements therein, and plaintiffs ordinarily are presumed to have relied on the offering materials. *See Herman & MacLean v.*

*Huddleston*, 459 U.S. 375, 381-82 (1983); 15 U.S.C. § 77k(a). Important limitations exist on this presumption, however. The recovery of a Section 11 plaintiff who purchased after an intervening 12-month earning statement is "conditioned on proof that such person acquired the security relying upon [an untrue statement or omission] in the registration statement." 15 U.S.C. § 77k(a); *accord In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1162 n.34; *see also, e.g.*, *Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458, 473 (S.D.N.Y. 2002) ("[I]f the plaintiff bought only after the issuance of a post-IPO financial report covering at least twelve months, the plaintiff will be required to establish reliance on the registration statement."); *Hammond for Hammond v. Hendrickson*, 1986 WL 8437, at *3 (N.D. Ill. July 30, 1986) (holding that class members who purchased after 12-month earnings statement would be required to "prove reliance on the alleged inaccuracies of the registration statement").

The reliance provision in Section 11(a) was added in the 1934 amendment to the Securities Act. Writing before the amendment, William O. Douglas (later Justice Douglas) explained why a reliance requirement was needed after the "early life of the security:"

> [T]he protection given to investors by Section 11 fills a long felt need in so far as it shifts the burden of proof. This is particularly desirable during the early life of the security. At that time the registration statement will be an important conditioner of the market. Plaintiff may be wholly ignorant of anything in the statement. But if he buys in the open market at the time he may be as much affected by the concealed untruths or the omissions as if he had read and understood the registration statement. So it seems wholly desirable to create a presumption in favor of the investor in this regard. If carried out logically, however, some time limitation might be placed upon this presumption, for in most cases after a year or so the statements made in the registration would have become outmoded and wholly discounted by a host of other factors. *In other words, the present provision for reliance [which at that time did not contain the post-earning statement exception] provides an excellent rule of thumb during the early life of the security. It has less justification the longer the security is outstanding.*

William O. Douglas & George E. Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 176 (1933) (emphasis added).

As the Ninth Circuit has recognized, the actual reliance requirement reflects Congress's determination "that in all likelihood the purchase and price of the security purchased after publication of such an earning statement will be predicated upon [the earning] statement rather than upon the information disclosed upon registration." *Hertzberg v. Dignity Partners*, *Inc.*, 191 F.3d 1076, 1081-82 (9th Cir. 1999) (quoting H.R. Rep. No. 1838, 73d Cong., 2d Sess. 41 (1934)). "In other words, Congress made an exception to the Section 11 presumption [of reliance] when 'in all likelihood' the purchase decision was based on factors other than the registration statement." *APA Excelsior*, 476 F.3d at 1275.

Section 11(a)'s reliance provision reflects fundamental considerations of fairness. It protects issuers and underwriters from "abuses of the process," *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 977 (8th Cir. 2002), by cabining what otherwise would be open-ended strict liability for misstatements in the registration statements. Without Section 11(a), strict liability could be wielded by opportunistic plaintiffs who had actually relied not on the registration statements, but on subsequent disclosures. Indeed, courts have recognized that the "no-fault nature" of Section 11 is predicated on "[t]he concept of reliance," and that reliance on the registration statement should not be presumed when it is impossible or unlikely, as evidenced by the timing of the plaintiff's purchase. *APA Excelsior*, 476 F.3d at 1272 (citing H.R. Rep. No. 85, 73d Cong., 1st Sess. 9 (1933) and holding that presumption of reliance did not apply where purchase was made *before* registration statement).

#### b) The *WorldCom* Court Was Mistaken In Reading The Reliance Element Out Of The Statute

Against this backdrop, Section 11(a)'s reliance requirement cannot be superseded *sub silentio* simply because the plaintiff also alleges that the subsequent 12-month earning statement is misleading. In concluding otherwise, this Court previously relied on *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 289 (S.D.N.Y. 2003), which read SEC regulations to eliminate the reliance requirement. The

*WorldCom* court noted that, like the Securities Act itself, the SEC regulations prohibit the enumerated form filings from containing material misstatements or omissions. *Id.* (citing 17 C.F.R. § 210.4-01(a)). By extension, the court concluded that, to constitute an "earning statement" triggering the reliance requirement under Section 11, a financial report can contain no material misstatements or omissions. *Id.*; *see also In re Enron Sec. Deriv. & ERISA Litig.*, 529 F. Supp. 2d 644, 696-97 (S.D. Tex. 2006) (adopting *WorldCom*'s analysis); *In re Countrywide Fin. Corp. Sec. Litig.*, --- F.R.D. ----, 2009 WL 7322254, at *32-33 (C.D. Cal. Dec. 9, 2009) (Pfaelzer, J.).

This reasoning overlooks the statutory language and purpose of Section 11. First, the plain language of the statute requires a plaintiff to prove actual reliance on the registration statement if he or she purchases the security after the issuer has released an "earning statement" covering the 12-month period after the offering. 15 U.S.C. § 77k(a). If Congress had meant that the "earning statement" must be "found to be materially accurate and complete," it would have said so. But it did not—and the reason is obvious from the discussion above. In crafting Section 11(a), Congress was concerned with *what* the purchaser relied upon, and refused to presume reliance on a registration statement when the passage of time and availability of more pertinent information made it more likely that the purchaser looked to this other information. *APA Excelsior*, 476 F.3d at 1275. The *accuracy* of an intervening earning statement does not impact the likelihood that it was the true influence of an aftermarket purchaser (as opposed to the registration statement for which Section 11 imposes liability). It is the *existence* of an intervening earning statement that is significant.

Moreover, the logic of Congress's statutory regime is evident given the potential liability of underwriters, which may be sued under Section 11 but are not often proper defendants in a private Rule 10b-5 suit. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 191 (1994). While investors may "look to the underwriter . . . to pass on the soundness of the security and the correctness of the

registration statement," *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973), the underwriter *plays no role* in the issuer's subsequent earning statements; any subsequent misrepresentations are irrelevant under Section 11. It makes no sense that the burden on reliance, and therefore the potential Section 11 liability of an underwriter, would turn on the content of a subsequent document that is irrelevant under the statute and beyond the ability of the underwriter to affect.

This framework also reveals the error in the *WorldCom* court's reliance on SEC regulations. *WorldCom*, 219 F.R.D. at 293-94. While one of those regulations—SEC Rule 158—defines the term "earning statement" as used in Section 11, it provides basically that an earning statement includes the financial statements required (for reporting companies) on SEC Forms 10-K and 10-Q or analogous materials. 17 C.F.R. § 230.158(a). Where the *WorldCom* court went awry was in construing Rule 158 to do more than simply identify the *documents* that qualify as "earning statements," and instead to impose *substantive requirements* for their accuracy.[5] While issuers are prohibited from filing Forms 10-K that contain material misstatements and omissions, a Form 10-K that *does* include a material misstatement *is still a Form 10-K*—and thus is still an "earning statement" within the meaning of Section 11. A deficient Form may violate other provisions of the securities laws (enforceable by private parties or

---

[5] The regulation does not purport to impose an accuracy requirement for earnings statements, as made clear by its provisio that even "[a]n 'earning statement' not meeting the requirements of this paragraph may otherwise be sufficient for purposes of the last paragraph of section 11(a)." 17 C.F.R. § 230.158(a). Indeed, if the SEC's regulations did purport to exempt certain earning statements from Section 11(a), the regulations would be void because they would conflict with the express language and intent of the statute. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *E.g.*, *Nw. Envtl. Advocates v. EPA*, 537 F.3d 1006, 1020 (9th Cir. 2008) (quoting *Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 842-43 (1984)).

the SEC), but it does not cease to exist with respect to other consequences flowing from that Form's filing.

Contrary to the *WorldCom* court's view, there is nothing "illogical" or unjust in concluding that a plaintiff must prove actual reliance on the registration statement if a 12-month earning statement has been issued, even if it contains misrepresentations or omissions. After 12 months have lapsed and a fresh earning statement issued, Congress has determined that, "in all likelihood," a purchaser would have relied on that earning statement, and so the purchaser is no longer entitled to the normal presumption of reliance on the registration statement. This rationale is unaffected by the content of subsequent statements, particularly as to underwriters who are not responsible for such subsequent statements under Section 11. If subsequent earning statements contain misstatements, an aftermarket purchaser is not without recourse—it may rely upon, for example, a claim for securities fraud under Section 10(b) of the Exchange Act. But such a purchaser is not covered by Section 11, absent an affirmative showing of reliance on the registration statement.

Michigan's purchases illustrate this point perfectly. It seems hard to believe that, in buying the 6.25% Subordinated Notes on August 15, 2007, Michigan did not rely primarily on the Second Quarter Form 10-Q issued just a week before on August 9, 2007, and instead was somehow injured by the registration statement filed over a year earlier. At the very least, Michigan should be required to plead and prove it relied on the registration statement if it wants to assert a claim for inaccuracies therein under Section 11. Congress required as much by the plain language of Section 11(a).

### C. Plaintiff Has Not Adequately Pleaded Privity As Required For Standing Under Section 12(a)(2) or Cal. Corp. Code § 25501

Finally, Plaintiff's claims against the Underwriter Defendants under Section 12(a)(2) of the Securities Act and Section 25501 of the California Corporations Code

are also defective.[6] Section 12(a)(2) imposes liability on any person who "offers or sells a security" by means of a materially false or misleading prospectus. 15 U.S.C. § 77*l*(a)(2). The term "seller" in Section 12 is narrow, meaning only the "owner who passed title" (along with any "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner"). *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988). Section 12 "contemplates a buyer-seller relationship not unlike traditional contractual privity." *Id.* at 642; *see also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 535-36 (9th Cir. 1989) (applying *Pinter* to Section 12(a)(2) claims). Similarly, privity is required for a claim under Cal. Corp. Code § 25501. *See, e.g.*, *Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 252-53 (2007) ("Section 25501 on its face requires privity between the plaintiff and the defendant."); *Rich v. Shrader*, 2010 WL 3717373, at *22 (S.D. Cal. Sept. 17, 2010) (dismissing claim under Cal. Corp. Code § 25501 and stating that "[p]rivity is required, thus, liability is limited to the actual or literal seller or purchaser") (citations omitted).

Here, Plaintiff has not alleged that any particular Underwriter Defendant actually sold any particular Certificates *directly* to Plaintiff in the Offering. In the allegations in support of the Section 12(a)(2) claim, Plaintiff merely lumps together several of the Underwriter Defendants as "Section 12(a)(2) Defendants" and does not state which Underwriter allegedly sold which security to Plaintiff. Am. Compl. ¶ 809. The allegations under Cal. Corp. Code § 25501 are equally sparse. Am. Compl. ¶ 859.

This Court has previously stated that such allegations are insufficient to plead a claim under Section 12(a)(2), and it should hold the same here with respect to both Section 12(a)(2) and Cal. Corp. Code § 25501. *In re Countrywide Fin. Corp. Sec.*

---

[6] These claims are asserted only against Underwriter Defendants Deutsche Bank Securities Inc., Goldman, Sachs & Co.,and J.P. Morgan Securities LLC.

*Litig.*, 588 F. Supp. 2d at 1183 (dismissing Section 12(a)(2) claims for failure to plead that plaintiffs "purchased the securities directly from specific underwriters, or directly traceable to specific underwriters, as required") (citation omitted).

**D. The Claim Under Cal. Corp. Code § 25501 Fails Because Plaintiff Does Not Allege An Offer or Sale In California**

Plaintiff's claim under Cal. Corp. Code § 25501 also fails for an even more fundamental reason—Plaintiff fails to allege the requisite nexus to the state. The Section 25501 claim is premised on a purported violation of Cal. Corp. Code § 25401, which makes it "unlawful for any person to offer or sell a security *in this state*" by means of a materially false statement. (Emphasis added.) Federal courts have strictly applied this pleading requirement, refusing to apply Section 25401 to offers or transactions that were not specifically alleged to have taken place in California. *See, e.g.*, *MTC Elec. Techs. Co., Ltd. v. Leung*, 876 F. Supp. 1143, 1147 (C.D. Cal. 1995) (dismissing 25401 claim because plaintiff failed to plead any offer or sale in California); *Hudson v. Sherwood Sec. Corp.*, 1987 U.S. Dist. LEXIS 16019, *16-18 (N.D. Cal. 1987) (dismissing 24501 claim because the securities were offered and sold in New York); *In re Activision Sec. Litig.*, 621 F. Supp. 415, 431-32 (N.D. Cal. 1985).

California Corporations Code Section 25008 sets out four conditions for when an offer or sale satisfies the "in this state" requirement of Section 25401: (1) "[t]he offer is directed to California and is received at the place to which it is directed," (2) "[t]he offer originates in California," (3) "[t]he acceptance of an offer to buy is communicated to the offeror in California," or (4) "[b]oth seller and purchaser are domiciled in California and the security is delivered to the purchaser in this state." *Hudson*, 1987 U.S. Dist. LEXIS 16019 at *17 (quoting 6 Witkin, Summary of California Law 8th (1974)); *In re Victor Technologies Sec. Litigation*, 102 F.R.D. 53, 60 (N.D. Cal. 1984); *see also* 9 Witkin, Summary of California Law 10th (2005) § 411, p. 1151.

Here, Michigan makes no attempt to plead any of these conditions. Its Complaint is simply devoid of any fact remotely suggesting that the Underwriter Defendants named under Cal. Corp. Code § 25501 sold it any security "in" California.

## IV. CONCLUSION

Accordingly, for the reasons stated above as well as in the Countrywide Defendants' briefing, the Underwriter Defendants respectfully submit that the claims against them should be dismissed.

DATED: May 6, 2011

Dean J. Kitchens
Alexander K. Mircheff
GIBSON, DUNN & CRUTCHER LLP

By: /s Dean J. Kitchens
Dean J. Kitchens

Attorneys for Underwriter Defendants

101049474_9.DOC

**PROOF OF SERVICE**

I, the undersigned, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 333 South Grand Avenue, Los Angeles, California 90071. On May 6, 2011, I served the forgoing document as follows:

**[X]** by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such electronic filing to counsel of record for all parties by operation of the Court's CM/ECF System.

**[ ]** by U.S. Mail in the ordinary course of business to the non-CM/ECF participants indicated on the attached Manual Notice List. I am readily familiar with the Firm's practice for the collection and processing of correspondence for mailing with the Postal Service and that the correspondence would be deposited with same that same day in the ordinary course of business.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct.

Executed on May 6, 2011, at Los Angeles, California.

Christopher A. Nowlin /s Christopher A. Nowlin

(Type of Print Name) (Signature)